# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ———————————————————— ) | |
| NATIONAL POSTAL MAIL HANDLERS ) | |
| UNION, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
|     v. ) | Case No. 1:06CV01986 (JR) |
| ) | |
| AMERICAN POSTAL WORKERS UNION, ) | |
| AFL-CIO, ) | |
| ) | |
|     and ) | |
| ) | |
| UNITED STATES POSTAL SERVICE, ) | |
| ) | |
|     Defendants. ) | |
| ———————————————————— ) | |

## PLAINTIFF NATIONAL POSTAL MAIL HANDLERS UNION'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(b) and Local Rule 56.1, Plaintiff National Postal Mail

Handlers Union (the "NPMHU") respectfully moves the Court for entry of Summary Judgment

in its favor. This motion is based on the Statement of Material Facts as to Which There Is No

Genuine Issue, the Joint Exhibits, and the Memorandum filed simultaneously in support thereof.

Wherefore, the NPMHU requests that the Court enter Summary Judgment in favor of the

NPMHU vacating the challenged arbitration award.

Respectfully submitted this 9th day of November 2007.

Respectfully submitted,


___/s/ Bruce R. Lerner____
Bruce R. Lerner (D.C. Bar No. 384757)
Andrew Roth (D.C. Bar No. 414038)
Todd E. Edelman (D.C. Bar No. 447455)
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, NW, Suite 1000
Washington, DC  20005
Telephone: (202) 842-2600
Facsimile: (202) 842-1888
Email: blerner@bredhoff.com

Attorneys for Plaintiff
National Postal Mail Handlers Union

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
NATIONAL POSTAL MAIL HANDLERS           )
UNION,                                  )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )        Case No. 1:06CV01986 (JR)
                                        )
AMERICAN POSTAL WORKERS UNION,          )
AFL-CIO,                                )
                                        )
        and                             )
                                        )
UNITED STATES POSTAL SERVICE,           )
                                        )
        Defendants.                     )
_____ )


**PLAINTIFF NATIONAL POSTAL MAIL HANDLERS UNION'S**
**MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**


Plaintiff National Postal Mail Handlers Union (the "NPMHU") respectfully

submits this Memorandum of Points and Authorities in Support of its Motion for

Summary Judgment.


**BACKGROUND**

A.  The tripartite dispute resolution agreement

The NPMHU and the American Postal Workers Union (the "APWU") are both

labor organizations representing employees of the United States Postal Service (the

"Postal Service").  *See* Plaintiff National Postal Mail Handlers Union's Statement of Material Facts As To Which There Is No Genuine Issue ("Material Facts") at ¶ 1.  The NPMHU serves as the collective bargaining representative of Postal Service employees in the mail handler "craft," while the APWU represents employees in the classifications comprising postal clerks.  *Id.* at ¶¶ 2-3.  The Postal Service has entered into separate collective bargaining agreements with each union.  *Id.* at ¶ 4.

Because changes in technology and in the means by which mail is processed have blurred the original distinctions between the work performed by members of the mail handler craft represented by the NPMHU and the clerical craft represented by the APWU, there have been frequent disputes during the past several decades over which craft has jurisdiction over particular work.  Material Facts at ¶ 5.  In 1979, the Postal Service issued Regional Instruction No. 399 ("RI-399") to describe the criteria for determining whether the clerk craft or the mail handler craft should be assigned to carry out various tasks.  *Id.* at ¶ 6.  In April 1992, the two unions and the Postal Service entered into a tripartite agreement titled "Memorandum of Understanding" concerning the "Regional Instruction 399 – Dispute Resolution Procedures" ("the MOU").  *Id.* at ¶ 7.

The MOU forecloses the consideration of certain types of jurisdictional disputes (i.e., disputes about which craft should perform a given task) brought by either union, stating that "[e]ffective with the signing of this Agreement, no new disputes will be initiated at the local level by either union challenging jurisdictional work assignments in any operations as they currently exist."  Material Facts at ¶ 8.  The MOU thus essentially "froze" existing work assignments, providing that, except as otherwise set forth in the sections of the MOU governing new work assignments, work in new or consolidated

facilities, and work related to operational changes, "all local craft jurisdictional assignments which are not already the subject of a pending locally initiated grievance will be deemed as a proper assignment for that facility." *Id.* Stated another way, unless there is new work, a new or consolidated facility, or work related to an operational change, complaints brought by either union after April 1992 with regard to jurisdictional work assignments are deemed untimely. *Id.*

The MOU also sets forth procedures for the resolution of those work jurisdictional complaints (referred to in the MOU as jurisdictional "disputes") that the unions can still properly bring. Material Facts at ¶ 9. The MOU establishes Dispute Resolution Committees at the local, regional, and national levels, each consisting of one representative of each of the three parties. *Id.* at ¶ 10. Pursuant to the MOU, a union first submits a jurisdictional dispute to the Local Dispute Resolution Committee ("LDRC"). *Id.* at ¶ 11. If the parties cannot resolve the dispute at that level, the moving union then may appeal the dispute to the Regional Dispute Resolution Committee ("RDRC"), *id.* at ¶ 12, and, if resolution still has not been reached, to arbitration at the regional level, *id.* at ¶ 13.[1]

B. The dispute over scanning work at the Oakland International Service Facility

In March 2001, the APWU filed a grievance relating to certain bar code scanning work allegedly being performed by mail handlers at the International Service Facility in Oakland, California. Material Facts at ¶ 15. The grievance alleged that "mail hander [sic] have been scanning the mail for dispatch since 1991; when the MIDAS system was

---

[1] In addition, if one of the union parties believes that the dispute presents an interpretive issue of general application, it may appeal that issue to the National Dispute Resolution Committee ("NDRC"). Material Facts at ¶ 14.

put in place." *Id.* In a subsequent letter confirming the agreement between the APWU

and the Postal Service to refer the dispute to the LDRC, the Postal Service noted that the

question of whether the grievance presents the type of jurisdictional claim properly

within the RI-399 dispute resolution process (i.e., a dispute that had been timely filed

under the requirements set forth in the MOU) could be raised throughout the process,

including at an arbitration hearing:

> If the Committee is in disagreement as to whether or not the grievance
> involves a jurisdictional claim, that question may be appealed through the
> Dispute Resolution Procedures, up to and including arbitration, for
> resolution *prior to the parties addressing the merits of the dispute*.

*Id.* at ¶ 16 (emphasis added).

In December 2001, the LDRC met to consider the jurisdictional dispute raised by

the APWU regarding scanning work performed at the Oakland International Service

Facility. Material Facts at ¶ 17. The APWU took the position that, although some

scanning work was apparently being performed by mail handlers, such duties should only

be assigned to the clerk craft workers it represented. *Id.* at ¶ 18. Referring specifically to

the MOU, the NPMHU responded that the APWU's dispute was untimely and thus "not

properly filed" with the LDRC; the NPMHU contended that the work in question had

been assigned to the mail handler craft prior to 1992 without challenge by any party and

that therefore no jurisdictional challenge was permitted under the MOU. *Id.* at ¶ 19. The

Postal Service agreed with the position advanced by the NPMHU, specifically noting that

"[m]anagement has not received any documentation from either union showing that this

[work assignment] was ever in dispute regarding the scanning operation." *Id.* at ¶ 20. As

a result, the LDRC was unable to reach an agreement as to this dispute. *Id.* at ¶ 21.

Following the procedures set forth in the MOU, the APWU subsequently appealed the dispute to the RDRC. Material Facts at ¶ 22.  At the RDRC, the Postal Service again maintained that the APWU's challenge to a jurisdictional work assignment should be rejected as untimely because it (i) did not involve a new or consolidated facility, new work, or an operational change, and (ii) had not been filed before April 1992.  *Id.* at ¶ 23.  Once again, the parties could not reach agreement.  *Id.* at ¶ 24.  On June 5, 2006, the APWU appealed the dispute to regional arbitration.  *Id.* at ¶ 25.

C.  Proceedings before Arbitrator Anderson

Shortly after the APWU appealed the dispute to arbitration, the three parties jointly sent a letter to the arbitrator submitting to him the case captioned "Case # F98C-IF J -01185458 (Loading Dock Scanning)."  Material Facts at ¶¶ 26-29.  In a June 8, 2006 letter to Donald A. Anderson (the "joint scheduling letter"), the arbitrator from the RI-399 Jurisdictional Dispute Arbitration Panel selected to hear this dispute, the parties confirmed that the dispute raised by the APWU would be heard in an arbitration hearing before him on June 27, 2006.  *Id.* at ¶¶ 26-27.  Consistent with the position taken by the Postal Service and NPMHU at the LDRC and RDRC, the joint scheduling letter did not indicate that the parties had already agreed that the dispute was arbitrable.  To the contrary, the joint scheduling letter specifically noted that no party had waived its right to raise arbitrability or timeliness issues:

> This letter does not constitute a waiver by either party of any issue of
> arbitrability or timeliness as it relates to the processing of the grievances,
> as it merely serves to confirm to the arbitrator the location, date and time
> [of the hearing].

*Id.* at ¶ 28.  The joint scheduling letter was signed by all three representatives from the Postal Service, NPMHU, and APWU who comprise the RDRC.  *Id.* at ¶ 29.

Arbitrator Anderson conducted the arbitration hearing on June 27, 2006.  Material Facts at ¶ 30.  As made clear by their closing briefs, the Postal Service and the NPMHU vigorously contested arbitrability at the hearing, echoing the arguments they had advanced at the LDRC and RDRC.  In its closing brief, the Postal Service urged Arbitrator Anderson to find that the dispute was untimely, and hence non-arbitrable under the MOU.  *Id.* at ¶ 31.  The Postal Service maintained that, because the APWU did not challenge the alleged performance of the scanning work by the mail handler craft at the Oakland facility prior to April 1992, the APWU's dispute was untimely-filed under the MOU, and thus must be deemed non-arbitrable:

> It is undisputed that the APWU simply did not file a grievance challenging the sharing of the scanning duties in 1991, nor did they challenge the sharing of this work even after being put on notice via the above-cited Memorandum of Understanding.  Thus, the APWU has forever forfeited their right to challenge the assignment of this work . . .

*Id.*  Emphasizing the language and requirements of the MOU, the Postal Service argued that Arbitrator Anderson must find the dispute non-arbitrable and not go on to consider the supposed "merits" of the APWU's dispute:

> All the parties are mandated by the 1992 Memorandum [of Understanding] to adhere strictly to procedural considerations; when it is clearly determined that none of the three criteria [new work, new or consolidated facility, or operational change] is present, *the case must be immediately dismissed as non-arbitrable.  No consideration, whatsoever, should be given to testimony at the hearing that addressed the merits of the case.  The opportunity for the APWU to challenge and attempt to make its case to establish sole jurisdiction of the scanning duties has long come and gone.*

*Id.* (emphasis added).

Similarly, the NPMHU focused on the arbitrability question, agreeing with the Postal Service that the untimeliness of the APWU's dispute required a finding of non-arbitrability and precluded Arbitrator Anderson from even considering the merits. In its closing brief, [2] the NPMHU made clear that – as the APWU itself had acknowledged in its initial grievance -- mail handlers had been performing scanning work at the Oakland facility since 1991. Material Facts at ¶ 32. Because no disputes were filed regarding this work assignment until 2001, and because the dispute did not relate to new work, work at a new or consolidated facility, or work related to an operational change, the NPMHU contended that the APWU's dispute was "improper and/or untimely" under the MOU. *Id.*[3]

Arbitrator Anderson issued his ruling and award on August 23, 2006. Material Facts ¶ 35. Despite the language in the joint scheduling letter stating that the submission of the case to the arbitrator "does not constitute a waiver by either party of any issue of arbitrability or timeliness as it relates to the processing of the grievances," and despite the fact that the positions taken by the NPMHU and the Postal Service charged the arbitrator with the primary task of resolving those very issues, Aribtrator Anderson began his findings by stating that the very submission of the case to him by the RDRC conclusively resolved those issues in favor of arbitrability:

> While acknowledging the Employer's reliance on the language of
> [the MOU], relative to the criterion for submitting jurisdictional issues
> into arbitration, [the arbitrator] could not ignore the fact that the RDRC
> committee [sic] agreed to go that route. It can only be presumed that

---

[2] In further support of this argument, the NPMHU also submitted a position paper from another arbitration pending before Arbitrator Anderson in which the NPMHU had argued that a dispute relating to a work assignment issue was similarly "not properly before the arbitrator" because it was not filed until 2002 and did not claim that the assignment involved new work, a new or consolidated facility, or work related to an operational change. Material Facts ¶ 33.

[3] The APWU responded to the arbitrability and timeliness arguments made by the Postal Service and the NPMHU in its closing brief. Material Facts ¶ 34.

committee was seeking a determination of jurisdiction for the disputed work and while the grievance identifying tracking number is preceded by the letter "J," which may be for tracking reasons only, it remains clear that the parties all agreed the grievance should, initially at least, be arbitrated utilizing the RI-399 MOU process. It would be inappropriate and beyond the Arbitrator's impartial role to deny the parties request for a jurisdictional determination for the work in question and once such a decision is made, he becomes "functus officio" and no longer has official quasi-legal standing in the case unless the parties mutually agree otherwise. Presumably the three, (3) parties mutually decided to seek third party neutral guidance as to the future of this dispute.

*Id.* at ¶ 36.

Toward the end of his opinion, Arbitrator Anderson returned to the arbitrability question, noting the Postal Service's contention that the MOU precluded the arbitration of disputes relating to unchallenged jurisdictional work assignments as they existed in 1992. Material Facts ¶ 36. While admitting that the parties "generally agreed" that such disputes could not be brought, Arbitrator Anderson addressed the language of the MOU by stating that the simple fact of the parties' joint submission of the matter to him somehow constituted a request that he ignore all arguments relating to timeliness and arbitrability and instead rule only on the "merits" of the work assignment dispute:

Here again, the Arbitrator found language and practice to be somewhat disjointed. As previously discussed in this report, arbitrability was generally favored by the Undersigned principally because the parties mutually agreed to adjudicate the jurisdictional dispute utilizing the RI-399 jurisdictional arbitration process. The Arbitrator did not find it appropriate to overrule this mutual agreement. While the language clearly points in the direction of limiting the filing of grievances for existing work, the parties nonetheless agreed to seek clarification of this dispute in the RI-399 arbitration process. To void this mutual agreement would be tantamount to a third party neutral assuming a role bordering on god-like judgement [sic].
*Id.*

Based on his apparent (but clearly mistaken) belief that the parties had charged him with the task of making a determination of the merits of the dispute without regard to

its arbitrability,  Aribitrator Anderson went on to make that determination.  Concluding

that the scanning work in question should have been assigned to the clerk craft, Arbitrator

Anderson ruled that the Postal Service violated RI-399 when it assigned the work to a

mail handler.  Material Facts ¶ 37. The instant action seeking to vacate Arbitrator

Anderson's award followed.


## ARGUMENT

A.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  If the moving party meets its initial

burden of demonstrating the absence of a genuine issue of material fact, the burden shifts

to the nonmoving party to establish that a genuine issue as to any material fact actually

does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586

(1986).  A nonmoving party has met its burden of showing that a dispute about a material

fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir.

1987) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  A scintilla of

evidence is insufficient; summary judgment may be granted if "the evidence is merely

colorable" or "not significantly probative."  *Anderson*, 477 U.S. at 249-51.

There is no genuine issue as to any fact material to the resolution of this dispute, and the case properly may be decided on summary judgment.  As we now show, the NPMHU is entitled to summary judgment as a matter of law.

B.  Where an Arbitrator's Award Clearly Goes Beyond the Issues Submitted for Resolution by the Parties, It Must be Vacated

Arbitrators have no inherent power to determine the issues on which they will rule in making their awards; rather, their authority to render decisions and make awards derives from the submission of specific issues to them by the parties.  *Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 112 (3d Cir. 1996).  "The parties, not the arbitrator, must define the issues.  The submission is the 'source and limit' of the arbitrator's power."  *Bowater Carolina Co. v. Rock Hill Local Union No. 1924*, 871 F.2d 23, 25 (4th Cir. 1989).  *See also Matteson*, 99 F.3d at 114 ("It is the parties, not arbitrator, who decide the issues submitted.")  Conversely, an arbitrator lacks the authority to rule on an issue that differs from those that the parties have agreed to submit to him.  *Williams v. E.F. Hutton & Co., No. 11*, 753 F.2d 117, 119 (D.C. Cir. 1985); *Courier-Citizen Co. v. Boston Electrotypers Union,* 702 F.2d 273, 281 (1st Cir. 1983).

Despite the general policy of judicial deference to the decisions of arbitrators, a court must review an arbitrator's award to insure that the arbitrator has not "dispense[d] his own brand of industrial justice."  *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).  In particular, courts review an arbitrator's interpretation of the issues submitted to him for decision to determine whether he has acted within the authority delegated to him by the parties.  *Matteson,* 99 F.3d at 113; *Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse*

*Indep. Truck Drivers Union, Local No. 1*, 611 F.2d 580, 583 (5th Cir. 1980) ("Whether an arbitrator has exceeded these bounds [established by the parties' submission] is an issue for judicial resolution."). An arbitrator's award must be vacated in cases "where the arbitrator clearly went beyond the scope of the submission," *Textile Workers Union of Am., Local Union No. 1386 v. American Thread Co.*, 291 F.2d 894, 896 (4th Cir. 1961), or where the arbitrator's interpretation of the issues is not "rationally derived" from the submission, *High Concrete Structures, Inc. v. United Elec., Radio & Mach. Workers of Am., Local 166*, 879 F.2d 1215, 1219 (3d Cir. 1989).  Indeed, courts have not hesitated to vacate arbitral awards where the award decided issues broader than or different from those submitted by the parties.  *See, e.g., Matteson*, 99 F.3d at 115; *Bowater Carolina Co.*, 871 F.2d at 26;  *Courier-Citizen Co.*, 702 F.2d at 281; *Retail Store Employees Union Local 782 v. Sav-On Groceries*, 508 F.2d 500, 503 (10th Cir. 1975); *American Thread Co.*, 291 F.2d at 900-01.

C.    Because Arbitrator Anderson's Award Clearly Went Beyond the Scope of the Issue Submitted for Resolution By the Parties, It Must be Vacated

Applying the foregoing legal principles here, it is clear that Arbitrator Anderson exceeded the authority granted to him by the parties, and that his resulting award must be vacated.  In issuing his award that the scanning work should be performed by the clerk craft, Arbitrator Anderson concluded that the parties to the dispute had mutually sought a determination as to whether such work had been properly assigned regardless of the timeliness or arbitrability of the dispute.  Nothing could be further from the truth.  Neither the NPMHU nor the Postal Service sought determination of the "merits" of the dispute in the manner defined by the arbitrator; by evaluating the merits of the work

jurisdictional dispute without regard to its timeliness or arbitrability, Arbitrator Anderson clearly went beyond the scope of the issue mutually submitted by the parties for resolution.

As the D.C. Circuit has recognized, because there is often not a formal document defining the issues submitted for arbitration, the presentations of the parties frequently define the scope of the issues to be decided. *Madison Hotel v. Hotel & Rest. Employees, Local 25*, 144 F.3d 855, 858 (D.C. Cir. 1998) (en banc). Such was the case here: the parties did not make any formal submission delineating the issue for Arbitrator Anderson to decide, but instead defined that issue through their presentations to him.

Repeating arguments they had made throughout the RI-399 dispute resolution process, both the NPMHU and the Postal Service argued that the APWU's dispute was untimely, and urged Arbitrator Anderson to dismiss it as non-arbitrable. Neither the NPMHU nor the Postal Service agreed to submit the merits of the underlying work jurisdictional dispute to the arbitrator without a prior determination as to its timeliness and arbitrability. To the contrary, both of these parties contended that Arbitrator Anderson should deem the APWU's dispute "improper and/or untimely," *see* Material Facts at ¶ 32, and "immediately dismiss[] [it] as non-arbitrable," *see id.* at ¶ 31, without considering the underlying merits at all. The Postal Service in particular could not have more specifically claimed that the parties had not mutually agreed to submit the merits of the dispute to the arbitrator, arguing that he should simply disregard all of the evidence presented on that point:

> . . . the case must be immediately dismissed as non-arbitrable. No
> consideration, whatsoever, should be given to testimony at the hearing that
> addressed the merits of the case. The opportunity for the APWU to

challenge and attempt to make its case to establish sole jurisdiction of the
scanning duties has long come and gone.

*See id.* at ¶ 31.

The parties' joint scheduling letter made it equally clear that the parties'
agreement to arbitrate did not constitute an agreement to submit the "merits" of the
dispute to the arbitrator without regard to the dispute's timeliness and arbitrability. Like
the letter from the Postal Service to the APWU confirming the parties' agreement to refer
the dispute to the LDRC, the joint scheduling letter explicitly stated that it did "not
constitute a waiver by either party of any issues of arbitrability or timeliness as it relates
to the processing of the grievances, as it merely serves to confirm to the arbitrator the
location, date and time [of the hearing]." *See* Material Facts at ¶ 28.

In making his award, Arbitrator Anderson could not have turned the issue
submitted to him by the parties more squarely on its head. The presentations of the
NPMHU and the Postal Service urged Arbitrator Anderson to dismiss the dispute as non-
arbitrable without reaching the merits, and the joint scheduling letter specifically noted
that the submission of the case to arbitration did not constitute a waiver on the issue of
arbitrability. Arbitrator Anderson, however, ruled that the parties had somehow
"mutually decided" to submit the merits of the dispute to him regardless of whether the
dispute was timely-filed or properly arbitrable, and that (for reasons not readily apparent
from the text of the award) not reaching the merits would require him to "assum[e] a role
bordering on god-like judgement (sic)." *See* Material Facts at ¶ 36. The arbitrator thus
entirely ignored the issue submitted to him by the parties for resolution, instead choosing
to resolve an issue – i.e., the merits of the work jurisdictional dispute, without regard to
its timeliness or arbitrability – that the NPMHU and the Postal Service had never agreed

to submit to arbitration.  Because he thus decided an issue that was simply not before

him, Arbitrator Anderson's award both goes "clearly beyond" the issue submitted by the

parties and is "not rationally derived" from the presentation of issues that provided the

basis for his authority.

    The D.C. Circuit's  decision in *Madison Hotel* does not militate in favor of

upholding Arbitrator Anderson's illogical and baseless award.  In that case, the D.C.

Circuit upheld an arbitrator's decision to define the scope of the issues to be decided as

whether the employer violated a collective bargaining agreement by abolishing certain

positions and by transferring the duties that had been part of those positions to other

employees.  *Madison Hotel*, 144 F.3d at 857.   The scope of the issues to be decided by

the arbitrator was not memorialized in a formal document, but "developed informally

during the course of the parties' presentations."  *Id.* at 857-58.  The D.C. Circuit found

that there was nothing in the parties' presentations "to cast the slightest doubt on the

arbitrator's judgment about the scope of this arbitration."  *Id.*

    In the instant case, as in *Madison Hotel,* the scope of the issue to be decided by

Arbitrator Anderson "developed informally" through the parties' presentations to the

arbitrator.  The similarities between the two cases, however, end there.  As shown above,

examination of the parties' presentations does far more than "cast . . . doubt" on

Arbitrator Anderson's judgment about the scope of the issue to be decided.  Indeed, a

review of the presentations made by the NPMHU and the Postal Service in this case

clearly shows that Arbitrator Anderson entirely ignored the issue framed by those

presentations and instead ruled on an issue not placed before him by the parties.

Arbitrator Anderson's blatant misinterpretation of the issue framed by the parties makes this case the exact converse of *Madison Hotel,* and requires that his award be vacated.

"To retain its viability as a most useful tool in dispute resolution . . . [arbitration] must be sufficiently guided by basic rules of decisionmaking to assure parties that the arbitrator will resolve only the disputes they submit." *Bowater Carolina Co.*, 871 F.2d at 26. In this case, Arbitrator Anderson flouted these basic rules when he resolved an issue not submitted to him by the parties. As a result, Anderson exceeded the authority conferred upon him by the parties, and the Court must vacate his award.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment for the NPMHU, and issue an Order vacating the award in the matter captioned "Case # F98C-IF J - 01185458 (Loading Dock Scanning)."

Respectfully submitted,

   /s/ Bruce R. Lerner   
Bruce R. Lerner (D.C. Bar No. 384757)
Andrew Roth (D.C. Bar No. 414038)
Todd E. Edelman (D.C. Bar No. 447455)
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, NW, Suite 1000
Washington, DC  20005
Telephone: (202) 842-2600
Facsimile: (202) 842-1888
Email: blerner@bredhoff.com

*Attorneys for Plaintiff*
*National Postal Mail Handlers Union*

Dated:  November 9, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
NATIONAL POSTAL MAIL HANDLERS        )
UNION,                                              )
                                                    )
      Plaintiff,                              )
                                                    )
      v.                                      )      Case No. 1:06CV01986 (JR)
                                                    )
AMERICAN POSTAL WORKERS UNION,       )
AFL-CIO,                                           )
                                                    )
      and                                     )
                                                    )
UNITED STATES POSTAL SERVICE,            )
                                                    )
      Defendants.                           )
_____)


**PLAINTIFF NATIONAL POSTAL MAIL HANDLERS UNION'S
STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**


A.     <u>The tripartite dispute resolution agreement</u>

     1.     The National Postal Mail Handlers Union (the "NPMHU") and the American

Postal Workers Union (the "APWU") are both labor organizations representing employees of the

United States Postal Service ("USPS" or "Postal Service").  See Complaint (d/e 1) at ¶¶ 4-5;

Answer and Counterclaim of Defendant APWU ("APWU Answer") (d/e 7) at ¶¶ 4-5; Answer of

Defendant USPS  ("USPS Answer") (d/e 14) at ¶¶ 4-5.

     2.     The Postal Service has recognized the NPMHU as the collective bargaining

representative of Postal Service employees in the mail handler "craft."   See Complaint (d/e 1) at

¶ 4; NPMHU Answer (d/e 7) at ¶ 4; USPS Answer (d/e 14) at ¶ 4.

3.    The Postal Service has recognized the APWU as the collective bargaining representative for employees in the classifications comprising postal clerks nationwide.  See Complaint (d/e 1) at ¶ 5; APWU Answer (d/e 7) at ¶ 5; USPS Answer (d/e 14) at ¶ 5.

4.    The Postal Service has entered into separate collective bargaining agreements with the NPMHU and with the APWU.  See Complaint (d/e 1) at ¶¶ 4-5; APWU Answer (d/e 7) at ¶¶ 4-5; USPS Answer (d/e 14) at ¶¶ 4-5.

5.    Because changes in technology and in the means of processing mail have blurred the original distinctions between the work performed by the mail handlers represented by the NPMHU and the clerks represented by the APWU, there have been frequent disputes during the past several decades over whether particular work should be performed by the mail handler craft represented by the NPHMU or by the clerk craft represented by the APWU.  See Joint Ex. 1[1] at 174-77 (Opinion and Award of Arbitrator Howard G. Gamser, Case No. AD-NAT-1311) ("Gamser Award")

6.    In 1979, the Postal Service issued Regional Instruction No. 399 ("RI-399"), which delineates criteria for making craft assignments and designates the primary craft assignments for a long list of functions performed by Postal Service employees.  Joint Ex. 1 at 167-185 (Gamser Award) (upholding RI-399 craft designations against challenges filed by the APWU).

7.    A subsequent agreement titled "Memorandum of Understanding" concerning "Regional Instruction 399 – Dispute Resolution Procedures" (the "MOU"), signed in April 1992 by the NPMHU, the APWU, and the Postal Service, created and described new procedures for resolving jurisdictional disputes.  See Joint Ex. 1 at 196-203 (MOU); Complaint (d/e 1) at ¶ 7; APWU Answer (d/e 7) at ¶ 7; USPS Answer (d/e 14) at ¶ 7.

---

[1] The parties have agreed to submit the relevant portions of the record in this case as Joint Exhibit 1.  The parties have also stipulated to the authenticity of the documents comprising this exhibit.

8.    The MOU provides:

Effective with the signing of this Agreement, no new disputes will be initiated at the local level by either union challenging jurisdictional work assignments in any operations as they currently exist.  Except as otherwise specifically provided in the New or Consolidated Facilities, New Work, or Operational Change sections contained in this memorandum, all local craft jurisdictional assignments which are not already the subject of a pending locally initiated grievance will be deemed as a proper assignment for that facility.

See Joint Ex. 1 at 196 (MOU).

9.    The MOU sets forth procedures for the resolution of those work jurisdictional disputes that the unions can still bring.  See Joint Ex. 1 at 196-201 (MOU).

10.    The MOU establishes Dispute Resolution Committees at the local, regional, and national levels, each consisting of one representative of each of the three parties.  See Joint Ex. 1 at 196 (MOU).

11.    Pursuant to the MOU, a union first submits a jurisdictional dispute to the Local Dispute Resolution Committee ("LDRC").  See Joint Ex. 1 at 197-98 (MOU).

12.    If the parties cannot resolve the dispute at the LDRC, the moving union then may appeal the dispute to the Regional Dispute Resolution Committee ("RDRC").  See Joint Ex. 1 at 198-99 (MOU).

13.    If the parties cannot resolve the dispute at the RDRC, the moving party may appeal the dispute to arbitration at the regional level. See Joint Ex. 1 at 199-201 (MOU).

14.    If one of the union parties believes that the dispute presents an interpretive issue of general application, it may appeal that issue to the National Dispute Resolution Committee ("NDRC").  See Joint Ex. 1 at 199-200 (MOU).

B.    The dispute over scanning work at the Oakland International Service Facility

15.    In March 2001, the APWU filed a grievance relating to certain bar code scanning work allegedly being performed by mail handlers at the International Service Facility in Oakland, California.  The grievance alleged that "mail hander [sic] have been scanning the mail for dispatch since 1991; when the MIDAS system was put in place."  See Joint Exhibit 1 at 74 (APWU grievance).

16.    In a subsequent letter to the APWU confirming the agreement between the APWU and the Postal Service to refer the dispute to the LDRC, the Postal Service stated:

> If the Committee is in disagreement as to whether or not the grievance involves a jurisdictional claim, that question may be appealed through the Dispute Resolution Procedures, up to and including arbitration, for resolution prior to the parties addressing the merits of the dispute.

See Joint Exhibit 1 at 50 (letter from M. Villalpando to S. Taylor).

17.    The LDRC met in December 2001 to consider the jurisdictional dispute raised by the APWU regarding scanning work performed at the Oakland International Service Facility. Joint Exhibit 1 at 43 (letter from B. Khalid to M. Villalpando).

18.    At the LDRC, the APWU took the position that, although some scanning work was apparently being performed by mail handlers, such duties should only be assigned to the clerk craft workers it represented. Joint Exhibit 1 at 54 (letter from F. Jacobs to LDRC).

19.    At the LDRC, the NPMHU took the position that the APWU's dispute was untimely and thus "not properly filed" with the LDRC.  See Joint Exhibit 1 at 55 (submission of NPMHU Local 302 to LDRC).  In a memorandum to the LDRC, the NPMHU stated:

> The Union contends that [the] APWU dispute is not properly filed.  The RI 399 procedures "New or Consolidated Facilities" does not apply.  The above operation was previously inventoried and signed by all parties.  RI 399 procedures provides

that jurisdictional assignments shall not be changed solely on the basis of moving operations into a new facility.  If jurisdictional assignments existed in the previous facility they shall carry over into the new facility.

*Id.*  In another memorandum to the LDRC, the NPMHU noted that "Mail Handlers have been scanning since the inception of the Midas system.  Mail Handlers have always been the primary scanners."  See Joint Ex. 1 at 57 (submission of NPMHU Local 302 to LDRC).

20.    At the LDRC, the Postal Service agreed with the position advanced by the NPMHU that the work should remain with the mail handler classification.  See Joint Ex. 1 at 45-48 (memorandum from Postal Service to LDRC).  The Postal Service noted that "[m]anagement has not received any documentation from either union showing that this [work assignment] was ever in dispute regarding the scanning operation nor has either union provided any previous grievance activity regarding scanning prior to the move to the new facility location." See Joint Ex. 1 at 47.

21.    The LDRC was unable to reach an agreement as to the work jurisdictional dispute raised by the APWU.  See Joint Ex. 1 at 43 (letter from B. Khalid to M. Villalpando).

22.    The APWU subsequently appealed the dispute to the RDRC.  See Joint Ex. 1 at 44 (letter from B. Khalid to F. Jacobs).

23.    At the RDRC, the Postal Service argued that the APWU's dispute should be rejected as untimely because it (i) did not involve a new or consolidated facility, new work, or work related to an operational change, and (ii) had not been filed prior to April 1992.  See Joint Ex. 1 at 33 (letter from M. Villalpando to S. Zamanakos and E. Daniel).

24.    The parties did not reach agreement at the RDRC.  See Joint Ex. 1 at 28-35 (submissions to RDRC).

25.    On June 5, 2006, the APWU appealed the dispute to regional arbitration.  See

Joint Ex. 1 at 27 (appeal to regional arbitration)

C.    Proceedings before Arbitrator Anderson

26.    Donald A. Anderson ("Arbitrator Anderson") – one of several regional arbitrators

on the Regional Instruction 399 (RI-399) Jurisdictional Dispute Arbitration Panel – was

appointed to be the arbitrator in the dispute, which was captioned "Case #F98C-IFJ-01185458

(Loading Dock Scanning)."  See Complaint (d/e 1) at ¶ 8; NPMHU Answer (d/e 7) at ¶ 8; USPS

Answer (d/e 14) at ¶ 8; Joint Exhibit 1 at 26 (scheduling letter).

27.    A June 8, 2006 letter to Arbitrator Anderson from all three parties scheduled the

arbitration hearing for June 27, 2006.  Joint Exhibit 1 at 26 (scheduling letter).

28.    The June 8, 2006 letter stated:

This letter does not constitute a waiver by either party of any issue of arbitrability
or timeliness as it relates to the processing of the grievances, as it merely serves to
confirm to the arbitrator the location, date and time [of the hearing].

Joint Exhibit 1 at 26 (scheduling letter).

29.    The June 8, 2006 letter was signed by USPS representative Mark Villalpando,

NPMHU representative Efraim Daniel, and APWU representative Steve Zamanakos.  See Joint

Ex. 1 at 26 (scheduling letter).  Villalpando, Daniel, and Zamanakos were the representatives of

the three parties who comprised the RDRC.  See Joint Ex. 1 at 38 (RDRC resolution).

30.    Arbitrator Anderson conducted the arbitration hearing on June 27, 2006.  See

Complaint (d/e 1) at ¶ 8; NPMHU Answer (d/e 7) at ¶ 8; USPS Answer (d/e 14) at ¶ 8.

31.    The Postal Service filed its closing brief on July 26, 2006.  See Joint Ex. 1 at 20-

25 (Postal Service brief).  In its closing brief, the Postal Service argued that the APWU's dispute

was untimely, and thus non-arbitrable under the MOU.  See *id.* at 21-24 (Postal Service brief).

In contending that the dispute was non-arbitrable, the Postal Service stated in its brief:

> All the parties are mandated by the 1992 Memorandum [of Understanding] to adhere strictly to procedural considerations; when it is clearly determined that none of the three criteria [new work, new or consolidated facility, or operational change] is present, the case must be immediately dismissed as non-arbitrable.  No consideration, whatsoever, should be given to testimony at the hearing that addressed the merits of the case.  The opportunity for the APWU to challenge and attempt to make its case to establish sole jurisdiction of the scanning duties has long come and gone.

See *id.* at 21 (Postal Service brief).  The Postal Service's brief further stated:

> It is undisputed that the APWU simply did not file a grievance challenging the sharing of the scanning duties in 1991, nor did they challenge the sharing of this work even after being put on notice via the above-cited Memorandum of Understanding.  Thus, the APWU has forever forfeited their right to challenge the assignment of this work . . .

See *id.* at 24 (Postal Service brief).

32.    The NPMHU filed its closing brief on July 31, 2006.  Joint Ex. 1 at 356-61 (NPMHU brief).  In its brief, the NPMHU stated that mail handlers had been performing scanning work at the facility since 1991.  See *id.* at 357.  The NPMU contended that, because no disputes were filed regarding this work assignment until 2001, and because the dispute did not relate to new work, work at a new or consolidated facility, or an operational change, the APWU's dispute was "improper and/or untimely" under the MOU.  See *id.*

33.    The NPMHU also submitted to Arbitrator Anderson for the record in this case a brief filed in another regional arbitration pending before him.  See Joint Ex. 1 at 11-12 (NPMHU Pasadena brief).  In that brief, the NPMHU argued that a dispute relating to a work assignment issue was "not properly before the arbitrator" because it was not filed until 2002 and did not claim that the assignment involved new work, a new or consolidated facility, or work related to an operational change.  See *id.* (NPMHU Pasadena brief).

34.     The APWU filed its closing brief on July 27, 2006.   See Joint Ex. 1 at 13-19

(APWU brief).  In its closing brief, the APWU responded to the arbitrability and timeliness

arguments raised by the Postal Service and the NPMHU.  See *id.* at 13-16 (APWU brief).

35.     Arbitrator Anderson issued his ruling and award in the case on August 23, 2006.

See Joint Ex. 1 at 1-9 (Anderson award).

36.     On the issue of arbitrability, Arbitrator Anderson began his findings by stating:

> While acknowledging the Employer's reliance on the language of [the MOU],
> relative to the criterion for submitting jurisdictional issues into arbitration, [the
> arbitrator] could not ignore the fact that the RDRC committee agreed to go that
> route.  It can only be presumed that committee was seeking a determination of
> jurisdiction for the disputed work and while the grievance identifying tracking
> number is preceded by the letter "J," which may be for tracking reasons only, it
> remains clear that the parties all agreed the grievance should, initially at least, be
> arbitrated utilizing the RI-399 MOU process.  It would be inappropriate and
> beyond the Arbitrator's impartial role to deny the parties request for a
> jurisdictional determination for the work in question and once such a decision is
> made, he becomes "functus officio" and no longer has official quasi-legal
> standing in the case unless the parties mutually agree otherwise.  Presumably the
> three, (3) parties mutually decided to seek third party neutral guidance as to the
> future of this dispute.

See Joint Ex. 1 at 3 (Anderson award).  Arbitrator Anderson returned to the arbitrability

issue at the end of his findings, noting the Postal Service's argument that the MOU

precluded the arbitration of disputes relating to unchallenged work jurisdictional

assignments as they existed as of the date the MOU was executed.  See *id.* at 9 (Anderson

award).   After stating that the parties "generally agreed" that, under the MOU, no new

disputes could be brought by either union challenging jurisdictional work assignments as

they currently exist, Arbitrator Anderson stated:

> Here again, the Arbitrator found language and practice to be somewhat disjointed.
> As previously discussed in this report, arbitrability was generally favored by the
> Undersigned principally because the parties mutually agreed to adjudicate the
> jurisdictional dispute utilizing the RI-399 jurisdictional arbitration process.  The
> Arbitrator did not find it appropriate to overrule this mutual agreement.  While the

language clearly points in the direction of limiting the filing of grievances for existing work, the parties nonetheless agreed to seek clarification of this dispute in the RI-399 arbitration process.  To void this mutual agreement would be tantamount to a third party neutral assuming a role bordering on god-like judgement.

See *id.*

37.     Arbitrator Anderson ruled that the scanning work in question should have been assigned to the clerk craft, and that the Postal Service violated RI-399 when it assigned the work to a mail handler.  See Joint Ex. 1 at 9 (Anderson award).

Respectfully submitted,


/s/ Bruce R. Lerner
Bruce R. Lerner (D.C. Bar No. 384757)
Andrew Roth (D.C. Bar No. 414038)
Todd E. Edelman (D.C. Bar No. 447455)

Bredhoff & Kaiser, P.L.L.C.
805 15th Street, NW, Suite 1000
Washington, DC 20005
Telephone: (202) 842-2600
Facsimile: (202) 842-1888
Email: blerner@bredhoff.com

Attorneys for Plaintiff
National Postal Mail Handlers Union


Dated: November 9, 2007

# Joint Exhibit 1

# Part 1

In the Jurisdictional
Arbitration Between:

AMERICAN POSTAL
WORKERS UNION  (APWU)

and

UNITES STATES POSTAL
SERVICE  (EMPLOYER)

and

NATIONAL POSTAL MAIL
HANDLERS UNION  (NPMHU)

Case #:  F98C – IF J - 01185458
(Loading Dock Scanning)

Before:
 Arbitrator Donald A. Anderson

APPEARANCES:

For The APWU ------- Steven J. Zamanakos, Counsel
Frederic Jacobs – President, Local 78
Dawn Whittington – Former General
Expeditor
Deborah Reams – Expeditor

For the NPMHU ----- Donald McAlister – Counsel
Harry Walker – Equipment Opr.
Mokneta Murray – Union Steward

For the USPS --------- Drucilla D. Whylie. Counsel     DRUSILLA
Debera Khalid - Operations Super-     WYLIE
visor.
Clementine Stanley – Mail Handler

ISSUE

1. Did the Employer violate RI-399 when it assigned the
work of scanning foreign mail into the MIDAS system
on the loading dock at the Oakland International Service
Center?"

2.

# BACKGROUND

The APWU contended that the scanning work involving foreign mail at the Oakland facility, (OISC) is contractually work which should be performed by its members.  Moreover, the APWU asserted that the Employer's decision to use Mail Handlers to perform said work pursuant to the completed "Inventory" signed in December, 2001 is without merit.  It remains that the instant grievance is a jurisdictional dispute which must be decided by the presiding arbitrator and not remanded back to the Article 15, grievance procedure of the Article 15 of the MOU without consent of all the parties involved.  The APWU argued that the contract clearly outlines work involving scanning to be performed by clerks not mail handlers.

The Employer and the NPMHU contended that the work in question has been performed by members of each union over the years and is assigned as such for efficiency and operational reasons and that the APWU filed a grievance for the sole purpose of having the scanning work on the dock exclusively designated as clerk work.  In addition the EMPLOYER and NPMHU agreed that the work in question does not meet the grievance filing requirement because new work is not involved; there was not a consolidation of facilities; nor was there an operational change at the ISF, Oakland, California, to prompt a legitimate grievance regarding the scanning dispute.

The foregoing describes the general positions of the parties, but there were numerous other issues upon which the parties disagreed which will be covered in subsequent discussion in this award.

Notwithstanding the foregoing, when the parties were unable to resolve their differences, they agreed to submit the dispute to jurisdictional arbitration as provided in their Memorandum of Understanding, RI-399.  (JX-1)  The hearing was held on June 27, 2006 at the International Service Center, Oakland, California. At the hearing the Employer and NPMHU asserted that the issue was improperly in arbitration because none of the three, (3) basic procedural filing requirements as outlined above were present. Nonetheless, with the agreement of each of the parties, the Arbitrator proceeded to hear evidence on each of the issues and would address the EMPLOYER/NPMHU motion for dismissal

2

3,

during his award deliberations. Opening statements were then offered followed by sworn testimony of witnesses. The parties were afforded full opportunity to present their positions in the matter. The parties elected to exchange their final arguments in written post hearing briefs prior to mailing the originals to the Arbitrator which were received on or about July 31, 2002.


## ISSUES, POSITIONS, ARGUMENT & ARBITRATOR FINDINGS

### ARBITRABILITY:

**Employer & NPMHU position:**

It contended that because the APWU's grievance did not meet the basic jurisdictional arbitration requirement found at JX-1 Tab L, which limits jurisdictional grievances from arbitration unless it can be shown that the disputed work is, "new or consolidated facility; new work; or an operational change." Since the disputed work meets none of these criteria, the grievance should not be heard in jurisdictional arbitration proceedings as per RI-399.

**APWU position:** It maintained that the grievance is arbitrable pursuant to the parties agreeing during the Regional Dispute Resolution Committee meeting, (JX-2, P.1) that the issue be submitted for jurisdictional determination.

**Arbitrator Findings:**

While acknowledging the Employer's reliance on the language of JX-1, Tab L, relative to the criterion for submitting jurisdictional issues into arbitration, he could not ignore the fact that the RDRC committee agreed to go that route. It can only be presumed that committee was seeking a determination of jurisdiction for the disputed work and while the grievance identifying number is preceded by the letter "J", which may be for tracking reasons only, it remains clear that the parties all agreed the grievance should, initially at least, be arbitrated utilizing the RI-399 MOU process. It would be inappropriate and beyond the Arbitrator's impartial role to deny the parties request for a jurisdictional determination for the work in question and once such a decision is made, he becomes "functus officio" and no longer has official quasi-legal standing in the case unless the parties mutually agree otherwise. Presumably the three, (3) parties mutually decided to seek third party neutral guidance as to the future of this dispute.

3

4,

Notwithstanding the foregoing, the Arbitrator also considered the EMPLOYER/NPMHU'S motion for dismissal of the grievance based on an untimely grievance filing by the APWU. Frankly at first blush the Arbitrator noted the extended time of the filing from the apparent first alleged violation but was persuaded to deny the EMPLOYER/NPMHU'S motion because of the continuing nature of the alleged violation. The following guiding arbitration principle is cited :

> "Many arbitrators have held that "continuing" violations of the agreement (as opposed to a single isolated and completed transaction) give rise to "continuing" grievances in the sense that the act complained of may be said to be repeated from day to day – each day there is a new occurrence . . . (although any back pay ordinarily runs only from the date of filing) . . . "
> ("How Arbitration Works") BNA 3rd Ed. By Elkouri & Elkouri, pp. 152-153)

There was no argument by any of the parties that management excepted one Mail Handler, Clementine Stanley, from its order to all other Mail Handler's to cease performing scanning duties, and that she continues to be the only one so allowed. The Arbitrator witnessed same.

Therefore, the Arbitrator was persuaded that the instant grievance should be heard and awarded based on its jurisdictional merit(s).

THE MERITS:

The EMPLOYER and NMPHU position:

The parties contended that the scanning work on the loading dock is in effect, de-minimus and also, is performed more efficiently and economically by Mail Handlers. Moreover, were a General Expeditor assigned exclusively to scan at the dock, he /she would simply stand around until the mail is ready to be loaded and then merely scan the appropriate label followed by the Mail Handler loading it. Mail Handler's performs the scanning task as part of their regular duties and no one need stand by for the task to be completed. Scanning is incidental to loading and has been

4

5₁

performed by Mail Handlers since 1991 at the OISC. There has never been an incident of efficiency/economic compromise during that time.

Furthermore, the Expeditor Position Description fails to even mention scanning as part of their work. While it alludes to record keeping of sorts, it is the MIDAS operation which actually keeps the records, not the Expeditor. In addition, there are no special skills needed to perform the scanning function because it is an automatic system requiring no special training or expertise.

Also, per Arbitrator Gamser's previous arbitration award explaining the meaning, intent, and application of RI-399, the Employer is to:

> "... make ... integrated assignments in the interest of efficiency and economy and under the authority granted to it in Article III, of the National Agreement."

and:

> "... the assignment made in Regional Instruction 399, are "primary" assignments only."

The Employer and the NPMHU also contended that there is nothing in the evidence to support the APWU's assertion that scanning is exclusively clerk work. The Mail Handler's have been scanning since 1991 at the OISC which has been and remains an integral part of their loading duties. It is also true that there was no APWU grievance challenge to such work assignments for many years regarding the alleged intrusion on APWU's work until this grievance. There has been a sharing of the scanning functions between the Clerks and Mail Handlers for years and for the APWU to now contend that all scanning work is theirs, is without evidentiary foundation

APWU Position:
The APWU argued that despite the Employer's assertions that Mail Handlers and Clerks, have shared the scanning duties over the years, the work is actually that of APWU represented clerks. It cited certain language found in the General Expeditor position description which it argued supported its position that the General

6,

Expeditor(s) have jurisdictional right to perform scanning duties.
To wit:

> "Arranges for the proper transfer for mail which
> may require the knowledge of incoming and/or
> outgoing schemes, transportation schedules, and
> receipt and dispatch information in performing
> mail distribution between highway contact routes,
> mail messengers and truck routes, and other mail
> units; and the separating , loading and unloading
> of railway storage cars, flexi-vans and piggy-back
> trailers. By contractors and postal employees to
> ensure proper and expeditious handling.. . .

> "May maintain records of mail volumes, work hours,
> and other record keeping;" (JE #4. Duties and Res-
> possibilities #4)

> "Ensures proper labeling, timely closing, routing and
> dispatch of all pouches and sacks within the assigned
> work area." (JE #4, Duties and Responsibilities  #5)

> *Loads, unloads, and move bulk mail and performs
> other duties incidental to the movement and processing
> of mail (JE #5)

It is clear, according to the APWU, that the foregoing description
places the greater responsibility for efficient and economic
distribution of mail upon them rather than on Mail Handlers.  That
is why Expediters enjoy a higher pay level than Mail Handlers.  It
is more efficient and operationally effective for Expeditors to
perform scanning because it results in a more accurate tracking of
mail.

Furthermore, the APWU contended that in 1991 when the
automatic MIDAS tracking system was made operative, the
EMPLOYER intended to have the scanning work performed by
Clerks given the fact that they were the employees who the
Employer selected to received training on the new mail tracking
approach.  (JE #2. P34)

6

In addition, the EMPLOER notified the APWU and NPMHU that the work of scanning was the principal responsibility of the General Expeditor. (JE #2. Pp 45, 46, 47)  The NPMHU never challenged this work assignment decision.

Finally, the APWU referenced the Employer correspondence of Debera Khalid (Clement) (JE #2 p .47) and Plant Manager Charles E. Frazier , April 30, 2001 (JE #2, p.46) as well as Quality Specialist, Gladys Clement, then coordinator for training Clerks in using the MIDAS system, all of whom clearly singled out General Expeditors to perform the MIDAS System scanning work.

Based on the foregoing the APWU solicited the Arbitrator to rule in its favor and award jurisdiction of scanning mail to the General Expeditor.  It also maintained that if a remedy is appropriate in this case, such a question is appropriately an Article 15 grievance procedure case.

ARBITRATOR FINDINGS & DISCUSSION ON THE MERITS:

The Arbitrator's findings regarding the merits on the question of jurisdiction for scanning, particularly on the loading dock, centered principally on the question as to why management declared its intention(s), in writing to assign such work to the General Expeditor job position and yet allowed Mail Handlers, at least one, to also do so on a continuing basis?

Moreover, the EMPLOYER'S memoranda in the form of then Operations Support Specialist, Debera Khalid (Clement) directive, dated April 27, 2001, (JX-2. P 47), and that of Plant Manager Charles E. Frazier, dated April 30, 2001, (JX-2 p.46) was clear that "Scanning is the principle responsibility of the General Expeditor." As they each declared.  In addition, Gladys Clement, then Quality Specialist who had received MIDAS System (Scanning Program) training and who coordinated the training of Expeditors and Clerk Craft Personnel, penned another correspondence dated July 24, 2001, (JX-2, p. 34) wherein she  revealed her responsibility to train, "Expeditors and Clerk Craft Personnel on how to input data information using the scanning system."  Under such clear work jurisdiction declarations, the question posed the Arbitrator in this case is answered by the cited EMPLOYER directives.

8,

Also, the evidence in this case did not adequately support the
EMPLOYER/NPMHU'S assertion of an established past practice of
Mail Handler's scanning because they had done so for many years;
that the work is de-minimus in nature; that the APWU Local knew
about the practice and had acknowledged same; that the reason the
Mail Handler Craft initially became involved in the process was
due to a General Expeditor's request they do so; and that its
contention that the use of Mail Handler's in scanning is more
economical and efficient; it nonetheless remains that General
Expeditors were previously identified and slotted for the work by
the EMPLOYER.

While it is true that the APWU waited for an extended period of
time to challenge the scanning work of Mail Handler's, basic labor
relations principle(s) does not absolutely require that grievances be
filed at the very first instance of a violation when such violations
are continuing as it is the case here. Of course, and as previously
cited, belated filing of grievances for such violations may often
times result in an adjustment of employer financial liability when
and if a remedy is determined.

However, it must also be pointed out that a "waiting in the
bush" approach and then to pounce on a violation for a maximum
remedy result, is not acceptable. But there are times when one
party or the other may find it advantageous to let violations slide
by because at the moment it may fit their particular need. But in
most instances the typical boiler-plate-type time restrictions for
filing found in most collective bargaining agreements, adequately
meet the parties respective bargaining need.

As to the EMPLOYER/NPMHU's argument that the General
Expeditor's job position description is void of mentioning scanning
as a work duty, and while the Arbitrator did not fully credit the
APWU's assertions on this point, the evidence was nonetheless
persuasive enough to link scanning with the responsibilities of
General Expeditors to ensure "proper and expeditious handling",
"Ensure proper labeling, timely closing, routing and dispatch of all
pouches and sacks within the assigned work area" and, ". . .
performs other duties incidental to the movement and processing
of mail," as being compatible with the purpose of the MIDAS
scanning process.

*9,*

Finally, the Undersigned closely reviewed the EMPLOYER'S claim relative to the RI-399 MOU language discussing "General Principles" (JX-1, Tab J, p.1), and "Scope of Settlement" (JX-1, Tab O, p. 2), wherein the parties generally agreed that:

> ". . . no new disputes will be initiated at the local level by either union challenging jurisdictional work assignments in any operation as they currently exist. . . . "

Here again, the Arbitrator found language and practice to be somewhat disjointed. As previously discussed in this report, arbitrability was generally favored by the Undersigned principally because the parties mutually agreed to adjudicate the jurisdictional dispute utilizing the RI-399 jurisdictional arbitration process. The Arbitrator did not find it appropriate to overrule this mutual agreement. While the language clearly points in the direction of limiting the filing of grievances for existing work, the parties nonetheless agreed to seek clarification of this dispute in the RI-399 arbitration process. To void this mutual agreement would be tantamount to a third party neutral assuming a role bordering on god-like judgement.

### AWARD

After full consideration and study of all the evidence before him including the awards of arbitrator(s) Gamser, Levak, Powell, Mittenthal, Hauck, Snow, Eischen and Lankford, and for the reasons discussed above, the Arbitrator was compelled to conclude that:

> The Employer violated RI-399 when it chose to assign a Mail Handler to perform scanning work on foreign mail at the loading dock at the OISC as it did in this case. Such scanning is the primary work of clerk General Expeditor(s).

Respectfully Submitted This
23rd Day of August, 2006.

**DONALD A. ANDERSON**
**Impartial Arbitrator**

0009

# DONALD A. ANDERSON
### Arbitrator

Silver Spur Road #375
Rolling Hills Estates, CA. 90274

Phone; (310) 377-2590
FAX: (310) 377-1940
E-mail – YAHSHUR29@AOL.COM

August 12, 2006

Steven Zamanakos, , APWU  &  Drucilla D. Wylie, USPS  &  Donald McAlister
2345 S, Alma School Rd.        135 N. Center Street           5 Thomas Mellon Cir.
Mesa, AZ 85210                 Mesa, AZ. 85201                San Francisco,CA. 94134

RE:  Arbitrator's Inquiry in the arbitration between:
APWU – NPWHU - USPS
RE:  Case #F98C – 1F – 01185458  (Class Action)

For clarification purposes, in the post hearing brief submitted by the NPMHU in the above referenced case, at paragraph one, (1) on page 3, to wit:

> "At the hearing it came out that this grievance was withdrawn at an earlier arbitration proceeding. As stated by Mr. Anderson the APWU had withdrawn this grievance in a previous hearing."

Be advised that while I may have referred to another case in passing during this hearing where the local Pasadena NPMHU withdrew its grievance, I do not recall, nor did I intend to suggest that the APWU did so for the above referenced case.

Please advise so as to clear up the record.

Sincerely

DONALD A. ANDERSON
**Impartial Arbitrator**

*Sent via FAX*
*8/13/06*

REGIONAL ARBITRATION
BEFORE
ARBITRATOR DONALD A. ANDERSON

CASE NUMBER: F98M-1F-C 02196624

MAIL HANDLERS UNION POSITION

This grievance was presented to Arbitrator Anderson on April 12, 2006, at the Pasadena Processing and Distribution Center. The grievance presented to the Arbitrator was filed by the National Postal Mail Handlers Union, Pasadena Branch, on July 19, 2002, claiming a violation of Article 7.2 of the National Agreement. The grievance was appealed through the grievance procedure, and when it arrived at the Step 3, the Regional Directors placed the grievance in abeyance pending a decision from the Regional Dispute Resolution Committee. The Regional Dispute Resolution Committee scheduled the case on the Regional Instruction 399 (RI-399) Jurisdictional Dispute Arbitration Panel.

The union's position at the hearing was that the Joint Exhibit # 1, Tab J, Regional Instruction 399-Dispute Resolution Procedures, General Principles, page 5, in the Section that reads, Regional Arbitration, the language is clear as to what type of cases the Arbitrators selected by the parties will hear: only jurisdictional cases.

Furthermore, the union asserted that the case was not properly before the Arbitrator, because the grievance did not involve a jurisdictional issue. The union's position was based on the Settlement Agreement regarding Operations 110-129 and 180-189; Dock Transfers; and Non-Jurisdictional Cases (Tab O, page 1, of the Joint Exhibit # 1), signed by the three parties on August 3, 2000; which reads, in pertinent part

> For these purposes, non-jurisdictional cases re those cases in which the underlying craft jurisdiction is not under challenge. These cases are cases where there exists an inventory that has been properly completed and signed by representatives of all three parties; cases where there was no dispute pending as of April 29, 1992, and there has been no claim of New or Consolidated Facilities, New Work, or Operational Change; and cases where the remedy sought by the grieving union does not include permanent reassignment of the work to a different craft.

As stated by the union, this grievance was filed in 2002; it does not claim New of Consolidated Facility; New Work, or Operational Change; and the remedy asked by the union in this grievance does not include permanent reassignment of the work to a different craft.

Based on the afore-mentioned facts, the union maintains that the case does not deal with jurisdictional issues and, therefore, it is not properly before the arbitrator.

Respectfully submitted,

*Benito Araiza*

Benito Araiza
Advocate
NPMHU-Local 303

July 27, 2006

APWU vs. USPS                          RE:  F98C-1F-J 01185458
NPMHU as intervening Union                  F98C-1F-J 01162415
                                            Dock Expediter
                                            Oakland, CA

## BRIEF OF THE APWU

### OPENING

A hearing was held at the Oakland, CA International Service Facility on June 27, 2006.
This was a tripartite hearing among three parties; APWU, NPMHU & USPS.  All parties
had an opportunity to present their respective positions and present testimony and
evidence to support their positions.  At the conclusion of the hearing, the parties
requested to brief both arbitrability and the merits of the case.  There was no objection to
this request, and the parties established July 28, 2006 as a postmark date for submission
of briefs to the Arbitrator.  The parties agreed to exchange briefs among themselves.

### ARBITRABILITY

### SUBSTANTIVE ARBITRABILITY

The Union believes the Arbitrator has the authority to issue a decision on the merits of
this grievance.  Arbitrator Snow wrote in a national level award (H7C-3D-D 13422)
(Attachment #1):

"...the goal of parties in a continuing relationship under a collective bargaining
agreement is that of achieving labor-management cooperation and peace through a fair
and even-handed resolution of differences in accordance with the parties' bargain as
codified in their collective bargaining agreement." (pp 17-18)

"A forfeiture of remedies does not promote this objective.  Indeed, a technical
procedural bar to a decision on the merits of a claim by a neutral third party probably
would be viewed by an average worker as an unfair "lawyer's trick designed to cover up
arbitrary or unwarranted discipline.  Were a perception that the grievance-arbitration
process is procedurally unfair to take root, it would greatly undermine the goal of
fostering peace in the workplace." (p 20)

"Because of the importance in workplace disputes of decisions on the merits of a
complaint, arbitrators long have balanced procedural rules with the goals of labor
arbitration in construing contractual language.  One starts in the common law with a
presumption against forfeitures, and there also exists in Anglo-American law the concept
of "disproportionate forfeiture," meaning a court of law will weigh the extent of

1

0013

forfeiture by a party against the importance to the other party of the risk which that individual sought to be protected. The same basic idea has been absorbed into labor arbitration, and forfeiture of remedies is so disfavored within the context of a workplace grievance that arbitrators generally have wanted proof of an unmistaken intention to permit forfeiture. In other words, parties intending such harsh results must clearly and unambiguously express their intent when crafting procedural rules." (pp 20-21)

This principal against forfeiture has been accepted by regional arbitrators. Arbitrator Hauck wrote in a regional award (E90C-4E-C 94023547) (Attachment #2):

"In view of Articles 1 and 15, the Arbitrator rules that the contract obligates the parties to resolve doubt as to the availability of contractual grievance procedures against the forfeiture of the right to present the grievance." (p 5)

"Thirty-seven years ago, the U.S. Supreme Court set forth guidelines to be followed in disputes about substantive arbitrability. The Court instructed that:

...an order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the dispute [see *Warrior and Gulf*, 80 S.Ct. 1347 (1960)].

While it has been modified somewhat since then, the basic long-standing tenant of the U.S. Supreme Court still being followed by arbitrators is that an agreement to arbitrate grievance disputes is the *quid quo pro* for an agreement not to strike. The Court directed that doubts concerning the substantive arbitrability of a dispute should be resolved in favor of arbitration. The doctrine of presumptive arbitrability standard continues to prevail." (p 7)

In viewing the Employer's arguments against hearing the merits, it becomes clear that the Employer is arguing **"substantive"** arbitrability. The Employer argues this grievance was disposed of when the parties completed the "Installation Inventory" in December 2001 (Joint Exhibit #3, p13). As the APWU understands the Employer's argument, the parties agreed that the work in question in this case is clerk work (Operation 222). Therefore, the dispute ended when the inventory was signed in December 2001.

There are three major flaws with the Employer's argument. First, the third party to the inventory, NPMHU maintained at the hearing that the work in question in this grievance is mail handler work. NPMHU argues the work in question belongs in their craft. They further argue that when the "Inventory" was signed, they were not agreeing that the work in question belonged to the clerks (JE #3, p20). That argument in itself rises to the level of a jurisdictional dispute between the two Unions that would have to be resolved by the Arbitrator.

Second, this grievance was taken from the Article 15 process for the sole purpose of determining jurisdiction. The remedy portion of the grievance is still a live issue that will

2

be disposed of in the Article 15 process. The APWU cannot be deprived of a hearing on the jurisdiction of the work and the merits of a proper remedy to this grievance. What the Employer is seeking is an arbitrability ruling on both merits and remedy asking that both be rendered moot. The Arbitrator does not have the authority under the RI 399 MOU (JE #1, Tab J) to make such a ruling. This would be a *"forfeiture of remedy"* discussed by Arbitrator Snow as being inappropriate.

Third, the APWU is the "moving" Union in this case. What the Employer is arguing is that they and the NPMHU have the contractual right to "take control" of APWU's grievance and send it back to Article 15. The Arbitrator must keep in mind that the parties at Step 3 of Article 15 agreed this case should be processed in the RI 399 forum (JE #2, p25-27). The cases were remanded to the LDRC and the parties again agreed to process the case in RI 399. The cases then went to the RDRC and all three parties agreed to process the cases in RI 399. The Arbitrator does not have the authority to overrule the RDRC.

In the final analysis, it would seem that the Employer and NPMHU want you to accept the notion that one or two of the parties may move the dispute out of the RI 399 process without the consent of the moving Union. That argument flies in the face of the 1992 MOU (JE #1, Tab J):

> **"Committee decisions shall be by mutual agreement of all 3 parties."**

In addition, the parties reached the following agreement at page 2 of the MOU:

> **"Any settlement entered into <u>at any level</u> must be a tripartite settlement."**

Also, the parties addressed the above scenario in the MOU Q&As (JE #1, Tab L, Q#3):

> **"If a grievance exists or is filed alleging a violation of the contract other than RI-399 (e.g. Article 7.2) and <u>one of the parties</u> believes the issue in the grievance constitutes a jurisdictional dispute, what if anything should be done with the grievance?**
>
> **Answer: It <u>must</u> be referred to the Dispute Resolution Committee for an initial determination as to whether or not it involves a jurisdictional claim, the grievance will be processed in the Dispute Resolution Procedures. If the Committee is in disagreement as to whether or not the grievance involves a jurisdictional claim, that question is appealable through the Dispute Resolution Procedures up to and including arbitration for resolution prior to the parties addressing the merits of the dispute. The three parties shall review cases at the lowest possible level which raise the potential of containing a jurisdictional dispute so that the proper procedure is utilized to resolve disputes/grievances."**

An additional point needs to be made regarding the late timing of this arbitrability argument. The RDRC met on this grievance in May 2006. There were no arguments

raised at that time by either the Employer, or NPMHU that this grievance was somehow rendered moot by the Inventory. This is five years <u>after</u> the Inventory was signed!

In view of the above, the Union does not believe the Employer and NPMHU have met their burden of proof. The Union believes that the Arbitrator has the authority to hear the merits of this case and determine if a violation of RI 399 exists.

## ISSUE

The APWU established the issue as:

"Did the Employer violate RI 399 when it assigned the work of scanning foreign mail into the Midas System on the loading dock at the Oakland ISF?

## BACKGROUND

The APWU filed an initial grievance on March 29, 2001 challenging the fact that mail handlers were scanning mail into the Midas System (JE #2, p48). In response to that grievance, APWU Oakland Local President, Fred Jacobs was sent a memo (JE #2, p47) from Operations Support Specialist, Debera Khalid (Clement) acknowledging that the work of scanning was in fact the work of a clerk General Expediter (JE #4). This jurisdictional question was reaffirmed by the Plant Manager, Charles E. Frazier by letter dated April 30, 2001 (JE #2, p46). Mr. Frazier notified both APWU & NPMHU that "**Scanning is the principle responsibility of the General Expediter.**" On May 4, 2001 Ms Khalid notified APWU President Jacobs that mail handlers will no longer have access to scanning (JE #2, p45). This was confirmed in testimony by NPMHU witnesses Harry Walker and NPMHU steward, Mokneta Murray. Ms Murray testified under cross examination that NPMHU did not file a challenge to the Employer's decision to award scanning to the clerks. From May 2001 forward, clerk General Expediters scanned the mail with the exception of one mail handler, Clementine Stanley. It seems that Ms Stanley was so adamant about performing the work of scanning the mail, the Employer was reluctant to challenge her and left her duties in a status quo to this day. The APWU argues that it is this failure to act on the part of the Employer that has caused this issue to go unresolved. But for Ms Stanley continuing to perform scanning, this case would have been resolved in early 2001 with no objection from NPMHU.

## ARGUMENTS

The starting point for a decision on jurisdiction begins with a review of the position descriptions of a clerk General Expediter (JE #4) and a Mail Handler (JE #5). The position description of the General Expediter clearly anticipates that the clerk:

"**Arranges for the proper transfer for mail which may require the knowledge of incoming and/or outgoing schemes, transportation schedules, and receipt and dispatch information in performing mail distribution between highway contact routes, mail messengers and truck routes, and other mail units; and the separating,**

4

loading, and unloading of railway storage cars, flexi-vans and piggy-back trailers, by contractors and postal employees to ensure proper and expeditious handling."

In addition, the General Expediter:

"May maintain records of mail volumes, work hours, and other record keeping;" (JE #4, Duties and Responsibilities #4)

The General Expediter is also responsible for:

"Ensures proper labeling, timely closing, routing and dispatch of all pouches and sacks within the assigned work area;" (JE #4, Duties and Responsibilities #5)

In stark contrast to the above, the position description of a Mail Handler includes:

"Loads, unloads, and moves bulk mail and performs other duties incidental to the movement and processing of mail." (JE #5)

It is clear from the above that the General Expediter has the greater responsibility of ensuring the contents of a dispatch are recorded and accurate. That is why the General Expediter is paid Level 6 and the Mail Handler Level 4.

In 1991 the Employer decided to go from a manual tracking system to the MIDAS System. The MIDAS system consisted of an electronic scanning of the bar code on the mail. This information would then be recorded in the electronic tracking system in case there were questions regarding a particular shipment. General Expediters, Deborah Reams and Dawn Whittington testified of the importance of the General Expediter performing the scanning in case there were questions regarding shipment and billing overseas. Both clerks testified that it would be impossible for a General Expediter to answer questions about a particular shipment unless they had scanned the contents of the container.

It was clearly the intent of the Employer in 1991 to have scanning performed by the General Expediter. In an un-refuted statement in the record, Gladys Clement wrote that the Employer assigned only clerks to the MIDAS System training (JE #2, p34). There was no evidence presented by either the Employer or NPMHU that refutes this document.

Early on in the processing of this dispute, the Employer and NPMHU made important admissions against interest. As stated earlier, the Employer notified both APWU & NPMHU that the work of scanning was the principal responsibility of the General Expediter (JE #2, pp 45, 46, 47). The NPMHU steward testified that NPMHU did not challenge the Employer's decision and did not challenge the fact that the Employer "locked" mail handlers out of the MIDAS System. It seems from the presentation of both the Employer and NPMHU that both are trying to keep mail handler Stanley happy by arguing that somehow she should be the exception to the rule and continue to perform the

5

work of the General Expediter. Keeping an employee happy is not the basis for making a jurisdictional ruling.

APWU's General Expediters also testified that it is more efficient and effective to have the General Expediter perform the scanning. APWU has already covered the effective portion regarding the ability of the General Expediter to track the contents of the container. From an efficiency standpoint, both clerks testified that mail handler Stanley would have to stop her work of loading the container in order to scan the mail. The two General Expediters testified that this caused delays in loading the containers which could cause a dispatch to be missed. It is important to note that the containers have to leave the dock by a certain time in order for their timely arrival on cargo ships destined for other countries. If a dispatch is missed, it could be days or weeks before another cargo ship has the capacity to carry the delayed shipment. This could result in lost revenue for the Employer. It is important to note that even mail handler Stanley testified that she had to stop her loading in order to scan the mail. While she tried to downplay the amount of time involved, it is clear to this advocate that she continues to want to scan the mail in order to take a break from the strenuous work of constantly loading containers. While this may be understandable for an older worker, it does not form the basis for jurisdiction. Also, the Employer did not rebut the testimony of the two General Expediters. Ms Khalid never supervised on the dock and there were no other dock supervisors that testified in order to refute the APWU's efficiency testimony. Therefore, the only conclusion that can be drawn is that it is more efficient to have the General Expediter scan the mail and the Mail Handler loads the mail into the container. This ensures the Expediter is aware of the contents of the shipment and can answer any questions about a shipment after it arrives in another country. It also ensures that the containers are loaded on time and will meet their dispatch.

In the final analysis, the APWU is respectfully requesting the Arbitrator to support the Employer's initial rulings in this case and award jurisdiction of scanning the mail to the General Expediters.

## REMEDY

The APWU would first remind the Arbitrator that this grievance was initiated under the parties Collective Bargaining Agreement via Article 15. In 1989 there was no RI 399 MOU and the unions routinely filed jurisdictional cases alleging a violation of Article 7. The MOU (JE #1, Tab J) established a process to determine "**jurisdiction**". It was never designed to determine remedy. Remedy, is left to the Article 15 process. **The APWU never forfeited remedy when it entered into the RI 399 MOU.** Earlier in this brief the APWU cited case law regarding "Forfeiture of Remedy". This case law states that arbitrators want proof of an unmistaken intention to permit forfeiture. There is no such proof. The Employer never cited any evidence that it was the intent of the parties in negotiating the RI 399 MOU to render a monetary remedy moot.

0018

Given that this grievance was generated under Article 15 and remanded to R1 399 for the purpose of establishing jurisdiction, it is logical to send it back to Article 15 after the jurisdiction question is answered by the R1 399 Arbitrator. The parties never directed the R1 399 Arbitrator to make a ruling on remedy. This is not a typical Article 15 process where the parties have given the Arbitrator full authority to fashion an appropriate remedy for a violation of the Collective Bargaining Agreement. This hearing is a special process to determine jurisdiction. Once that is accomplished, the case must be sent back to Article 15 to determine an appropriate remedy.

Assuming arguendo that the Arbitrator believes he has the authority to rule on remedy, the APWU would argue the following:

1. The traditional remedy for a cross craft violation is to award the losing craft a monetary remedy (straight time or overtime) for all hours worked by employees in the other craft. The APWU has furnished Article 15 awards on point (Attachments 3-6).
2. There is no dispute among the parties that the work in dispute was performed by mail handler Stanley from 2001 until the present.
3. The APWU is seeking four hours per day. This is a reasonable calculation given the number of containers that are loaded each day by Ms Stanley.
4. Both APWU witnesses testified that a General Expediter job was lost. APWU Exhibit #1 demonstrates the loss of a General Expediter job in June 2000. This job should be returned to the clerk craft.

The APWU's preference is that the Arbitrator finds that the work in question is clerk craft work under R1 399. In addition, the APWU respectfully requests the Arbitrator remand this grievance back to Article 15 arbitration for the sole purpose of determining remedy. Included in this brief is correspondence between the parties dated December 2, 1992 (Attachment #7) clearly articulating that remedy is more appropriately heard in the Article 15 process. In addition, an award from fellow panel member, Arbitrator Lankford (Attachment #8) on the matter of remedy and Article 15 is enclosed.

Steven J Zamanakos
National Business Agent
APWU, AFL-CIO

7

0019

## POSTAL SERVICE'S CLOSING BRIEF
## F98C-1F-C 01185458
## OAKLAND INTERNATIONAL SERVICE FACILITY
## DATE OF HEARING:  JUNE 27, 2006
## BEFORE ARBITRATOR DONALD A. ANDERSON

**PROCEDURAL ISSUE:**  Is the instant grievance properly before an arbitrator on the RI-399 panel?

**ISSUE:**  Did the Service violate the National Agreement, including RI-399, when the APWU contends a Mail Handler performed scanning duties on the Loading Dock?

Jurisdictional disputes between the Clerk and Mail Handler crafts existed prior to the Postal Reorganization Act in 1970 and increased in frequency over the years. As the Postal Service adapted many technical and mechanizational changes in the methods and means employed to accomplish the work in an efficient and effective manner, thus, has the increase in challenge between these two crafts of employees followed suit.  Evolving, after many years, from this mayhem, the Postal Service finally issued RI 399 Guidelines in February 1981, wherein, the APWU filed a national level grievance claiming the Service violated the 1978 Memo of Understanding and Article 7 of the 1978 National Agreement when it issued said Guidelines.

National Arbitrator Gamser's award (Joint Exhibit 1, Tab F) validated the propriety of primary craft assignments made in the regional instruction. Gamser noted that he was guided by the criteria in the USPS/NPOMH/APWU/NALC Memo of Understanding on jurisdictional disputes.  This criteria enumerated in that memorandum are:

1. Existing work practice assignments;
2. Manpower costs;
3. Avoidance of duplication of effort and "make work" assignments;
4. Effective utilization of manpower, including the Postal Service's need to assign employees across craft lines on a temporary basis;
5. The integral nature of all duties which comprise a normal duty assignment;
6. The contractual and legal obligations and requirements of the parties.

Gamser also considered the decisions of "arbitrators who had decided earlier jurisdictional disputes", changes in the way in which mail was processed including the "disappearance of reliance upon rail transportation, . . . . adoption of the zip code, . . . de-emphasis on scheme knowledge, technological changes and innovations, . . . and reliance on bulk mail handling and mechanization."  He emphasized that "distinctions between clerk duties and those traditionally assigned to the mail handler" had been "blurred".

Arbitrator Gamser reached the decision that RI 399 was a legitimate exercise of management's mandate under law to "make . . . integrated assignments in the interest of efficiency and economy and under the authority granted to it in Article III of the National Agreement."

Arbitrator Gamser found that an essential element of RI 399 was "the assignment made in Regional Instruction 399 are "primary" assignments only. There is no entitlement bestowed upon either the Clerks nor the Mail Handlers to perform each of these operations at every facility. Gamser stated that "no hard and fast demarcations have been made. No wholesale dislocations or reassignments of functions or operations is contemplated." This is a very important factor to consider, Mr. Arbitrator because in today's hearing the Mail Handler Union is attempting to secure an assignment in contrast to Mr. Gamser's precedent setting award.

Mr. Arbitrator, it is the Postal Service's position that this grievance is not properly before you today. It is our position that the grievance in question only deals with the assignment of already existing work at the International Service Facility. The APWU argues in this grievance file that the work they challenge already exists on a Clerk Expediter position. Therefore, in accordance with the (Joint Exhibit 1, Tab J) – the RI 399 binder – that declaration by the APWU demonstrates that even the APWU believes this grievance is not jurisdictional in nature as it doesn't involve a new or consolidated facility; doesn't address new work, and doesn't address an operational change.

The RI-399 Instructions are very explicit. The parties at the national level agreed to procedures that must be adhered to when a question of jurisdiction arises. The Memo of Understanding, (Joint Exhibit 1, Tab L), the Memo on "Regional Instruction 399 – Dispute Resolution Procedures", limits challenge to jurisdiction under only 3 specific reasons: if a new or consolidated facility occurs; new work; or operational change. These three things, and *nothing* else. Period. None of these occurrences were present in today's case to warrant arbitrating this case in the RI 399 process.

A review of all three parties' position papers (Joint Exhibit 2) reveals the same thing: There is no dispute that none of the three criteria identified in the 1992 Memorandum of Understanding, "RI-399 Jurisdictional Dispute Resolution Procedures", that governs RI 399 issues is present in this case. That, alone, Mr. Arbitrator, should result in an immediate ruling by the arbitrator that this grievance is improperly before you, today. All the parties are mandated by the 1992 Memorandum to adhere strictly to procedural considerations; when it is clearly determined that none of the three criteria is present, the case must be immediately dismissed as non-arbitrable. No consideration, whatsoever, should be given to testimony at the hearing that addressed the merits of the case. The opportunity for the APWU to challenge and attempt to make its case to establish sole jurisdiction of the scanning duties has long come and gone.

0021

In response to the APWU's "Position Paper" (Joint Exhibit 2, page 3), the Postal Service would like to address the following:

> Assignment of a "J" number only signifies that in accordance with (Joint Exhibit 1, Tab P), the three members of the RDRC agreed that "the absence of grievance numbers is hindering the processing and tracking of such cases." As a result, the three parties agreed that the "initiating Union would be responsible to contact the appropriate USPS District Labor Relations Office to obtain a GATS "J" number and to add that number to the case prior to making the appeal." The mere existence of a "J" number does not signify that the other two parties agree that the issue is truly a jurisdictional dispute - the "J" merely is utilized for tracking purposes as already agreed to by the RDRC members to identify a case in the system that the initiating Union asserts is jurisdictional.

> Additionally, at the hearing, the APWU advocated asserted in his Opening, that the grievance was jurisdictional as evidenced by the three signatures of the members of the Regional Dispute Resolution Committee, on the scheduling letter (Joint Exhibit 2, page 1). The APWU is incorrect in this assertion, as a review of the Scheduling Letter clearly reveals in the last paragraph:

>> [This] letter does not constitute a waiver by either party of any issues of arbitrability or timeliness as it relates in the processing of the grievances, as it merely serves to confirm to the arbitrator the location, date and time, pursuant to the terms of Article 15, Section 4.B.2 of the 2000 National Agreement..... (emphasis added)

> The foregoing paragraph merely re-affirms the parties' agreement as in any arbitration case, the remaining parties at the hearing may raise procedural arguments challenging the propriety of that grievance being brought forth in that process.

In response to the APWU's assertion that "There are no provisions in either RI-399 or the mail handle position description for mail handlers to perform such work", the Postal Service would respond:

> Neither the position description the APWU alludes to; namely, "General Expediter" nor "Mail Handler" position description, assign "scanning duties" to either craft. The quotation from the position description under "4" to which the APWU refers, is not the work being challenged in this grievance. The Mail Handlers scan the tag from the dolly containing the sacks, bags, or parcels. The mail is then placed on a conveyer belt to be loaded into a truck or van - undisputedly Mail Handler work. The scan performed by the Mail Handler does not involve maintaining any record keeping, volume counts, or processing of data. It involves the singular task of utilizing a

3

0022

hand-held scanner to scan a bar code on the label. The information is automatically entered into the computer. It does not require any additional work on behalf of the Mail Handler. Contrary to what the APWU asserts, there is no secondary task of the Mail Handler "entering information into the tracking systems". The APWU is erroneous in their description of the duty at issue in this case.

In response to the APWU's assertion that the "scanning" was assigned to the General Expediter in Operation 222 for Loading Dock and not challenged by the NPMHU when the parties agreed to the Inventory, the case file evidence establishes this assertion to be incorrect:

First, and foremost, the APWU local president, Fredric Jacobs, already acknowledged that the Mail Handler craft performed scanning duties in 1991. Specifically, Mr. Jacobs stated, in his August 24, 2001 Position Paper (Joint Exhibit 2, page 28) the following:

. . . [The] Mail Handler Craft became involved in the process [of scanning] at the request of a Clerk Craft employee that was not willing to carry out her duties and requested that her (Mail Handler) friend assist her.

Mr. Jacobs attached a statement from Clerk Gladys Clement who stated that the MIDAS scanning program was implemented in 1991. Ms. Clement stated that a mail handler craft employee commenced performing scanning duties as well as the Clerk craft employee during that early time frame.

Additionally, Mr. Jacobs' claim that the original Inventory of the scanning operation indicates that only an Expediter of the Clerk Craft was assigned to perform scanning duties is not supported by his evidence. Mr. Jacobs attached a copy of the original Plant Inventory where this work was done prior to opening the facility we are in today. That Inventory states:

Dispatch Unit
Staffed by 9 mail handlers and 4 expediters
This operation scans and loads all outgoing Transpac mails.

Mr. Arbitrator, nowhere in that Inventory description does it state that only clerks are assigned scanning duties. It states that "this operation" scans and loads all outgoing mail.....

It must be noted, Mr. Arbitrator, that no one in the APWU has alluded to ever filing a grievance in 1991 challenging the Mail Handler sharing the scanning functions. In fact, no one in the APWU ever filed a grievance within the prescribed time limits challenging the fact both unions were performing scanning

4

0023

duties since 1991. This failure on behalf of the APWU bars them from even being before you today, Mr. Arbitrator, as their excessively late challenge is contrary to the mandatory requirement set forth in (Joint Exhibit 1, Tab J, page 1), the "Memorandum of Understanding Regarding Regional Instruction 399 - Dispute Resolution Procedures:

> **General Principles**
> *Effective with the signing of this Agreement [April 16, 1992], no new disputes will be initiated at the local level by either union challenging jurisdictional work assignments in any operations as they currently exist.* Except as otherwise specifically provided in the New or Consolidated Facilities, New Work, or Operational Change sections contained in this memorandum, *all local craft jurisdictional assignments which are not already the subject of a pending locally initiated grievance will be deemed as a proper assignment for that facility.* (emphasis added)

It is undisputed that the APWU simply did not file a grievance challenging the sharing of the scanning duties either in 1991, nor did they challenge the sharing of this work even after being put on notice via the above-cited Memorandum of Understanding. Thus, the APWU has forever forfeited their right to challenge the assignment of this work - albeit it is shared by both unions. Even, *arguendo*, if the Arbitrator believes testimony on the merits establishes that the work in question is exclusively Expediter work, the procedures of RI 399 - namely, none of the three criteria were present in this case to establish a jurisdictional challenge - mandate that the assignment of the work to *both* crafts must remain undisturbed.

So intent were the national parties in their stance that jurisdictional disputes may only arise under three specific conditions, they further agreed in Joint Exhibit 1, Tab O, page 2:

> **4. Scope of the Settlement**
> Pursuant to the Memorandum of Understanding (dated April 16, 1992, but effective April 29, 1992) "no new disputes will be initiated at the local level by either union challenging jurisdictional work assignments in any operations as they currently exist. Except as otherwise specifically provided in New or Consolidated Facilities, New Work, or Operational Change sections contained in this memorandum, **all local craft jurisdictional assignments which are not already the subject of a pending locally initiated grievance (prior to April 29, 1992) will be deemed as a proper assignment for that facility.**" (emphasis added)

Based on the foregoing, the Postal Service respectfully requests:

> The Arbitrator issue a decision stating the instant case is not properly in RI-399., and as a result, the scanning duties continue to be performed by both the Mail Handler and APWU crafts - as they undisputedly have

0024

always done even prior to April 1992, per the aforementioned agreements and requirements reached at the national level.

Respectfully,

Drusilla D. Wylie
U. S. Postal Service

July 26, 2006

6

06/22/2006 13:37 FAX 17148454625     SWANK BUSINESS CENTER          T-760   P.002/002   F-111
                                         4807771886

FROM :USPS                    FAX NO. :9256874193          Jun. 08 2006 11:08AM P2

JT-2

## PACIFIC AREA PROCESSING CENTER
### SAN FRANCISCO CA 94199-4401

DATE: June 8, 2006

Donald A. Anderson
904 Silver Spur Road, #375
Rolling Hills Estates, CA 90274-3800

Pursuant to Article 15, Section 4, B.2, of the 2000 National Agreement, the
following arbitration cases(s) has been scheduled before this arbitrator on the
Regional Instruction 399 (RI-399) Jurisdictional Dispute Arbitration Panel. The
hearing will begin at 9:00 am on the following date in the Main Conference Room
at the postal facility located at 500 85th St, Rm A-2 Oakland, CA 94622.

06/27/06
F98C-1F-J 01185488 CL20001     CLASS ACTION     JURS OAKLAND INTL SV P1
F98C-1F-J 01162415 CL14501     CLASS ACTION     JURS OAKLAND INTL SV P2

This letter does not constitute a waiver by either party of any issues of arbitrability
or timeliness as it relates to the processing of the grievances, as it merely serves
to confirm to the arbitrator the location, date and time, pursuant to the terms of
Article 15, Section 4, B.2 of the 2000 National Agreement and the backup
case(s) pursuant to Article 15, Section 4, A.4 of the 2000 National Agreement.


Mark Villalpando               Efraim Daniel               Steve Zamanakos
USPS Representative            NPMHU Representative        APWU Representative

cc:   Labor Relations, Bay Valley
      O. Gonzalez, APWU
      R. Siu, NPMHU

0026



## APPEAL TO REGIONAL ARBITRATION

DATE: 6/5/06

Mr. Gary Connelly, Dir Labor Rel
USPS
390 Main Street #234
San Francisco, CA  94105

Dear Sir:

Please be advised that pursuant to the M.O.U. on RI-399, I have authorized and hereby appeal the below referenced case to arbitration.

F98C-1F-C  011854s8

Case # F98C-1F-C  011262415

Installation  OAKLAND

Operation # DOCK EXPEDITER

Sincerely,

*Steven J Zancanakas*

Authorized Union Representative

cc:  RDRC Members

0027

# REGIONAL DISPUTE RESOLUTION COMMITTEE

## Unresolved Dispute – APWU Position Paper

Case No: F98C-1F-J  01185458

APWU – Oakland, CA

The following represents APWU's position regarding the above referenced case:

The APWU would first point out that the Regional # should receive a "J" number signifying it is a RI 399 case.

The APWU would also acknowledge that its case, F98C-1F-C  01162415 has in fact been combined with the above referenced case.

As the RDRC member understands the APWU grievance, the APWU is challenging the fact that mail handler employees are performing the work of the General Expediter on the "Loading Dock" and the "Custom Dock" at the Oakland International Service Facility. Mail handlers are scanning the mail and entering the information into the tracking systems of the Employer. One such system is the "MIDAS" system. There are no provisions in either RI 399 or the mail handler position description for mail handlers to perform such work

The APWU argues that the assignment of "scanning" was assigned to the General Expediter in Operation 222 for the Loading Dock and Operation 351 for the Custom Dock. This was not challenged by NPMHU when the parties agreed to the Inventory. The Employer agreed with the above in their LDRC position papers dated April 30, 2001 & December 13, 2001.

A review of the position description of the General Expediter, SP-2025 indicates under Duties and Responsibilities:

4. **Assists supervisor in carrying out special assignments, such as, mail volume counts, information for surveys, observing handling of selected mail matter, and other similar duties. May maintain records of mail volumes, work hours, and other record keeping; assists with on-the-job training.**

There are no references of a similar nature in the position description of a Mail Handler, KP-0008.

It is clear, that the local parties established the work in question as clerk work in their Inventory. There have been no changes under the four criteria listed in the 1992 MOU. Therefore, the work must remain in the clerk craft.

Steven J. Zamanakos
APWU Representative

6/23/06
date

0029

06/22/2006 13:36 FAX 17148454625      SWANK BUSINESS CENTER      ☑003/004

# REGIONAL DISPUTE RESOLUTION COMMITTEE

## Unresolved Dispute-NPMHU Position Paper

Case No: *F98C-1F-C 01185 458*                    Page *1* of ___

The following represents the NPMHU's position regarding the above-referenced case:

At the Oakland International Service Facility the function of scanning of international mail at the Loading (Dispatch Unit) Dock is work that is a proper assignment for Mail Handler Craft employees. These employees are already the primary craft already working the Dispatch Unit. It would Not be efficient or effective to assign a Clerk Expeditor to do this work. Mail Handlers have performed the duties in dispute since prior to the Move from the Oakland P & DC. Therefore the scanning performed at the Dispatch Unit at the Oakland ISF is a proper assignment to the Mail Handler Craft.

_Efram Daniel_
Efram Daniel
NPMHU Representative

6/22/06
Date

RECEIVED

MAY 3 0 2006

MESA NBA OFFICE

Labor Relations
PACIFIC AREA


**UNITED STATES
POSTAL SERVICE**

May 23, 2006

Steven J. Zamanakos
APWU, AFL-CIO
2345 S. Alma School, Suite 201
Mesa, AZ 85210

Efraim Daniel
NPMHU, AFL-CIO
1135 N 87th Way
Scottsdale, AZ 85257

Facility: Oakland International Service Center
Grievant: Class Action
USPS #: F98C-1F-C 01185458
Union Local: CL20001

Gentlemen:

Below shall represent the Employer's position related to the matter in the captioned appeal.

On March 30, 2006, the tripartite Regional Dispute Resolution Committee (RDRC) met and discussed the instant appeal. As a result of said discussion, the members agreed regional case number F98C-1F C 01162415 shall be combined with the instant case.

Prior to 1998, International Mails was located on the 3rd floor at the Oakland P&DC. The work in question, scanning and loading of all Outgoing Trans Pac Mail encompassed the operation referred to as the "Dispatch Unit." The operation was inventoried by the parties consisting of staffing from both the Mail Handler and Clerk crafts.[1] The work performed within the Dispatch Unit was done by both crafts without record of a dispute.[2]

---

1 APWU Position Paper dated August 24, 2001, Attachment 2
2 USPS Position Paper dated December, 13, 2001

3131 ARCH AIRPORT RD.
STOCKTON CA 95213
(209) 983-6210
FAX (209) 983-6499

0031

2

USPS #: F98C-1F- C 01185458
Union Local: CL20001

In 1998 the International Mails, to include the Dispatch Unit, was moved from the 3rd floor at the Oakland P&DC to a temporary warehouse known to the local parties as "Mother's Cookies." The temporary move was made while awaiting the completion of construction of the current Oakland International Service Facility. During this interim period, it is important to note that the jurisdictional work assignments, as they relate to "scanning" remained as they previously existed at the Oakland P&DC. Meaning both crafts performed the work.

In 2000 the International Mails Operation was moved to its current location known as the Oakland International Service Facility. In 2001, the parties opened discussions related to the parties' Installation Inventory. By letter dated April 30, 2001 the Service sought to clarify existing assignments only to avoid potential crossing craft issues in the future. The Service proposed to amend the existing inventory by adding the following paragraph:

> "Scanning is the principle responsibility of the General Expeditor. In the event of an unforeseen situation/emergency, Mail Handlers may be allowed to scan, on, using the Supervisor's account. Mail Handlers will not be allowed to perform any Data Entry duties." [3]

Said proposal was strongly contested by the Mail Handler craft wherein the Local National Postal Mail Handlers Union representative asserts the following:

> "Mail Handlers have been scanning since the inception of the Midas system. Mail Handlers have always been the primary scanners. Not on an "as needed basis. The T.M.E. position currently on the dock area did scan at all. The TME position eliminated by management did the verification of the initial scanning by mail handlers."[4]

First, in accordance with the Memorandum of Understanding between the United States Postal Service (USPS), American Postal Workers Union (APWU) and the National Postal Mail Handlers Union (NPMHU) reference Regional Instruction 399 Dispute Resolution Procedures dated April 16, 1992[5] the parties agreed:

---

[3] Letter Dated April 30, 2001 Re: RI-399 Inventory-Amendment
[4] NPMHU Local Position Re: Operation 222
[5] Arbitration Exhibits, Joint Exhibit 1, Item J

3

USPS #: F98C-1F- C 01185458
Union Local: CL20001

> *Effective with the signing of the Agreement, <u>no new disputes will be initiated at the local level by either union challenging jurisdictional work assignments in any operations as they currently exist.</u> Except as otherwise specifically provided in the New or Consolidated Facilities, New Work, or Operational Change sections contained in this memorandum, all local craft jurisdictional assignments which are not already the subject of a pending locally initiated grievance will be deemed as a proper assignment for that facility. (Underlining added for emphasis)*

Furthermore, while under the heading of "New or Consolidated Facilities found in the above reference MOU, the parties agreed in relevant part,

> *"<u>Jurisdictional assignments shall not be changed solely on the basis of moving operation(s) into a new facility. If jurisdictional assignments existed in a previous facility, they shall be carried forward into the new facility</u> except where operational changes as described below result in the reassignment from one craft to another." (Underlining added for emphasis)*

Accordingly, it is the Employer's position that the APWU may only create a new dispute challenging jurisdictional work assignments when:

1. New or Consolidated Facilities;
2. New Work;
3. Or Operational Change occurs.

Prior to moving the international mails to the International Mail Service Facility from the Oakland P&DC (as well as during the interim period at the "Mother's Cookies" facility for that matter), both crafts performed the scanning duties. Hence, the parties' aforementioned MOU reference Regional Instruction 399 Dispute Resolution Procedures dated April 16, 1992 precludes the APWU from initiating a new dispute challenging jurisdictional work assignments as it previously existed.

Finally, the Service takes the position that, in the light of the rights which are reserved in Article III of the National Agreement, determination as to primary craft assignments made in accordance with Regional, Instruction No. 399 seek to achieve an efficient and cost effective way to resolve the jurisdictional quagmire between the unions while at the same time creating the least amount of confusion in the field. This is done by considering matters such as the skill level involved in the task under review, productivity, past practice, and the need for efficiency and economy.

0033

4

USPS #: F98C-1F- C 01185458
Union Local: CL20001

Here in the instant case, clerks within the International Mails Service Facility process the mail, to include scanning. Once processed, the mail piece is placed into mail pouch.[6] When full, the mail pouch is sealed, scanned, and placed onto a nutting truck.[7] The nutting truck is then wheeled to the platform operation for dispatch.

Once on the platform, the mail pouches are then removed from the nutting truck and scanned again, using a hand held scanner, by a mail handler who then loads the mail pouch onto a conveyer belt where the mail pouch are then loaded onto a vehicle for dispatch. It is this process that is at the heart of the parties' dispute.

The APWU asserts the scanning of the mail pouch on the platform prior to loading the vehicle should be performed by the General Expeditor. While the NPHMU asserts the scanning of said mail pouch had always been performed by the mail handler craft and is an incidental task related to the loading of a vehicle function within the 210-239 Platform Operation.[8]

While it is the Service's position that the task of scanning, whether it be on the platform by the mail while loading a vehicle or by a clerk when sealing a mail pouch takes not special skill level beyond that in which the mail handler already posses (e.g. the task doe not require scheme knowledge, keying, etc...) and is incidental task to the primary function of loading of a vehicle. Therefore, it is appropriate for mail handlers to scan mail pouches on the platform if such scanning is performed as part of an operation where the Mail Handler Craft is the primary craft as done at the previous facilities in the past.[9]

As a final point on efficiency and economy, should the a determination be made, as the APWU asserts, that the Clerk craft be designated the primary craft of scanning mail pouches prior to the loading of said pouches onto a vehicle for dispatch by a mail handler on the platform operation, said determination would result in multiple and unnecessary handling.    Such double handling would result in a situation contrary to the general rule of avoidance of duplication of work and the principle of an efficient and effective operation.[10]  For this reason said allied duties can not be

---

[6] Bag used for First-Class, registered, and airmail. Also, a special blue and orange pouch used for Express Mail Service.
[7] Small wheeled hand truck to move or store small quantities of mail within a postal facility. Named for designer of truck. (Also Platform Truck.)
[8] Function # 2: Loading and unloading vehicles-Mail Handler (210-239 Platform Operation).
[9] Step 4 decision H4M-NA-C 29
[10] Letter of Intent: Regional Instruction 399

4

0034

5

USPS #: F98C-1F- C 01185458
Union Local: CL20001

efficiently or effectively separated and that the efficiencies of the intergraded operation must prevail.

Mark Villalpando
USPS RDRC Member

cc. Area Labor Relations:              Drusilla Wylie



**UNITED STATES POSTAL SERVICE**
Labor Relations Department
475 L'Enfant Plaza, SW
Washington, DC  20260-4100

November 2, 1987

Mr. Louis D. Elesie
International Trustee
National Post Office Mail Handlers,
  Watchmen, Messengers and Group
  Leaders, AFL-CIO
One Thomas Circle, N.W., Suite 525
Washington, DC  20005-5802

Dear Mr. Elesie:

On March 12, 1987, and on various dates thereafter, Joseph N.
Amma Jr., representing the National Post Office Mail
Handlers, Watchmen, Messengers & Group Leaders Division, and
Frank Jacquette, representing the U.S. Postal Service, held
prearbitration discussions with regard to H4M-NA-C 29, Air
Records Processor.  The issue in this case is whether the
U.S. Postal Service properly assigned the Air Records
Processor position to the clerk craft.

During the discussions, it was mutually agreed that the Air
Records Processor position is the appropriate position for
purposes of operating Air Contract/Data Collection System
(ACDCS) equipment and that such position was appropriately
assigned in accordance with the provisions of Article 1.5 of
the 1984 National Agreement.  It is further recognized that
the primary craft for providing allied labor in support of
this equipment shall be the Mail Handler Craft and employees
shall be assigned consistent with the principles of Regional
Instruction 399.  Allied labor shall include facing and
loading of mail onto the feed portion of the equipment and
the off-loading of mail when distribution is not required.
It may also be appropriate for mail handlers to scan incoming
or transient mail if such scanning is performed as part of an
operation where the Mail Handler Craft is the primary craft.
It is further understood that, except as indicated above,
staffing beyond the Air Records Processor assignment will be
from the mail handler craft.

Mr. Louis D. Elesie                                                    2

Please sign and return the enclosed copy of this letter
acknowledging you agreement to settle this case, withdrawing
H4N-NA-C 29 from the pending national arbitration listing.

Sincerely,


Stephen W. Furgeson                 Louis D. Elesie
Acting General Manager              International Trustee
Grievance and Arbitration           National Post Office Mail
   Division                            Handlers, Watchmen,
                                       Messengers, Group
                                       Leaders, AFL-CIO

11/2/87
Date

06/22/2006 13:36 FAX 17148454625          SWANK BUSINESS CENTER                    ☒002/004
5-24-206 12:11PM    FROM 209 983 6499                                            P. 2

## REGIONAL DISPUTE RESOLUTION COMMITTEE

### Resolution

Case No.: F98C-1F-C 01162415          City, States, Zip Code: Oakland CA

Operation No.: 222          Descriptive Title of Operation: Platform/Scanning

Pursuant to the terms and conditions of the trilaterally negotiated RI 399 National Dispute Resolution MOUs, dated April 16, 1992, the designated Regional Representatives for the USPS, APWU and NPMHU met on March 30, 2006.

Following a full review and discussion of the Operation(s) in dispute, the parties at the Regional Level have reached the following resolution:

    I.   The above referenced case shall be combined with regional case number F98C-1F-C 01185458 (CL20001), which is currently pending arbitration appeal.


Mark Villalpando                Steven J. Zamanakos            Efrain Daniel
USPS Representative             APWU Representative            NPMHU Representative

Date: 5/24/06        Date: 6/23/06        Date: 6/22/06

cc. File:    F98C-1F-C 01185458 (CL20001)

0038

Labor Relations
PACIFIC AREA OFFICE

FEB 2 8 2003

 **UNITED STATES**
**POSTAL SERVICE**

RECEIVED
MAR 7 - 2003
OAKLAND APWU

Shirley J. Taylor                          Certified No.:
National Business Agent                    7001 2510 0008 2441 5312
APWU, AFL-CIO
1799 Old Bayshore Highway, Suite 240
Burlingame, CA 94010-1312

Step 3 Grievance Decision
Facility: Oakland Intl. Sv.
Grievant: Class Action
USPS #: F98M-1F-C 01185458
Local Union #: CL20001

Dear Ms. Taylor:

You and I discussed the above captioned Step 3 grievance on January 29, 2003.

The question(s) at issue in this grievance is whether the Employer violated Articles 7 and 8 of the 1998 National Agreement and/or Regional Instruction 399 (RI-399) when local management assigned or otherwise permitted clerks to perform the functions identified by the Step 2 standard grievance form.

After a full review of the grievance, I have concludes that the grievance might involve a jurisdictional issue. Therefore, in accordance with Question and Answer #3 of the October 21, 1992 national tripartite "Q and A-RI-399 Dispute Resolution Committee (RDRC) for a determination on, and any necessary adjudication of, the jurisdictional issue. The grievance will be **HELD IN ABEYANCE** AT Step 3 until the jurisdictional issue is resolved, or we are otherwise directed to proceed by the RDRC.

Sincerely,

Mark Villalpando
Area Labor Relations Specialist

cc:    Manager, Labor Relations:          Oakland District
       PWU:                               Western Regional Coordinator
       RDRC



**OAKLAND LOCAL**

AMERICAN POSTAL WORKERS UNION • AFL-CIO

7700 Edgewater Dr., Suite 656
Oakland, CA 94621
(510) 635-8497
(510) 635-8782 fax

Gary Connely
Area Manager, Labor Relations
Pacific Area
U.S. Postal Service
400 Oyster Point Blvd.,
South San Francisco, CA. 94099

RECEIVED

JAN 1 5 2002

MESA NBA OFFICE

CERTIFIED MAIL # 7000 1670 0003 9243 1924

**General Officers**

FREDRIC JACOBS
President

YOLANDA G. BYRD
Executive Vice
President

ROBERT JEFFREY
Secretary-Treasurer

DERRICK LEE
Records Secretary

LEE EVANS, JR.
JUANITA BOLES
Business Agents

**Craft Directors**

PAUL LEW
Director, Clerk Craft

MICHAEL L. HINES
Director, Maintenance
Craft

KENNETH MITCHELL
Director, Motor Vehicle
Craft

## APPEAL FORM
## L.D.R.C. RI-399

Check One

**NATIONAL POSTAL MAIL HANDLERS** _____

**AMERICAN POSTAL WORKERS UNION** _____ x _____

APPEAL TO REGIONAL DISPUTE RESOLUTION COMMITTEE:

DATE: 12/27/01    LDRC COMMITTEE MEMBER : Fredric Jacobs

REGION   PACIFIC AREA        GRIEVANCE #: F98C 1F C01185458
                                          F98C 1F C01162415

CITY AND STATE: Oakland, CA.

THIS APPEAL IS BEING MADE PURSUANT TO THE M.O.U. ON RI-399. THE
PARTIES WERE UNABLE TO RESOLVE THE DISPUTE AT THIS LEVEL, AND
THEREFORE, AS THE MOVING PARTY, WE ARE APPEALING IT TO THE
REGIONAL DISPUTE RESOLUTION COMMITTEE.

ISSUE IN DISPUTE:   Loading Dock

               Custom Dock

ENCLOSED IS THE COMPLETE CASE FILE, INCLUDING THE WRITTEN
DECISION FROM THE LOCAL DISPUTE RESOLUTION COMMITTEE.

SINCERELY,

FREDRIC JACOBS, PRESIDENT

CC: Omar Gonzalez - APWU Western Region Coordinator

 **Oakland Local**

American Postal Workers Union • AFL-CIO • 7700 Edgewater Drive, Suite 656 • Oakland, CA 94621 Ph. (510)635-8497• fax (510)635-8782

## STEP 3 GRIEVANCE APPEAL FORM

| GRIEVANT PERSON OR UNION (FROM LINE B) DAWN WHITTINGTON | CRAFT CLERK | REGIONS GRIEVANCE # F98C 1F C01185458 |
|---|---|---|
| DSCIPLINE (NATURE OF) OR CONTRACT ISSUE ART 7, 15, RI 399 AGREEMENT | DATE OF STEP 2 N/A | LOCAL GRIEVANCE # CL-200-01 |

**THE ABOVE GRIEVANCE IS BEING APPEALED TO STEP 3 / DATE:  DECEMBER 27, 2001**

AREA DIRECTOR
EMPLOYEE LABOR RELATIONS
PACIFIC AREA OFFICE
400 OYSTER POINT BLVD.
SOUTH SAN FRANCISCO, CA 94099-4401

## REMAND          REMAND          REMAND

The appeal is in accordance with Article 15 Grievance Arbitration Procedures Sec 2 Step 2(h) and Step 3(a) for the following reasons:.

The instant grievance is being appealed to step 3 of the grievance procedure for reasons cited and discussed at the Union's Step 2 grievance appeal and additions and corrections (see attached rebuttal).

## REMAND          REMAND          REMAND

and we have attached the Step 2 appeal grievance form, the employers written Step 2 decision and our corrections and additions to the Step 2 decision if we submitted same to employer's Step 2 representative.

| FROM: LOCAL UNION (NAME OF) APWU Oakland Local | ADDRESS 7700 Edgewater Drive #656, | CITY Oakland | STATE CA | ZIP 94621 |
|---|---|---|---|---|

Sincerely

Signature: _____ FREDRIC JACOBS

Title: _____ PRESIDENT

Shirley Taylor
National Business Agent
American Postal Workers Union, AFL-CIO

0042



# Oakland Local

American Postal Workers Union • AFL-CIO • 7700 Edgewater Drive, Suite 656 • Oakland, CA
94621 Ph. (510)635-8497• fax (510)635-8782

## STEP 3 GRIEVANCE APPEAL FORM

| GRIEVANT PERSON OR UNION (FROM LINE B)<br>APWU | CRAFT<br>CLERK | REGIONS GRIEVANCE #<br>F98C 1F C01162415 |
|---|---|---|
| DSCIPLINE (NATURE OF) OR CONTRACT ISSUE<br>VIOLATION ARTICLE 7 | DATE OF STEP 2<br>N/A | LOCAL GRIEVANCE #<br>CL-145-01 |

THE ABOVE GRIEVANCE IS BEING APPEALED TO STEP 3 / DATE:   DECEMBER 27, 2001

AREA DIRECTOR
EMPLOYEE LABOR RELATIONS
PACIFIC AREA OFFICE
400 OYSTER POINT BLVD.
SOUTH SAN FRANCISCO, CA 94099-4401

## REMAND          REMAND                REMAND

The appeal is in accordance with Article 15 Grievance Arbitration Procedures Sec 2 Step 2(h) and Step 3(a) for the following reasons:.

**The instant grievance is being appealed to step 3 of the grievance procedure
for reasons cited and discussed at the Union's Step 2 grievance appeal and
additions and corrections (see attached rebuttal).**

## REMAND          REMAND                REMAND

and we have attached the Step 2 appeal grievance form, the employers written Step 2 decision and our corrections and additions
to the Step 2 decision if we submitted same to employer's Step 2 representative.

| FROM: LOCAL UNION (NAME OF)<br>APWU Oakland Local | ADDRESS<br>7700 Edgewater Drive #656, | CITY<br>Oakland | STATE<br>CA | | ZIP<br>94621 |
|---|---|---|---|---|---|

Sincerely

Signature: _Fredric Jacobs_
FREDRIC JACOBS

Title:_____
          PRESIDENT

Shirley Taylor
National Business Agent
American Postal Workers Union, AFL-CIO

0042

Oakland International Service Facility

 **UNITED STATES**
**POSTAL SERVICE**

December 13, 2001

*RECEIVED*
*DEC 17 2001*
*OAKLAND APWU*

Mark Villalpando
Area Labor Relations Specialist
400 Oyster Point
So San Francisco CA  94099-4401

Re:  Remand Step 3 Grievance Decision(s)
     Oakland International Service Facility
     Class Action
     USPS#:    F98C-1F-C 01162417
               F98C-1F-C 01162415
               F98C-1F-C 01185458

The Local Dispute Resolution Committee met on Friday, December 7, 2001 regarding the above mentioned grievances.  Please note; Grievance **USPS# F98C-1F-C 01185458** and **F98C-1F-C 01162415** are both regarding Mail Handlers scanning on the Loading Dock.

There was no agreement reached (please see enclosed) regarding these two grievances. Therefore we request to **Reappeal** both of the above mentioned grievances back to Step 3.

Regarding Grievance USPS# **F98C-1F-C 01162417** - The Local Dispute Resolution Committee has reached agreement in this matter.  Fredric Jacobs, Local President APWU has agreed that the work being performed does not involve scheme sortation, therefore this grievance is considered resolved.

If you have any questions or concerns, you may contact me at (510) 567-6444.

Debera Khalid
Operations Support Specialist

Enclosure(s)

cc:   D. Nehring
      H. Gibbs
      F. Jacobs
      G. Jenkins

500 85TH AVENUE
OAKLAND CA  94622-9997
TEL:  (510) 567-6444
FAX:  (510) 567-6446

0043

Oakland International Service Facility


**UNITED STATES**
**POSTAL SERVICE**

December 13, 2001

RECEIVED

DEC 1 7 2001

OAKLAND APWU

Fredric Jacobs
7700 Edgewater Drive, Suite 656
Oakland CA  94621

**Re:    RI399 Inventory Dispute(s)**
**Management's Position**

Per agreement, enclosed is management's position regarding the Custom Dock and the
Loading Dock disputed inventories.

As I understand our agreement, you as the moving Union will appeal the dispute(s) to the
Regional Committee within twenty-one days from the receipt of all parties position papers.

If you have any questions or concerns, you may contact me at (510) 567-6444.

Debera Khalid
Operations Support Specialist

Enclosure(s)

cc:    D. Nehring
       H. Gibbs
       G. Jenkins

Oakland International Service Facility

 **UNITED STATES**
**POSTAL SERVICE**

December 13, 2001

**To:**   **Local Dispute Resolution Committee**
**Oakland International Service Facility**

**Re:**  **RI399 Dispute - Management Position - Custom Dock**

| | |
|---|---|
| **Operation #** | **351** |
| **Function#** | **01** |
| **Craft Assigned** | **Mail Handler LV04** |
| | **Mail Handler Tech LV05** |
| | **Mail Handler Eq Op LV05** |
| | **Clerk General Expeditor LV06** |

**Diagram:**       **see attached**

## Unit Description

The function of this unit is to load/unload trucks and/or ship containers and mail verification for Inbound Customs Mail.  There are currently three (3) Mail Handler Tech's who have bid job positions that specify 'verification' as a part of their assigned duties.  There are no clerk bid job positions that specify 'verification' as a part of their assigned duties.

There are no bid job positions that specify 'checker' for either clerk or mail handlers.

## Management's Position

The work in this unit has always been performed by the Mail Handler craft.  Clearly, loading and unloading vans and/or ship containers is work for the Mail Handler craft.

Verifying is simply the removal of tags from Inbound sacks/parcels.  The tags are bound using rubber bands, by the verifier, in stacks of ten.  The stacks are turned over to the FGN Office Record Clerks Unit so mailers can be billed properly.  On an as needed basis, clerks may assist the verifier by noting, in writing, each sack/parcel that is unloaded.  When this occurs, the list and the tags are turned over to the FGN Office Record unit.

Management contends that the work in this unit is mail handler work.  Clerks should not be identified as checkers/verifiers as there is no such position and they are not utilized for eight hours a day, or for five days a week.

500 85TH AVENUE
OAKLAND CA  94622-9997
TEL:  (510) 567-6201
FAX:  (510) 567-6323

0 45



UNIT
OPERATION #
FUNCTION #1
DESCRIPTION
STAFF

CUSTOMS DOCK
351
PLATFORM - INTERNATIONAL
LOAD/UNLOAD/MAIL VERIFICATION - INBOUND CUSTOMS MAIL
(1) GENERAL EXPEDITOR
(15) MAILHANDLERS
(3) MAILHANDLER TECH./ VERIFIERS
(1) MAILHANDLER EQUIPMENT OPERATOR
TRANSPORT MAIL AND EQUIPMENT

OAKLAND ISF
500 85TH AVE.
OAKLAND CA  94622-9997

CONVEYOR BELT

LOADER

LOADER

DESK

STAGING AREA

DESK

DESK

DESK

STAGING

CUSTOMS DOCK

WORKROOM FLOOR

GUARD RAILS
VERIFICATION
AREA

1
2
3
4
5
6
7
8

0046

Oakland International Service Facility


**UNITED STATES**
**POSTAL SERVICE**

December 13, 2001

**Re:  RI399 Dispute - Management Position - Loading Dock**

| | |
|---|---|
| **Operation #** | **222** |
| **Function#** | **01** |
| **Craft Assigned** | **Mail Handlers, Mail Handler Techs, Mail Handler Eq. Ops** |
| | **General Expeditor** |
| **Diagram:** | **see attached** |

## Unit Description

The function of this unit is to load and unload vans.  In addition, all mail pieces loaded into a van must be scanned *prior* to loading.  Currently, scanning is performed by using a hand-held scanning unit.  The mail piece is scanned and then placed into a container for loading or directly into the van.  Employees who scan have computer access user privileges via the MIDAS system.  The MIDAS system is basically a tracking system used by International Facilities for billing and other purposes.   As the mail is scanned, all pertinent information form the mail piece, such as weight, mail type, cost, etc., is stored in the MIDAS data base.

## Management's Position

The previous Regional Inventory 399 regarding the Loading Dock clearly indicate both the Clerk and Mail Handler crafts share responsibilities in regards to the scanning of International Mail at the Loading (Dispatch Unit) Dock.

Management has not received any documentation from either union showing that this unit was ever in dispute regarding the scanning operation nor has either union provided any previous grievance activity regarding scanning prior to the move to the new facility location.

Management contends that both crafts have the duty of scanning mail, as directed by the supervisor.  There have been no problems in the past or any evidence of either craft performing duties outside of his/her craft.   The primary responsibility for scanning is that of the General Expeditor.  However, as stated in the proposed inventory, Mail Handlers will be assigned to scan as needed.  The mail handler may be allowed to scan, using the computer access account of the immediate supervisor in unforeseen or emergency situations.  (see enclosed)

While management desires the flexibility of utilizing mail handlers if needed, management does not want to violate the contract by allowing computer access or data entry for the mail handler.

500 85TH AVENUE
OAKLAND CA  94622-9997
TEL:   (510) 567-6444
FAX:  (510) 567-6446

0047

**OAKLAND ISF**
500 85TH AVE.
OAKLAND CA 94622-9997

UNIT
OPERATION #  222
FUNCTION #1  LOADING DOCK
DESCRIPTION  PLATFORM  LOAD/UNLOAD
             LOADING OUT - GOING MAIL AND BAR-CODE SCANNING
STAFF  * (2) GENERAL EXPEDITORS (BAR-CODE SCANNING)
       (12) MAILHANDLERS
       (2) MAILHANDLER EQUIPMENT OPERATORS
       TRANSPORT MAIL AND EQUIPMENT

STAGING

COMPUTER TERMINALS
INCLINE BELTS

DESK

29

32

37

A  E  B  9
A  E  B  10
A  E  B  11
A  E  B  12

RAIL

TME COMPUTER TERMINALS

DESK
PRINTERS

28  30

TABLE  COMPUTER  DESK

STAGING

13

14

15

* NOTE:
"Scanning is the principle responsibility of the General Expeditor. In the event of an unforeseen situation/emergency, Mail Handlers may be allowed to scan, only, using the Supervisors account. Mail Handlers will not be allowed to perform any Data Entry duties."

PAGE 8

0048

LABOR RELATIONS
Pacific Area Office

 **UNITED STATES**
**POSTAL SERVICE**

October 15, 2001

Shirley J. Taylor                          Certified #:
National Business Agent                    7000 1670 0007 4333 1491
APWU, AFL-CIO
1799 Old Bayshore Highway, Suite 240
Burlingame CA 94010-1312

                                           Step 3 Grievance Decision
                                           Facility: Oakland Intl. Service
                                           Grievant: Class Action
                                           USPS No.: F98C-1F-C 01185458
                                           Union No.: CL20001

Dear Ms. Taylor,

You and I discussed the subject Step 3 grievance on September 21, 2001.

After a full review of the grievance file, You and I agreed to **REMAND** the following grievance to the Step 2 level. The Step 2 Representatives shall meet, rediscuss and decision the grievance in accordance with Article 15.2. Thereafter, the time limits and procedures applicable to Step 2 grievance shall apply. When rediscussing the grievance the representatives shall:

1. Pursuant to the national tripartite "RI-399 Dispute Resolution Procedures-Question and Answers" dated October 21, 1992, the grievance will be referred to the Local Dispute Resolution Committee for an initial determination as to whether or not it involves a jurisdictional claim.

2. The parties shall review the Building Inventory and any grievances filed by either the APWU or the NPMHU prior to 1992 with regards to the work in dispute.

3. The local parties shall identify what craft is presently performing the work currently in question.

400 OYSTER POINT BLVD.
SOUTH SAN FRANCISCO CA 94099-4401
(650) 635-3250
FAX (650) 635-3248

0049

- 2 -

Step 3 Grievance Decision
Facility: Oakland Intl. Service
Grievant: Class Action
USPS No.: F98C-1F-C 01185458
Union No.: CL20001

4. If the Committee is in disagreement as to whether or not the
grievance involves a jurisdictional claim, that question may be
appealed through the Dispute Resolution Procedures, up to and
including arbitration, for resolution prior to the parties
addressing the merits of the dispute.

If the grievance is resolved at Step 2, the representatives shall provide the
undersigned with a copy of the resolution, identified by the above captioned Step 3
grievance number.

However, if the Step 2 representatives are unable to resolve the grievance, and it is
reappealed to Step 3, the Local should do so under the above captioned Step 3
grievance.

Sincerely,

Mark Villalpando
Area Labor Relations Specialist

cc: Manager, Labor Relations:        Oakland District

0050

LABOR RELATIONS
Pacific Area Office

 UNITED STATES
POSTAL SERVICE

September 28, 2001

Shirley J. Taylor                                    Certified #:
National Business Agent                              7000 1670 0007 4333 1507
APWU, AFL-CIO
1799 Old Bayshore Highway, Suite 240
Burlingame CA 94010-1312

                                                     Step 3 Grievance Decision
                                                     Facility: Oakland Intl. Service
                                                     Grievant: Class Action
                                                     USPS No.: F98C-1F-C 01162415
                                                     Union No.: CL14501

Dear Ms. Taylor,

You and I discussed the subject Step 3 grievance on September 7, 2001.

After a full review of the grievance file, You and I agreed to **REMAND** the following grievance to the Step 2 level. The Step 2 Representatives shall meet, rediscuss and decision the grievance in accordance with Article 15.2. Thereafter, the time limits and procedures applicable to Step 2 grievance shall apply. When rediscussing the grievance the representatives shall:

1.  Pursuant to the national tripartite "RI-399 Dispute Resolution Procedures-Question and Answers" dated October 21, 1992, the grievance will be refereed to the Local Dispute Resolution Committee for an initial determination as to whether or not it involves a jurisdictional claim.

2.  The parties shall review the Building Inventory and any grievances filed by either the APWU or the NPMHU prior to 1992 with regards to the work in dispute.

3.  The local parties shall identify what craft is presently performing the work currently in question.

400 OYSTER POINT BLVD.
SOUTH SAN FRANCISCO CA 94099-4401
(650) 635-3250
FAX. (650) 635-3248

- 2 -

Step 3 Grievance Decision
Facility: Oakland Intl. Service
Grievant: Class Action
USPS No.: F98C-1F-C 01162415
Union No.: CL14501

   4. If the Committee is in disagreement as to whether or not the
      grievance involves a jurisdictional claim, that question may be
      appealed through the Dispute Resolution Procedures, up to and
      including arbitration, for resolution prior to the parties
      addressing the merits of the dispute.

If the grievance is resolved at Step 2, the representatives shall provide the
undersigned with a copy of the resolution, identified by the above captioned Step 3
grievance number.

However, if the Step 2 representatives are unable to resolve the grievance, and it is
reappealed to Step 3, the Local should do so under the above captioned Step 3
grievance.

Sincerely,

Mark Villalpando
Area Labor Relations Specialist

cc:  Manager, Labor Relations:              Oakland District



**AMERICAN POSTAL WORKERS UNION • AFL-CIO**

**August 24, 2001**

7700 Edgewater Dr., Suite 65
Oakland, CA 94621
(510) 635-8497
(510) 635-8782 fax

**General Officers**

FREDRIC JACOBS
President

YOLANDA G. BYRD
Executive Vice
President

ROBERT JEFFREY
Secretary-Treasurer

DERRICK LEE
Records Secretary

LEE EVANS, JR.
JUANITA BOLES
Business Agents

**Craft Directors**

PAUL LEW
Director, Clerk Craft

MICHAEL L. HINES
Director, Maintenance
Craft

KENNETH MITCHELL
Director, Motor Vehicle
Craft

**TO:    Local Dispute Resolution Committee**

**RE:    Operational Unit: Loading Dock**
**International Service Facility**
**Oakland, CA.**
**Operation Number: 222**
**Function: Load/Unload Vans, Containers**
**Bar-Code Scanning**
**INSTALLATION: Oakland International Service Facility**

**Dear Sirs/Madams:**

**APWU'S Position:** Contrary to the NPMH's assertion that Mail Handlers have been scanning since the inception of the MIDAS System and have always been the primary scanners, the APWU contends that from the onset the Clerk Craft was exclusively assigned to perform the duties of the MIDAS System (Scanning System).

Gladys Clement was the MIDAS System Program Coordinator when the program was implemented in 1991. According to Ms. Clement, the system was designed for Clerk Craft employees to calculate postage weight, rates and charges for dispatching International mail and to expedite data input and record keeping for accounts payable. She only trained Expediters, other Clerk Craft Personnel and Management on how to input data information using the Scanning System.

The original Inventory of the scanning operation indicates that only TME's (Transit Mail Expediters) of the Clerk Craft were assigned to perform scanning duties (See Attachment 2). The Mail Handler Craft became involved in the process at the request of a Clerk Craft employee that was not willing to carry-out her duties and requested that her (Mail Handler) friend assist her. (See Attachment 1).

For all the reasons above, the APWU maintains that scanning duties should be exclusively performed by Clerk Craft personnel.

Respectfully submitted by,

Fredric Jacobs
President

cc: Executive Vice President   Assistant Clerk Craft Director
    Clerk Craft Director        Dawn Whittington

0053



## OAKLAND LOCAL

### AMERICAN POSTAL WORKERS UNION • AFL-CIO

7700 Edgewater Dr., Suite 6
Oakland, CA 94621
(510) 635-8497
(510) 635-8782 fax

**General Officers**

FREDRIC JACOBS
President

YOLANDA G. BYRD
Executive Vice
President

ROBERT JEFFREY
Secretary-Treasurer

DERRICK LEE
Records Secretary

LEE EVANS, JR.
JUANITA BOLES
Business Agents

**Craft Directors**

PAUL LEW
Director, Clerk Craft

MICHAEL L. HINES
Director, Maintenance
Craft

KENNETH MITCHELL
Director, Motor Vehicle
Craft

August 24, 2001

TO:    **Local Dispute Resolution Committee**
       **International Service Facility**
       **Oakland, CA**

RE:    **Custom Dock Operation 351, Verification Inbound Customs Mail**

**Dear Sirs/Madams:**

**APWU Position: Management has stipulated that Clerk Craft employees do, in fact, perform Checker/Verification duties on the Custom Dock, Operation 351.**

**Ergo, the APWU reiterate its contention that Clerks should be identified as Checkers/Verifiers in the Custom Dock Operation Inventory.**

**Respectfully submitted by,**

Fredric Jacobs
President
cc: Executive Vice President
    Clerk Craft Director
    Assistant Clerk Craft Director
    Dawn Whittington

FJ:en

on Executive



# NATIONAL POSTAL MAIL HANDLERS UNION
### DIVISION OF LIUNA, AFL-CIO
### LOCAL 302

**GERALDINE JENKINS,** *Local President*

| JUANITA CONTRERAS | YOLANDA GEDDINS-SEUELL | FRANKLIN SMITH | WILLIE G. DAVIS |
|---|---|---|---|
| *Vice President* | *Treasurer* | *Recording Secretary* | *State Executive Board Member* |

5 THOMAS MELLON CIRCLE, SUITE 252 • SAN FRANCISCO, CALIFORNIA 94134 • TELEPHONE (415) 467-3289 • FAX (415) 467-3604

Local Dispute Resolution Committee (LDRC)
Oakland International Service Facility
Oakland, Ca.

Re: Jurisdictional Assignment Inventory Dispute

Pursuant to our meeting on July 30, 2001 the Mail Handlers Union is initiating the dispute identified below:

A. Custom Dock, Operation 351
B. Function # 1, Load/Unload Mail
    Verification-Inbound Customs Mail
C. (1) General Expeditor
    (15) Mail Handlers
    (3) Mail Handler Tech./Verifiers
    (1) Mail Handler Equipment Operator
        Transport Mail and Equipment
D. The Inventory shows that the functions in this
    activity are Load/Unload/mail verification. The
    Mail Handler craft is the primary craft for these
    functions and is properly assigned.
E. The Union contends that APWU dispute is not
    properly filed. The RI 399 procedures "New or Consolidated
    Facilities" does not apply. The above operation was previously
    inventoried and signed by all parties. RI 399 procedures provides
    that jurisdictional assignments shall not be changed solely on the
    basis of moving operation(s) into a new facility. If jurisdictional
    assignments existed in the previous facility they shall carry
    over into the new facility.



UNIT
OPERATION #
351
FUNCTION #1
DESCRIPTION
STAFF

PLATFORM - INTERNATIONAL
LOAD/UNLOAD/MAIL VERIFICATION - INBOUND CUSTOMS MAIL
(1) GENERAL EXPEDITOR
(15) MAILHANDLERS
(3) MAILHANDLER TECH./ VERIFIERS
(1) MAILHANDLER EQUIPMENT OPERATOR
TRANSPORT MAIL AND EQUIPMENT

CUSTOMS DOCK

OAKLAND ISF
500 85TH AVE.
OAKLAND CA  94622-9997

CONVEYOR BELT

LOADER

LOADER

DESK

STAGING AREA

STAGING

W O R K R O O M   F L O O R

DESK

DESK

C U S T O M S   D O C K

GUARD RAILS
VERIFICATION
AREA

DESK

1

2

3

4

5

6

7

8

0056

31



**NATIONAL POSTAL MAIL HANDLERS UNION**
DIVISION OF LIUNA, AFL-CIO
**LOCAL 302**

GERALDINE JENKINS, *Local President*

| JUANITA CONTRERAS | YOLANDA GEDDINS-SEUELL | FRANKLIN SMITH | WILLIE G. DAVIS |
| *Vice President* | *Treasurer* | *Recording Secretary* | *State Executive Board Member* |

5 THOMAS MELLON CIRCLE, SUITE 252 • SAN FRANCISCO, CALIFORNIA 94134 • TELEPHONE (415) 467-3289 • FAX (415) 467-3604

---

Local Dispute Resolution Committee (LDRC)
Oakland International Service Facility

Re: Jurisdictional Assignment Inventory Dispute

The Mail Handlers Union is initiating the dispute identified below:

    A.  Loading Dock, Operation 222
    B. Load/Unload vans containers and Bar-Code Scanning
    C. (2) General Expeditors (Bar-Code Scanning)
       (12) Mail Handlers
      (2) Mail Handler Equipment Operators
        Transport Mail and Equipment
    D.  The previous Inventory regarding Loading Dock indicated
that both clerk and mail handler crafts share responsibilities in
regard to the scanning of international Mail at the Loading
(Dispatch Unit) Dock. The Inventory was signed by all parties.
There was no dispute.
    E.  The Union contends that the function in question by the
Mail Handlers Union is the scanning operation. The APWU
and Management position that the primary responsibility for
scanning is that of the General Expeditor, is unfounded.
Mail Handlers have been scanning since the inception of the
Midas system. Mail Handlers have always been the primary scanners.
Mail Handlers have always been the primary scanners. Not on an
"as needed basis". The T.M.E. position currently on the dock area did
not scan at all. The T.M.E. position eliminated by management did the
verification of the initial scanning by mail handlers.

0057



OAKLAND ISF
500 85TH AVE.
OAKLAND CA 94622-9997

UNIT          LOADING DOCK
OPERATION #   222
FUNCTION #1   PLATFORM  LOAD/UNLOAD
DESCRIPTION   LOADING OUT - GOING MAIL AND BAR-CODE SCANNING
STAFF         * (2) GENERAL EXPEDITORS (BAR-CODE SCANNING)
              * (12) MAILHANDLERS
              (2) MAILHANDLER EQUIPMENT OPERATORS
              TRANSPORT MAIL AND EQUIPMENT

* NOTE:
"Scanning is the principle responsibility of the General Expeditor.  In the event of an unforeseen situation/emergency, Mail Handlers may be allowed to scan, only, using the Supervisors account.  Mail Handlers will not be allowed to perform any Data Entry duties."

PAGE

0058

QUALITY SPECIALIST
OAKLAND INTERNATIONAL SERVICE FACILITY


**UNITED STATES**
**POSTAL SERVICE**

July 24, 2001

FREDRICK JACOBS
AMERICAN POSTAL WORKERS UNION
7700 EDGEWATER DR STE 656
OAKLAND CA  94621-3095

**Subject: SCANNING SYSTEM**

This is to advise you that I received training on the MIDAS System **(Scanning Program)** during the implementation in 1991.  I was the coordinator for this program and I was sent to several states to receive training.

After completion of the training I was responsible for the training of all **Expeditors and Clerk Craft Personnel**, on how to input data information using the scanning system.  Management received training on how to retrieve the necessary reports.

This system is a **(clerk craft position)** designs to calculate postage weight, rate and charges for dispatching International Mail. To expedite data input and record keeping for accounts payable.  Information is kept on file in the records room for three years.

The Mail handler craft became involved in the process at the request of an employee that was not willing to carry-out her duties and requested that her (mail handler) friend assist her.

Sincerely,

GLADYS CLEMENT

500 85TH AVENUE ROOM A-14
OAKLAND, CA 94622-9701
(510) 567-6277
FAX: (510) 567-6446

0059
34

# INTERNATIONAL MAILS
## THIRD FLOOR

OPERATION

## DISPATCH UNIT

**STAFFED BY 9 MAILHANDLERS & 4 EXPEDITORS
THIS OPERATION SCANS AND LOADS ALL OUTGOING
TRANSPAC MAILS.**



0060

35

# Joint Exhibit 1

# Part 2



**APWU** ████████ **Local**

American Postal Workers Union • AFL-CIO • 7700 Edgewater Drive, Suite 656 • Oakland, CA 94621
Ph. (510)635-8497• fax (510)635-8782

## STEP 3   GRIEVANCE APPEAL FO RM

| GRIEVANT PERSON OR UNION (FROM LINE B) | CRAFT | REGIONS GRIEVANCE # |
|---|---|---|
| **DAWN WHITTINGTON** | **CLERK** | **F98C 1F C01185458** |

| Discipline (Nature of) or Contract (Issue) | Date of Step 2 | Local Grievance # | USPS Grievance # |
|---|---|---|---|
| **ARTICLE 7, 15, RI 399 AGREEMENT** | **JUNE 21, 2001** | **CL-200-01** | **N/A** |

THE ABOVE GRIEVANCE IS BEING APPEALED TO STEP 3 / DATE: JUNE 25, 2001

AREA DIRECTOR
EMPLOYEE LABOR RELATIONS
WESTERN REGION
PACIFIC AREA OFFICE
400 OYSTER POINT BLVD.
SOUTH SAN FRANCISCO, CA 94099-4401

The appeal is in accordance with Article 15 Grievance Arbitration Procedures Sec 2 Step 2(h) and Step 3(a) for the following reasons:

> Instant grievance is being appealed to Step 3 of the grievance procedure for reasons cited and discussed at the Step 2 hearing & cited within the Union's Grievance appeal.

and we have attached the Step 2 appeal grievance form, the employers written Step 2 decision and our corrections and additions to the Step 2 decision if we submitted same to employer's Step 2 representative.

| FROM: LOCAL UNION (NAME OF) | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| APWU    Oakland Local #78 | 7700 Edgewater Drive Suite 656 | | Oakland | CA  94621 |

Sincerely

Signature _Yolanda Byrd_
Yolanda Byrd
Clerk Craft Director

Shirley Taylor
National Business Agent
American Postal Workers Union, AFL-CIO
799 Old Bayshore Highway, Suite 240
Burlingame, CA 94010

0061

36

Oakland International Service Facility

**UNITED STATES**
**POSTAL SERVICE**

June 13, 2001

Ref:        J.T.JOHNSON  Step 2  Designee

Subject:    **STEP 2 GRIEVANCE DECISION**
            Installation:   **Oakland ISF**
            Installation Finance #:   **05-4522**
            Grievant's Name:   **Dawn Whittington**
            Incident Date:   **05-14-01**
            Local Union Grievance #:   **CL-200-01**
            Local Management Grievance #:   **F98C-1F-C01185458**

RECEIVED
JUN 2 1 2001
OAKLAND APWU

To:        Michael Stempihar,  Shop Steward
           American Postal  Workers Union
           7700  Hegenberger Rd.  Suite  626
           Oakland, CA  94621

Receipt is acknowledge of a Step 2 standard grievance from which alleges management is in violation of Article  7 & 15  of the National Agreement.  As a result, a Step 2 discussion  was held between you and me on June 13, 2001.  All of the relevant facts were discussed and understood.

The Union contends -  Management has permitted and instructed mailhandlers to perform the duties of the Clerk Expediter on the Loading Dock by scanning the barcoded mail for dispatch. The Union contends that this is crossing craft.

After careful review of the relevant facts and documents presented in this case, and based on the particular circumstances, I have decided to DENY your grievance.

The reason for my decision are as follows:   In Management Ex #1 both Union were notified that we would revert back to status quo until a decision has been reached by the RI 399 dispute resolution committee.

Julius T. Johnson
Step 2  Designee
Oakland International Service Facility



**AMERICAN POSTAL WORKERS UNION • AFL-CIO**
**OAKLAND LOCAL**
7700 Edgewater Drive, Suite 656 • Oakland, CA 94621
(510) 635-8497 • FAX (510) 635-8782

## STEP 2 GRIEVANCE APPEAL FORM

| | | | |
|---|---|---|---|
| 1 | DISCIPLINE (NATURE OF) OR CONTRACT (ISSUE) *Article 7, 15 CBA, RI399 Agreement* | DATE *June 13, 2001* | LOCAL GRIEVANCE # *CL-200-01* |

| | | | |
|---|---|---|---|
| 2 | TO USPS STEP 2 DESIGNEE (NAME & TITLE) Labor Relations Representative | INSTALLATION Oakland, CA 94615 | CRAFT *CLERK* |

| | |
|---|---|
| 3 | FROM: LOCAL UNION (NAME OF) APWU Oakland Local   ADDRESS 7700 Edgewater Drive #656, CITY Oakland, STATE CA ZIP 94621 |

| | | | |
|---|---|---|---|
| 4 | STEP 2 AUTHORIZED UNION REP. – (NAME & TITLE) *Michael Stempihar, Steward Stations* | AREA CODE (510) PHONE 635-8497 | AREA CODE (510) FAX 635-8782 |

| | | | |
|---|---|---|---|
| 5 | LOCAL UNION PRESIDENT Tom Beardsley, President | AREA CODE (510) PHONE (OFFICE) 635-8497 | AREA CODE (510) FAX 635-8782 |

**WHERE – WHEN**    **STEP 1 MEETING & DECISION**    **MET WITH**

| | | | | |
|---|---|---|---|---|
| 6 | UNIT/SEC/BR/STA/OFC *Loading Dock, I.S.F.* | DATE *5/14/01* | TIME | USPS REP - SUPR *Sam Odom* | STEWARD *Michael Stempihar* |

| | | | |
|---|---|---|---|
| 7 | STEP 1 DECISION BY (NAME & TITLE) *Sam Odom Supervisor* | DATE & TIME *5/17/01* | INITIALS | INITIALING ONLY VERIFIES DATE OF DECISION |

| | |
|---|---|
| 8 | GRIEVANT PERSON OR UNION (LAST NAME FIRST) *Whittington, Dawn*   ADDRESS   CITY   STATE   PHONE |

| | | | | | | |
|---|---|---|---|---|---|---|
| 9 | SOCIAL SEC. NO. | SERVICE SENIORITY | FTR ☒ PTR ☐ PTF ☐ | LEVEL *05* | STEP *0* | DUTY HRS *06:45 - 3:15* | OFF DAYS ☒ S ☐ M T W T F |

| | | | | | |
|---|---|---|---|---|---|
| 10 | PAY LOCATION | WORK LOCATION *International Service Facility, 500 85th Ave., Oakland,* | ADDRESS *CA. 94622* | LIFETIME SECURITY ☐ YES ☐ NO | VETERAN ☐ YES ☐ NO |

**11** Pursuant to Article 15 of the National Agreement we hereby appeal to Step 2 the following Grievance alleging a Violation of (but not limited to) the following: NATIONAL, (Art./Sec.)

LOCAL MEMO (ART./SEC..) OTHER MANUALS, POLICIES, L/M MINUTES, ETC.

**12** DETAILED STATEMENT OF FACTS/CONTENTIONS OF THE GRIEVANT

1. *MANAGEMENT HAS PERMITTED AND INSTRUCTED MAILHANDLERS TO PERFORM THE DUTIES OF THE*
2. *CLERK EXPEDITER ON THE LOADING DOCK BY SCANNING THE BAR CODED MAIL.*
3.
4. *Ex. A - REQUEST FOR INFORMATION*
5. *Ex. B - RI-399 INVENTORY AMENDMENT*
6.
7.
8.

⊛ RECEIVED JUN 13, 2001 INTERNATIONAL MAILS

**CORRECTIVE ACTION REQUESTED** It is requested that a copy of the supervisor's Step 1 Report Form 2608, be mailed to the Union along with the Step 2 decision for this grievance.

1. *GRIEVANT BE PAID AT THE RATE OF TIME AND ONE HALF (1½) THE BASE PAY FOR EACH HOUR*
2. *A MAILHANDLER PERFORMS THE SCANNING WORK THAT IS NOT CONSISTENT WITH THE RI 399*
3. *INVENTORY FOR A PERIOD FOURTEEN (14) DAYS PRIOR TO THE DATE THIS GRIEVANCE IS*
4. *FILED (MAY 14, 2001) AND UNTIL GRIEVANT IS REINSTATED TO LEVEL 6 EXPEDITER DUTIES.*

Signature *Michael Stempihar*    0063

*STEWARD STATIONS*

File # _CL-200-01_

1. THE UNION CONTENDS THAT MANAGEMENT IS IN VIOLATION OF

2. THE ORIGINAL RI 399 INVENTORY FOR THE OAKLAND FOREIGN

3. UNIT WHICH STATES THAT THE SCANNING OF THE BAR CODED MAIL

4. IS THE DUTY OF THE EXPEDITER. IN ADDITION, AN "RI 399-

5. AMENDMENT" LETTER DATED APRIL 30, 2001 STATES THAT

6. "SCANNING IS THE PRINCIPLE RESPONSIBILITY OF THE GENERAL

7. EXPEDITER." THIS LETTER IS SIGNED BY CHARLES E. FRAZIER, JR.

8. PLANT MANAGER OF THE OAKLAND INTERNATIONAL SERVICE FACILITY.

9. (EX. B.)

29

| United States Postal Service **Grievance Summary - Step 1** | 1. Grievant's Name (Last, First and Middle Initial) APUW, |
|---|---|

Forward the original of this form to your Step 2 Management Official. Complete Items 1 through 12 and 21.
If grievance is denied, complete Items 13 through 20. If additional space is required, continue on reverse.
See Handbook EL-921, Supervisor's Guide to Handling Grievances.

| 2. Facility Oakland International Service Facility | 3. Craft Clerk | 4. Grievant's Title APWU/CLASS ACTION | |
|---|---|---|---|

| 5. Date of | | 6. Was Grievance Timely at Step 1? | 7. Date of Step 1 Answer | 8. Union Official |
|---|---|---|---|---|
| a. Incident 05/14/01 | b. Step 1 Meeting 05/14/01 | ☒ Yes    ☐ No | 05/17/01 | Michael Stempihar |

**9. Issue (Complaint or Alleged Violation)**
That management is in violation of Article 7, 15, C.B.A. and RI 399 agreement.

**10. Remedy Requested (Specify Requirements to Resolve Grievance)**
That Senior Clerk be paid at overtime rate, for allowing Mailhandlers to scanned mail on the loading dock.

**11. Decision (Check One)**  ☐ Sustained  ☐ Settled  ☒ Denied  ☐ Closed  ☐ Withdrawn  ☐ Other _____

**12. Reasons for Decision**
No violation of Article 7, 15, C.B. and RI 399 agreement,

| 13. Grievance Data | | | | | 14. Craft or Relevant Seniority Date |
|---|---|---|---|---|---|
| a. Level | b. Step | c. Tour 2 | d. Section Dispatch | e. Pay Location | Clerk |

| 15. Check One ☐ FTR ☒ PTR ☐ PTF ☐ Rural Designation Code _____ | 16. Off Days SAT/SUN | 17. Work Schedule 0700-1550 |
|---|---|---|

**18. Background (State All Relevant Information And Attach All Supporting Documents)**
Based on my research, Mailhandlers have been scanning the mail for dispatch since 1991. When the MIDAS system was put in place. The General Expeditors (Clerks) also scans the mail for dispatch and accountability.

**19. Management's Position**
Due to past practice, management is not in violation of Article 7, 15, and RI 399 agreement. Clock rings of scanning will clearly show that mailhandlers and clerks both are scanning in accordance to RI 399 agreement.

**20. Union's Position**
That scanning is electronic technique by which information are sense, which is record keeping duties to be perform by clerk only.

| 21. a. Management Official (Name and Title) Samuel Odom Supervisor, Distribution Operations | 21. b. Telephone Number (510) 567-6340 | 21. c. Signature |
|---|---|---|

TransFORM PS Form 2608, August 1986

0065

RO206
REBECCA J. MACAPAGAL

HUMAN RESOURCES INFORMATION SYSTEM
ABBREVIATED VACANCY NOTICE
"CALL 1-800-222-2415 TO BID"

INSTALLATION: BE56  OAKLAND POST OFFICE
CLERK                OPENING DATE: 02/12/01
                     CLOSING DATE: 02/22/01

POSTING NO: CKO201
RRFR = RESIDUAL RESULTING FROM REPOSTING

JOB ID: 9084474
231555XX   MAIL PROCESSOR          SP2037   P   04   TOUR 1      PL 186   FON: 1100   D/A: 110
           TA88   OAKLAND PROC/DIST CTR                          AUTOMATION UNIT
           TA88-0193 AUTOMATION TR I OPRN UNIT
           SCHEDULE NO: 00114   START: 2300   END: 0730   DAYS OFF: TUE/WED
           COMMENTS: AFSM 100 UNIT, WILL BE ASSIGNED TO THE AUTOMATION UNIT
                     AS NEEDED. OTHER DUTIES AS ASSIGNED BY THE SUPERVISOR.
                     NEW POSITION.

JOB ID: 9084475
231555XX   MAIL PROCESSOR          SP2037   P   04   TOUR 1      PL 186   FON: 1100   D/A: 110
           TA88   OAKLAND PROC/DIST CTR                          AUTOMATION UNIT
           TA88-0193 AUTOMATION TR I OPRN UNIT
           SCHEDULE NO: 00118   START: 2300   END: 0730   DAYS OFF: WED/THU
           COMMENTS: AFSM 100 UNIT, WILL BE ASSIGNED TO THE AUTOMATION UNIT
                     AS NEEDED. OTHER DUTIES AS ASSIGNED BY THE SUPERVISOR.
                     NEW POSITION.

JOB ID: 9084476
231555XX   MAIL PROCESSOR          SP2037   P   04   TOUR 1      PL 186   FON: 1100   D/A: 110
           TA88   OAKLAND PROC/DIST CTR                          AUTOMATION UNIT
           TA88-0193 AUTOMATION TR I OPRN UNIT
           SCHEDULE NO: 00123   START: 2300   END: 0730   DAYS OFF: THU/FRI
           COMMENTS: AFSM 100 UNIT, WILL BE ASSIGNED TO THE AUTOMATION UNIT
                     AS NEEDED. OTHER DUTIES AS ASSIGNED BY THE SUPERVISOR.
                     NEW POSITION.

JOB ID: 9014034
231511XX   GENERAL EXPEDITOR       SP2-25   P   06   TOUR 2      PL 211   FON: 1700   D/A: 110
           TF99   OAKLAND STLTE INTRNTNL SRV CTR   OAKLAND STLTE INTRNTNL SRV CTR   INTERNATIONAL MAILS
           TF99-0019 INTERNATIONAL MAILS TR II OPRN
                     SCHEME
           SCHEDULE NO: 00025   START: 0700   END: 1530   DAYS OFF: SAT/SUN
           COMMENTS: WORK AREA: 500 85TH AVE. OAKLAND, CA 94621.
                     SATISFACTORY COMPLETION OF COURSE #5594200.
                     EXPEDITER TRAINING PROGRAM IS REQUIRED AFTER
                     BEING AWARDED THIS POSITION.
                     OTHER DUTIES AS ASSIGNED BY THE SUPERVISOR.
VACATED BY: BROWN        I J   EMP ID: 2624   ON DATE: 01/02/01
           TOTAL SCHEME DEFERMENT DAYS: 036

JOB ID: 9015317
231504XX   DISTRIBUTION CLERK      KP12     P   05   TOUR 2      PL 219   FON: 1400   D/A: 110
           TF99   OAKLAND STLTE INTRNTNL SRV CTR   OAKLAND STLTE INTRNTNL SRV CTR   INTERNATIONAL MAILS
           TF99-0019 INTERNATIONAL MAILS TR II OPRN
           SCHEDULE NO: 00025   START: 0700   END: 1530   DAYS OFF: SAT/SUN
           COMMENTS: OTHER DUTIES AS ASSIGNED BY THE SUPERVISOR.
                     INTERNATIONAL MAILS: 500 85TH AVE OAKLAND, CA 94621.
                     PREFERENCE: (1) I&I ISF-CLERKS (2) ISF-CLERKS W/REATREAT RIGHTS
                     MUST BID TO EXERCISE RETREAT RIGHTS; (3) ALL OTHER CLERKS.
VACATED BY: SANTA ANA    N C   EMP ID: 5598   ON DATE: 01/02/01



**APWU** ~~Oakland Local~~

American Postal Workers Union • AFL-CIO • 7700 Edgewater Drive, Suite 656 • Oakland, CA 94621
Ph. (510)635-8497· fax (510)635-8782

## STEP 3 GRIEVANCE APPEAL

| GRIEVANT PERSON OR UNION (FROM LINE B) | | CRAFT | REGIONS GRIEVANCE # |
|---|---|---|---|
| APWU     APWU | | **CLERK** | **N/A** |

| DISCIPLINE (NATURE OF) OR CONTRACT ISSUE | DATE OF STEP 2 DECISION | LOCAL GRIEVANCE # | USPS GRIEVANCE # |
|---|---|---|---|
| **VIOLATION ARTICLE 7** | **N/A** | **CL-145-01** | **N/A** |

## THE ABOVE GRIEVANCE IS BEING APPEALED TO STEP 3 / DATE:    MAY 14,2001

**EMPLOYEE LABOR RELATIONS**
**WESTERN REGION**
**PACIFIC AREA OFFICE**
**400 OYSTER POINT BLVD.**
**SOUTH SAN FRANCISCO, CA 94099-4401**

The appeal is in accordance with Article 15 Grievance Arbitration Procedures Sec 2 Step 2(h) and Step 3(a) for the following reasons:.

The Postal Service failed to provide a written decision therefore, instant grievance is being appealed to Step 3 of the grievance procedure.

and we have attached the Step 2 appeal grievance form, the employers written Step 2 decision and our corrections and additions to the Step 2 decision if we submitted same to employer's Step 2 representative.

| FROM: LOCAL UNION (NAME OF) | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| **APWU Oakland Local** | **7700 Edgewater Drive #656,** | **Oakland** | **CA** | **94621** |

Sincerely,

Signature: _Yolanda Byrd_

Yolanda Byrd

Title ___CLERK CRAFT DIRECTOR___    0067

**Shirley Taylor**
**National Business Agent**
**American Postal Workers Union, AFL-CIO**
**1799 Old Bayshore Highway, Suite 240**
**Burlingame, CA 94010**
**en/s**

A8

MANAGER DISTRIBUTION OPERATIONS
OAKLAND INTERNATIONAL SERVICE FACILITY


**UNITED STATES
POSTAL SERVICE**

DATE: May 08, 2001

REF: J.T.J. Step 2 Designee

SUBJ:    Step 2 Grievance Decision
         Installation:  Oakland P&DC
         Installation Finance #:  05-5509
         Grievant's Name:  Class Action
         Incident Date:  09-01-00
         Local Union Grievance #:  CL-145-01
         Local Management Grievance #:

RECEIVED

MAY 1 6 2001

OAKLAND APWU

TO:   Michael Stempihar, Shop Steward
      American Postal Workers Union
      7700 Hegenberger Rd.  Suite 626
      Oakland, CA  94621

Receipt is acknowledged of a Step 2 standard grievance from which alleges management is in violation of Article ___7___ of the National Agreement.  As a result, a step 2 discussion was held between you and me on **April 21, 2001**.  All of the relevant facts were discussed and understood.

The Union contends —

_____

After careful review of the relevant facts and documents presented in this case and based on the particular circumstances, I am requesting that this grievance be held in abeyance.  Management will revert back to status quo.  This grievance is part of the RI399 dispute and should be settled once the Dispute Resolution Committee has made their decision.

Julius T. Johnson
Step 2 Designee
Oakland International Service Facility
500 85th Avenue
Oakland CA  94622-9702

500 85TH AVENUE
OAKLAND CA  94622-9702
(510) 567-6391
FAX: (510) 567-6381

0068
43

*Management Ex #1*

OAKLAND INTERNATIONAL SERVICE FACILITY


**UNITED STATES POSTAL SERVICE**

May 7, 2001

GERRI JENKINS
PRESIDENT LOCAL 302
5 THOMAS MELLON CIRCLE #252
SAN FRANCISCO CA 94134-2501

FREDRIC JACOBS, LOCAL PRES
AMERICAN POSTAL WORKERS UNION
7700 EDGEWATER DRIVE, SUITE 656
OAKLAND CA 94621-3095

SUBJECT:   RI399 Inventory

Due to disputes from both parties, American Postal Workers Union and Mail Handlers, Local 302, concerning the Platform Scanning Operation, management will revert back to 'Status Quo' until a decision has been reached by the RI399 Dispute Resolution Committee.

This correspondence supersedes any previous notifications regarding this issue.

This memo will be faxed to both unions and hardcopies will be mailed.

Charles E. Frazier, Jr.
Plant Manager
Oakland International
Service Facility

Cc:    H. Gibbs
       S. Winston

0069

500 85TH AVENUE
OAKLAND CA 94622-9997
(510) 567-6201
FAX: (510) 567-6323

## Fredric Jacobs

| | |
|---|---|
| **From:** | DEBERA KHALID <DKHALID@email.usps.gov> |
| **To:** | oakevp <oakevp@pacbell.net> |
| **Cc:** | CHARLES FRAZIER <CFRAZIER@email.usps.gov>; LOUIS BUCKINGHAM <LBUCKING@email.usps.gov> |
| **Sent:** | Friday, May 04, 2001 11:20 AM |
| **Subject:** | Platform Issue |

Fred

I've been advised that, per the RI399, the Mail Handlers who have access to the Scanning on the Platform will be deleted from access to scanning by the end of the day.

If you have any questions or concerns, let me know.

Deb=

*Ex G* 0070

05/04/2001

OAKLAND INTERNATIONAL SERVICE FACILITY


**UNITED STATES**
**POSTAL SERVICE**

April 30, 2001

GERRI JENKINS                          FREDRIC JACOBS, LOCAL PRES
PRESIDENT LOCAL 302                     AMERICAN POSTAL WORKERS UNION
5 THOMAS MELLON CIRCLE #252            7700 EDGEWATER DRIVE, SUITE 656
SAN FRANCISCO CA 94134-2501           OAKLAND CA 94621-3095

SUBJECT:    RI399 Inventory - Amendment

Enclosed you will find an Amended copy of Page 8 – Loading Dock of the RI399
Inventory.  The amendment is the following comment:

*Scanning is the principle responsibility of the General Expeditor.  In the event of an
unforeseen situation/emergency, Mail Handlers may be allowed to scan, on, using the
Supervisors account.  Mail Handlers will not be allowed to perform any Data Entry duties.*

Management felt this clarification was necessary to ensure there are no 'crossing craft'
issues regarding this operation.


Charles E. Frazier, Jr.
Plant Manager
Oakland International
Service Facility

Cc:    H. Gibbs
       S. Winston

Enclosure

## Fredric Jacobs

| | |
|---|---|
| **From:** | DEBERA KHALID <DKHALID@email.usps.gov> |
| **To:** | GLADYS CLEMENT <GCLEMENT@email.usps.gov>; HOWARD GIBBS <HGIBBS@email.usps.gov>; oakevp <oakevp@pacbell.net> |
| **Cc:** | CHARLES FRAZIER <CFRAZIER@email.usps.gov> |
| **Sent:** | Friday, April 27, 2001 12:48 PM |
| **Subject:** | RI399 |

Hi Fred

I've been in meetings all yesterday and this morning at the Plant. I ran into Howard and he told me of your concerns regarding the Custom Dock, and I agree.

I'm sending out an amendment for that section with the following on Monday:

*Note:

Scanning is the principle responsibility of the General Expeditor. In the event of an unforseen situation/emergency, Mail Handlers will be allowed to scan, only, using the Supervisors account. Mail Handlers will not be allowed to perform any Data Entry duties.

If you or Howard want to suggest any modifications to the above, let me know as soon as possible, as I would like to send the amendment out on Monday.

Sorry for the snafu.

Gladys, please add the exact above comment to the Custom Dock portion of the 399.

Thanks
Deb=

*Ex. F*    **0072**

04/27/2001

RI 99 / CLASS                                                              CL-145-01

ON MARCH 29, 2001 A STEP ONE MEETING WAS HELD BETWEEN SHOP STEWARD MICHAEL STEMPINAR AND SUPERVISOR SAM ODOM. DURING THIS STEP ONE MEETING THE UNION INFORMED SUPERVISOR ODOM THAT THE EXPEDITER ON THE DOCK WAS NOT BEING ALLOWED TO PERFORM THE DUTIES AS DEFINED BY THE BID ASSIGNMENT DESCRIPTION. TO WIT: SCAN THE OUTBOUND BARCODES ON THE MAIL AND CONTAINE. IT WAS BROUGHT TO SUPERVISOR ODOMS ATTENTION THAT MAILHAND WERE PERFORMING THESE DUTIES. IT WAS ALSO BROUGHT TO SUPER VISOR ODOMS ATTENTION THAT AS PER THE CURRENT MAILHANDLERS NATIONAL AGREEMENT ON PAGE 182 (EX. A) THE VEHICLE RECORD KEEPING WHICH INCLUDES THE SCANNING OF BARCODES ON CONTAINERS AND PARCELS IS THE FUNCTION OF THE CLERK CRAFT.

THE CLOCK RINGS FOR THE MAILHANDLER WHO IS PERFORMING THE SCANNING OF THE OUTBOUND MAIL ON THE DOCK IS INCLUDED AS (EX. E), A TOTAL OF TWELVE (12) PAGES. IN ADDITION, IN-PLANT SUPPORT SPECIALIST DEBERA KHALID HAS CONCURRED THAT THE SCANNING DUTIES ARE THE PRINCIPLE RESPONSIBILI. OF THE GENERAL EXPEDITER, (EX. F) AND "THAT PER THE RI 399 MAILHANDLERS WHO HAVE ACCESS TO THE SCANNING ON THE PLATFORM WILL BE DELETED FROM ACCESS TO SCANNING BY THE END OF THE DAY." (EX G).

U.S. Postal Service
# Grievance Summary – Step 1

1. Grievant's Name (Last, First and Middle Initial)
APWU

Forward the original of this form to your Step 2 Management Official. Complete Items 1 through 12 and 21.
If grievance is denied, complete Items 13 through 20. If additional space is required, continue on reverse.

See Handbook EL-921, Supervisor's Guide to Handling Grievances.

2. Facility
ISF

3. Craft
Clerk

4. Grievant's Title
Apwu/Class Action

5. Date of

a. Incident
3-30-2001

Step 1 Meeting
3-30-2001

6. Was Grievance Timely at Step 1?
☑ Yes  ☐ No

7. Date of Step 1 Answer
4-3-2001

8. Union Official
Michael Stampinak

9. Issue (Complaint or alleged violation) (Article 7.) That management is in violation of the National Agreement.

10. Remedy Requested (Specify requirements to resolve grievance) That Scanning by Mail handler is Crossing Craft.

11. Decision (Check one)  ☐ Sustained  ☐ Settled  ☑ Denied  ☐ Closed  ☐ Withdrawn  ☐ Other (Specify)

12. Reasons for Decision Management is not in violation of Article 7.

| 13. | | Grievance Data | | | 14. Craft or Relevant Seniority Date |
|-----|-----|-----|-----|-----|-----|
| a. Level | b. Step | c. Tour | d. Section | e. Pay Location | Apwu/Class Action |
| | | 2 | | | |

15. Check One  ☐ FTR  ☐ PTR  ☐ PTF  ☐ Rural Designation Code____

16. Off Days
S/S

17. Work Schedule
7:00 Am — 1550

18. Background (Provide all relevant information and attach all supporting documents)
Based on my research Mail handler have been scanned the mail for dispatch since 1991. when the MPDAS System was put in place. The General Expediters (Clerk) also Scans the Mail for dispatch and accountability. At the present both craft the Mail for dispatch.

19. Management's Position Base on pass Practice since Mail handler have been Scanning since 1991. There is no violation of Article 7.

20. Union's Position That Scanning is electronic technique by which information are Sensed; which is record Keeping Duties to be preform by Clerks only.

0074

21. a. Management Official (Name and Title)
Samuel Odom

21. b. TEL ☐ PEN ☐ Com
(510) 567-6340

21. c. Signature
D. E. Odom

RECEIVED

MAY 3 0 2006

MESA NBA OFFICE

Labor Relations
PACIFIC AREA

 UNITED STATES
POSTAL SERVICE

May 24, 2006

Steven J. Zamanakos
APWU, AFL-CIO
2345 S. Alma School, Suite 201
Mesa, AZ 85210

Facility: Oakland International Service Center
Grievant: Class Action
USPS #: F98C-1F-C 01185458
Union Local: CL20001

Steve:

Per our phone conversation today, attached are the installation inventories related to the above referenced case.  Please include a copy in the moving papers.

Mark Villalpando
USPS RDRC Member

3131 ARCH AIRPORT RD.
STOCKTON CA 95213
(209) 983-6210
FAX (209) 983-6499

FROM : International Service Facility   FAX NO.  : 510 567-6280          May. 23 2006 09:54AM P2

# Oakland International

# Service Facility

# Regional Instruction

# 399

December 2001

FROM : International Service Facility  FAX NO. : 510 567-6280          May. 23 2006 09:54AM  P3

**The Oakland International Service Facility is located at:**

**500 85th Avenue**
**Oakland California  94622**

0077

This page intentionally left blank.

FROM : International Service Facility  FAX NO. : 510 567-6280          May. 23 2006 09:54AM  P5

# TABLE OF CONTENTS

SMALL PARCEL AND BUNDLE SORTER
MECH. KEYCODE SORTATION OF SMALL PARCELS ................................... 1

FLAT SORTING MACHINE OPERTION, INTERNATIONAL
MECH. KEYCODE SORTATION OF FLAT MAIL PIECES ............................... 2

MANUAL PARCEL
BAGGING PARCELS / MIDAS DATA ENTRY ........................................ 3

OPENING UNIT – INTERNATIONAL OUTBOUND
OPENING UNIT – INTERNATIONAL OUTBOUND ................................... 4

OPENING UNIT – INTERNATIONAL INBOUND
OPENING UNIT – INBOUND DOMESTIC .......................................... 5

PLATFORM LOAD/UNLOAD
LOAD/UNLOAD CONTAINERS ................................................... 6

PLATFORM – INTERNATIONAL
LOAD/UNLOAD/MAIL VERIFICATION – INBOUND CUSTOMS MAIL ................ 7

PLATFORM LOAD/UNLOAD
LOAD/UNLOAD VANS-CONTAINERS AND BAR-CODE SCANNING ................... 8

PLATFORM
DISTRIBUTION AND SHRINK WRAP PALLETS OF MAIL .......................... 9

AO PRINTS
CODE / BILL / DISPATCH – INTERNATIONAL ................................... 10

REPAIR / REWRAP INTERNATIONAL MAIL
REPAIR / REWRAP INTERNATIONAL MAIL ..................................... 11

REGISTERED MAIL / DIPLOMATIC POUCHES-INTERNATIONAL
DISTRIBUTION OF DIPLOMATIC AND INTERNATIONAL MAIL ................ ..... 12

FROM : International Service Facility   FAX NO. : 510 567-6280      May. 23 2006 09:55AM  P6

UNIT                SPBS
OPERATION #         346
FUNCTION # 1        SMALL PARCEL AND BUNDLE SORTER
DESCRIPTION         SMALL PARCEL, KEYCODE SORTATION OF SMALL PARCELS
                    MECH: KEYCODE POST DIST.MACH, - CLERKS
                    (7) SMALL PARCEL POST DIST.MACH. - CLERKS
STAFF               KEY CODE, SWEEP, TIE-OUT SACKS, DISPATCH
                    (7) MAILHANDERS
                    DISPATCH, DUMP, CULL, SWEEP, WEIGH MAIL

**OAKLAND ISF**
500 85TH AVE.
OAKLAND CA 94622-9997



PAGE 1

0080

FROM : International Service Facility  FAX NO. : 510 567-6280       May. 23 2006 09:55AM P7

UNIT    FSM
OPERATION # 305
FUNCTION # 1  FLAT SORTING MACHINE OPERATION, INTERNATIONAL
DESCRIPTION   FLAT SORTING MACHINE SORTATION OF FLAT MAIL PIECES
MECH. KEYCODE SORTATION OF FLAT MAIL PIECES
STAFF   (5) FLAT SORTER MACHINE OPERATORS - CLERKS
KEY CODING MAIL, SWEEPING, DISPATCHING
(1) MAILHANDLER EQUIPMENT OPERATOR (TRUST TER. / FSM)
TRANSPORTING MAIL AND EQUIPMENT

OAKLAND ISF
500 85TH AVE.
OAKLAND CA 94622-9997

BMC, BMC, BMC, CAL. PUS-TNS SACK RACK, FUN KIR SUVA BKK SACK RACK, TAHITI VAN SING SACK RACK, SGN BANG. AUT SACK RACK, LABEL CASE

BINS 1–100

GPC, APIA N.HER MACAO COOK IS. SACK RACK, MLA PKG SACK RACK, JAPAN HK SACK RACK, INDIA NZ CAMB. SACK RACK, BMC units, FRAME A, B M C, DOLLY, DOLLY

CODING STATION 1, 2, 3, 4

PAGE 2

0081

FROM : International Service Facility   FAX NO. : 510 567-6280          May. 23 2006 09:56AM P8

**OAKLAND ISF**
500 85TH AVE.
OAKLAND CA 94622-9997

UNIT
OPERATION #
FUNCTION # 1
DESCRIPTION
STAFF

PARCEL POST BAGGING
102
MANUAL PARCEL
BAGGING PARCELS / MIDAS DATA ENTRY
(38) DISTRIBUTION CLERKS

BAGGING
MIDAS

UNIT
OPERATION #
FUNCTION # 1
DESCRIPTION
STAFF

LIPS
107
PARCEL SORTER INTERNATIONAL MAIL
MECH. SORTATION OF PARCELS
PARCEL POST DIST.MACH./ KEY CODING MAIL
(4) PARCEL POST DIST.MACH./ KEY CODING MAIL
(9) MAILHANDLERS (LOAD, DUMP, CULL, SWEEP)
(1) MAILHANDLER EQUIPMENT OPERATOR
TRANSPORT MAIL & EQUIPMENT

BAGGING / MIDAS

BMC

(2) PRINTERS

STAGING
EMPTY BMCS

DOLLY
DOLLY
DOLLY
DOLLY
DOLLY
DOLLY
DOLLY
DOLLY
DOLLY
DOLLY
DOLLY
DOLLY
DOLLY
DOLLY

DESK & COMPUTER

BMC
BMC
BMC
BMC
BMC

SCALE

DESK   SCALE   DOLLY
DESK   SCALE   DOLLY
DESK   SCALE   DOLLY
DESK   SCALE   DOLLY
DESK   SCALE   DOLLY
DESK   SCALE   DOLLY
DESK   DOLLY
DESK

CODING STATION 1   CODING STATION 2

BELT

DUMP MASTER

DUMP MASTER

SCALE

PAGE

FROM : International Service Facility   FAX NO. : 510 567-6280        May. 23 2006 09:57AM P1



UNIT
OPERATION #
FUNCTION #1
DESCRIPTION
STAFF

343
OPENING UNIT OUTBOUND (INTL)
OPENING UNIT-INTERNATIONAL OUTBOUND
MAIL PREPARATION / WEIGHING / OVERLABELING
(10) MAILHANDLERS

OAKLAND ISF
500 85TH AVE.
OAKLAND CA 94622-9997

FROM : International Service Facility    FAX NO. : 510 567-6280    May. 23 2006 09:57AM P2

UNIT
OPERATION #
FUNCTION #1
DESCRIPTION
STAFF

OPENING UNIT INBOUND (DOMESTIC)
344
OPENING UNIT-INTERNATIONAL INBOUND
MAIL PREPARATION
(9) MAILHANDLERS
(2) MAILHANDLER EQUIPMENT OPERATORS
TRANSPORTING MAIL AND EQUIPMENT

**OAKLAND ISF**
500 85TH AVE.
OAKLAND CA 94622-9997

RAIL

DOLLY

SACK RACK

DESK

BMC'S

(3) BAG BELTS

BMC'S

STAGING AREA

BMC

PAGE 5

0084

FROM : International Service Facility   FAX NO. : 510 567-6280          May. 23 2006 09:57AM  P3

**OAKLAND ISF**
500 85TH AVE.
OAKLAND CA 94622-9997

UNIT
OPERATION # 221   RECEIVING DOCK
FUNCTION # 1   PLATFORM LOAD/UNLOAD
DESCRIPTION   LOAD/UNLOAD CONTAINERS
STAFF
(1) GENERAL EXPEDITOR - CLERK
(4) MAILHANDLERS - LOAD/UNLOAD
(3) MAILHANDLER EQUIPMENT OPERATORS - TRANSPORT MAIL AND EQUIPMENT

INCOMING EXPORTS

STAGING AREA

STAGING AREA

STALL 16

STALL 17

STALL 18

STALL 19

STALL 20

WASTE MANAGEMENT PICK-UP

FROM : International Service Facility   FAX NO. : 510 567-6280        May. 23 2006 09:59AM P1

UNIT
OPERATION #1
FUNCTION #1
DESCRIPTION
STAFF

CUSTOMS DOCK
351
PLATFORM - INTERNATIONAL
LOAD/UNLOAD/MAIL VERIFICATION - INBOUND CUSTOMS MAIL
(1) GENERAL EXPEDITOR
(15) MAILHANDLERS
(3) MAILHANDLER TECH / VERIFIERS
(1) MAILHANDLER EQUIPMENT OPERATOR
TRANSPORT MAIL AND EQUIPMENT

OAKLAND ISF
500 85TH AVE.
OAKLAND CA 94622-9997

LOADER
LOADER
DESK
STAGING AREA
CONVEYOR BELT
STAGING
DESK
DESK
DESK
WORKROOM FLOOR
CUSTOMS DOCK
GUARD RAILS
VERIFICATION
AREA

PAGE 7

0086

UNIT
OPERATION # 222
FUNCTION #1 PLATFORM LOAD/UNLOAD
DESCRIPTION LOAD/UNLOAD VANS-CONTAINERS AND BAR-CODE SCANNING
STAFF (2) GENERAL EXPEDITORS
(12) MAILHANDLERS
(2) MAILHANDLER EQUIPMENT OPERATORS
TRANSPORT MAIL AND EQUIPMENT

OAKLAND ISF
500 85TH AVE.
OAKLAND CA 94622-9997

LOADING DOCK

STAGING

INCLINE BELTS

COMPUTER TERMINALS

DESK

RAIL

TIME COMPUTER TERMINALS

PRINTERS

DESK

STAGING

TABLE

COMPUTER

DESK

PAGE 8

0087

FROM : International Service Facility  FAX NO. : 510 567-6280      May. 23 2006 09:59AM  P3

UNIT    TRUST TERRITORIES
OPERATION #    230
FUNCTION #1    PLATFORM
DESCRIPTION    DISTRIBUTION AND SHRINK WRAP PALLETS OF MAIL
STAFF    (1) MAIL-HANDLER EQUIPMENT OPERATOR
TRUST TERRITORY / FSM
TRANSPORT MAIL AND EQUIPMENT

**OAKLAND ISF**
500 85TH AVE.
OAKLAND CA 94622-9997

MAIL TO BE PALLETIZED

| CHUUK | MAJURO |
| EBEYE | PONAPE |
| KOROR | YAP |
| KUSAIE | |

| DESK | SCALE |

SIDE WINDER

PALLET

PALLET

T R U S T   T E R R I T O R I E S

BMC'S

DOLLIES

FROM : International Service Facility   FAX NO. : 510 567-6280        May. 23 2006 10:00AM  P4

UNIT                    AO PRINTS
OPERATION #             454
FUNCTION #1             CODE / BILL / DISPATCH - INTERNATIONAL
DESCRIPTION             BAR-CODING AND DISPATCHING INTERNATIONAL OUTBOUND MAIL
STAFF                   FROM OPERATION 102 AS NEEDED

**OAKLAND ISF**
500 85TH AVE.
OAKLAND CA  94622-9997

DOLLY   DESK   DESK   DOLLY

DOLLY   DESK   DESK   DOLLY

DOLLY   DESK

STAGING AREA FOR MIDAS

SERVO   DESK   DESK

TABLE

FROM : International Service Facility    FAX NO. : 510 567-6280    May. 23 2006 10:00AM P5



UNIT
OPERATION #
FUNCTION #1
DESCRIPTION
STAFF

REWRAP
574
REPAIR / REWRAP INTERNATIONAL MAIL
REPAIR / REWRAP INTERNATIONAL MAIL
(1) MAILHANDLER
(1) MAIL HANDLER REWRAPPER

OAKLAND ISF
500 85TH AVE.
OAKLAND CA 94622-9997

RAIL

SAFE
AIR

STRAP.
MACHINE

DOOR

TABLE

CABINET

DOLLIES

STAGING AREA

QUALITY PACKAGING SYSTEM

FENCE

DOLLY

PIE CHART

STRAP.
MACHINE

E C N E F

FROM : International Service Facility   FAX NO. : 510 567-6280    May. 23 2006 10:00AM P6

UNIT                REGISTRY UNIT
OPERATION # 578
FUNCTION #1    REGISTERED MAIL / DIPLOMATIC POUCHES-INTERNATIONAL
DESCRIPTION   DISTRIBUTION OF DIPLOMATIC AND INTERNATIONAL MAIL
STAFF   (1)GENERAL EXPEDITOR
        (6) DISTRIBUTION CLERKS
        (1) GENERAL CLERK

**OAKLAND ISF**
500 85TH AVE.
OAKLAND CA. 94622-9997



FROM : International Service Facility  FAX NO. : 510 567-6280    May. 23 2006 10:01AM  P7

OAKLAND INTERNATIONAL SERVICE FACILITY

 **UNITED STATES**
**POSTAL SERVICE**

April 30, 2001

GERRI JENKINS
PRESIDENT LOCAL 302
5 THOMAS MELLON CIRCLE #252
SAN FRANCISCO CA 94134-2501

FREDRIC JACOBS, LOCAL PRES
AMERICAN POSTAL WORKERS UNION
7700 EDGEWATER DRIVE, SUITE 656
OAKLAND CA 94621-3095

SUBJECT:  RI399 Inventory - Amendment

Enclosed you will find an Amended copy of Page 8 – Loading Dock of the RI399
Inventory.  The amendment is the following comment:

*Scanning is the principle responsibility of the General Expeditor.  In the event of an
unforeseen situation/emergency, Mail Handlers may be allowed to scan, on, using the
Supervisors account. Mail Handlers will not be allowed to perform any Data Entry duties.*

Management felt this clarification was necessary to ensure there are no 'crossing craft'
issues regarding this operation.

Charles E. Frazier, Jr.
Plant Manager
Oakland International
Service Facility

Cc:    H. Gibbs
       S. Winston

Enclosure

500 85TH AVENUE
OAKLAND CA 94622-9997
(510) 567-6201
FAX: (510) 567-6323

0092

FROM : International Service Facility    FAX NO. : 510 567-6280    May. 23 2006 10:01AM  P8

FROM : International Service Facility  FAX NO. : 510 567-6280          May. 23 2006 10:01AM  P9

OAKLAND INTERNATIONAL SERVICE FACILITY


**UNITED STATES**
**POSTAL SERVICE**

December 7, 2001

**SUBJECT:  OAKLAND INTERNATIONAL SERVICE FACILITY**
**RI 399 INVENTORY**

The RI 399 Local Dispute Resolution Committee including Geri Genkins, President Local 302, Fredric Jacobs, Local President APWU and Debera Khalid, Operations Support Specialist, are in agreement with the RI 399 Inventory as submitted, December 7, 2001, with the following exceptions which are in dispute:

      **Loading Dock Page 8**
      **Custom Dock Page 7**


_Fredric Jacobs_             12/7/01
**Fredric Jacobs, Local President APWU**      **Date**

_Geri Jenkins_             12/7/01
**Geri Jenkins, President Local 302**      **Date**

_Debera Khalid_             12/07/01
**Debera Khalid, Operations Support Specialist**      **Date**

# FAX

**To:** | Mark Villalpando, Labor Relations |

**From:** | Debera Khalid, Operations Support Specialist |

**Fax#** | (925) 687-4193 |

**Date:** | May 23, 2006 |

**Subject:** | RI399 |

**NOTES:** | Per your request.

Here's the Old 399 from the Plant. Ignore my scribblings. The first one is the unit in question.

# INTERNATIONAL MAIL

# OPERATIONS

INTERNATIONAL SERVICE FACILITY
500  85th AVE.
OAKLAND, CA 94622-9701
Tel:  (510) 567-6333

0096

# INTERNATIONAL MAILS
### THIRD FLOOR

OPERATION 351

1  ## DISPATCH UNIT

STAFFED BY 9 MAILHANDLERS & 4 EXPEDITORS
THIS OPERATION SCANS AND LOADS ALL OUTGOING
TRANSPAC MAILS.



PAGE 1

0097

Distribute Mail - Clks

− A.O. OUTBOUND PRINT UNIT −
(OPR. 343)

EXHIBIT #3
(A) OPERATION 343 − Distribution, AO Primary
Keying.
(B) Auction − (Same as above
(C) OKM − ufrs (14) OK's (4) H1's



FROM : International Service Facility    FAX NO. : 510 567-6280    May. 23 2006 12:18PM

# - STATES INBOUND PRINTS (OPR. 344) -

**EXHIBIT #5**

(A) Operation 344    Inbound AO Prints
(B) Function        Culling Operation
(C) Mailhandlers    (13) Mailhandlers    (1) Equipment Operators

SLIDE # 1

SLIDE # 2

SLIDE # 3

DOUBLE A LINE

SACK RACK

CUSTOMS

MACH.

NON-MACH.

MACH.

CUSTOMS

CUSTOMS

MACH.

NON-MACH.

MACH.

CONVEYOR BELT #1

CONVEYOR BELT #2

NON-MACH FLTS

INTEL AIR MAIL

MACHINEABLE FLTS

RE-WRAP

NON-MACH FLTS

INTEL AIR MAIL RTS

MACH FLTS

NON-MACH FLTS

INTEL AIR MAIL RTS

RE-WRAP

MACH FLTS

RE-WRAP

NON-MACH FLTS

MACH. FLTS.

RE-WRAP

NON-MACH FLTS

INTEL AIR MAIL RTS

SACK RACK

## - CONVEYOR BELT -

| CUSTOMS | MACHINEABLE | NON-MACH. | MACH. | CUSTOMS |
|---------|-------------|-----------|-------|---------|

BADGE READER →

H5

← TIME CARDS

EXHIBIT #6

(A) Operation 032 Letter Distribution

(B) FUNCTION Same as Above

(C) Clerk Craft (7) Clerks

(1) 032 – Flat Distribution, (4) Clerks
Rehins (2) Clerks

(E) 343 Culling Operation (3) Clerks (2) Mailhandler
Short Paid (1) Clerk    (2) Mailhandler

1ST CLASS FOREIGN UNIT

STAGING AREA

SCALE #8

- FGN -
3RD CLASS LTR CASES

1ST FGN BMC
DOLLIE
3RD CLASS RACK
RACK
3RD CL. FLTS CASES

SCLAM BMC
DOLLIE
3RD CLASS RACK

AIR
DESK
SCALE
AIR MAIL RACK

1ST CLASS RACK
1ST CLASS RACK

- FGN -

1ST CLASS RACK
1ST CLASS RACK

U-CARTS
GPC

1ST CLASS BELT

HAMPERS

1ST CLASS DISPATCH DOLLIES

COMPUTER

AIRMAIL BMC

PRINT RACK
PRINT RACK

SHORT PAID DESK

1ST CL. CASES (LTRS) - FGN -

1ST CL. LTRS CASES - FGN -

# INTERNATIONAL MAILS
### THIRD FLOOR

OPERATION 349

## MULTI – SLIDE
STAFFED BY 9 MAILHANDLERS
MONORAIL # 1



E9

E

NEW ZEALAND
TAHITI
S U V A

PROG
PHILLIPPINES

SIDNEY
THAILAND

HONG KONG
KOREA

CODER

L        R

TAIWAN
SINGAPORE

JAPAN
INDIA

B
E
L
T

A O PRINTS
PARCEL POST
MISSENTS

M E L B
MALAYSIA
NO M – B
A P I A
PAGO PAGO

PAGE 7

0102

STD POSITION DESCRIPTION                    U. S. Postal Service

## GENERAL EXPEDITER, PS-06

### FUNCTIONAL PURPOSE

Arranges for the proper transfer for mail which may require the knowledge of incoming and/or outgoing schemes, transportation schedules, and receipt and dispatch information in performing mail distribution between highway contract routes, mail messengers and truck routes, and other mail units; and the separating, loading, and unloading of railway storage cars, flexi-vans and piggy-back trailers, by contractors and postal employees to ensure proper and expeditious handling.

### DUTIES AND RESPONSIBILITIES

1. Expedites the distribution and dispatch of all mails processed in the assigned work areas.

2. Coordinates the dispatch of mail from cases, registry section, and/or other areas by giving timely notice of regular and emergency dispatches to ensure expeditious handling of mail. Coordinates the movement of mails from the platform (or related receipt point) to processing areas or from cases to pouches, and pouches to dispatch points or platform.

3. Recommends changes in pouch and sack racks, pouch authorization, and work assignments as changes in distribution and dispatch schedules dictate.

4. Assists supervisor in carrying out special assignments, such as, mail volume counts, information for surveys, observing handling of selected mail matter, and other similar duties. May maintain records of mail volumes, work hours, and other record keeping; assists with on-the-job training.

5. Ensures proper labeling, timely closing, routing and dispatch of all pouches and sacks within the assigned work area; arranges for equipment.

6. Keeps informed on contract provisions for routes serving the facility such as, loading agreements, correct sized vehicles, proper protection of the mail and other special conditions. Periodically inspects contract vehicles and reports deficiencies or irregularities to supervisor.

7. Keeps informed of all scheduled arrivals and departures at the duty station, and has knowledge of the most expeditious dispatches to ensure an alternative rerouting of preferential mails due to unusual circumstances; determines whether mail should be held for alternate connections.

(Continued on Next Page)

STD POSITION DESCRIPTION                    U. S. Postal Service

## GENERAL EXPEDITER,  PS-06

(Continued from Previous Page)

8. Examines outgoing and incoming vehicles to determine degree of utilization and adherence to highway safety regulations and reports irregularities to supervisor.

9. Recommends arrangements for extra trips of service when necessitated by volume or unusual circumstances.

10. Oversees the loading and unloading of storage cars, flexi-vans, piggy-back trailers, or other mail containers intended for transportation by rail when such activities are performed at the facility.

11. Maintains close contact with supervisor in the distribution and vehicle service units to assure close coordination of all mail handling operations.

12. Performs manual distribution of all classes of mail.

13. Performs other job related tasks in support of primary duties.

**SUPERVISION**

Supervisor, Distribution Operations, or other designated supervisor.

**SELECTION METHOD**

Senior Qualified

**BARGAINING UNIT**

CLERK

**KEY POSITION REFERENCE**

KP-0015

95

(End of Document)

Document Date: 11-02-94                    Occupation Code: 2315-11XX
                                                        SPD Number: SP-2025
                        Page:      2.

0104

STD POSITION DESCRIPTION                          U. S. Postal Service

## MAIL HANDLER, MH-04

### FUNCTIONAL PURPOSE

Loads, unloads, and moves bulk mail and performs other duties
incidental to the movement and processing of mail.

### DUTIES AND RESPONSIBILITIES

1. Unloads mail from trucks.  Separates all mail received from
   trucks and conveyors for dispatch to other conveying units
   and separates and delivers mail for delivery to
   distribution areas.

2. Places empty sacks or pouches on racks, labels them where
   prearranged or where racks are plainly marked, dumps mail
   from sacks, cuts ties, faces letter mail, carries mail to
   distributors for processing, places processed mail into
   sacks, removes filled sacks and pouches from racks and
   closes and locks sacks and pouches.  Picks up sacks,
   pouches, and outside pieces, separates outgoing bulk mails
   for dispatch and loads mail onto trucks.

3. Handles and sacks empty equipment; inspects empty equipment
   for mail and restrings sacks.

4. Cancels stamps on parcel post, operates cancelling
   machines, carries mail from cancelling machine to
   distribution cases.

5. Assists in supply and slip rooms and operates copy machine
   and related office equipment.

6. In addition, may perform any of the following duties: make
   occasional simple distribution of parcel post mail that
   requires no scheme knowledge; operate electric fork lifts;
   rewrap damaged parcels; weigh incoming sacks; clean and
   sweep work areas, offices, rest rooms, and trucks where
   work is not performed by a regular cleaner.

7. With approval of the Chief Postal Inspector, acts as an
   armed guard for valuable registry shipments and as a
   watchman and guard around post office building.

### SUPERVISION

Supervisor, Distribution Operations, or other designated
supervisor.

### SELECTION METHOD

Senior Qualified

(Continued on Next Page)

Document Date: 11-02-94                  Occupation Code: 2315-01XX
                                         SPD Number: KP-0008

0105

STD POSITION DESCRIPTION                    U. S. Postal Service

## MAIL HANDLER, MH-04

(Continued from Previous Page)

**BARGAINING UNIT**

MAIL HANDLER

**KEY POSITION REFERENCE**

KP-0008

9

(End of Document)

A-1

OAKLAND INTERNATIONAL SERVICE FACILITY

 **UNITED STATES POSTAL SERVICE**

June 5, 2000

**Subject:** NOTIFICATION OF ABOLISHMENT/TEMPORARY ASSIGNMENT

**Name:** MITCHELL, K
**Job ID #** 8494835

Due to operational changes, effective Friday, July 14, 2000, your Bid Job # 8494835 will be abolished. Therefore, you will become an Unencumbered employee effective Saturday, July 15, 2000.

Your temporary work schedule, effective Saturday July 15, 2000 will be as follows:

| | |
|---|---|
| Work Area: | Oakland P & DC, 1675 7th Street/T-2 Operations |
| Title: | General Expiditor LV06 |
| PL: | 213 |
| BT: | 0700-1530 |
| SDO: | SatSun |

As an Unencumbered employee, you are encouraged to bid for those vacancies for which you are eligible.

If you choose not to bid, you may be assigned to a residual vacancy based on your seniority and skills.

Charles E. Frazier Jr.
Plant Manager
Oakland International
Service Facility

725 B 85TH AVENUE
OAKLAND CA 94621-1252
510-251-3430
510-251-3422 FAX

0107

A0752

EMPLOYEE PROFILE
DISPLAY STANDARD SCHEDULE

TF99        OAKLAND INTRNTNL SRV CTR            CA

SCHEDULE NO: 00171

START TIME: 06 00
END TIME: 14 30
LUNCH PERIOD: 030 (MINUTES)
LUNCH START: 00 00
DAYS OFF: SAT / SUN
TOTAL WEEKLY HRS/MIN: 40 00

REMARKS:
FLEX TIME (Y/N): N (HQ/REGIONS ONLY)

FLSA WORK WEEK STARTS AT  22 00  FRI

ALL TIMES IN MILITARY TIME

DC900123 DEPRESS ENTER TO REQUEST ANOTHER DISPLAY.

PDAM0245

H-L

0108

A0752

JOB SLOTS
DISPLAY

JOB SLOT:   9007502   OAKLAND INTRNTNL SRV CTR        CA
            TF99   0019   INTERNATIONAL MAILS TR II OPRN UNIT
            2315-11XX   GENERAL EXPEDITOR
            SP2-25   PS   06

POSITION CLASSIFICATION:   CLERK
            POSITION TYPE:   FULL TIME
            DES/ACT:   110
            LDC:   1700   TOUR:   2

FACILITY:   OAKLAND STLTE INTRNTNL SRV CTR
WORK AREA:   INTERNATIONAL MAILS
SECTION:                                PAY LOCATION:   232

STATUS:   OCCUPIED
EFFECTIVE:   2002 04 20
INCUMBENT:   REAMS          DEBORAH        L

PDAM0355

0109

A0752

JOB SLOTS
DISPLAY

JOB SLOT:  9007502

TF99    OAKLAND INTRNTNL SRV CTR        CA
TF99 0019    INTERNATIONAL MAILS TR II OPRN UNIT
2315-11XX    GENERAL EXPEDITOR
SP2-25    PS    06

COMMENTS:
WORK AREA: 500 85TH AVE., OAKLAND, CA 94621.
SATISFACTORY COMPLETION OF "COURSE #50565-00
EXPEDITER TRAINING PROGRAM" IS REQUIRED AFTER
BEING AWARDED THIS POSITION. OTHER DUTIES AS
RESIDUAL. REPLACES #8494833.

PDAM0358

0110



# DESTINATION:

**DATE:** 06-10-06   **TIME:** 10:00

# OAKLAND INT'L & BMC

**VIA**
**CHICAGO BMC**
**60899**

# 94Z

*06-21-06*
*M.H.*
*Loaded*
*Did not*
*Scan*

## CONTENTS:                                    TYPE

### SAC VIDES FOR HONG KONG ONLY



```
USORDA-HKHKGA-ATT-60030-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
```

from
**USORDA**                                          F   CN35

Mail No.                  for        By Airmail
            **0030**
Date                      **VICTORIA**
**10 JUN,2006**           （HONG KONG）

Receptacle No.        Flight No
            **006**    HW-60811-> OAK
**COMME**

                                    Offload
Class    Kg                          **HKG**
VIDES                                100845  90
**008.6**

**ORIGIN: J. T. Weeker Service Center- ISC**
**PLACARD EFFECTIVE DATE:**     03/27/03
NOTE ANY IRREGULARITIES WITH THIS CONTAINER OR TRANSPORTATION ON THE BACK OF THIS
PLACARD AND MAIL IT TO THE MANAGER OF TRANSPORTATION NETWORKS,
O'Hare International Airport, 514 Express Center Drive, Chicago IL 60688-9998  or phone 773-894-9060

045                                                      94Z-45LD/ATS1/14/04
                                                         0111

```
O P E N   S U R F A C E   F I L E   (O A K)              Page  1
(By  Skid/ULD/BMC ID Number)        06-05-2006,08:48:19.72 MONDAY

ORG DEST/CL DISP SACK      KILOS BARCODED SKID/ULD#        COMMENTS
--- ------- ---- ----      ----- -------- ---------        --------
OAK KWSCS   24   001       22.2  06/03/06 KWSS00038        Y
OAK KWSCS   24   002       24.0  06/03/06 KWSS00038        Y
OAK KWSCS   24   004       16.5  06/03/06 KWSS00038        Y
OAK KWSCS   24   005       27.0  06/03/06 KWSS00038        Y
OAK KWSCS   24   006       26.6  06/03/06 KWSS00038        Y
OAK KWSCS   24   007       14.2  06/03/06 KWSS00038        Y
OAK KWSCY   24   003       20.2  06/03/06 KWSS00038        Y
********************************************************************
        TOTAL WT =      150.7 KGS   TOTAL RECORDS =        7
********************************************************************
```





```
C L O S E D   S U R F A C E   F I L E   (O A K)              Page  1
(By  Skid/ULD/BMC ID Number)                    10-20-2005,09:31:59.85 THURSDAY

ORG DEST/CL DISP SACK      KILOS  LOADED    VEHICLE NUMBER  SKID/ULD#    COMMENTS

OAK KWSAS    38  995        13.8 10/20/05  TEXU--4767983   YOKS01634
OAK KWSAS    38  996        19.1 10/20/05  TEXU-4767983    YOKS01634
OAK KWSAS    38  997        12.4 10/20/05  TEXU-4767983    YOKS01634
OAK KWSAS    38  998        15.6 10/20/05  TEXU-4767983    YOKS01634
OAK KWSAS    38  999        10.4 10/20/05  TEXU-4767983    YOKS01634
OAK KWSMS    38  994        19.1 10/20/05  TEXU-4767983    YOKS01634
OAK TYONS    38  162         5.9 10/20/05  TEXU-4767983    YOKS01634
OAK TYONS    38  163        10.2 10/20/05  TEXU-4767983    YOKS01634
OAK TYONS    38  164        10.4 10/20/05  TEXU-4767983    YOKS01634
OAK TYONT    38  165F        1.9 10/20/05  TEXU--4767983   YOKS01634
*********************************************************************************
       TOTAL WT =      118.8 KGS  TOTAL RECORDS =      10
*********************************************************************************
```

*AO Final Disp# 31*

*(rotated label section)*

TO: SUPERVISOR, BAGGING
FR: EXPEDITOR D. REAMS
DATE: 10.20.05

*Tetra FINALS*

AO PRINTS / EMPTY SACKS

BILL NUMBER: 38

COUNTRY: JAPAN (YOK)

*in Sket 999 F7*

| | AO | MTY |
|---|---|---|
| JAPAN (KWS) | N/A | N/A |
| TOKYO (TYO) | — | 38 |

from TERM-17
Mail No.

Date 20 OCT, 2005
Receptacle No.

No. of Sacks 010

Class SACKS
Kg 118.8

05YOKS01634

for YOK S 01634
YOKOHAMA PORT

SKID OF SACKS

SKID - FULL
AFFIX TO SKID
NOT TO SACK
SCAN AT L DOCK

200813   05

YOK

0113

SACKS SCANNED FOR DAY 05/15/06

1. REAMS, D.       689
2. STANLEY, C.     207
--------
TOTAL BARCODES FOR 05/15 = 896

SACKS SCANNED FOR DAY 04/12/06

1. VELASCO, B.     473
2. ROGERS, J.      166
3. STANLEY, C.     111
--------
TOTAL BARCODES FOR 04/12 = 750

A-1

01147

| Container Numéro du Conteneur | Seal Number Scellé Numéro | Disp # Type | Origin Origine | Destination Destination | | Red Label Sacks | LC/AO Sacks | M Sacks | CP Outs | S/V Sacks | Diplomatic Sacks |
|---|---|---|---|---|---|---|---|---|---|---|---|
| APLU-8969442 | 0041091 0041092 | 9 REBUTS | USOAKS U.S.A. | THBKKA Thailand | count wgt. kgs | | | 6 33.8 | | | |
| APLU-8969442 | 0041091 0041092 | 13 | USOAKS U.S.A. | THBKKA Thailand | count wgt. kgs | 27 245.0 | 37 448.5 | | | | |
| APLU-8969442 | 0041091 0041092 | 13 | USOAKS U.S.A. | LAVTEA LAOS | count wgt. kgs | 2 6.6 | 2 43.4 | | | | |
| APLU-8969442 | 0041091 0041092 | 13 | USOAKS U.S.A. | THBKKA Thailand | count wgt. kgs | | | 116 1193.6 | | | |
| APLU-8969442 | 0041091 0041092 | 15 | USOAKS U.S.A. | LAVTEA LAOS | count wgt. kgs | | | 29 337.5 | | | |
| APLU-8969442 | 0041091 0041092 | 14 | USOAKS U.S.A. | LAVTEA LAOS | count wgt. kgs | | | | | 1 15.5 | |
| APLU-8969442 | 0041091 0041092 | 13 | USOAKS U.S.A. | LAVTEA LAOS | count wgt. kgs | | | | | 4 42.1 | |
| APLU-8969442 | 0041091 0041092 | 04 | USSFOA | LAVTEA LAOS | count wgt. kgs | | | | | 1 10.9 | |
| APLU-8969442 | 0041091 0041092 | 003 | USHNLA | LAVTEA LAOS | count wgt. kgs | | | 3 35.3 | | | |
| APLU-8969442 | 0041091 0041092 | 9 ORDINARY | USHNLS U.S.A. | THBKKA Thailand | count wgt. kgs | | 1 1.4 | | | | |
| APLU-8969442 | 0041091 0041092 | 9 | USHNLS U.S.A. | THBKKA Thailand | count wgt. kgs | | | | | | |
| APLU-8969442 | 0041091 0041092 | 10 | USHNLS U.S.A. | THBKKA Thailand | count wgt. kgs | | 1 1.0 | | | | |
| APLU-8969442 | 0041091 0041092 | 8 ORDINARY | USHNLS U.S.A. | THBKKA Thailand | count wgt. kgs | | 1 20.9 | | | | |

Administration postale des États-Unis
Dispatching exchange office/Bureau D'echange expéditeur
USPS

OAKLAND, CA

Ship Name/Paquebot: APL CANADA V/141
Shipping Line/Compagnie: AMERICAN PRESIDENT LINES
Sailing Date/Date du départ: 04/12/06
Voyage Number: 141
Port of Debarkation/Port De Debarquement/Destination: (BKK) BANGKOK
46SOA 00143

Signature and Stamp
Signature et timbre
Dispatching exchange office
Bureau d'échange expéditeur

USPS
OAK ORF
APR 10
OAKLAND, CA
*946Z*

The undersigned confirms receipt in good condition of the mail listed above.
La soussigné reconnaît avoir reçu en bon état les dépeches mentionnées ci-dessus.

Signature and stamp
Signature et timbre
Destination exchange office
Bureau D'echange de destination

0115

Dispatching exchange office/Bureau D'echange expediteur

Ship Name/Paquebot: APL CANADA V/141

Shipping Line/Compagnie: AMERICAN PRESIDENT LINES

Voyage Number: 141

Port of Debarkation/Port De Debarquement/Destination: (BKK) BANGKOK

04/12/06

46SDA 00143

| Container Number / Numéro du Conteneur | Seal Number / Sceau Numéro | Disp # Type | Origin / Origine | Destination / Destination | | Red Label Sacks | LC/AO Sacks | M Sacks | CP Sacks | CP Cuis | S/V Sacks | Diplomat Sacks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| APLU-8969442 | 0041091 | 1 | USOAKS U.S.A. | LAVTEA LAOS | count |  |  |  |  |  |  |  |
| APLU-8969442 | 0041092 |  |  |  | wgt. kgs |  |  |  |  |  |  |  |
| APLU-8969442 | 0041091 | 11 | USHNLS U.S.A. | THIBKKA Thailand | count |  | 2.4 |  |  |  |  |  |
| APLU-8969442 | 0041092 |  |  |  | wgt. kgs |  |  |  |  |  |  |  |
| APLU-8969442 | 0041091 | 12 | USOAKS U.S.A. | THIBKKA Thailand | count | 3 |  |  |  |  |  |  |
| APLU-8969442 | 0041092 |  |  |  | wgt. kgs | 15.5 |  |  |  |  |  |  |
| APLU-8969442 | 0041091 | 8 | USOAKS U.S.A. | LAVTEA LAOS | count | 1 |  |  |  |  |  |  |
| APLU-8969442 | 0041092 |  |  |  | wgt. kgs | 2.3 |  |  |  |  |  |  |
|  |  |  |  |  | count |  |  |  |  |  |  |  |
|  |  |  |  |  | wgt. kgs |  |  |  |  |  |  |  |
|  |  |  |  |  | count |  |  |  |  |  |  |  |
|  |  |  |  |  | wgt. kgs |  |  |  |  |  |  |  |
|  |  |  |  |  | count |  |  |  |  |  |  |  |
|  |  |  |  |  | wgt. kgs |  |  |  |  |  |  |  |

OAKLAND, CA

REAMS, DEBORAH

Signature and Stamp
Signature et timbre

USPS
OAK DDF
UKLND, CA
9482
APR 10

Dispatching exchange office
Bureau d'echange expediteur

| Grand Totals / Sacks | Obs / Observations | Pounds | [Totals] | Kilos | count | 4 | 32 | 39 | 156 |  | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 245 |  | 5414 |  | 2456.2 | wgt. kgs | 17.8 | 286.4 | 491.9 | 1636.6 |  | 53.5 |

The undersigned confirms receipt in good condition of the mail listed above
La soussigné reconnait avoir reçu en bon état les dépotés mentionnées cidessus.

Signature and stamp
Signature et timbre

Destination exchange office
Bureau D'echange de destination

Please sign and return one copy
to the following address:

Oakland P-14
900 80th Ave.
Oakland, CA 9482-7702

40 FT CONTRACT # USP-381
1 - 40 FT CONTAINER

Dispatching exchange office/Bureau d'échange expéditeur

БЭИС

OAKLAND, CA

| Ship Name/Paquebot | | Voyage Number | | Port of Debarkation/Port De Debarquement/Destination |
| APL CANADA V/141 | | 04/12/06 | | 46SOA 00144 |
| Shipping Lines/Compagnie | | 141 | | ( MNL ) |
| AMERICAN PRESIDENT LINES | | | | MANILA |

| Container Number Numéro du Conteneur | Seal Number Scellé Numéro | Disp # Type | Origin Origine | Destination Destination | | Red Label Sacks | LC/AO Sacks | M Sacks | CP Sacks | CP Colis | S/V Sacks | Diploma- Sacks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLHU-4531394 | 0041095 0041096 | 14 | U.S.A. | PHMNLA Philippines | count | | | | | | | |
| | | | | | wgt. kgs | | | | | | | |
| CLHU-4531394 | 0041095 0041096 | 16 | U.S.A. ORDINARY | PHMNLA Philippines | count | | | | 110 | | | |
| | | | | | wgt. kgs | | | | 1443.7 | | | |
| CLHU-4531394 | 0041095 0041096 | 10 ORDINARY | U.S.A. | PHMNLA Philippines | count | | | | 3 | | | |
| | | | | | wgt. kgs | | | | 45.1 | | | |
| CLHU-4531394 | 0041095 0041096 | 7 | U.S.A. | PHMNLA Philippines | count | | | | | | 1 | |
| | | | | | wgt. kgs | | | | | | 1.0 | |
| CLHU-4531394 | 0041095 0041096 | 2 REBUTS | U.S.A. | PHMNLA Philippines | count | | | 1 | | | | |
| | | | | | wgt. kgs | | | 8.6 | | | | |
| CLHU-4531394 | 0041095 0041096 | 9 | U.S.A. | PHMNLA Philippines | count | | 5.3 | | 1 | | | |
| | | | | | wgt. kgs | | 5.3 | | 50.2 | | | |
| CLHU-4531394 | 0041095 0041096 | 9 ORDINARY | USHNLS U.S.A. | PHMNLA Philippines | count | | | 111 | 4 | | | |
| | | | | | wgt. kgs | | | 1337.6 | 50.2 | | | |
| CLHU-4531394 | 0041095 0041096 | 4 REBUTS | USOAKS U.S.A. | PHMNLA Philippines | count | | | | 1 | | | |
| | | | | | wgt. kgs | | | | 5.8 | | | |
| CLHU-4531394 | 0041095 0041096 | 13 | USOAKS U.S.A. | PHMNLA Philippines | count | 1.0 | 38.4 | | | | | |
| | | | | | wgt. kgs | 1.0 | 382.4 | | | | | |

PS Form 2908 (1-91 20280-7138) C18

Signature and Stamp
Signature et timbre

REAMS, DEBORAH

USPS
OAK DXF
APR 1 0
9462?
OAKLAND, CA

AO-FT CONTRACT #: ISJ378
1 = 40-FT CONTAINER

| Observations | Grand Totals: | | |
| | Sacks | Colis | Totals |
| 273 | 7224 | 3327.4 | |

Please sign and return one copy
to the following address!
Oakland P & DC
Rosa R-10
5300 95th Ave.
Oakland CA 94622-9702

The undersigned confirms receipt in good condition of the mail listed above
La soussigné, inconnail aur, it avoir reçu en bon état les dépêches mentionnées
ci-dessus.

Signature and stamp
Signature et timbre

Destination exchange office
Bureau D'échange de destination

011

HP OfficeJet T Series
Personal Printer/Fax/Copier/Scanner

Fax History Report for
Int'l Service Facility
510-567-6283
Apr 26 2006 10:29am

**Last Fax**

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Apr 26 | 10:26am | Sent | 918002961482 | 2:25 | 4 | OK |

Result:
  OK - black and white fax
  OK color - color fax

Country to receive unfol mail is contacted via fax

HP OfficeJet T Series
Personal Printer/Fax/Copier/Scanner

**Fax History Report** for
Int'l Service Facility
510-567-6283
Apr 28 2006 6:32am

<u>Last Fax</u>

| <u>Date</u> | <u>Time</u> | <u>Type</u> | <u>Identification</u> | <u>Duration</u> | <u>Pages</u> | <u>Result</u> |
|------|------|------|------|------|------|------|
| Apr 28 | 6:29am | Sent | 918002961482 | 2:33 | 5 | OK |

Result:
    OK - black and white fax
    OK color - color fax

# FINALS

TO: SUPERVISOR, BAGGING UNIT
FR: EXPEDITOR D. REAMS
DATE: _____

## AO PRINTS / EMPTY SACKS

BILL NUMBER: _____

COUNTRY: P R OF CHINA (TSN)

|  | AO | MTY |
|---|---|---|
| P R OF CHINA (PEK) | ___ | ___ |
| MONGOLIA, ULAANBATOR (ULN) | ___ | ___ |
| NEPAL, KATMANDU (KTM) | ___ | ___ |

SHIP: _____

TIME IN: _____    TIME OUT: _____

CLOSING CLERK: _____

# FINALS

TO: SUPERVISOR, BAGGING UNIT
FR: EXPEDITOR D. REAMS
DATE: _____

## PARCEL POST / REBUTS

BILL NUMBER : _____

COUNTRY: P R OF CHINA (TSN)

|  | PP | REB |
|---|---|---|
| P R OF CHINA (PEK) | ___ | ___ |
| MONGOLIA, ULAANBATOR (ULN) | ___ | ___ |
| NEPAL, KATMANDU (KTM) | ___ | ___ |

SHIP: _____

TIME IN: _____    TIME OUT: _____

CLOSING CLERK: _____

# Joint Exhibit 1

# Part 3

ATTACHMENT 1

REGIONAL INSTRUCTION - 399 REVIEW

INSTALLATION INVENTORY

OF

MAIL PROCESSING OPERATIONS

The inventory attached uses Regional Instruction 399 for Operations and function #'s. The X shown in column 3 indicates the craft performing the function. The 'X is not intended to in any manner denote the number of employees performing the function.

The diagrams attached outline the set up of each operation. The number of employees as well as craft shown on the diagrams are not part of the official inventory and should be disregarded.

FACILITY      GMF

CITY          Oakland

STATE         CA

ZIP CODE      94615

DATE COMPLETED    4/27/93

SIGNATURES (LDRC REPRESENTATIVES):

MANAGEMENT REPRESENTATIVE _____

APWU REPRESENTATIVE _____

MAIL HANDLER REPRESENTATIVE _____



LOCAL DISPUTE RESOLUTION COMMITTEE
INVENTORY
DIAGRAMS

OAKLAND BRANCH

ATTACHMENT 1

REGIONAL INSTRUCTION – 399 REVIEW

INSTALLATION INVENTORY

OF

MAIL PROCESSING OPERATIONS

The inventory attached uses Regional Instruction 399 for Operations and function #'s. The X shown in column 3 indicates the craft performing the function. The X is not intended to in any manner denote the number of employees performing the function.

The diagrams attached outline the set up of each operation. The number of employees as well as craft shown on the diagrams are not part of the official inventory and should be disregarded.

FACILITY _____ GMF

CITY _____ Oakland

STATE _____ CA

ZIP CODE _____ 94615

DATE COMPLETED _____ 4/27/93

SIGNATURES (LDRC REPRESENTATIVES):

MANAGEMENT REPRESENTATIVE _____

APWU REPRESENTATIVE _____

MAIL HANDLER REPRESENTATIVE _____

0123

REGIONAL INSTRUCTION - 399 REVIEW

INSTALLATION INVENTORY OF MAIL PROCESSING OPERATIONS

LDRC REPRESENTATIVE
MGMT INITIALS
APWU
NH

| 1. OPERATION NUMBER OR LOCAL DESCRIPT. OF OPERATION | 2. FUNCTION NUMBER OR LOCAL DESCRIPTION OF FUNCTION | 3. CURRENT # OF CRAFT EMPLOYEES ASSIGNED | | 4. NUMBER OF ATTACHED DIAGRAM |
|---|---|---|---|---|
| FACILITY GMF | CITY OAKLAND    STATE/ZIP CODE 94615    DATE 1/15/93 | CLERK | MAILHANDLER | |
| 001 | 1 through 7 | X | X | |
| 010 | 1 through 10, 11, 12 & 14 | X | X | |
| 020 | 1, 2, & 3, 4 & 5 | X | X | |
| 029 | Riffle Mail | X | X | |
| 030 | 1 & 2, 3 through 8 | X | | |
| 040 | 1 & 2, 3, 4, 5, & 6, 7, 8, & 9 | X (BOTH CRAFTS) | X (BOTH CRAFTS) X | |
| 043 | 3, 4, 5, 6,, & 8, 7 & 9 | X (BOTH CRAFTS) | X (BOTH CRAFTS) X | |

0124

REGIONAL INSTRUCTION - 399 REVIEW

INSTALLATION INVENTORY
OF
MAIL PROCESSING OPERATIONS

DATE 1/15/93

FACILITY GMF   CITY OAKLAND   STATE/ZIP CODE 94615

| 1. OPERATION NUMBER OR LOCAL DESCRIPTION OF OPERATION | 2. FUNCTION NUMBER OR LOCAL DESCRIPTION OF FUNCTION | 3. CURRENT # OF CRAFT EMPLOYEES ASSIGNED — CLERK | MAILHANDLER | 4. NUMBER OF ATTACHED DIAGRAMS |
|---|---|---|---|---|
| 044 | 1, 2, 8, & 9 ; 3, 4, 5, & 7 ; 8 - N/A | X (BOTH CRAFTS) X | | |
| 045 | 1, 2, 6, & 9 ; 3, 4, 5, 7, & 8 | X (BOTH CRAFTS) X | | |
| 050/055 | 1, 2, 3, & 4 ; 6, 10, 11, 12, 13, & 14 ; 5 & 7 - N/A | X (BOTH CRAFTS) X | | |
| 060 | 1, 2, 5, 6 & 9 ; 4, 7 & 8 ; 3 - N/A | X (BOTH CRAFTS) X | X | |
| 070 | 1, 2, & 6 ; 4, 5, 7 & 8 ; 3 - N/A | X (BOTH CRAFTS) X | X | |
| 073 | 1, 7, & 9 ; 2 | X (BOTH CRAFTS) X | X (BOTH CRAFTS) X | |

LDRC REPRESENTATIVES
MGMT INITIALS
APWU
HU

012

REGIONAL INSTRUCTION - 399 REVIEW

INSTALLATION INVENTORY
OF
MAIL PROCESSING OPERATIONS

LDRC REPRESENTATIVES
INITIALS MGMT
APWU
MH

FACILITY GMF    CITY OAKLAND    STATE/ZIP CODE 94615    DATE 1/15/93

| 1. OPERATION NUMBER OR LOCAL DESCRIPT. OF OPERATION | 2. FUNCTION NUMBER OR LOCAL DESCRIPTION OF FUNCTION | 3. CURRENT # OF CRAFT EMPLOYEES ASSIGNED | | 4. NUMBER OF ATTACHED DIAGRAMS |
|---|---|---|---|---|
| | | CLERK | MAILHANDLER | |
| 073 (Cont'd) | 4, 5, 6, & 8; 9; 3 - N/A | X | X | |
| 074 | 1, 2, & 6; 4, 5, 7, & 8; 9 | X (BOTH CRAFTS); X | X | |
| 075 | 1; 2, 6, & 9; 3, 4, 5, 7, & 8 | X; X (BOTH CRAFTS) | X (BOTH CRAFTS) X | |
| 088-089 | OCR MACHINE DISTRIBUTION | X | | |
| 080-087 | MPLSM DISTRIBUTION | X | | |
| 090-098 100 105 | SPLSM DISTRIBUTION − 1 through 3; Disputed: 4, 6 & 7; 5&8 N/A; − 1 through 3 + 5 − 7; 4 | X | X X | |

012

REGIONAL INSTRUCTION - 399 REVIEW

INSTALLATION INVENTORY
OF
MAIL PROCESSING OPERATIONS

FACILITY _GMF_    CITY _OAKLAND_    STATE/ZIP CODE _94615_    DATE _1/15/93_

LDRC REPRESENTATIVES
INITIALS MGMT
APWU
MH

| 1. OPERATION NUMBER OR LOCAL DESCRIPT. OF OPERATION | 2. FUNCTION NUMBER OR LOCAL DESCRIPTION OF FUNCTION | 3. CURRENT # OF CRAFT EMPLOYEES ASSIGNED | | 4. NUMBER OF ATTACHED DIAGRAM |
|---|---|---|---|---|
| | | CLERK | MAILHANDLER | |
| 109 | 1 through 6 | X | X | |
| 110-129 | Disputed | | | |
| 134 | Does Not Exist | | | |
| 150 | 1, 2, 6, & 9 | X (BOTH CRAFTS) | | |
| 160 | 3, 5, 7 & 8 | X | | |
| 160 | 1, 2, 6, & 9 / 3, 4, 5, 7, & 8 | X (BOTH CRAFTS) / X | | |
| 168/169 | 1 through 10 | X / X (BOTH CRAFTS) | | |
| 170 | 1, 2, 6 & 9 | X | X (BOTH CRAFTS) | |
| 175 | 3, 4, 5, 7 & 8 / 3, 4, 5, 7, & 8 | X (BOTH CRAFTS) | | |
| 180-189 | Disputed | | | |

REGIONAL INSTRUCTION – 399 REVIEW

INSTALLATION INVENTORY
OF
MAIL PROCESSING OPERATIONS

FACILITY __GMF__    CITY __OAKLAND__    STATE/ZIP CODE __94615__    DATE __1/15/93__

| 1. OPERATION NUMBER OR LOCAL DESCRIPT. OF OPERATION | 2. FUNCTION NUMBER OR LOCAL DESCRIPTION OF FUNCTION | 3. CURRENT # OF CRAFT EMPLOYEES ASSIGNED | | 4. NUMBER OF ATTACHED DIAGRAMS |
|---|---|---|---|---|
| | | CLERK | MAILHANDLER | |
| 200 Piedmont & Laurel Zones Only | 1 through 7 | | | |
| 210-239 | 1, 2, 3, 4, 6, 9, 11, & 12 5, 7, 8 & 10 – N/A | | | |
| 213 | Disputed | X | | |
| 549 | 1 & 2 | X | X | |

LDRC REPRESENTATIVES
INITIALS MGMT
APWU
NPMHU

Pacific Area Labor Relations
Canyon Station
c/o 135 N. Center Street
Mesa, AZ 85201-9998

 **UNITED STATES POSTAL SERVICE.**

January 31, 2007

Teresa Gonsalves
Law Department – USPS
475 L'Enfant Plaza, SW
Room 6424
Washington, DC 20260-1150

RE:    RI 399 Hearing Case Number F98C-1F-J 01185458
       Oakland International Service Center

Dear Teresa,

It was a pleasure speaking to you earlier today.

As requested, enclosed is the case file regarding the above-captioned case. As I mentioned during our conversation, *Joint Exhibit 1* in both Pacific and Western Areas is the same document jointly agreed to between the three parties and provided to the arbitrators prior to them hearing any cases. The only thing I didn't include (lack of space in the envelope was the culprit) are copies of the arbitration awards the APWU advocate provided with his closing brief. If you need them, please let me know, and I will forward them under separate cover.

Any questions or need for further information? Please don't hesitate to let me know.

Sincerely,

Drusilla Wylie
(somewhat different than the arbitrator's botched spelling)
Office: (480) 890-7804
Cell:   (623) 523-3566

Attachments

0129



RI 399

DECEMBER 15, 2004

0130

# RI - 399
# Jurisdictional
# Dispute  Resolution
# Procedures

---

# Arbitration Exhibits

# *Joint Exhibit*
# *#1*

RI 399 Arbitration Exhibits
Western Area (Western)


**TABLE OF CONTENTS**

A.  Table of Contents                                          (TOC)
B.  MOU from 1975 CBA                                          (75CBAMOU)
C.  MOU from 1978 CBA                                          (78CBAMOU)
D.  Original Transmittal                     2/16/79           (399Orig)
E.  Revision 1 Transmittal                   6/15/79           (399Rev1)
F.  Gamser Award AD-NAT-1311                 10/13/81          (Gamser 1311)
G.  Revision 2
        Transmittal to APWU                  2/28/84           (399Rev2A)
        Transmittal to NPMHU                 2/28/84           (399Rev2M)
        APWU Grievance Settlement            8/30/84           (399rev2AGriev)
H.  LOI re 110/180 Operations                                 (87110LOI)
I.  MOU re 110/180 Operations                                 (87110MOU)
J.  Dispute Resolution Procedure MOUs        4/16/92           (41692DRPs)
K.  Inventory Instructions                   Undated           (InitialInv)
L.  Questions and Answers                    10/21/92          (Q&A1992)
M.  Agreement on Inventories                 3/23/94           (32394Inv)
N.  Eischen Award H7C-NA-C32                 4/24/98           (Eischen-Spreading)
O.  2000 Settlement Agreements               8/3/00            (8300SettAgrs)
P.  Issues Pending at National Level         8/02              (NatIssues)
Q.  Hearing Procedures                       12/04             (HrngProc)
R.  GATS Numbers – No Challenges             11/23/04          (JNosArb)
S.  RDRC Members' Information                Undated           (RepListWS)
T.  Glossary of Postal Terms  - Pub 32                         (Glossary)

Note:  The members of the RDRC agree that any and all handwritten notations and/or markings appearing on the above-referenced exhibits have no meaning for purposes of arbitration hearings before this panel and are to be disregarded.

Tab 15.A

# AGREEMENT

between
United States Postal Service
and

American Postal Workers Union, AFL-CIO

National Association of Letter Carriers, AFL-CIO

National Post Office Mail Handlers, Watchmen,
Messengers and Group Leaders
Division of the Laborers' International Union
of North America, AFL-CIO

National Rural Letter Carriers' Association

   

July 21, 1975 — July 20, 1978

MEMORANDUM OF UNDERSTANDING
BETWEEN THE U.S. POSTAL SERVICE
AND THE AMERICAN POSTAL WORKERS UNION,
AFL-CIO
NATIONAL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO
NATIONAL POST OFFICE MAIL HANDLERS, WATCHMEN,
MESSENGERS AND GROUP LEADERS DIVISION OF THE
LABORERS' INTERNATIONAL UNION OF NORTH
AMERICA, AFL-CIO
NATIONAL RURAL LETTER CARRIERS' ASSOCIATION

The American Postal Workers Union, AFL-CIO, the National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Division of Laborers' International Union of North America, AFL-CIO, the National Association of Letter Carriers, AFL-CIO, the National Rural Letter Carriers' Association, and the United States Postal Service, recognize that disputes exist among the parties relating to the crafts to which various duties performed by employees represented by the Unions have been assigned. In order to resolve such disputes the parties agree that a standing national level Committee on Jurisdiction, composed of representatives of each party, shall be established to identify and resolve such current and any future jurisdictional disputes. (Current disputes include, but are not limited to, cases subject to the December 14, 1973, Agreement between the American Postal Workers Union, AFL-CIO, the National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Division of Laborers' International Union of North America, AFL-CIO, and the United States Postal Service.)

Within 90 days subsequent to September 4, 1973 each Union shall submit to the Committee a written description of the scope of the duties it believes are properly assignable to employees it represents. The Committee shall meet to identify those duties over which no dispute as to jurisdiction exists, and to resolve conflicting claims of jurisdiction over duties made by any of the parties.

Any member of the Committee may identify a disputed assignment and request consideration of such assignment by the Committee. Those members of the Committee representing the Postal Service and those Unions which claim jurisdiction over a disputed work assignment shall participate in the Committee's discussions involving the dispute. Representatives of those Unions not making claims of jurisdiction shall not participate in the deliberations of the Committee. In resolving disputed assignments, the Committee shall consider, among other relevant factors, the following:

1. existing work assignment practices;

2. manpower costs;

3. avoidance of duplication of effort and "make work" assignments;

4. effective utilization of manpower, including the Postal Service's need to assign employees across craft lines on a temporary basis;

148

0134

5. the integral nature of all duties which comprise a normal duty assignment;

6. the contractual and legal obligations and requirements of the parties.

Modifications of craft jurisdiction on the national level, including revisions of existing position descriptions and existing local craft assignments of work will be changed by the Employer upon agreement of those members of the Committee participating in the resolution of the dispute. Determinations made by the Committee where all parties participating agree shall be binding on all parties to this Memorandum.

In the event that a dispute is not resolved by the Committee within 180 days after the date it is first considered by the Committee, any of the Unions claiming jurisdiction over the duties may, within 15 days thereafter, request that the dispute be arbitrated under the provisions of Article XV of the National Agreement. Failure to make such a timely request shall constitute a waiver of the claim. All parties to this Memorandum may participate in the arbitration and all parties shall be bound by the arbitrator's award whether or not they participated in the arbitration proceeding. The arbitrator's award shall be final and binding.

This Memorandum of Understanding does not apply to craft assignment of new positions subject to the provisions of Article I, Section 5.

Date: September 4, 1975

| | |
|---|---|
| **BENJAMIN F. BAILAR (S)** | **FRANCIS S. FILBEY (S)** |
| U S Postal Service | American Postal Workers Union, AFL-CIO |
| | **JAMES H. RADEMACHER (S)** |
| | National Association of Letter Carriers, AFL-CIO |
| | **PETER FOSCO (S)** |
| | National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Division of the Laborers' International Union of North America, AFL-CIO |
| | **LESTER F. MILLER (S)** |
| | National Rural Letter Carriers' Association |

149

0135

9

## MEMORANDUM OF UNDERSTANDING
## BETWEEN THE U. S. POSTAL SERVICE
## AND THE AMERICAN POSTAL WORKERS UNION, AFL-CIO
## NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO
## NATIONAL POST OFFICE MAIL HANDLERS, WATCHMEN,
## MESSENGERS AND GROUP LEADERS DIVISION OF LABORERS'
## INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO
## NATIONAL RURAL LETTER CARRIERS' ASSOCIATION

The American Postal Workers Union, AFL-CIO, the National

Post Office Mail Handlers, Watchmen, Messengers and Group

Leaders Division of Laborers' International Union of North

America, AFL-CIO, the National Association of Letter Carriers,

AFL-CIO, the National Rural Letter Carriers' Association,

and the United States Postal Service, recognize that disputes

exist among the parties relating to the crafts to which

various duties performed by employees represented by the

Unions have been assigned.  In order to resolve such dis-

putes the parties agree that a standing national level

Committee on Jurisdiction, comprised of representatives of

each party, shall be established to identify and resolve

such current and any future jurisdictional disputes.

(Current disputes include, but are not limited to, cases

subject to the December 14, 1973, Agreement between the

American Postal Workers Union, AFL-CIO, the National Post

Office Mail Handlers, Watchmen, Messengers and Group Leaders

Division of Laborers' International Union of North America,

AFL-CIO, and the United States Postal Service.)

Within 90 days subsequent to September 4, 1975 each Union
shall submit to the Committee a written description of the
scope of the duties it believes are properly assignable to
employees it represents. The Committee shall meet to
identify those duties over which no dispute as to jurisdic-
tion exists, and to resolve conflicting claims of juris-
diction over duties made by any of the parties.

Any member of the Committee may identify a disputed assign-
ment and request consideration of such assignment by the
Committee. Those members of the Committee representing the
Postal Service and those Unions which claim jurisdiction
over a disputed work assignment shall participate in the
Committee's discussions involving the dispute. Represen-
tatives of those Unions not making claims of jurisdiction
shall not participate in the deliberations of the Committee.
In resolving disputed assignments, the Committee shall con-
sider, among other relevant factors, the following:

1.    existing work assignment practices;

2.    manpower costs;

3.    avoidance of duplication of effort and "make work"
      assignments;

4.    effective utilization of manpower, including the
      Postal Service's need to assign employees across craft
      lines on a temporary basis;

-381-

0137

5. the integral nature of all duties which comprise a
   normal duty assignment;

6. the contractual and legal obligations and requirements
   of the parties.

Modifications of craft jurisdiction on the national level,
including revisions of existing position descriptions and
existing local craft assignments of work will be changed by
the Employer upon agreement of those members of the Com-
mittee participating in the resolution of the dispute.
Determinations made by the Committee where all parties
participating agree shall be binding on all parties to this
Memorandum.

In the event that a dispute is not resolved by the Committee
within 180 days after the date it is first considered by the
Committee, any of the Unions claiming jurisdiction over the
duties may, within 15 days thereafter, request that the
dispute be arbitrated under the provisions of Article XV of
the National Agreement. Failure to make such a timely
request shall constitute a waiver of the claim. All parties
to this Memorandum may participate in the arbitration and
all parties shall be bound by the arbitrator's award whether
or not they participated in the arbitration proceeding. The
arbitrator's award shall be final and binding.

0138

This Memorandum of Understanding does not apply to craft assignment of new positions subject to the provisions of Article I, Section 5.


Date:   September 4, 1975


_U. S. Postal Service_             _American Postal Workers Union, AFL-CI_


_National Association of Letter Carrie_
AFL-CIO


_National Post Office Mail Handlers,_
_Watchmen, Messengers and Group_
_Leaders Division of Laborers'_
_Internatiohal Union of North_
_America, AFL-CIO_


_National Rural Letter Carriers' Assoc_

0139

AP. 14

## MEMORANDUM OF UNDERSTANDING

### BETWEEN THE U.S. POSTAL SERVICE

### AND THE

### AMERICAN POSTAL WORKERS UNION, AFL–CIO NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL–CIO NATIONAL POST OFFICE MAIL HANDLERS, WATCHMEN, MESSENGERS AND GROUP LEADERS DIVISION OF THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO

The American Postal Workers Union, AFL–CIO, the National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Division of Laborers' International Union of North America, AFL–CIO, the National Association of Letter Carriers, AFL–CIO, and the United States Postal Service, recognize that disputes exist among the parties relating to the crafts to which various duties performed by employees represented by the Unions have been assigned. In order to resolve such disputes the parties agree that a standing national level Committee on Jurisdiction, comprised of representatives of each party, shall be established to identify and resolve such current and any future jurisdictional disputes. (Current disputes include, but are not limited to, cases subject to the December 14, 1973 Agreement between the American Postal Workers Union, AFL–CIO, the National Post Office Mail Handlers, Watchmen, Messengers and Group Leaders Division of Laborers' International Union of North America, AFL–CIO, and the United States Postal Service.) Each Union may submit to the Committee a written description of the scope of the duties it believes are properly assignable to employees it represents. The Committee shall meet to identify those duties over which no dispute as to jurisdiction exists, and to resolve conflicting claims of jurisdiction over duties made by any of the parties.

Any member of the Committee may identify a disputed assignment and request consideration of such assignment by the Committee. Those members of the Committee representing the Postal Service and those Unions which claim jurisdiction over a disputed work assignment shall participate in the Committee's discussions involving the dispute. Representatives of those Unions not making claims of jurisdiction shall not participate in the deliberations of the Committee. In resolving disputed assignments, the Committee shall consider, among other relevant factors, the following:

1. existing work assignment practices;
2. manpower costs;

3. avoidance of duplication of effort and "make work" assignments;
4. effective utilization of manpower, including the Postal Service's need to assign employees across craft lines on a temporary basis;
5. the integral nature of all duties which comprise a normal duty assignment;
6. the contractual and legal obligations and requirements of the parties.

Modifications of craft jurisdiction on the national level, including revisions of existing position descriptions and existing local craft assignments of work will be changed by the Employer upon agreement of those members of the Committee participating in the resolution of the dispute. Determinations made by the Committee where all parties participating agree shall be binding on all parties to this Memorandum.

In the event that a dispute is not resolved by the Committee within 180 days after the date it is first considered by the Committee, any of the Unions claiming jurisdiction over the duties may, within 15 days thereafter, request that the dispute be arbitrated under the provisions of Article XV of the National Agreement. Failure to make such a timely request shall constitute a waiver of the claim. All parties to this Memorandum may participate in the arbitration and all parties shall be bound by the arbitrator's award whether or not they participated in the arbitration proceeding. The arbitrator's award shall be final and binding.

This Memorandum of Understanding does not apply to craft assignment of new positions subject to the provisions of Article I, Section 5.

Date: September 15, 1978

A P
# 2



regional
instructions

PART 300
POSTAL OPERATIONS
1085-PO-204

| SUBJECT | Mail Processing Work Assignment Guidelines | DATE 2/16/79 | FILING NO. 399 |

## I.  INTRODUCTION

The enclosed "Mail Processing Work Assignment Guidelines," provide primary craft designations relative to the performance of specific mail processing work functions. Compliance with the principles contained therein is mandatory and applicable to the assignment of all categories of employees in the regular work force. These assignment guidelines are to be implemented at all postal installations which perform mail processing, in accordance with the implementation criteria outlined below and consistent with the terms of the 1978 National Agreement.

## II.  IMPLEMENTATION CRITERIA

### A.  Efficient and Effective Operation

All actions taken relative to implementation of these guidelines must be consistent with an efficient and effective operation.  Consistent with this obligation, no postal installation shall declare employees excess, increase the number of employees and/or increase work hours solely as a result of this instruction.

### B.  Four (4) Hours Criteria

If there are four (4) or more hours of continuous work consisting of one or more work functions in one or more operations designated to the same primary craft, the performance of the work should be assigned to an employee of that primary craft.

### C.  Distribution Activities

Where the functions of obtaining empty equipment, obtaining unprocessed mail, loading ledges and sweeping are an integral part of the distribution function and cannot be efficiently separated, the entire operation will be assigned to the primary craft performing the distribution activity.

| INITIATING OFFICE Operations Group | ACTION OFFICE Regional Mail Processing | PAGES 1 of 4 |

- 2 -

D.  **Changes in Duty Assignments**

No employee's current duty assignment will be modified
by removing functions designated to another primary
craft until and unless such duty assignment becomes
vacant through attrition.  In addition, management may
continue to revert or abolish positions no longer
needed.

E.  **Assignment of New and/or Additional Work**

Assignment of new or additional work, not previously
existing in the installation, shall be made in accord-
ance with the primary craft designations contained in
this instruction.

III.  **IMPLEMENTATION PROCEDURES**

A.  **Responsibilities**

Sectional Center Managers will review mail processing
operations in installations within their designated
MSC areas.  This review will include, at a minimum, an
examination of the work being performed, current duty
assignments and a determination concerning what actions
will be necessary to comply with the "Mail Processing
Work Assignment Guidelines."

B.  **Identification of Primary Craft**

All post offices with mail processing operations will,
based on the primary craft designations, identify:

1.  full-time clerk or mail handler duty assignments
    which are assigned to the inappropriate craft.

2.  full-time clerk or mail handler duty assignments
    which include both clerk and mail handler primary
    craft functions.

3.  work functions performed by part-time flexible
    clerks and mail handlers.

C.  **Implementation Plan**

Based upon the above identification, each sectional
center manager will develop a detailed implementation
plan which will contain at a minimum:

- 3 -

1. the number of full-time clerk and mail handler employees.

2. the number, by tour and duties, of full-time clerks and mail handlers:

   a. with 8 hour assignments in the inappropriate craft.

   b. whose duty assignments includes 4 or more (but less than 8) hours of work in the inappropriate craft.

3. the number of full-time clerk and mail handler vacancies as of January 26, 1979.

4. the number of full-time clerk and mail handler vacancies that are anticipated, by postal quarter, during PQ's III and IV, FY 1979, and FY 1980.

5. the number of clerk and mail handler part-time flexible employees.

6. the number of clerk and mail handler part-time flexible employees, by tour, duties and hours, performing primary craft functions designated to a different craft.

7. actions that will be taken to achieve immediate compliance, and those actions which will require phased implementation.

8. the estimated time frame (as may be necessary) for implementation, including quarterly estimates.

9. any current clerk or mail handler functions not covered in the "Mail Processing Work Assignment Guidelines."

D. Adherence

Each sectional center manager will insure that the following actions, when taken, are consistent with this instruction:

0143

4

- 4 -

1. Review each vacant full-time clerk and mail handler duty assignment.

2. Establishment of new full-time duty assignments.

3. Accession of clerk and mail handler employees.

4. Scheduling and staffing studies.

E.  Reporting Requirements

The management sectional center implementation plan will be forwarded by March 19, 1979, through the District Office to the Regional Director, Mail Processing, who will be responsible for approving the MSC's plan, insuring its timely and effective implementation, and for monitoring performance against the plan. At least once every six months, a designated regional coordinator will review each MSC to determine its progress relative to making proper clerk-mail handler work assignments. The first review cycle must be completed no later than September 1, 1979, with subsequent regional reviews of MSC performance occurring semi-annually thereafter.

C. Neil Benson
C. Neil Benson
Acting Senior Assistant
Postmaster General
Operations Group

Enclosure

Standard distribution plus 2 copies to each MSC

0144

5

MAIL PROCESSING WORK ASSIGNMENT GUIDELINES

U. S. Postal Service
November 15, 1978

11/15/78

## POST OFFICE - PRIMARY CRAFT DESIGNATIONS

| Operation | | Function | Primary Craft |
|---|---|---|---|
| 001 Platform Acceptance and Weigher's Unit | 1. | Accept, classify, and compute postage on second- and third-class mail. | Clerk |
| | 2. | Determine correct classification of second- and third-class and all other matter mailed under a permit, and determine if sufficient deposit has been made by the mailer to cover the cost of mailing. | Clerk |
| | 3. | Accept pre-cancelled and meter matter mailed in bulk quantities and verify postage. | Clerk |
| | 4. | Accept other classes of mail and receipts if necessary. | Clerk |
| | 5. | Advise customers as to proper mailing procedures. | Clerk |
| | 6. | Maintain records of permit holders, deposits, withdrawals and miscellaneous information. | Clerk |
| | 7. | Make necessary reports and submit to the manager of finance or equivalent. | Clerk |
| 010 Originating Mail Preparation | 1. | Transporting empty equipment. | Mail Handl |
| | 2. | Obtaining mail (courtesy windows, drop units, staging areas, etc.). | Mail Handl |
| | 3. | Open and dump sacks or other containers. | Mail Handl |
| | 4. | Cull (separate mail by type, and make basic local/out of town splits into trays, hampers, conveyors, etc.). | Mail Handl |
| | 5. | Tray loose metered mail, etc. | Mail Hand |

- 1 -

0146

| Operation | | Function | Primary Craft |
|---|---|---|---|
| 010 Originating Mail Preparation (Continued) | 6. | Face and cancel letters on the facer canceler (Mark II or equivalent). | Mail Handler |
| | 7. | Cancel letters on Mark II that were rejected on first pass. | Mail Handler |
| | 8. | Hand cancel, cancel with model G or other device. | Mail Handler |
| | 9. | Tray canceled mail for distribution operations. | Mail Handler |
| | 10. | Rate and cancel short paid mail. | Clerk |
| | 11. | Repair damaged letters. | Mail Handler |
| | 12. | Examine sacks for mail content. | Mail Handler |
| | 13. | Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 14. | Back stamping of missent mail. | Mail Handler |
| 020 Originating Meter Mail Preparation | 1. | Transporting empty equipment. | Mail Handler |
| | 2. | Prepare originating metered, permit imprint, and official penalty mail received from collection routes, lobby drop, dock, slides, chutes, conveyors, and other sources for distribution. | Mail Handler |
| | 3. | Traying letters and separating mail by type into different containers, separating by local and out of town. | Mail Handler |
| | 4. | Reporting mail with incorrect meter dates and rating short paid mail. | Clerk |
| | 5. | Identification and handling of presorted and riffle mail. | Clerk |
| 029 Riffle Mail | | Distribution of customer sequenced mail by ZIP Code, state or otherwise, which is sorted by batches, avoiding piece by piece distribution. Riffle | Clerk |

- 2 -

0147

| Operation | | Function | Primary |
|---|---|---|---|
| 029 Riffle Mail Continued | | mail can be sorted at letter cases, tray packs or pouch racks, depending on the make up. | |
| 030 Combined Outgoing- Incoming Letter Primary | 1. | * Transporting empty equipment. | Mail Handl |
| | 2. | *Obtaining letters from staging areas for distribution. | Mail Handl |
| | 3. | *Loading ledges. | Mail Handl |
| | 4. | Manual distribution of letter mail. | Clerk |
| | 5. | Distribution of NIXIE mail. | Clerk |
| | 6. | *Sweeping, containerizing and transporting. | Mail Handl |
| | 7. | Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 8. | *Pulling and dispatching pouches and/or other containers. | Mail Handl |
| 040 Outgoing Letter Secondary | 1. | * Transporting empty equipment. | Mail Handl |
| | 2. | *Obtaining unprocessed mail. | Mail Handl |
| | 3. | *Loading ledges. | Mail Handl |
| | 4. | Manual distribution of letter mail. | Clerk |
| | 5. | Distribution of NIXIE mail. | Clerk |

*In offices where the tasks of obtaining empty equipment, obtaining unprocessed mail, loading ledges, sweeping and containerizing is a integral part of the distribution function, the entire operation i a function of the primary craft performing the distribution.

– 3 –

0148

4

| Operation | Function | Primary Craft |
|---|---|---|
| 040 Outgoing Letter Secondary (Continued) | 6. *Sweeping | Mail Handler |
| | 7. *Containerizing and transporting. | Mail Handler |
| | 8. Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 9. Pulling and dispatching pouches and/or other containers. | Mail Handler |
| 043 State Distribution-Letters | 1. *Transporting empty equipment. | Mail Handler |
| | 2. *Obtaining unprocessed mail. | Mail Handler |
| | 3. *Loading ledges. | Mail Handler |
| | 4. Manual distribution of letter mail. | Clerk |
| | 5. Distribution of NIXIE mail. | Clerk |
| | 6. *Sweeping | Mail Handler |
| | 7. *Containerizing and transporting. | Mail Handler |
| | 8. Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 9. Pulling and dispatching pouches and/or other containers. | Mail Handler |
| 044 Sectional Center Distribution letters | 1. *Transporting empty equipment. | Mail Handler |
| | 2. *Obtaining unprocessed mail. | Mail Handler |
| | 3. *Loading ledges. | Mail Handler |
| | 4. Manual distribution of letter mail. | Clerk |
| | 5. *Sweeping. | Mail Handler |
| | 6. *Containerizing and transporting. | Mail Handler |
| | 7. Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 8. Distribution of NIXIE Mail. | Clerk |
| | 9. Pulling and dispatching pouches and/or other containers. | Mail Handler |

*Note-See asterisk, page 3        - 4 -

0149

| Operation | | Function | Primary Craft |
|---|---|---|---|
| 045 Non-Preferential Distribution-Letters | 1. | * Transporting empty equipment. | Mail Handl |
| | 2. | *Obtaining unprocessed mail. | Mail Handl |
| | 3. | *Loading ledges. | Mail Handl |
| | 4. | Manual distribution of letter mail. | Clerk |
| | 5. | *Sweeping. | Mail Handl |
| | 6. | *Containerization & transporting. | Mail Handl |
| | 7. | Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 8. | Distribution of NIXIE mail. | Clerk |
| | 9. | *Pulling and dispatching pouches and/or other containers. | Mail Handl |
| 050/055 Priority Mail Distribution | 1. | *Transporting empty equipment. | Mail Handl |
| | 2. | *Culling, facing and canceling. | Mail Handl |
| | 3. | *Opening and dumping. | Mail Handl |
| | 4. | *Transporting mail. | Mail Handl |
| | 5. | *Loading ledges. | Mail Handl |
| | 6. | Distribution of priority mail. | Clerk |
| | 7. | *Sweeping. | Mail Handl |
| | 8. | *Containerizing. | Mail Handl |
| | 9. | *Pulling and dispatching pouches or other containers. | Mail Handl |
| | 10. | Rating mail matter. | Clerk |
| | 11. | Maintaining current schedules and schemes. | Clerk |
| | 12. | Handling registry mail. | Clerk |

*Note — See asterisk, page 3

0150

| Operation | | Function | Primary Craft |
|---|---|---|---|
| 050/055 Priority Mail Distribution | 13. | Maintaining receipt and dispatch records. | Clerk |
| | 14. | Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| 060 Outgoing Flat Primary | 1. | *Transporting empty equipment. | Mail Handler |
| | 2. | *Obtaining unprocessed mail. | Mail Handler |
| | 3. | *Loading ledges. | Mail Handler |
| | 4. | Manual distribution of flat mail. | Clerk |
| | 5. | *Sweeping. | Mail Handler |
| | 6. | *Containerizing and transporting. | Mail Handler |
| | 7. | Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 8. | Distribution of NIXIE mail. | Clerk |
| | 9. | *Pulling and dispatching pouches and/or other containers. | Mail Handler |
| 070 Outgoing Flat Secondary | 1. | *Transporting empty equipment. | Mail Handler |
| | 2. | *Obtaining unprocessed mail. | Mail Handler |
| | 3. | *Loading ledges. | Mail Handler |
| | 4. | Manual distribution of flat mail. | Clerk |
| | 5. | *Sweeping. | Mail Handler |
| | 6. | *Containerizing and transporting. | Mail Handler |
| | 7. | Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 8. | Distribution of NIXIE mail. | Clerk |
| | 9. | *Pulling and dispatching pouches and/or other containers. | Mail Handler |

*Note - See asterisk, page 3

— 6 —

0151

| Operation | Function | Primary Craft |
|---|---|---|
| 073 State Distribution Flats | 1. *Transporting empty equipment. | Mail Handler |
| | 2. *Obtaining unprocessed mail. | Mail Handler |
| | 3. *Loading ledges. | Mail Handler |
| | 4. Manual distribution of flat mail. | Clerk |
| | 5. Distribution of NIXIE mail. | Clerk |
| | 6. *Sweeping. | Mail Handler |
| | 7. *Containerization and transporting. | Mail Handler |
| | 8. Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 9. *Pulling and dispatching pouches and/or other containers. | Mail Handler |
| 074 Sectional Center Flat Distribution | 1. *Transporting empty equipment. | Mail Handler |
| | 2. *Obtaining unprocessed mail. | Mail Handler |
| | 3. *Loading ledges. | Mail Handler |
| | 4. Manual distribution of flat mail. | Clerk |
| | 5. *Sweeping. | Mail Handler |
| | 6. *Containerizing and transporting. | Mail Handler |
| | 7. Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 8. Distribution of NIXIE mail. | Clerk |
| | 9. *Pulling and dispatching pouches and/or other containers. | Mail Handler |
| 075 Outgoing Flat Secondary Non-Preferential | 1. *Transporting empty equipment. | Mail Handler |
| | 2. *Obtaining unprocessed flats. | Mail Handler |
| | 3. *Loading ledges. | Mail Handler |

*Note - See asterisk, page 3

- 7 -

0152

13

| Operation | Function | Primary Craft |
|---|---|---|
| 075 Outgoing Flat Secondary Non-Preferential (Cont'd.) | 4. Manual distribution of flat mail. | Clerk |
| | 5. *Sweeping. | Mail Handler |
| | 6. *Containerization and transporting. | Mail Handler |
| | 7. Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 8. Distribution of NIXIE mail. | Clerk |
| | 9. *Pulling and dispatching pouches and/or other containers. | Mail Handler |
| 080-087 MPLSM Distribution | Machine distribution of all classes of letters. | Clerk |
| | Note: Allied labor required is normally performed by clerks. | |
| 088-089 Optical Character Reader Distribution | OCR machine distribution of all classes of letter mail. | Clerk |
| | Note: See 080-087 note. | |
| 090-098 SPLSM Distribution | Machine distribution of all classes of letters. | Clerk |
| | Note: See 080-087 note. | |
| 100 Outgoing Parcel Distribution | 1. *Transporting empty equipment. | Mail Handler |
| | 2. *Obtaining mail from staging area. | Mail Handler |
| | 3. *Dumping sacks or containers. | Mail Handler |
| | 4. Manual distribution of parcel post, without scheme knowledge. | Mail Handler |
| | 5. Manual distribution of parcel post requiring scheme knowledge. | Clerk |
| | 6. *Pulling and dispatching sacks or other containers. | Mail Handler |

*Note - See asterisk, page 3

— 8 —

| Operation | Function | Primary Craft |
|---|---|---|
| 100 Outgoing Parcel Distribution (Continued) | 7. *Containerizing and transporting mail to dispatch areas. | Mail Handler |
| | 8. *Hanging sacks and inserting labels. | Mail Handler |
| 105 Mechanized Parcel Sorter | 1. *Transporting empty equipment. | Mail Handler |
| | 2. *Obtaining mail from staging areas. | Mail Handler |
| | 3. *Dumping sacks or containers. | Mail Handler |
| | 4. Distribution of parcel post through the use of parcel sorting machines. | Clerk |
| | 5. *Pulling and dispatching sacks or other containers. | Mail Handler |
| | 6. *Containerizing and transporting mail to dispatch areas. | Mail Handler |
| | 7. *Handling sacks and inserting labels. | Mail Handler |
| 109 Rewrap | 1. Transporting empty equipment. | Mail Handler |
| | 2. Obtaining mail from staging areas. | Mail Handler |
| | 3. Assembling contents of damaged parcels. | Mail Handler |
| | 4. Operate strapping machines, heat tunnels and other rewrap mechanization. Reload mechanization with strapping, film, etc., and provide routine daily maintenance on mechanization. | Mail Handler |
| | 5. Readdressing parcels. | Mail Handler |
| | 6. Keeping records as required. | Mail Handler |

Note: All of the work performed in this operation can be considered an integral function of Operation 100 or 200 and may be assigned to the craft doing that distribution.

*Note – See asterisk, page 3

| Operation | | Function | Primary Craft |
|---|---|---|---|
| 110-129 Outgoing SPR Distribution Pouch Sack & Loose Pouch | 1. | * Transporting empty equipment. | Mail Handler |
| | 2. | *Obtaining mail from staging area. | Mail Handler |
| | 3. | *Dumping sacks, pouches, or containers. | Mail Handler |
| | 4. | *Hanging sacks or pouches. | Mail Handler |
| | 5. | *Inserting labels. | Clerk |
| | 6. | *Cutting bundles and facing letters and flats. | Mail Handler |
| | 7. | Distribution of outgoing IPP's, newspapers, rolls, letter or flat bundles, slugs, Special Delivery or Special Handling parcel post. | Clerk |
| | 8. | *Pulling sacks, pouches or containers for dispatch. | Mail Handler |
| | 9. | *Containerizing and transporting. | Mail Handler |
| | 10. | *Operating "strapping" equipment. | Mail Handler |
| 134 Sectional Center Distribution | 1. | *Transporting empty equipment. | Mail Handler |
| | 2. | *Obtaining unprocessed mail. | Mail Handler |
| | 3. | *Loading unprocessed mail. | Mail Handler |
| | 4. | Manual distribution of mail. | Clerk |
| | 5. | *Sweeping. | Mail Handler |
| | 6. | *Containerization and transporting. | Mail Handler |
| | 7. | Distribution of NIXIE mail. | Clerk |
| | 8. | Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 9. | *Pulling and dispatching pouches and/or other containers. | Mail Handler |

*Note - See asterisk, page 3

- 10 -

16

| Operation | Function | | Primary Craft |
|---|---|---|---|
| 150 Incoming Letter Primary | 1. | *Transporting empty equipment. | Mail Handler |
| | 2. | *Obtaining mail from staging area. | Mail Handler |
| | 3. | *Loading ledges. | Mail Handler |
| | 4. | Manual distribution of letter mail. | Clerk |
| | 5. | *Sweeping. | Mail Handler |
| | 6. | *Containerizing and transporting. | Mail Handler |
| | 7. | Distribution of NIXIE mail. | Clerk |
| | 8. | Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 9. | *Pulling and dispatching pouches and/or other containers. | Mail Handler |
| 160 Incoming Letter Secondary | 1. | *Transporting empty equipment. | Mail Handler |
| | 2. | *Obtaining mail from staging area. | Mail Handler |
| | 3. | *Loading ledges. | Mail Handler |
| | 4. | Manual distribution of letter mail. | Clerk |
| | 5. | *Sweeping | Mail Handler |
| | 6. | *Containerizing and transporting. | Mail Handler |
| | 7. | Distribution of NIXIE mail. | Clerk |
| | 8. | Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 9. | *Pulling and dispatching pouches and/or other containers. | Mail Handler |

Note - See asterisk, page 3

- 11 -

0156

| Operation | | Function | Primary Craft |
|---|---|---|---|
| 168/169 Box Section Primary and Secondary | 1. | *Transporting empty equipment. | Mail Handler |
| | 2. | *Obtaining mail from staging areas. | Mail Handler |
| | 3. | *Loading ledges. | Mail Handler |
| | 4. | *Hanging and labeling sacks or pouches. | Mail Handler |
| | 5. | Manual distribution of mail. | Clerk |
| | 6. | Window service incidental to box section activities. | Clerk |
| | 7. | *Pulling and dispatching sacks or pouches. | Mail Handler |
| | 8. | Distribuiton of NIXIE mail. | Clerk |
| | 9. | Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 10. | *Sweeping. | Mail Handler |
| 170 Incoming Flat Primary | 1. | *Transporting empty equipment. | Mail Handler |
| | 2. | *Obtaining flats from staging area. | Mail Handler |
| | 3. | *Loading ledges. | Mail Handler |
| | 4. | Manual distribution of flat mail. | Clerk |
| | 5. | *Sweeping. | Mail Handler |
| | 6. | *Containerizing and transporting. | Mail Handler |
| | 7. | Distribution of NIXIE mail. | Clerk |
| | 8. | Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 9. | *Pulling and dispatching pouches and/or other containers. | Mail Handler |

*Note - See asterisk, page  3

- 12 -

0157

15

| Operation | | Function | Primary Craft |
|---|---|---|---|
| 175 Incoming Flat Secondary | 1. | *Transporting empty equipment. | Mail Handler |
| | 2. | *Obtaining flats from staging area. | Mail Handler |
| | 3. | *Loading ledges. | Mail Handler |
| | 4. | Distribution of flat mail. | Clerk |
| | 5. | *Sweeping. | Mail Handler |
| | 6. | *Containerizing and transporting mail to dispatch areas. | Mail Handler |
| | 7. | Distribution of NIXIE mail. | Clerk |
| | 8. | Identifying and reporting, as appropriate, mail not meeting postal regulations. | Clerk |
| | 9. | *Pulling and dispatching pouches and/or other containers. | Mail Handler |
| 180-189 Incoming SPR Distribution, Opening and Traying | 1. | *Transporting empty equipment. | Mail Handler |
| | 2. | *Obtaining mail from staging areas. | Mail Handler |
| | 3. | *Dumping sacks, pouches, or containers. | Mail Handler |
| | 4. | *Hanging and labeling sacks or pouches. | Mail Handler |
| | 5. | Distribution of incoming IPP's newspaper rolls, letter or flat bundles, Special Delivery or Special Handling parcel post to sacks, pouches, or containers. | Clerk |
| | 6. | *Cutting bundles and facing letters and flats. | Mail Handler |
| | 7. | *Containerizing and transporting. | Mail Handler |
| | 8. | *Pulling and dispatching pouches and/or other containers. | Mail Handler |

*Note - See asterisk, page 3

- 13 -

0158

|  |  | | Primary Craft |
|---|---|---|---|
| **Operation** | | **Function** | |
| 200 Incoming Parcel Distribution | 1. | * Transporting empty equipment. | Mail Handler |
| | 2. | *Obtaining mail from staging area. | Mail Handler |
| | 3. | *Dumping sacks or containers. | Mail Handler |
| | 4. | *Hanging and labeling sacks. | Mail Handler |
| | 5. | Manual distribution of parcel post. | Clerk |
| | 6. | *Containerizing and transporting | Mail Handler |
| | 7. | *Pulling and dispatching pouches and/or other containers. | Mail Handler |
| 210-239 Platform Operations | 1. | Transporting empty equipment. | Mail Handler |
| | 2. | Loading and unloading vehicles | Mail Handler |
| | 3. | Separating mixed collection mails. | Mail Handler |
| | 4. | Non-scheme separation of sacks, pouches or outside parcels for further processing. | Mail Handler |
| | 5. | Manual sorting of sacks, pouches, and outside parcels for destination dispatch requiring scheme knowledge. | Clerk |
| | 6. | Manual separation of sacks, pouches and outside parcels requiring no scheme knowledge. | Mail Handler |
| | 7. | Mechanized sorting of sacks, pouches and outside parcels requiring scheme knowledge. | Clerk |
| | 8. | Mechanized sorting of sacks, pouches, and outside parcels requiring no scheme knowledge. | Mail Handler |
| | 9. | Operating ~~freight elevators~~ tow motors, fork lifts and jacks. | Mail Handler |
| | 10. | Directing traffic. | Mail Handler |

*Note - See asterisk, page 3

- 14 -

0159

2

| Operation | | Function | Primary Craft |
|---|---|---|---|
| 210-239 Platform Operations (Continued) | 11. | Transporting mail to and from platform areas. | Mail Handl |
| | 12. | Making dock connection transfers. | Clerk |
| 240-339 Distribution at Stations & Branches | | Distribution of mail. -The designation of a primary craft can be applied to a detached unit which performs or supports a mail processing operation. | Clerk |
| 549 Sack Examination | 1. | Examining and segregating empty bags. | Mail Handl |
| | 2. | Bundling, sacking, tying and labeling empty mail bags. | Mail Handl |

0160

# BULK MAIL CENTERS

## Primary Craft Designations

In Bulk Mail Centers, where the tasks of transporting empty equipment and mail, as well as other ancillary activities, are an integral part of the distribution function and cannot be separated, the entire operation is a function of the primary craft performing the distribution.

| Operation | | Function | Primary Craft |
|---|---|---|---|
| Inbound Docks | 1. | Unload vehicles. | Mailhandler |
| | 2. | Stage and transport pallets. | Mailhandler |
| | 3. | Dumping hampers | Mailhandler |
| | 4. | Culling | Mailhandler |
| | 5. | Minor on-site repairs | Mailhandler |
| | 6. | Vehicle record keeping | Clerk |
| | 7. | Weigh and acceptance | Clerk |
| Outbound Docks | 1. | Load vehicles | Mailhandler |
| | 2. | Culling | Mailhandler |
| | 3. | Roller table separations | Mailhandler |
| | 4. | Tend missent/malfunction chutes | Mailhandler |
| | 5. | Stage and transport containers | Mailhandler |
| | 6. | Vehicle record keeping | Clerk |

0161

2 2

| Operation | | Function | Primary Craft |
|---|---|---|---|
| Primary Parcel Sorting | 1. | Facing and keying | Clerk |
| | 2. | Culling at parcel induction stations. | Clerk |
| | 3. | Minor on-site repairs/bag damage. | Clerk |
| | 4. | Sort foreign mail. | Clerk |
| | 5. | Distribution at roller tables to sacks/containers. | Clerk |
| | 6. | Distribution at missents/malfunction chutes. | Clerk |
| | 7. | Container loader tending | Mailhandler |
| | 8. | Obtaining and moving empty equipment. | Mailhandler |
| Secondary Parcel Sorting | 1. | Facing and keying | Clerk |
| | 2. | Culling for minor on-site repairs. | Clerk |
| | 3. | Distribution of parcels to sacks/containers. | Clerk |
| | 4. | Container loader tending | Mailhandler |
| | 5. | Obtaining and moving empty equipment. | Mailhandler |

0162

| Operation | Function | Primary Craft |
|---|---|---|
| Sack Sorting, Rewrap IPPs and Non-ZIP Coding | 1. Sack sorting keying. | Mailhandler |
| | 2. Culling and on-site repairs. | Mailhandler |
| | 3. Tend missent/malfunction chutes | Mailhandler |
| | 4. Rewrap | Mailhandler |
| | 5. ZIP Coding unzipped mail. | Clerk |
| | 6. Dumping hampers, sacks, etc. | Mailhandler |
| | 7. Culling of irregular parcels. | Mailhandler |
| | 8. Sorting of irregular parcels. | Clerk |
| | 9. Empty equipment handling | Mailhandler |
| | 10. Transport sacks/containers | Mailhandler |
| | 11. Sack sorter run out tending | Mailhandler |
| Sack Shakeout, Container Dumping | 1. Sack shakeout | Mailhandler |
| | 2. Container dumping | Mailhandler |
| | 3. Culling for non-machinable mail and damaged parcels. | Mailhandler |
| | 4. Empty sack processing | Mailhandler |
| Loose in the Mail | 1. Sort, match and record keeping | Clerk |
| | 2. Collect and transport | Mailhandler |
| | 3. Culling and trash screening | Mailhandler |

0163

2 <

| Operation | Function | Primary Craft |
|---|---|---|
| ISO | 1. ISO sorting | Mailhandler |
| | 2. Transporting containers and empty equipment. | Mailhandler |
| Outgoing SPR Opening and Distribution | 1. Dumping containers, racks, pallets | Mailhandler |
| | 2. Culling and bundle repair | Mailhandler |
| | 3. Distribute second- and third-class to sacks and containers. | Clerk |
| | 4. Empty equipment handling | Mailhandler |
| | 5. Transport sacks, containers pallets. | Mailhandler |

O

AX #23

cc:  Messrs.  Newman
                    Morgen
                    Jordan
                    Wolff

**regional instructions**

UNITED STATES POSTAL SERVICE

PART 300
POSTAL OPERATIONS
1096 -PO-209

| SUBJECT Revisions to Mail Processing Work Assignment Guidelines | DATE 6-15-79 | FILING NO 399(Navy) R |
|---|---|---|

RECEIVED

JUN 22 1979

INDUSTRIAL RELATIONS

PURPOSE

Make the following changes to Regional Instruction 1085-PO-204, February 16, 1979:

1.  Operation 010, item 4

    Add:  Distribution to cases or sack/pouch racks will be assigned in accordance with the appropriate distribution operation.

2.  In the following operations and functional items, delete the word <u>dispatching</u> and substitute the word <u>transporting</u>:

    a. Operation 030, item 9        j. Operation 074, item 9
    b. Operation 040, item 9        k. Operation 075, item 9
    c. Operation 043, item 9        l. Operation 134, item 9
    d. Operation 044, item 9        m. Operation 150, item 9
    e. Operation 045, item 9        n. Operation 160, item 9
    f. Operation 050/055, item 9    o. Operation 170, item 9
    g. Operation 060, item 9        p. Operation 175, item 9
    h. Operation 070, item 9        q. Operation 180-189, item 9
    i. Operation 073, item 9

3.  Operation 080-087 "<u>Note</u>" should read:

    Allied labor required is normally performed by clerks because of the rotation system employed.

4.  Operation 110-129, delete <u>SPR</u> in the operation heading and replace with <u>IPP</u>.

5.  Operation 210-239, item 9, delete "freight elevators."

6.  Inbound Docks - EMC, item 9, insert "parcel" between the words <u>on-site</u> and <u>repairs</u>.

| ORIGINATING OFFICE Operations Group | ACTION OFFICE Regional Mail Processing | PAGES 1 of 2 |
|---|---|---|

- 2 -

7.  Sack sorting, Rewrap IPP's and non-ZIP Coding, item 2, insert "parcel" between the words <u>on-site</u> and <u>repairs</u>.

C. Neil Benson
Acting Senior Assistant
    Postmaster General
Operations Group

Standard distribution plus two copies to each MSC.

In the Matter of the Arbitration between       :

AMERICAN POSTAL WORKERS UNION, AFL-CIO          :       Case No. AD-NAT-1311

       and                                      :

NATIONAL POST OFFICE, MAIL HANDLERS,            :       OPINION AND AWARD
WATCHMEN, MESSENGERS, AND GROUP LEADERS         :
DIVISION OF THE LABORERS INTERNATIONAL          :
UNION OF NORTH AMERICA, AFL-CIO                 :

BACKGROUND:

Even prior to the issuance of Regional Instruction No. 399, MAIL PROCESSING WORK ASSIGNMENT GUIDELINES, by the USPS, and its subsequent revisions and amendments, the APWU voiced its dissatisfaction with the decisions made by the USPS in regard to the primary craft assignments relative to the performance of specific mail processing work functions. This long-running dispute came to a head after all efforts to effect a compromise between the competing contentions of the APWU, the Mail Handlers and the Postal Service had not resulted in an agreement, and the USPS published Regional Instruction No. 399, and set about making new work assignments.

A definitive statement of the APWU protest was contained in a letter dated September 28, 1979 from General President Emmet Andrews of the APWU to Assitant Postmaster General James Gildea.

Several days, in this lengthy hearing, were spent in arguing the arbitrability of the contentions raised by the APWU. After much discussion, on and off the record, the parties agreed to enter into a stipulation to resolve that issue. The stipulation provided: (1) that the USPS and the Mail Handlers would withdraw

their objection to the arbitrability of the issue presented by
the APWU, (2) that the APWU would not challenge the legality of
the issuance of Regional Instruction No. 399, (3) that the parties
would meet and agree on what particular assignments were contested
by the APWU and which were to be resolved in this arbitration
proceeding, and (4) the USPS and the Mail Handlers would not
object to the APWU seeking a retroactive remedy if the Arbi-
trator were to sustain its contention that the USPS had violated
the National Agreement in making these assignments.

When this stipulation was accepted, the APWU agreed that
only those assignments contained in Regional Instruction No. 399
at issue were those listed in President Andrews' September 28,
1979 to APG Gildea.

That letter set forth the following assignments to which
the APWU took exception:

> "(1) Operation 010 – We dispute the award of
> any portion of this operation to the mail
> handlers craft as the primary craft with
> the exception of letter cancellation on
> facer-cancellers.

> "(2)  Operation 020 – This Union disputes the
> assignment of any portion of this operation
> to the mail handler craft as the primary craft.

> "(3)  Operation 050/055 – We dispute the
> assignment of any work in the primary mail
> function to mail handlers as the primary craft.

> "(4)  100 – We dispute the award of the distrib-
> ution of all parcel post without scheme knowledge
> to the mail handlers.

> "(5)  Operation 105 – We dispute the assignment
> of dispatching in Item No. 5 to the Mailhandler
> craft.  We also challenge to award of inserting
> labels to the mail handler craft.

> "(6)  Operation 109 – We dispute the readdressing
> of parcels and record keeping other than an actual

count of parcels rewrapped as a primary function of the mail handler craft. We also challenge the insertion of the note at the bottom of Operation 109 as we claim all distribution work.

"(7) Operation 168/169 - We dispute the assignment of mail handlers to the box section in any post office.

"(8) Operation 180/189 - We dispute the assignment of labeling of sacks and the dispatching of pouches to the mail handler craft.

"(9) Operation 200 - We dispute the assignment of labeling of sacks and the dispatching of pouches to the mail handler craft.

"(10) 210/239 - We dispute the assignment of manual sorting of outside parcels as a primary function of the mail handler craft, even though such distribution is non-scheme.

"(11) We challenge the award of loading of ledges and sweeping cases as a primary function of the mail handler craft wherever such an award is made throughout the several pages of Regional Instruction No. 399.

"(12) In the Bulk Mail Centers we dispute the award of the missent/malfunction chutes as a primary function of the mail handler craft.

"We also dispute the assignment of non-machineable outside parcel sortation to the mail handler craft as a primary function."

The APWU contended, on the basis of the criteria established in the USPS-Mail Handler-APWU-NALC Memorandum of Understanding on Jurisdictional Disputes, which is set out on pages 142-143 of the July 21, 1978 National Agreement, the USPS should have assigned the clerk craft as the primary craft for all of these operations, except for 010 and 020, which should have been jointly assigned to the mail handlers and the clerks.

The criteria enumerated in that Memorandum are:

0169

1. existing work assignment practices;
2. manpower costs;
3. avoidance of duplication of effort and "make work" assignments;
4. effective utilization of manpower, including the Postal Service's need to assign employees across craft lines on a temporary basis;
5. the integral nature of all duties which comprise a normal duty assignment;
6. the contractual and legal obligations and requirements of the parties.

The APWU also pointed out that the Memorandum provided as well that other relevant factors could be considered by the committee to decide jurisdictional disputes or, in turn, by the arbitrator if no resolution of a dispute were achieved by the committee and the matter proceeded to be arbitrated under Article XV. The APWU urged that the criteria considered by the NLRB in Section 10 (k) proceedings also be weighed. The APWU also urged that "community of interest" be considered as another criteria as it had been by other arbitrators in postal service jurisdictional disputes which went to arbitration prior to the agreement being reached to establish the jurisdictional disputes committee. The APWU also made reference to an arbitration decision issued by National Arbitrator Garrett in 1974 wherein various relevant criteria were discussed in a successful effort of the APWU to resist a challenge by the Mail Handlers to an ultimate decision of the USPS to uphold the assignment of three disputed positions in Oakland, San Francisco and Seattle to the clerk craft.

The Mail Handlers agreed that the criteria listed in the Memorandum of Understanding, among other relevant factors, could be employed to determine whether the assignments made in Regional Instruction No. 399 required a reassignment of the disputed oper-

-4-

ations to the APWU.  The Mail Handlers also argued that the APWU
waived its right to dispute those assignments in Regional Instruc-
tion No. 399 by refusing to negotiate about such assignments during
the 1978 national negotiations.

The Postal Service took the position that, in the light of
the rights which it reserved in Article III of the National Agreement,
it was entitled to designate the Mail Handlers as the primary craft,
where applicable, for the assignments challenged by the Clerks
in this proceeding.  The Postal Service alleged that the determination
as to primary craft assignments finally made in Regional Instruction
No. 399 sought to achieve an efficient and cost effective way to
resolve the jurisdictional "morass" between these unions while at
the same time creating the least amount of confusion in the field.
By weighing the skill level involved in these tasks under review,
productivity, past practice, and the need for efficiency and
economy, and after consultation with the union officials from the
competing crafts, the USPS team came up with a determination as
to which craft would be considered primary in making assignments
and, where necessary, where the other craft could be assigned as
a supplemental or secondary craft.

Such proposals as the postal officials presented were discussed
intensively with union representatives from the competing crafts
at first in joint meetings and later in separate sessions during
1977 and right up to and during the 1978 negotiations.  Specific
proposals were made for post office operations as well as those
conducted at the Bulk Mail Centers.  When these negotiations ended
without an agreement, the Postal Service undertook to issue its

own jurisdictional guidelines incorporating to some extent the positions adopted by the APWU as well as the Mail Handlers as a compromise. After receiving comments from the field, the USPS issued revised guidelines which were submitted to the unions for comment. Weighing these comments from its own operating officials as well as the reaction from the APWU and the Mail Handlers, the USPS took the bit in its teeth and issued Regional Instruction No. 399 on February 26, 1979. This formulation of primary and secondary assignments brought forth the protest in General President Andrews' letter of September 28, 1979 discussed above.

OPINION OF THE ARBITRATOR:

It is necessary preliminarily to address the argument raised by the Mail Handlers that the APWU had waived its right to arbitrate the merits of its case contesting the assignments made in Regional Instruction No. 399 because the APWU indicated that it had an agreement with the Postal Service and refused to participate in subsequent negotiations with the USPS and the Mail Handlers on these disputed work assignments after the remainder of the 1978 collective bargaining agreement had been agreed upon.

The evidence in this record did support the Mail Handlers claim that it did continue to negotiate on jurisdictional matters after the wage agreement had been made and after the APWU left the main bargaining table. After further negotiations, the spokes-man for the Mail Handlers and for the Post Office did sign a joint statement which reads as follows:

6

"The parties hereto agree that within sixty (60) days of July 21, 1978, the Employer shall issue for prompt national implementation a detailed statement setting forth those work assignments which are within the exclusive jurisdiction of the Mail Handlers Craft. Disputes arising out of the issuance of such a statement shall be subject to the dispute resolution provisions contained in the Memorandum of Understanding on Jurisdiction agreed to by the unions party to the National Agreement.

Disputes between the parties hereto with respect to implementation of the aforementioned statement shall be subject to the provisions of Article XV of the National Agreement."

A reading of this agreement between the Mail Handlers and the USPS will reveal that these parties did provide and recognize the continued existence of the Memorandum of Understanding on Jurisdiction which was also contained in the new National Agreement. Under the terms of that Memorandum, the APWU could still contest any assignments of jurisdiction made by the USPS regardless of the agreement of the Mail Handlers to the terms of the assignment. That Memorandum also provides that where the machinery established in the National Agreement does not resolve jurisdictional disputes the aggrieved party may employ the arbitration procedure found in Article XV. A waiver of the right to employ the disputes resolution machinery so provided cannot be found in the agreement which was reached by only two of the parties upon whom such jurisdictional assignments might have an impact.

Additionally, the record made in the early days of this proceeding will clearly establish that the Mail Handlers did stipulate and agree that the issues raised by the September 28, 1979 letter of President Emmet Andrews would be addressed on the merits by the Arbitrator.

In weighing the merits of the contentions raised by the APWU, the Arbitrator was guided principally by the criteria established in the Memorandum of Understanding, which are set forth above, as well as by the other considerations voiced by the arbitrators who decided earlier jurisdictional disputes between these same parties. Furthermore, the changes which have taken place in mail processing in the postal service in the relatively recent past also had to be taken into consideration in order to realistically appraise the compliance by the Postal Service with the criteria mentioned above in its determinations made in publishing and implementing Regional Instruction No. 399 in the manner protested by the APWU.

There is no question that with the passage of the Postal Reorganization Act, as the USPS pointed out, Congress decreed that greater emphasis on efficiency and economy would have to be exhibited by management. To that end, management was charged by the Congress with the responsibility for reviewing all postal service operations to promote greater efficiency and more expeditious mail handling.

At the same time, perhaps spurred on by postal reorganization legislation, there have been dramatic and far reaching changes adopted in the actual mail distribution process. Even more apparent than the disappearance of reliance upon rail transportation has been the impact of the adoption of the zip code on the need to employ scheme knowledge in the same manner as had previously been required. In addition to a deemphasis in the reliance upon scheme knowledge, technological changes and innovations, having widespread

effect upon the operations now required to process the mail, as contrasted to the earlier techniques and systems which were employed, are now in operation.  Greater reliance upon bulk mail handling and mechanization along with the adoption of the Bulk Mail Center system and the use of the letter sorting machine are just some examples of the revolutionary changes which have taken place.

Although distinctions between clerk duties and those traditionally assigned to the mail handler are still apparent in many of the mail processing operations, the impact of the legislation which required that management reconsider its way of delivering mail as well as revamp the methods and means employed to do so has blurred those distinctions in several areas of mail handling.

All of the considerations referred to above have impacted upon the present day skill requirements and responsibilities of the individual crafts.  The Arbitrator must determine whether President Andrews' grievance is positioned upon a correct contention that the assignments in Regional Instruction No. 399, which are the basis of his protest, violate any Postal Service obligation imposed in the 1978 National Agreement, and whether the Postal Service obeyed any restrictions upon making such primary craft assignments as they may be imposed by the terms of the Agreement.

Some further words, by way of background, may be in order. Disputes between the APWU and the Mail Handlers over the proper craft assignment of certain positions in mail processing have been ongoing for many years, even prior to the establishment of the reorganized Service in 1970.  In the bargaining which took place

leading up to the making of the 1975 aggreement, this juris-
dictional rivalry almost caused negotiations to collapse. This
event led to the establishment of the Jurisdictional Committee
pursuant to the Memorandum of Understanding.

After the 1975 Agreement was then consummated, the Unions
met with the Postal Service in an attempt to resolve jurisdictional
issues. It was apparent that the primary cause of friction was
the overlapping claims of the Clerks and the Mail Handlers. A
special subcommittee was then formed on which representatives of
the Clerks, the Mail Handlers and the Postal Service served.
Many meetings of this subcommittee were held but the parties did
not make much progress. In January of 1977, at the request of
these unions, the Service assembled a team to develop a proposal
on resolving the conflicting jurisdictional claims. This team
was to be guided by the six criteria mentioned in the Memorandum
of Understanding, past practice, certain previous arbitration
decisions dealing with conflicting jurisdictional claims, and
also were directed to keep in mind the USPS' desire to achieve
greater efficiency and economy of operations. The team also was
to consult various handbooks issued by the Service containing
bargaining unit position descriptions, personnel practices, and
the qualification standards for all Postal Service positions.

The overall goal of their efforts, as they described it,
was to develop an efficient and cost effective way to resolve the
jurisdictional claims while creating the least amount of confusion
in the field.

As part of their study, this team broke down the mail processing

-10-

E0176

operations in the post offices into their component functions.
Then, weighing the skill level involved, productivity, past prac-
tice, and the need for efficiency and economy, the team recommended
that either the Clerks or the Mail Handlers be assigned as the
primary craft to each respective function in each operation. The
team deliberately designated one or the other craft as the "primary
craft" so management would have some flexibility in making assign-
ments.

The initial proposal, which did not cover assignments at
bulk mail centers, was then presented separately to each of the
Unions for comments and criticism. This was in November of 1977.
Each Union had some reservations about some of the original primary
craft assignments made by the Postal Service, but the testimony
in this proceeding did not indicate that the methodology employed
by the Postal Service team had been attacked. After meetings with
these Unions, the Service compromised in some areas as did the
Unions. In April of 1978, the Service presented the Unions with
a new document which incorporated many of the proposals and dispute
between these Unions, not directly associated with the Postal
Service's proposed assignments, they would not agree to accept
the Service's proposal.

Negotiations for the 1978-1981 National Agreement then got
underway. During the course of these negotiations, using another
team of management officials who were experienced in bulk mail
center operations, another package of craft assignments covering
bulk mail center operations was developed.

In those negotiations, another subcommittee was established

to work with a Federal Mediator in an attempt to resolve the on-going jurisdictional issue. Both Unions proposed changes in the previous presentation made by the Postal Service. Those efforts did not result in an agreement to which they could all subscribe, and the jurisdictional issue went back to the main table.

It was at this point, as discussed earlier, that the Mail Handler President insisted that the jurisdictional issue be resolved. The Clerks' President claimed that all the issues to be addressed at the main table had been resolved and that he had an agreement. He left the negotiations.

After further discussion with the Mail Handlers and also after adopting many of the changes also demanded by the APWU in earlier negotiations, the Postal Service issued a revised copy of its proposed guidelines to both Unions and to its field management officials for comment. This was in August of 1978. A further revision was distributed in November of 1978 and the guidelines were published as a Regional Instruction on February 16, 1979. Thereafter, the APWU raised certain objections to several of the provisions of the Instructions. Three additional meetings with the APWU were held and further changes in the Instructions were made to meet those objections. An amended version of Regional Instruction No. 399 was eventually issued on June 15, 1979, and an errata sheet to supplement it was published on July 6, 1979.

Each of the thirteen objections to that document set out in President Andrews' letter of September 28, 1979 were reviewed by the Arbitrator against the guidelines agreed to by the parties to this dispute in the Memorandum of Understanding. Found

in the 1975 and 1978 Agreements.  The Arbitrator also adopted
the suggestion of the APWU and considered the guidelines custom-
arily employed by the National Labor Relations Board in 10 (k)
cases, as well as a wide variety of factors including past
practice, skills involved, and qualifications necessary to per-
form the work as it presently is performed.  None of these factors
was given predominant weight although the APWU urged in many
instances that traditional practice based upon the earlier require-
ment of scheme knowledge should be afforded such weight.  If the
Arbitrator were to do so, he would have to ignore the obvious
extraordinary changes in mail processing operations to which re-
ference was made earlier.

Much of the testimony was concerned with the APWU claim
that all of the work involved, with one exception, in either
Operation 010 or 020, should be awarded to Clerks rather than
Mail Handlers, as provided in the Regional Instruction, or in
certain instances there should be an award of jurisdiction to
both crafts jointly.  The testimony in this record, even that
offered by APWU witnesses, confirmed that 010 and 020 operations
are traditionally basic mail handler craft work.  That is not
to say that in some offices, during peak hours, management has
not assigned other crafts to this type of work.  However, such
supplemental use of other crafts does not establish the preeminence
of the clerk craft assertion of jurisdiction.  The fact that certain
APWU studies indicated joint manning of these operations at certain
facilities does not alter the present dictate of Regional Instruction
399, which would not require that practice be disturbed.  If the

/ 3.

evidence as to manpower costs, employee required skills or qual-
ifications, and the avoidance of duplication of effort as well as
the integration of duty assignments are also considered, the test-
imony fully justifies the assignments of the functions in the 010
and 020 operations as they are set out in Regional Instruction No.
399.

As to Operations 050/055, at the hearing, the APWU objection
was modified to only encompass post offices where the primary mail
is so reduced so that allied functions ought to be part of the
distribution process which the Regional Instruction give to clerks.
If one reads the footnote found on the bottom of page 3 of the
Regional Instruction, it appears that such integration of the op-
eration and such an assignment is contemplated under the circum-
stances to which the APWU made reference. Management is mandated
to make such integrated assignments in the interest of efficiency
and economy and under the authority granted to it in Article III
of the National Agreement.

Regarding Operation 100, the Clerks alleged that since this
operation involved single piece distribution it should by tradition
and practice be assigned to Clerks. This is non-scheme parcel post
handling. The Mail Handler key position description specifically
reads "simple distribution of parcel post." Such non-scheme dis-
tribution must be equated with the term "simple distribution." In
the past, it is true, much of the parcel post operation was worked
by Clerks. Without scheme knowledge presently being required, the
rational for making this a primary clerk assignment no longer exists.
The testimony in this record on such work assignment practices

# Joint Exhibit 1

# Part 4

across the Country now shows a mixed practice at best and not one which would support the Clerk's claim to primary assignment based on any present national practice.

Operations 105, 180/189, and 200:  Labeling and Dispatching: All these operations involve the same functions of labeling and dispatching sacks and pouches of mail.  The APWU witness appeared to argue that since a Clerk was responsible for distribution, permitting a Mail Handler to insert a label on a sack could cause that sack to be misrouted and the Clerk could be charged with and held responsible for such an error.  These labels come from a label holder containing many pre-printed labels.  All the Mail Handler is required to do is to physically insert such a pre-printed label into the proper place on the sack or pouch.  Although Mail Handlers obviously have the necessary skill to perform this function, Regional Instruction No. 399 does provide that when labeling and dispatching are an integral part of the distribution function, they will be performed by Clerks.  For this reason, it must be found that the Regional Instruction in a realistic and most efficient manner provides for the primary assignment to be determined  by considering the efficiencies of an integrated operation.  The evidence of national practice as to the assignment of this function discloses that both Mail Handlers and Clerks have been assigned primary jurisdiction at different facilities for these operations.

As for Operation 109 (Parcel Rewrap), Operation 168/169 (Box Section) and Missent Malfunction Chutes, the testimony in this record, which can be afforded evidentiary weight, indicates that rewrap operations do not require skills beyond those possessed by the Mail Handlers  and certainly  do not  require scheme

knowledge. Other testimony supports the claim of the Mail
Handlers that rewrap operations at some facilities in the field
have always been performed by members of that craft. It cannot
be found, based upon the record made by the APWU, that there has
been a failure to abide by relevant criteria in the manner in
which these operations have been assigned. With regard to Operation
168/169 (Box Section), once again, Regional Instruction No. 399
would permit the assignment of these operations to the Clerk craft
in the event that it appears to be integrated with the distribution
function. As for missent/malfunction chutes, such testimony as is
to be found in this record only reveals that some basis for making
this assignment primarily to the Mail Handler craft can be found to
be consistent with past practice. Affirmative evidence of a fail-
ure to abide by the guidelines provided by the criteria in the
Memorandum or otherwise was not provided by the APWU.

Much testimony and observation time on the field visit was
devoted to Platform Operation 210/239. The APWU protested the
primary craft assignment of manual sorting of outside parcels to
the Mail Handlers. Since Mail Handlers customarily are employed
on the docks, it was efficient and more productive to integrate
their assigned tasks by having them undertake the manual sorting
of outside parcels accomplished in this work area. Such testimony
as was offered on this point indicated that past practice would
support the Mail Handlers' claim that non-scheme separation of sacks,
parcels, and particularly outsize parcels on the platform has been
regarded as Mail Handler assignments at many facilities.

President Andrews also objected to the assignment of any ledge

loading and sweeping to Mail Handlers. Here again, the asterisk on page 3 of the Regional Instruction would require that such assignments be made to the craft primarily responsible for and integrated with the distribution function. Where, as is most prevalent, distribution is performed by the Clerk craft, considerations of efficiency and economy as well as the rational integration of operations would dictate that ledge loading and sweeping be primarily assigned to the Clerk craft.

Another major controversy appears to concern the handling of non-machinable outsides. These are the packages which are too bulky or heavy or too awkward to be processed by machine. Such packages are distributed, at present, through Bulk Mail Centers. The present method employed for their distribution does not require nor employ scheme knowledge. The testimony did indicate that such "parcels" are brought to the distribution point by Mail Handlers and they are physically taken away by Mail Handlers. Requiring the intervention of a Clerk to direct the flow of such NMO's would interrupt the integration of such operations which may be achieved by having the same individuals handle the whole process of non-scheme NMO sortation. The directive contained in the Memorandum guidelines to take into consideration efficiency and productivity, would be violated if the primary assignment of such operations required this function be performed by a member of the Clerk craft.

Some additional comments are necessary to support the conclusion that the findings made above, concerning the propriety of the primary assignments made in Regional Instruction No. 399, are consistent with the conclusions reached by Arbitrator Garrett in

Case No. AW-NAT-5753, introduced in evidence by the APWU. In that case, the Arbitrator found that certain work assignments were unilaterally transferred from the Clerk craft to the Mail Handlers. In this case, the testimony and other evidence in the record establishes that each of the disputed assignments were being performed by Mail Handlers as well as Clerks at various facilities throughout the Country. Additionally, as stated earlier, the assignments made in Regional Instruction No. 399 are "primary" assignments only. There is no entitlement bestowed upon either the Clerks nor the Mail Handlers to perform each of these operations at every facility. No employee presently performing any of the disputed operations of functions is to be replaced except by attrition. No hard and fast demarcations have been made. No whole-sale dislocations or reassignments of functions or operations is contemplated.

It must also be noted that the Garrett Award did provide that changed conditions could bring about changes in assignments. As was discussed earlier in this Opinion, revolutionary changes in the process of mail handling have been experienced. Regional Instruction No. 399 has reacted to those changes on a national basis by a reevaluation of previous functional assignments in a very limited way. Craft lines have not been obliterated nor ignored. They have been recast in a formal writing to reflect changes in practice, which have evolved over the period of the past several years, which were responsive to the technological and other operational changes which have been instituted by management to move the mail more efficiently and effectively.

18

These dramatic changes in the way the mail is now moved and in the even more dramatically different way the mail will be distributed and transmitted in the future will certainly impact upon the work environment and job content of every postal employee. Although the APWU did assert that as a result of the implementation of Regional Instruction No. 399 the employment opportunities for members of the Clerk craft had been dispropor- tionately been reduced, the evidence which the Union offered in support of such a claim was not fully persuasive. This record does not support a finding that over some period of time as a result of the implementation of Regional Instruction No. 399, coupled with further technological advances and operational changes which will be made, that employees possessing higher skills and qualifications will be less in demand. The contrary appears more likely.

For the reasons set forth above, the Undersigned must ultimately conclude that the publication and implementation of Regional Instruc- tion No. 399 has not violated the cited provisions of the National Agreement, the Memorandum of Understanding on Jurisdiction appended thereto, or any of the other accepted criteria for jurisdictional determinations to which the APWU made reference.

THEREFORE, after due deliberation, the Undersigned makes the following

### AWARD

The grievance presented by the APWU in Case No. AD-NAT-1311 must be and hereby is denied.

HOWARD G. GAMSER, ARBITRATOR

Washington, D. C.
October 13, 1981

-19-

0 0185



APWU #25

UNITED STATES POSTAL SERVICE
475 L'Enfant Plaza, S.W.
Washington, DC 20260

February 28, 1984

Mr. Moe Biller
President
American Postal Workers
   Union, AFL-CIO
817 14th Street, N.W.
Washington, D.C. 20005-3399

Dear Mr. Biller:

This is in reference to the Mail Processing Work
Assignment Guidelines (R.I. 399) issued February 16, 1979.

The following revisions are to be incorporated into this
document:

1.  In Operations 110-129 the words "opening and traying"
    will be added to the operation description.  This
    description change accurately reflects the work
    currently being performed.

2.  Item 3 in Operations 110-129 will be revised as
    follows:

        "Dumping sacks, pouches, or containers.  Cull/
        segregate mail by type/characteristics and make
        basic local/out-of-town splits to trays, hampers,
        gurneys, conveyors, nutting trucks, or other
        containers.

    This change reflects that, in operations where culling
    is not an integral part of the distribution function,
    the primary craft for assignment of this work is mail
    handler.

3.  Operations 140-149 will be added to reflect
    Multi-Position Flat Sorting Machine distribution.  The
    primary craft for the machine distribution of all
    classes of flats will be identified as clerk.

Mr. Moe Biller

2

4.   Item 3 in Operations 180-189 will be revised as
     follows:

          •Dumping sacks, pouches, or containers. Cull/
          segregate mail by type/characteristics and make
          basic local/out-of-town splits to trays, hampers,
          gurneys, conveyors, nutting trucks, or other
          containers.

     This represents the same type of change as identified
     above in Operations 110-129.

If you have any questions regarding the foregoing material,
please contact John Mularski of my staff at 245-4729.

                    Sincerely,

                    James C. Gildea
                    Assistant Postmaster General
                    Labor Relations Department

REGIONAL INSTRUCTIONS 399
MANUAL
Page 23

Addendum



UNITED STATES POSTAL SERVICE
475 L'Enfant Plaza, SW
Washington, DC 20260

AP # 25
26

February 28, 1984

RECEIVED
MAY 11 55 AM '84

N.P.O.M.H. UNION

Mr. Lonnie L. Johnson
National Director
National Post Office Mail Handlers,
    Watchmen, Messengers and Group
    Leaders, AFL-CIO
1225 19th Street, N.W.
Washington, D.C.  20036-2411

Dear Mr. Johnson:

This is in reference to the Mail Processing Work
Assignment Guidelines (R.I. 399) issued February 16, 1979.

The following revisions are to be incorporated into this
document:

1.   In Operations 110-129 the words "opening and traying"
     will be added to the operation description.  This
     description change accurately reflects the work
     currently being performed.

2.   Item 3 in Operations 110-129 will be revised as
     follows:

         "Dumping sacks, pouches, or containers.  Cull/
         segregate mail by type/characteristics and make
         basic local/out-of-town splits to trays, hampers,
         gurneys, conveyors, nutting trucks, or other
         containers.

     This change reflects that, in operations where culling
     is not an integral part of the distribution function,
     the primary craft for assignment of this work is mail
     handler.

3.   Operations 140-149 will be added to reflect
     Multi-Position Flat Sorting Machine distribution.  The
     primary craft for the machine distribution of all
     classes of flats will be identified as clerk.

Page 24

Mr. Lonnie L. Johnson

2

4.   Item 3 in Operations 180-189 will be revised as
     follows:

       *Dumping sacks, pouches, or containers. Cull/
       segregate mail by type/characteristics and make
       basic local/out-of-town splits to trays, hampers,
       gurneys, conveyors, nutting trucks, or other
       containers.

     This represents the same type of change as identified
     above in Operations 110-129.

If you have any questions regarding the foregoing material,
please contact John Kularski of my staff at 245-4729.

                          Sincerely,

                          *James C. Gildea*
                          James C. Gildea
                          Assistant Postmaster General
                          Labor Relations Department



UNITED STATES POSTAL SERVICE
475 L'Enfant Plaza, SW
Washington, DC 20260

AP
#28

11

5.

Mr. Thomas A. Neill
Industrial Relations Director
American Postal Workers Union,
AFL-CIO
817 14th Street, N. W.
Washington, D. C. 20005-3399

AUG 30 1984

Re: M. Biller
    Washington, D. C. 20500
    H1C-NA-C 104

Dear Mr. Neill:

On July 26, 1984, we met with to discuss the above-captioned grievance at the fourth step of our contractual grievance procedure.

The subject grievance is settled based on the following understanding regarding the revisions to Regional Instruction 399, Mail Processing Work Assignment Guidelines issued February 28, 1984:

1. The changes listed in Operations 110-129 and 180-189 refer to mail being processed in bulk. These revisions reflect the manner in which mail is currently being processed.

2. The word "separate" will be used in lieu of the word "segregate" wherever the sentence "Cull/segregate mail by type/characteristics and make basic local/out-of-town splits to trays, hampers, gurneys, conveyors, nutting trucks, or other containers" appears in the revision.

3. These revisions are not intended to change the manner in which Regional Instruction 399 is applied in the field.

Please sign and return the enclosed copy of this decision as acknowledgment of agreement to settle this case.

The time limits were extended by mutual consent.

Sincerely,

Daniel A. Kahn
Labor Relations Department

Thomas A. Neill
Industrial Relations Director
American Postal Workers Union,
AFL-CIO

0190

APWU 30A

## LETTER OF INTENT

The parties agree that no later than ninety (90) days from the effective date of the 1987 National Agreement, Management will issue the following clarifying instructions regarding Operations 110-129 and 180-189 of Regional Instruction 399.

The following provides additional guidance to determine the appropriate craft designation and assignment for distribution and separation activities for Operations Numbers 110-129 and 180-189 opening unit activities.

The current language in Regional Instruction 399 for Operations 110-129 and 180-189 contains instructions to assign mail handlers to "Cull/separate mail by type/characteristics and make basic local/out-of-town splits to trays, hampers, gurneys, conveyers, nutting trucks, or other containers."

Additional instructions are contained in the document to assign clerks to "Distribution of outgoing IFP's, newspapers, rolls, letter of flat bundles, slugs, Special Delivery of Special Handling parcel post."

0191

There has been some confusion as to the distinction between "basic local/out-of-town splits," which is assigned to mail handlers, and distribution, which is assigned to clerks.

The term basic local/out-of-town splits was intended to encompass that activity where initial separations are made by ZIP Code and city, state address information, to expedite subsequent distribution or dispatching and pouching operations. For example, the type of separations allowable would be for local city, local SCF, home state, SCFs and major cities within the home state, states for which the local office performs major city and sectional center separations in their pouching operations, groups of mixed states, where separation in the opening unit would expedite pouching operations. The allowable separations will be based on city, state, and 3- and 5-digit ZIP Code information.

Thomas J. Fritsch
Assistant Postmaster General
Labor Relations Department
U.S. Postal Service

Louis D. Elesie
International Trustee
Mail Handlers Division,
LIUNA, AFL-CIO

Date: 6-19-87

0192

MEMORANDUM OF UNDERSTANDING

BETWEEN THE

UNITED STATES POSTAL SERVICE

AND THE

JOINT BARGAINING COMMITTEE

(AMERICAN POSTAL WORKERS UNION, AFL-CIO

NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL-CIO)

The parties agree that no later than ninety (90) days from the effective date of the 1987 National Agreement, Management will issue the following clarifying instructions regarding Operation 110-129 and 180-189 of Regional Instruction 399.  The Postal Service will not make any changes in R.I. 399 during the life of this Agreement without the agreement of the Unions.

The following provides additional guidelines to determine the appropriate craft designation and assignment for distribution and separation activities for Operations Numbers 110-129 and 180-189 unit activities.

The current language in Regional Instruction 399 for Operations 110-129 and 180-189 contains instructions to assign clerks to "Distribution of outgoing IPP's, newspapers, rolls, letter or

0193

flat bundles, slugs, Special Delivery or Special Handling parcel post.".

Additional instructions are contained in the document to assign mail handlers to "Cull/separate mail by type/characteristics and make basic local/out-of-town splits to trays, hampers, gurneys, conveyers, nutting trucks, or other containers" in Operations 110-129 and 180-189.

There has been some confusion as to the distinction between "basic local/out-of-town splits," which is assigned to mail handlers, and distribution, which is assigned to clerks.

The term distribution, as defined in Section 521.2 of the M-32 Handbook, includes a sortation of mail to ADC's, states, sectional centers, cities, foreign countries, official mail, associate offices, stations, branches, carrier routes, holdouts (e.g., firms, addresses, institutions, boxes), box sections, ZIP Codes, uncoded mail, nixie, APO, FPO, or similar separations.

All distribution of mail in Operations 110-129 and 180-189 is the work of the clerk craft.

0194

The Unions signatory to this Memorandum of Understanding are not bound by any other agreement or Letter of Intent between the Employer and any other Union.

Thomas J. Fritsch
Assistant Postmaster General
Labor Relations Department
U.S. Postal Service

Moe Biller
President
American Postal Workers Union,
    AFL-CIO

Vincent R. Sombrotto
President
National Association of
    Letter Carriers, AFL-CIO

Date: 7-19-87

0195

J-5

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE, THE
AMERICAN POSTAL WORKERS UNION, AFL-CIO, AND
THE NATIONAL POSTAL MAIL HANDLERS UNION,
A DIVISION OF LABORERS'
INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO

REGIONAL INSTRUCTION 399 - DISPUTE RESOLUTION PROCEDURES

*General Principles*

The parties to this Agreement agree to a new procedure for
resolving jurisdictional disputes under Regional Instruction
399 (hereafter "RI-399"). The new procedures will be imple-
mented sixty (60) calendar days after the effective date of
this Agreement.

Effective with the signing of this Agreement, no new
disputes will be initiated at the local level by either
union challenging jurisdictional work assignments in any
operations as they currently exist. Except as otherwise
specifically provided in the New or Consolidated Facilities,
New Work, or Operational Change sections contained in this
memorandum, all local craft jurisdictional assignments which
are not already the subject of a pending locally initiated
grievance will be deemed as a proper assignment for that
facility.

In order to provide for expeditious and efficient resolution
of jurisdictional disputes only one representative case
shall be processed for each operation/function in dispute.
Multiple disputes arising out of the same or substantially
similar issues or facts shall not be allowed.

Dispute Resolution Committees shall be established at the
local, regional and national levels.  The Committee shall be
composed of one (1) representative from each of the three
parties.  The representative on the Committee may be assis-
ted by a technician at any or all meetings if advance notice
is given to the other two parties.  At larger installations
the local parties may mutually agree to establish more than
one (1) Committee; however, there shall not be more than one
(1) Committee per facility.  Committee decisions shall be by
mutual agreement of all 3 parties.

/

Meetings of the Committee must be scheduled with sufficient
frequency so that a decision can be rendered within the time
limits contained in this Agreement. The time limits con-
tained in this Agreement may be extended by mutual agreement
of the parties. If a committee fails to render a decision
within the time frames in this Agreement the moving union
may appeal the dispute to the next step in the procedure.

Each party at the local level will be responsible for
maintaining an inventory of jurisdictional assignments not
in dispute. As jurisdictional disputes are resolved under
this procedure, the results shall be added to the inventory.

The national parties shall mutually determine and implement
a new numbering system to be utilized in this procedure.

All parties to this Agreement may participate in the
arbitration proceedings at either level and all parties
shall be bound by the arbitrator's award whether or not
they participate in the arbitration proceedings. The
arbitrator's award shall be final and binding.

Any settlement entered into at any level must be a
tripartite settlement.

<u>Local Level</u>

The Local Dispute Resolution Committee (LDRC) will have
thirty (30) calendar days after receipt of a properly filed
dispute to attempt to resolve the dispute.

    1.   A dispute may be initiated by either Union. It
        must be submitted in writing to the other two
        parties. It must, at minimum, contain:

        A.  the operation number/description,

        B.  the function number/description,

        C.  what craft is presently assigned the work,

        D.  a diagram of the operation with a written
            narrative describing the disputed function,

        E.  the contentions of the party filing the
            dispute.

2

F.   The condition which permits the filing of
the dispute; i.e., new or consolidated
facility, new work, or operational changes.

2.   If a dispute is resolved, a tripartite settlement
agreement will be signed by the parties and the
jurisdictional work assignment shall be added to
the local inventory of agreed upon craft assign-
ments.   The settlement agreement will include the
*grievance number, the identification of the oper-
ation and functions involved and the determina-
tion of the appropriate craft.*   A diagram jointly
prepared with a narrative describing the disputed
operation/function will be attached to the
settlement, if possible.

3.   If the dispute is unresolved at the end of the
thirty (30) day period, a tripartite decision
will be written by the Committee setting forth
the position of each party.   The moving Union may
appeal the dispute to the Regional Committee
within twenty-one (21) calendar days of the date
the decision is reduced to writing and signed by
the three parties.   A copy of the appeal and the
complete case file must be sent to each of the
Regional parties by the appealing Union.

Regional Level

The Regional Dispute Resolution Committee (RDRC) shall
have sixty (60) calendar days after receipt of a properly
appealed dispute to attempt to resolve the dispute.

1.   If a dispute is resolved a tripartite settlement
agreement will be signed by the parties.   The
Agreement shall contain the same information
specified in the section of this Agreement for
local settlement of disputes.   The Agreement will
be sent to the local committee for implementation
and the work assignment shall be added to the
local inventory of agreed upon craft assignments.

3

2.  If the dispute is unresolved at the end of the sixty (60) calendar day period, a tripartite decision will be written by the Committee setting forth the position of each party. The moving Union may appeal the dispute to regional arbitration within twenty-one (21) calendar days of the date of receipt of the written decision of the Committee. Copies of the appeal will be provided to the other parties.

3.  If any member of the Regional Committee identifies an appealed dispute as involving an interpretive issue which is of general application, that member shall inform the other members *of the specific issue(s)*, in writing, prior to the issuance of a decision by the Committee on that dispute. The written decision by the Committee shall have this written notification attached to the decision. If such an issue is so identified and remains unresolved on the date of the Regional Committee decision, the moving union may only appeal such dispute to the National Committee. Failure of a party to identify such an issue prior to the date of the decision by the Regional Committee precludes appeal to the National Committee of that specific dispute.

4.  The RDRC may, by mutual agreement, remand a case back to the LDRC with specific instructions.

National Level

The National Dispute Resolution Committee (NDRC) shall have sixty (60) calendar days after receipt of a properly filed or appealed dispute to attempt to resolve the dispute.

1.  Either union party may initiate a dispute at the National level when such dispute involves an interpretive issue which under the National *Agreement is of general* application. Such disputes shall be provided to the National Committee, in writing, and must specify in detail the facts giving rise to the dispute, the precise interpretive issues to be decided and the contentions of the Union.

4

2.    If a dispute is resolved, a tripartite settlement agreement will be signed by the parties.

3.    If the dispute is unresolved at the end of the sixty (60) calendar day period, a tripartite decision will be written by the Committee setting forth the position of each party. The moving Union may appeal the dispute to National Arbitration within twenty-one (21) calendar days of the date of receipt of the written decision of the Committee. Copies of the appeal will be provided to the other parties.

4.    In the event the National Committee, after review, decides that a dispute appealed from the regional level does not involve an interpretive issue which is of general application, the dispute shall be remanded to the regional level and placed on the list of pending arbitration cases.

## Regional Arbitration

A panel of two (2) arbitrators will be jointly selected by the parties for each of the five (5) regions. Additional arbitrators may be added to a regional panel up to a maximum of five (5) by mutual agreement of the parties. Selection of the arbitrators will be by a method and for a time period to be agreed upon by the parties. Such panel of arbitrators shall hear only jurisdictional cases. Their fees and expenses will be allocated on a basis of one-half (1/2) to management and one-half (1/2) shared equally by the participating unions. If any party decides not to participate in the arbitration proceedings, the remaining parties will equally divide the arbitrator's fees and expenses. The current practices of the parties related to allocation of cost for canceled dates will be continued.

Scheduling of regional arbitration cases will be jointly performed by the parties from a list of dates submitted by the arbitrators. All scheduling correspondence with the arbitrators will be jointly signed by the parties. The method of scheduling will be jointly agreed to by the parties. The factors to be considered in establishing such a method shall be:

5

1.  a first-in/first-out basis;

2.  cost effectiveness of the system;

3.  volume of cases in a particular geographic area;

4.  availability of advocates for each party; and

5.  a proportionate allocation of dates for each geographic area.

Cases will be scheduled and heard within ninety (90) calendar days after receipt of the appeal. Jurisdiction arbitrators will provide their decisions to the parties within thirty (30) calendar days of the close of the record.

National Arbitration

One arbitrator will be jointly selected by the parties at the national level on the basis of mutual agreement. Once selected, the arbitrator will hear only jurisdictional disputes. The arbitrator's fees and expenses will be allocated on the basis of one-half (1/2) to management and one-half (1/2) shared equally by the participating unions. However, if a party decides not to participate in the arbitration proceedings, the remaining parties will equally divide the arbitrator's fees and expenses. Scheduling of cases will be jointly performed by the parties from a list of dates submitted by the national arbitrator. Time frames will be the same as those designated for regional arbitration. The method of scheduling will normally be on a first-in/first-out basis.

Pursuant to Article 15 of the National Agreement, only disputes involving interpretive issues under the National Agreement which are of general application will be arbitrated at the national level.

Additionally, the national-level arbitrator may be invited to participate in an advisory capacity at National Committee meetings on items related to problems of consistency of regional-level awards or other problems mutually determined by the committee. The arbitrator may be empowered by mutual agreement of the parties to issue instructions to the regional-level arbitrators which were consistent with any mutual understanding on these issues reached as a result of committee discussions. Payment for such services will be made as for an actual arbitration hearing.

6

## New Or Consolidated Facilities

The following procedures shall apply to the opening of new or consolidated facilities.

Forty-five (45) calendar days prior to the opening of a new or consolidated facility, the members of the RDRC will be notified of the date on which activation will take place. Within ninety (90) calendar days of that activation, the LDRC designated for the facility will conduct an inventory of jurisdictional assignments at the facility and will attempt to resolve any disputes which arise from these discussions. If necessary, representatives of the RDRC will assist the local parties with on-site reviews.

Jurisdictional assignments shall not be changed solely on the basis of moving operation(s) into a new facility. If jurisdictional assignments existed in a previous facility, they shall be carried forward into the new facility except where operational changes as described below result in the reassignment from one craft to another.

In a new or consolidated facility, the jurisdictional assignment in the previous facilities must be considered by the LDRC in the determination mentioned above, in the event the consolidated operation(s) had a mixed practice in the previous installations.

The decision of the LDRC will be processed in accordance with the decision and appeals procedures previously outlined, including appeals to the higher levels of the process.

## New Work

This section refers to implementation of RI-399 involving work which had not previously existed in the installation.

The procedures for activation of a new or consolidated facility shall apply to the assignment of new work to an installation. The standards contained in Section II.E of RI-399 shall apply in making the craft determinations.

## Operational Change

Management will not engage in operational changes for the purpose of affecting the jurisdictional assignments in a

7

facility. It is the intent of the parties to continue craft jurisdictional assignments which are not already the subject of a grievance as indicated on page 1, paragraph 2, of this Agreement.

To the extent that operational changes are made that may result in the reassignment of functions from one craft to another management must present and discuss such changes with the LDRC thirty (30) days prior to the effective date of the operational change. Within 14 days from the effective date, the adversely impacted union may appeal the operational change to arbitration. A tripartite arbitration shall be heard within sixty (60) days of the effective date of the operational change in order to resolve any jurisdictional disputes. The issue to be decided in cases involving operational changes will be whether the proposed change is consistent with RI-399 and/or the intent of this Agreement.


for _Willi Juames_                          _Moe Biller_

SHERRY A. CAGNOLI                           MOE BILLER
Assistant Postmaster                        President
   General                                  American Postal Workers
Labor Relations Department                    Union, AFL-CIO
U.S. Postal Service


                                            _Glenn Berrien_

                                            GLENN BERRIEN
                                            President
                                            National Postal Mail
DATE  4-16-92                                  Handlers Union


8

0203

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE, THE
AMERICAN POSTAL WORKERS UNION, AFL-CIO AND
THE NATIONAL POSTAL MAIL HANDLERS UNION,
A DIVISION OF LABORS'
INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO

REGIONAL INSTRUCTION 399 - TRANSITIONAL PROCEDURES

## General Principles

This memorandum is intended to facilitate the transition
to the new RI-399 Dispute Resolution Procedures (DRP).
All grievances pending on the date of signing of the DRP
Memorandum shall be processed in accordance with the
Transitional Procedures contained in this memorandum.

Once the pending grievances have been processed in
accordance with the transitional procedures contained
in this memorandum, this memorandum shall no longer be
effective.

As specified in this memorandum, the parties at all three
levels, shall concurrently identify and inventory all
pending jurisdictional grievances.  The processing of the
cases shall be from the top down, i.e., beginning at the
national level, the regional level, and then the local
level.  This method will allow remanded cases to be
considered along with other pending grievances at the
appropriate level.

## Local Level

All jurisdictional grievances pending at Step 1 or 2, in
addition to jurisdictional cases remanded to the local
level, will be referred to the Local Dispute Resolution
Committee (LDRC).  The LDRC will have thirty (30)
calendar days from the implementation date of the new
procedures to jointly identify pending jurisdictional
cases and to assure that each of the parties has complete
copies of all case files.

7

The three parties will execute and include in each case file a jointly developed diagram of the operation in question, with a narrative describing the duties performed in the disputed function. If the parties cannot agree regarding the diagram or narrative, the parties separately may present their views for inclusion in the file.

At the end of the thirty (30) day period from the implementation date of the new procedure, the LDRC shall have identified and categorized all pending cases at Step 1 or 2 involving jurisdictional disputes. At that point, the LDRC will have thirty (30) days to attempt to resolve all disputes identified as pending at that level.

In addition to identifying, processing and attempting to resolve jurisdictional assignments which are in dispute, the Local Committee will engage in a joint effort to inventory all jurisdictional assignments which are not in dispute utilizing Attachment 1. Such effort will begin no later than the implementation date of the new procedure and be completed no later than one hundred twenty (120) calendar days after that date. Local inventories will include the following information:

1.   operation number/description;

2.   function number/description;

3.   craft assignment;

4.   a diagram; and

5.   a signature of the appropriate representative of each party.

If any party disputes part or all of the inventory that dispute may also be submitted to the Regional Committee in keeping with the time frame for appeal of a jurisdictional dispute. The sole issue in inventory disputes to be determined by the Regional Committee is whether a grievance existed over the disputed operation/function on the date of the signing of the DRP Memorandum.

*10*

## Regional Level

The Regional Dispute Resolution Committee (RDRC) will identify all jurisdictional cases pending at Step 3 or regional arbitration, and jurisdictional cases remanded to the regional level. The parties will categorize cases dealing with the same function in a given operation in each facility and the moving Union will select one of the cases to serve as the representative case, with all others challenging the same function within an operation placed on hold pending resolution of the representative case. Any case or group of cases may be remanded to the local level by mutual agreement of the parties. This review shall be completed within sixty (60) days of the implementation date of the new procedure.

The RDRC shall decide local appeals consisting of: 1. cases determined to properly be at that level in the review process mentioned above; and, 2. questions appealed to it involving a determination as to whether or not a dispute existed on the date of signing the DRP Memorandum. The appeals will be processed in accordance with the time frames and procedures contained in the DRP Memorandum.

If a question is appealed to the Regional Committee involving a determination as to whether a dispute existed on the date of signing the DRP Memorandum and a determination is reached at the regional level that a dispute did exist over the operation/function, the local parties will be advised in writing to process the dispute in accordance with the new procedures. The time limits for such a dispute will commence on the date of receipt by the moving union of the regional determination.

In the event the Regional Committee is unable to agree as to whether a dispute existed on the date of signing the DRP Memorandum, the moving union may appeal that question to regional-level arbitration within twenty-one (21) calendar days of the date of receipt of the Regional Committee's written decision. The issue to be decided by the arbitrator will be the same as the one presented to the Regional Committee.

/ /

<u>National Level</u>

The National Dispute Resolution Committee (NDRC) shall
identify all cases pending at Step 4 or national arbi-
tration. This review shall be completed within sixty
(60) days of the implementation date of the DRP Memo-
randum. Any case or group of cases may be remanded to a
lower level by mutual agreement of the parties. National
level cases will be processed in accordance with the time
frame and procedures contained in the DRP Memorandum.


SHERRY A. CAGNOLI
Assistant Postmaster
  General
Labor Relations Department
U.S. Postal Service


MOE BILLER
President
American Postal Workers
  Union, AFL-CIO


GLENN BERRIEN
President
National Postal Mail
  Handlers Union

DATE 4-16-92

/ 2

0207

Joint exhibit
#8

Instruction for Completion of
RI-399 Installation Inventory
of Mail Processing Operations

On April 16, 1992 the parties reached agreement on a
Memorandum of Understanding - Regional Instruction 399 -
Transitional Procedures.  One of the provisions of that
memorandum provided for the Local Committee to engage in a
joint effort to inventory all jurisdictional assignments
which are not in dispute utilizing Attachment 1.  (Copy
attached)

The purpose of the inventory is to identify all mail
processing operations/functions which were not in dispute
(i.e., those operations/functions which were not a subject
of a pending locally initiated grievance on April 29,
1992.)

Reports received by the National Committee indicate some
misunderstanding exists in the field concerning these
inventories.  Therefore, the following information is
provided as guidance to the Local Committees to ensure that
the inventories serve the purpose for which they were
created.

The inventories are to identify operations/functions which
are not in dispute.  The are solely a determination of the
facts as they existed on April 29, 1992.  All
operations/functions which are not the subject of a locally
initiated grievance as of that date should be listed on the
inventory and the craft(s) who performed the work on that
date must be listed in Column 3.  When the disputed
functions are resolved in the future, they are to be added
to the inventories.

Column 1 should list the operation number or a local
description of the operation.  This should be done in
sufficient detail to allow the parties in the future to be
able to determine the baseline craft assignments in each
operation.

Column 2 is an identification of the function number as
listed in RI-399 or a local description of the function.
Each function within an operation should be listed unless
the entire operation is staffed with one craft.

Column 3 lists the number of craft employees assigned to
the operation/function.  It may not be a precise number if
the staffing fluctuates.  In that event it could be a range
of numbers.  If both clerks and mail handlers performed the
function on April 29, 1992, and no locally initiated
grievances existed contesting this staffing, both crafts
will be listed in Column 3.

*1*

-2-

Column 4 should identify the number of diagrams which are attached detailing the physical layout of the operation. The diagrams are important in the event disputes arise in the future due to operational changes.

If the local practices within an installation vary as to staffing of an operation by tour, the inventory should reflect that fact.

The parties at the national and regional levels are currently attempting to resolve the backlog of RI-395 disputes, and the Local Committees' cooperation in properly completing the inventories will be of major significance in assisting them in accomplishing this task.

2

ATTACHMENT 1

REGIONAL INSTRUCTION - 399 REVIEW

INSTALLATION INVENTORY

OF

MAIL PROCESSING OPERATIONS

FACILITY _____

CITY _____

STATE/ _____

ZIP CODE _____

DATE COMPLETED _____

SIGNATURES (LDRC REPRESENTATIVES):

MANAGEMENT REPRESENTATIVE _____

APWU REPRESENTATIVE _____

MAIL HANDLER REPRESENTATIVE _____

3

0210

ATTACHMENT I

REGIONAL INSTRUCTION - 399 REVIEW

INSTALLATION INVENTORY
OF
MAIL PROCESSING OPERATIONS

LDRC REPRESENTATIVE
INITIALS MGMT
APWU _____
MH _____

| FACILITY | CITY | STATE/ZIP CODE | DATE | | |
|----------|------|----------------|------|---|---|
| 1. OPERATION NUMBER OR LOCAL DESCRIPT. OF OPERATION | 2. FUNCTION NUMBER OR LOCAL DESCRIPTION OF FUNCTION | | 3. CURRENT # OF CRAFT EMPLOYEES ASSIGNED | | 4. NUMBER OF ATTACHED DIAGRAM |
| | | | CLERK | MAILHANDLER | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

4

0211

Q AND A - RI-399 DISPUTE RESOLUTION PROCEDURES

The United States Postal Service, the American Postal Workers Union, AFL-CIO and the National Postal Mail Handlers Union have jointly produced this question and answer document on the RI-399 Dispute Resolution Procedures.

1.   What issues have the National Dispute Resolution Committee identified as subjects for discussion at that level?

Answer: The NDRC has identified several issues for discussion at the National Level. The National parties are not presently in agreement as to whether or not these issues are properly at the National Level. Additionally, the National parties have not agreed to the proper phraseology to describe the issues. The issues include:

1.  Containerization of trays/tubs
2.  OCR mail preparation
3.  Dock connection transfers
4.  Spreading of mail
5.  Containerization of ACDCS mail
6.  SPBS
7.  MOD scales system
8.  Presort

The above listed terminology for each issue is used for identification purposes only.  The language used to describe each issue is not intended to be determinative of any substantive issue.

2.   If these issues are pending in cases presently before either the RDRC or the LDRC, what, if any, action should be taken by those committees?

Answer:   The RDRC and/or the LDRC should identify the facilities in which disputes over these issues exist and place those disputes on hold pending the outcome of the national discussion.

3.   If a grievance exists or is filed alleging a violation of the contract other than RI-399 (e.g. Article 7.2) and one of the parties believes the issue in the grievance constitutes a jurisdictional dispute, what if anything should be done with the grievance?

Answer:   It must be referred to the Dispute Resolution Committee for an initial determination as to whether or not it involves a jurisdictional claim.  If it is determined it involves a jurisdictional claim, the grievance will be processed in the Dispute Resolution Procedures.  If the Committee is in disagreement as to whether or not the grievance involves a jurisdictional claim, that question is

/                    J-10

appealable through the Dispute Resolution Procedures up to and including arbitration for resolution prior to the parties addressing the merits of the dispute. The three parties shall review cases at the lowest possible level which raise the potential of containing a jurisdictional dispute so that the proper procedure is utilized to resolve disputes/grievances.

4.    If a settlement of a grievance is signed after April 29, 1992 between only two of the parties on a subject which is arguably properly addressed by the Committee, what status does that settlement have?

Answer: It is not a proper settlement and is considered null and void. This is true even if a claim exists that the written settlement is a written confirmation of an oral settlement reached prior to April 29, 1992. This answer also applies to cases involving contract provisions other than RI-399 if the answer to question 3 had been properly applied to the grievance and it was determined to involve a jurisdictional claim.

5.    If a jurisdictional grievance was settled between only two of the parties prior to April 29, 1992 but it was not implemented as of that date, what is the proper method for handling that settlement?

Answer: The case file, including the settlement, should be referred to the Regional Committee for review. If the Regional Committee agrees it is a proper settlement the local parties will be so advised and the settlement will be implemented. If the Regional Committee can not agree the settlement is proper, the local parties will be so advised. The employer can then implement the settlement and the adversely affected union can enter a dispute with the local committee. The time limits for entering this dispute will begin on the date the adversely affected union is notified of the Regional Committee's determination.

6.    If a dispute is unresolved by the Local Committee, who must receive a copy of the appeal from the Local Committee's decision?

Answer: The moving union must send a copy of the complete file to each of the Regional parties. A listing of the addresses is attached to this document.

7.    Does a standard appeal form exist for appeals under the RI-399 Dispute Resolution Procedure?

Answer: Standard appeal forms will be provided through the individual unions to their locals and the Regional Committee members.

Page 2

2

8.   If a grievance exists in an Associate Office which is not represented by an established local of one of the union parties, who selects the Local Dispute Resolution Committee member for that office?

    **Answer:**  The union who filed the grievance must notify the Regional Committee of the existence of the grievance and the Regional Committee member of the union without a local in that office will designate the local member of the Committee.

9.   Are members of the Local Dispute Resolution Committee entitled to compensation for time spent in performing their responsibilities?

    **Answer:**  The provision of Article 17 shall be applied.

10.  What date will be used for determining date of appeal to arbitration in the scheduling process under the new procedures?

    **Answer:**  All cases covered by the Transition Agreement will be decisioned by the Regional or National Committee and the moving union will be required to appeal the case to arbitration. The date of appeal from the Committee's decision will be the controlling date.

11.  If a local committee identifies an operation/function which existed on April 29, 1992, which was routinely staffed by both crafts and neither craft had a dispute pending claiming jurisdiction on April 29, 1992, who should be listed as the proper craft in the inventory for this operation/function?

    **Answer:**  Both crafts should be listed in column three (3) of the Installation Inventory of Mail Processing Operations. The assignment of craft employees in that operation shall continue as it existed on April 29, 1992.


_____
Moe Biller, President
American Postal Workers Union


_____
Joseph J. Mahon, Jr.
Vice President, Labor Relations
United States Postal Service


_____
Glenn Berrien, President
National Post Office MH Union


10/21/92
_____
Date

3

50-1994 11:06AM          USPS LANCASTER DISTRICT                717 295 7525    P.03

J2B

TRIPARTITE AGREEMENT ON RI-399 INVENTORIES
BETWEEN THE
UNITED STATED POSTAL SERVICE AND THE
AMERICAN POSTAL WORKERS UNION, AFL-CIO, AND THE
NATIONAL POSTAL MAIL HANDLERS UNION, AFL-CIO


The United States Postal Service, the American Postal Workers
Union, AFL-CIO, and the National Postal Mail Handlers Union,
AFL-CIO, agree on the following procedures for completion of
inventories of jurisdictional assignments pursuant to the
Memorandum of Understanding on RI-399 Transitional Procedures
dated April 16, 1992:


1.  All facilities which have completed inventories will
    furnish a copy of the completed inventory to the Regional
    Dispute Resolution Committee (RDRC) no later than
    April 22, 1994.

2.  In those facilities for which inventories have not been
    completed, the Postal Service representative on the LDRC
    or his designee must complete the inventory no later than
    April 22, 1994.  These inventories will reflect which
    craft was performing each operation within the facility
    as of April 29, 1992.

3.  Completed inventories will be provided to the LDRC
    representatives of both unions no later than April 27,
    1994.  Written acknowledgment of receipt by the union
    representatives must be obtained.

4.  If either union believes there is a pending dispute
    regarding an operation listed on the inventory, they must
    provide a written exception, with supporting
    documentation (moving papers of a pending
    dispute/grievance), to the management representative no
    later than May 11, 1994.

5.  Copies of the completed inventories, with any written
    exceptions, will be forwarded to the RDRC by the Postal
    Service representative, via certified mail with return
    receipt, no later than May 18, 1994.

6.  If the RDRC representative of either union believes there
    is a pending dispute regarding an operation listed on the
    inventory for which the LDRC representative has not
    already provided a written exception, they will provide a
    written exception, with supporting documentation (moving
    papers of a pending dispute/grievance), not later than
    June 1, 1994.

0215

7. Any inventory items for which exceptions have not been
   provided as of June 1, 1994, will be considered
   not in dispute, and will be deemed as proper assignments
   for that facility. As of June 1, 1994, any pending
   disputes/grievances which have not been documented
   through the above procedures will be considered closed.


John W. Dockins
RI-399 Coordinator
U.S. Postal Service

Larry Gervais
RI-399 Coordinator
American Postal Workers
   Union, AFL-CIO


William Flynn
RI-399 Coordinator
National Postal Mail
   Handlers Union, AFL-CIO


Date  3-23-'94

0216

# NATIONAL JURISDICTIONAL DISPUTE ARBITRATION PROCEEDINGS

In the Matter of the Arbitration Between

UNITED STATES POSTAL SERVICE

   - and -

AMERICAN POSTAL WORKERS UNION

   - and -

NATIONAL POSTAL MAIL HANDLERS UNION

Case No. H7C-NA-C 32

Subject: Primary Craft for
        Spreading the Mail to
        Carrier Cases

Dana Edward Eischen, Arbitrator

Appearances

For the APWU:

O.Donnell, Schwartz & Anderson, P.C.
by Anton Hajjar, Esq.
     -and-
C. J. Guffey, Jr., Asst. Director, Clerk Division

For the Postal Service:

Kevin B. Rachel, Esq.
Labor Relations Counsel
     -and-
John W. Dockins,
Labor Relations Specialist

For the NPMHU:

Bredhoff & Kaiser
by Bruce R. Lerner, Esq.
     -and-
Richard B. Collins,
Asst. to the President
     -and-
William J. Flynn, Jr., Manager,
Contract Administration Department

0217

2

### Also Present

For the USPS:

Rodney Lambson, Labor Relations Specialist
Daniel Magazu, Labor Relations Specialist
Janice San Jose, Labor Relations Specialist

For the APWU:

Moe Biller, President
Robert Tunstall, Director, Clerk Division
James P. McCarthy, Asst. Director, Clerk Division
Larry Gervais, Special Asst. to the President

Thomas F. Maier, National Business Agent
Eddie De Hoyos, R.I. 399 Committee
Jim Bertolowe, R.I. 399 Advocate
Robert D. Kessler, National Business Agent
Robert Bloomer, Jr., Special Asst. To the President
Sam Lisenbe, R.I. 399 Advocate
Roosevelt Steward, R.I. 399 Advocate
Shirley J. Taylor, National Business Agent
Steve Zamanakos, National Business Agent
Stephen Klinger, R.I. 399 Advocate
Ron Suslak, R.I. 399 Advocate
Tony Mastas, N.E. Regional Dispute Committee
Larry R. Sorrells, R.I. 399 Advocate

### PROCEEDINGS

Hearings were held in Washington, D.C. on May 29, July 23, and August 13-14, 1997 at which the Parties all were represented by Counsel and afforded full opportunity to present documentary evidence, testimony subject to cross-examination and oral argument. Following receipt of the transcribed stenographic record, post hearing briefs and reply briefs were filed and exchanged and the record was closed in mid-January 1998. Given the significance of the issue and the volume of the record, the Parties graciously allowed me some additional time for the rendition of this Opinion and Award.

3

## BACKGROUND

This case comes before me for final and binding determination in National Jurisdictional

Arbitration, pursuant to procedures established by an April 16,1992 Memorandum of Understanding

("MOU") between the United States Postal Service, ("USPS" or "postal Service"), the American

Postal Workers Union, AFL-CIO ("APWU" or "Postal Workers") and the National Postal Mail

Handlers Union, ("NPMHU" or "Mail Handlers"). That tripartite MOU of April 16, 1992, entitled,

"REGIONAL INSTRUCTION 399 – DISPUTE RESOLUTION PROCEDURES" ("RI-399 DRP"),

*infra*, was aimed at resolving longstanding jurisdictional disputes involving the Postal Service, the

clerk craft represented by the APWU and mail handlers represented by the NPMHU. In 1997, the

three Parties mutually appointed me as their National Jurisdictional Arbitrator to hear and decide

deadlocked cases properly referred to arbitration under the RI-399 DRP.

This is the first case presented for National-level arbitration under the RI-399 DRP dated

April 16, 1992, but it did not arise under those procedures. As the case number indicates, the instant

dispute had its genesis as a National-level grievance filed some ten (10) years ago by APWU, under

Article 15.3 D of the consolidated 1987-1990 National Agreement between the Postal Service and

a Joint Bargaining Committee ("JBC") formed by APWU and the National Association of Letter

Carriers ("NALC"). [During both 1975 and 1978, the APWU and the NPMHU bargained with the

Postal Service jointly (together with the National Association of Letter Carriers in 1975 and 1978,

and with the National Rural Letter Carriers' Association in 1975.) At other times pertinent to this

case, the Postal Service entered into separate and distinct National collective bargaining agreements

with the NPMHU; and the 1994-1998 National contract between the APWU and the USPS also is

separate from the NALC and NRLCA contract for that period. Because the NALC and NRLCA are

4

not parties to these proceedings and for ease of reference, the 1987-90 (APWU/NALC)/USPS

contract and the separate APWU/USPS contracts will be referred to collectively as Postal

Worker/USPS contracts, and the 1975 and 1978 National Agreements will be referred to as

JBC/USPS Agreements, to distinguish each from the separate and distinct Mail Handler/USPS

contracts.]

The seminal decision by Arbitrator Howard Gamser, [Case No. AD-NAT-1311, Oct. 13,

1981, ("Gamser Award")], upholding the validity and vitality of Regional Instruction No. 399, is a

primary benchmark for understanding the history and evolution of the jurisdictional guidelines and

a touchstone for the National Jurisdictional Arbitrator called upon to review primary craft

designations under the RI-399 DRP of April 1992. At page 9 of that Award, Arbitrator Gamser

pointed out: "Disputes between the APWU and the Mail Handlers over the proper craft assignment

of certain positions in mail processing have been ongoing for many years, even prior to the

establishment of the reorganized [Postal] Service in 1970." In masterful detail which would be

redundant and presumptuous for me to attempt to replicate, the Gamser Award describes the process

by which the National-level Committee on Jurisdiction ("COJ"), established pursuant to MOU

arising out of 1975 and 1978 JBC National Agreements, attempted to develop jurisdictional

guidelines for resolving, *inter alia,* an escalating number of craft conflicts between the Postal

Workers and the Mail Handlers.

Under the terms of the controlling MOU, each Union had until early December 1975 to

"submit to the Committee a written description of the scope of the duties it believes are properly

assignable to employees it represents". Representatives of the Postal Service and the involved

5

Unions then were to discuss, and possibly resolve, work assignments that were in dispute, by considering, "among other relevant factors," the following expressly listed criteria:

1.  existing work assignment practices;
2.  manpower costs;
3.  avoidance of duplication of effort and "make work" assignments;
4.  effective utilization of manpower, including the Postal Service's need to assign employees across craft lines on a temporary basis;
5.  the integral nature of all duties which comprise a normal duty assignment;
6.  the contractual and legal obligations and requirements of the parties.

[To this day, these same six (6) criteria are listed in Article 1, Section 1.5A of the Parties' respective National Agreements to govern the assignment of all newly created positions "to the national craft unit most appropriate for such position."]

The Gamser Award describes how a deadlock in the COJ discussions eventually led Management members of the Committee to form their own task force, including representatives from postal field operations, to draft and circulate to the affected Unions a set of proposed jurisdictional guidelines (Gamser Award, p.7):

> [T]he Service assembled a team to develop a proposal on resolving the conflicting jurisdictional claims. This team was to be guided by the six criteria mentioned in the Memorandum of Understanding, past practice, certain previous arbitration decisions dealing with conflicting jurisdictional claims, and also were directed to keep in mind the USPS' desire to achieve greater efficiency and economy of operations. The team also was to consult various handbooks issued by the Service containing bargaining unit position descriptions, personnel practices, and the qualification standards for all Postal Service positions....The overall goal of their efforts, as they described it, was to develop an efficient and cost effective way to resolve the jurisdictional claims while creating the least amount of confusion in the field.

The draft guidelines prepared by the Management team were submitted to representatives of both Unions in the Fall of 1977, for their comments and criticisms. Discussions and negotiations followed, in which, "[a]fter meetings with these Unions, the [Postal] Service compromised in some areas as did the Unions." (Gamser Award, p.11 ). Eventually, after several revisions which

6

incorporated a number of the Unions' suggestions,, the Postal Service published the guidelines as "Regional Instruction 399", on February 16, 1979.

Thirteen (13) specific objections from APWU challenging RI-399 formed the basis for the national grievance from the Postal Workers, eventually decided by Arbitrator Gamser.    After receiving evidence and hearing arguments from all three parties, he rejected all of the claims submitted by the APWU, denied the underlying grievance and concluded: "the publication and implementation of Regional Instruction No. 399 has not violated the cited provisions of the National Agreement, the Memorandum of Understanding on Jurisdiction appended thereto, or any of the other accepted criteria for jurisdictional determinations to which the APWU made reference." (Gamser Award, p.19).

Seven (7) years later, a simmering controversy between APWU and NPMHU over the work of "spreading the mail" was brought to a head with issuance of a memorandum to USPS regional labor relations managers on November 1, 1988, by William J. Downes, Director, Office of Contract Administration, Labor Relations Department, reading in pertinent part as follows:

> Recently there has been some confusion regarding the issue of spreading the mail to carriers.    We have reviewed the appropriate operational documents and relative arbitration awards that have been issued on this matter and the following represents our position:
>
> 1.  The basic function of transporting mail belongs to the mail handler craft and should be assigned to mail handlers when available and in accordance with Regional Instruction 399.

Several days later, on November 15, 1988, Joseph J. Mahon, Jr., Assistant Postmaster General for Labor Relations, sent letters to the Presidents of APWU, NPMHU and NALC (which represents all city letter carriers), reading in almost identical terms, as follows:

> Recently we have been receiving numerous inquiries from the field regarding the issue of spreading the mail to carriers.    We have reviewed the appropriate operational

7

documents and relative arbitration awards that have been issued on this matter and the following represents our position:

1.The basic function of transporting mail belongs to the mail handler craft and should be assigned to mail handlers when available and in accordance with Regional Instruction 399.

[Mahon's current title is Vice President for Labor Relations. He was then and now the highest ranking labor relations official of the Postal Service.]

The NALC did not challenge the Postal Service designation of the Mail Handlers as "primary craft" for "spreading the mail", but on November 18, 1988, APWU President Biller replied, stating in words or substance that an interpretive dispute of general application existed, prompting him to file a National-level grievance under Article 15.3.D of the APWU-USPS contract. The grievance asserted that spreading is equivalent to distribution and that "under RI-399, the M-32 Handbook and the F-2 Handbook, distribution of presorted bundles and sacks to carriers is clerk craft work." By letter of November 28, 1989, Samuel Pulcrano of the USPS Grievance and Arbitration Division denied that grievance, asserting: "In accordance with Regional Instruction 399, the basic function of transporting the mail belongs to the mailhandler craft and should be assigned to mailhandlers when available." The APWU immediately appealed the grievance to National-level arbitration under the 1987-90 APWU-USPS contract.

On February 6, 1990, Biller wrote to Mahon recanting the contention that the spreading of mail grievance presented a National-level interpretive issue of general application and asking the Postal Service to send all such cases which had been referred to Step 4, back to the Regional level. The Postal Service replied by letter received on March 2, 1990, declining Biller's request to remand the grievances and insisting that a National-level dispute was joined. After several years of this

8

stalemate, the APWU invoked the newly developed provisions of the RI-399 DRP , which allow either Union to appeal interpretive disputes of general application to the national level; first for discussion and possible resolution by the National Dispute Resolution Committee ("NDRC") and, if necessary, for final and binding arbitration by the National Jurisdictional Arbitrator. When the three parties were unable to reach agreement, the APWU appealed this case to national jurisdictional arbitration on March 31, 1995, three years after adoption of the Dispute Resolution Procedures.

Subsequently, the case was scheduled by agreement of the Parties as the first case to be heard by their newly-appointed National Jurisdictional Arbitrator, pursuant to the RI-399 DRP. Following lengthy discussions, which were not finalized until half way through the first day of hearings on May 29, 1997, all three parties agreed on the precisely stipulated question to be determined in this arbitration, as set forth *infra*.

## ISSUE

At the arbitration hearing, the Parties jointly stipulated that the following question is presented for determination in this case:

Whether the Postal Service properly assigned the Mail Handler craft as the primary craft to spread mail to letter carrier cases (i.e., the taking of mail, including but not limited to sacks, trays, flat buckets, and bundles, to carrier cases), when such mail has been previously identified and marked by carrier route numbers.

9

# PERTINENT CONTRACT PROVISIONS

### RI-399, February 16, 1979

•••••••••••••••••••

| 240-339 | | |
|---|---|---|
| Distribution | Distribution of mail. | Clerk |
| at Stations | -The designation of a primary craft | |
| & Branches | can be applied to a detached unit | |
| | which performs or supports a mail | |
| | processing operation. | |

•••••••••••••••••••

## MEMORANDUM OF UNDERSTANDING
## BETWEEN THE
## UNITED STATES POSTAL SERVICE, THE
## AMERICAN POSTAL WORKERS UNION, AFL-CIO, AND
## THE NATIONAL POSTAL MAIL HANDLERS UNION,
## A DIVISION OF LABORERS'
## INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO

### REGIONAL INSTRUCTION 399 - DISPUTE RESOLUTION PROCEDURES

#### General Principles

The parties to this Agreement agree to a new procedure for resolving jurisdictional disputes under Regional Instruction 399 (hereafter "RI-399") The new procedures will be implemented sixty (60) calendar days after the effective date of this Agreement

Effective with the signing of this Agreement, no new disputes will be initiated at the local level by either union challenging jurisdictional work assignments in any operations as they currently exist. Except as otherwise specifically provided in the New or Consolidated Facilities, New Work, or Operational Change sections contained in this memorandum all local craft jurisdictional assignments which are not already the subject of a pending locally initiated grievance will be deemed as a proper assignment for that facility.

In order to provide for expeditious and efficient resolution of jurisdictional disputes only one representative case shall be processed for each operation/function in dispute. Multiple disputes arising out of the same or substantially similar issues or facts shall not be allowed.

Dispute Resolution Committees shall be established at the local, regional and national levels. The Committee shall be composed of one (1) representative from each of the three parties. The representative on the Committee may be assisted by a technician at any or all meetings if advance notice is given to the other two parties. At larger installations the local parties may mutually agree to establish more than one (1) Committee; however, there shall not be more than one (1) Committee per facility. Committee decisions shall be by mutual agreement of all 3 parties.

Meetings of the Committee must be scheduled with sufficient frequency so that a decision can be rendered within the time limits contained in this Agreement. The time limits contained in this Agreement may be extended by mutual agreement of the parties. If a committee fails to render a decision within the time frames in this Agreement the moving union may appeal the dispute to the next step in the procedure.

10

Each party at the local level will be responsible for maintaining an inventory of jurisdictional assignments not in dispute. As jurisdictional disputes are resolved under this procedure, the results shall be added to the inventory.

The national parties shall mutually determine and implement a new numbering system to be utilized in this procedure.

All parties to this Agreement may participate in the arbitration proceedings at either level and all parties shall be bound by the arbitrator's award whether or not they participate in the arbitration proceedings. The arbitrator's award shall be final and binding.

Any settlement entered into at any level must be a tripartite settlement.

Local Level

The Local Dispute Resolution Committee (LDRC) will have thirty (30) calendar days after receipt of a properly filed dispute to attempt to resolve the dispute.

1. A dispute may be initiated by either Union. It must be submitted in writing to the other two parties. It must, at minimum, contain:

   A    the operation number/description,

   B    the function number/description,

   C    what craft is presently assigned the work,

   D    a diagram of the operation with a written narrative describing the disputed function,

   E    the contentions of the party filing the dispute.

   F    The condition which permits the filing of the dispute; i.e., new or consolidated facility, new work, or operational changes

2. If a dispute is resolved, a tripartite settlement agreement will be signed by the parties and the jurisdictional work assignment shall be added to the local inventory of agreed upon craft assignments. The settlement agreement will include the grievance number, the identification of the operation and functions involved and the determination of the appropriate craft. A diagram jointly prepared with a narrative describing the disputed operation/function will be attached to the settlement, if possible.

3. If the dispute is unresolved at the end of the thirty (30) day period, a tripartite decision will be written by the Committee setting forth the position of each party. The moving Union may appeal the dispute to the Regional Committee within twenty-one (21) calendar days of the date the decision is reduced to writing and signed by the three parties. A copy of the appeal and the complete case file must be sent to each of the Regional parties by the appealing Union.

Regional Level

The Regional Dispute Resolution Committee (RDRC) shall have sixty (60) calendar days after receipt of a properly appealed dispute to attempt to resolve the dispute.

0226

11

1.    If a dispute is resolved a tripartite settlement agreement will be signed by the parties. The Agreement shall contain the same information specified in the section of this Agreement for local settlement of disputes. The Agreement will be sent to the local committee for implementation and the work assignment shall be added to the local inventory of agreed upon craft assignments.

2.    If the dispute is unresolved at the end of the sixty (60) calendar day period, a tripartite decision will be written by the Committee setting forth the position of each party. The moving Union may appeal the dispute to regional arbitration within twenty-one (21) calendar days of the date of receipt of the written decision of the Committee. Copies of the appeal will be provided to the other parties.

3.    If any member of the Regional Committee identifies an appealed dispute as involving an interpretive issue which is of general application, that member shall inform the other members of the specific issue (s) , in writing, prior to the issuance of a decision by the Committee on that dispute. The written decision by the Committee shall have this written notification attached to the decision. if such an issue in so identified and remains unresolved on the date of the Regional Committee decision, the moving union may only appeal such dispute to the National Committee. Failure of a party to identify such an issue prior to the date of the decision by the Regional Committee precludes appeal to the National Committee of that specific dispute.

4     The RDRC may, by mutual agreement, remand a case back to the LDRC with specific instructions.

Na:ional Level

The National Dispute Resolution Committee (NDRC) shall have sixty (60) calendar days after receipt of a properly filed or appealed dispute to attempt to resolve the dispute.

1     Either union party may initiate a dispute at the National level when such dispute involves an interpretive issue which under the National Agreement is of general application. Such disputes shall be provided to the National Committee, in writing, and must specify in detail the facts giving rise to the dispute, the precise interpretive issues to be decided and the contentions of the Union.

2     If a dispute is resolved, a tripartite settlement agreement will be signed by the parties.

3     If the dispute is unresolved at the end of the sixty (60) calendar day period, a tripartite decision will be written by the Committee setting forth the position of each party  The moving Union may appeal the dispute to National Arbitration within twenty-one (21) calendar days of the date of receipt of the written decision of the Committee. Copies of the appeal will be provided to the other parties.

4     In the event the National Committee, after review, decides that a dispute appealed from the regional level does not involve an interpretive issue which is of general application, the dispute shall be remanded to the regional level and placed on the list of pending arbitration cases*

Regional Arbitration

A panel of two (2) arbitrators will be jointly selected by the parties for each of the five (5) regions. Additional arbitrators may be added to a regional panel up to a maximum of five (5) by mutual agreement of the parties. Selection of the arbitrators will be by a method and for a time period to be agreed upon by the parties. Such panel of arbitrators shall hear only jurisdictional cases. Their fees and expenses will be allocated on a basis of one-half (1/2) to management and one-half (1/2) shared equally by the participating unions. If any party decides not to participate in the arbitration proceedings, the remaining parties will equally divide the arbitrator's fees and expenses. The current practices of the parties related to allocation of cost for canceled dates will be continued.

12

Scheduling of regional arbitration cases will be jointly performed by the parties from a list of dates submitted by the arbitrators. All scheduling correspondence with the arbitrators will be jointly signed by the parties. The method of scheduling will be jointly agreed to by the parties. The factors to be considered in establishing such a method shall be:

1.    a first-in/first-out basis;

2.    cost effectiveness of the system;

3.    volume of cases in a particular geographic area;

4.    availability of advocates for each party; and

5.    a proportionate allocation of dates for each geographic area.

Cases will be scheduled and heard within ninety (90) calendar days after receipt of the appeal. Jurisdiction arbitrators will provide their decisions to the parties within thirty (30) calendar days of the close of the record.

<u>National Arbitration</u>

One arbitrator will be jointly selected by the parties at the national level on the basis of mutual agreement. Once selected, the arbitrator will hear only jurisdictional disputes. The arbitrator's fees and expenses will be allocated on the basis of one-half (1/2) to management and one-half (1/2) shared equally by the participating unions. However, if a party decides not to participate in the arbitration proceedings, the remaining parties will equally divide the arbitrator's fees and expenses. Scheduling of cases will be jointly performed by the parties from a list of dates submitted by the national arbitrator. Time frames will be the same as those designated for regional arbitration. The method of scheduling will normally be on a first-in/first-out basis.

Pursuant to Article 15 of the National Agreement, only disputes involving interpretive issues under the National Agreement which are of general application will be arbitrated at the national level.

Additionally, the national-level arbitrator may be invited to participate in an advisory capacity at National Committee meetings on items related to problems of consistency of regional-level awards or other problems mutually determined by the committee. The arbitrator may be empowered by mutual agreement of the parties to issue instructions to the regional-level arbitrators which were consistent with any mutual understanding on these issues reached as a result of committee discussions. Payment for such services will be made as for an actual arbitration hearing.

<u>New Or Consolidated Facilities</u>

The following procedures shall apply to the opening of new or consolidated facilities.

Forty-five (45) calendar days prior to the opening of a new or consolidated facility, the members of the RDRC will be notified of the date on which activation will take place. within ninety (90) calendar days of that activation, the LDRC designated for the facility will conduct an inventory of jurisdictional assignments at the facility and will attempt to resolve any disputes which arise from these discussions. If necessary, representatives of the RDRC will assist the local parties with on-site reviews.

Jurisdictional assignments shall not be changed solely on the basis of moving operations into a new facility. If jurisdictional assignments existed in a previous facility, they shall be carried forward into the new facility except where operational changes as described below result in the reassignment from one craft to another.

0228

13

n a new or consolidated facility, the jurisdictional assignment in the previous facilities must be considered by the LDRC in the determination mentioned above, in the event the consolidated operations had a mixed practice in the previous installations.

The decision of the LDRC will be processed in accordance with the decision and appeals procedures previously outlined, including appeals to the higher levels of the process.

New Work

This section refers to implementation of RJ-399 involving work which had not previously existed in the installation

The procedures for activation of a new or consolidated facility shall apply to the assignment of new work to an installation. The standards contained in Section II.E of RJ-399 shall apply in making the craft determinations.

Operational Change

Management will not engage in operational changes for the purpose of affecting the jurisdictional assignments in a facility. It is the intent of the parties to continue craft jurisdictional assignments which are not already the subject of a grievance as indicated on page 1, paragraph 2, of this Agreement

To the extent that operational changes are made that may result in the reassignment of functions from one craft to another management must present and discuss such changes with the LDRC thirty (30) days prior to the effective date of the operational change  Within 14 days from the effective date, the adversely impacted union may appeal the operational change to arbitration., A tripartite arbitration shall be heard within sixty (60) days of the effective date of the operational change in order to resolve any jurisdictional disputes. The issue to be decided in cases involving operational changes will be whether the proposed change is consistent, with RJ-399 and/or the intent of this Agreement.

SHERRY A  CAGNOLI
Assistant Postmaster
General
Labor Relations Department
U.S Postal Service

MOE BILLER
President
American Postal Workers
Union, AFL-CIO

GLENN BERRIEN
President
National Mail Handlers Union

DATE  4-16-92

14

## POSITIONS OF THE PARTIES

The following statements of position have been distilled to their essence by extrapolation and

edition from the respective post hearing briefs and reply briefs:

### The APWU

The APWU does not bear the burden of proof just because, in this particular case, it is the party challenging management's interpretation. This is not that sort of litigation. it is, rather, a National-level interpretive case. Either the Postal Service's and Mail Handlers' interpretation is right or the APWU's is right. There can be no award holding that the APWU is wrong but expressing no opinion about whether the Postal Service and/or Mail Handlers are right.

As odd as it may appear to this arbitrator who was selected by the parties to be the National-level arbitrator in the RI-399 dispute resolution procedure, RI-399 simply does not apply here. The seeming incongruity is explained by the procedural history of this dispute. In order to unblock the multitude of APWU grievances, the APWU agreed to place the issue of spreading the mail before this tribunal. It has done so without prejudice in order to get this dispute resolved. This does not mean that RI-399 controls the dispute: it simply means that the issue is before this arbitrator on an ad hoc basis.

The point here is that RI-399, which applies only to Mail Processing activities, has no application to this spreading dispute because this activity takes place only in Customer Services operations. That RI-399 is inapplicable is clear from the fact that document on its face applies only to Mail Processing operations. The very Regional Instruction (Filing No. 399), dated February 16, 1979, implementing the November 15, 1978, primary craft designations states that its subject is "Mail Processing Work Assignment Guidelines" and the designated "action office" is "Regional Mail Processing" (Emphasis added in original).

The fact that RI-399 does not apply to this dispute does not mean that there is no rule to apply. The initial award after postal reorganization in 1970 was that of Sylvester Garrett on April 2, 1975. ("West Coast Award"). In craft disputes not governed by RI-399, the West Coast decision is still the law. Garrett's influence is still profoundly felt in this industry. In ruling for the Mail Handlers in a 1977 APWU-Mail Handler dispute over the transfer of a mail handler assignment to the clerk craft, Arbitrator Garrett stated that a "a 'status quo' rule [was] laid down in the West Coast decision." In the August 1, 1994, Oakton/Vienna case, joint arbitrators Richard Mittenthal and Nicholas Zumas held that the West Coast award was the "governing principle" in the dispute between the NALC and the Rural Letter Carriers Association over whether the urbanization of those communities had transformed rural routes into city delivery routes. Thereafter, on September 29, 1994, the same principles caused Mittenthal to deny the APWU's special delivery craft's claim of special delivery positions in Arlington, TX, where no special delivery messengers had ever been employed.

That distribution is the work of the clerk craft is beyond dispute. Indeed, the Postal Service and Mail Handlers admit as much, but insist that spreading is not distribution. If it is distribution, the grievance must be granted. The physical act of spreading is identical whether it is done with or without scheme knowledge. In this respect, the comparison with single piece distribution with and without scheme knowledge is precisely on point. Just as the work of non-scheme distribution continued as clerk work, so the non-scheme distribution of spreading mail to carrier cases continues to be distribution. What the Postal Service has attempted to do, with sophistry and hubris, is define away the issue by arguing that non-scheme spreading is not distribution. The arbitral precedents utterly demolish this reasoning.

Article 19 incorporates all handbooks, manuals and regulations of the Postal Service which relate to wages, hours and working conditions" into the National Agreement. No doubt this is why the internal committee which developed RI-399 was directed, among other things, "to consult various handbooks issued by the Service containing

15

... personnel practices ...." Several such handbooks and manuals define distribution in Customer Services operations as including spreading:

Appendix A, page 18, of the F-2 Handbook defines LDC 43 Distribution as follows:

> All nonsupervisory hours used in the distribution at stations & branches of preferential and bulk business letters, flats, IPPs and parcel post to carrier routes (including distribution of missorts) and all distribution at non-MOD offices. Also includes hours used in the distribution of presort bundles and sacks and spreading of mail to carrier routes as well as any distribution of box mail made in conjunction with the distribution of mail to carrier routes. Excludes the distribution of post office box mail as defined in LDC 44 (emphasis added).

Handbook M-32 defines distribution at stations and branches (Operation 240C) in similar terms:

> All distribution of mail to carrier routes performed at stations and branches. Includes the distribution of missents, presort bundles and sacks, spreading of mail to carrier routes. and any distribution of box mail made in conjunction with the distribution of mail to carrier routes. Does not include the distribution of box mail as defined in operation 769. It is recommended that a separate operation number be assigned to each station or branch (emphasis added)

Alternatively, RI-399 itself makes the clerk craft the primary craft for spreading the mail. Thus, if the Arbitrator finds that RI-399 applies here, the APWU still must prevail. Operations 240-339, entitled "Distribution at Stations and Branches," lists only one function and assigns it to the clerk craft. There is no mention whatsoever of "allied functions" comparable to those found in other RI-399 operations. If one looks at what RI-399 says rather than what the Postal Service and Mail Handlers want it to say, the outcome is clear: distribution at stations and branches belongs to the clerk craft. distribution falls under LDC 43, and LDC 43 defines spreading as distribution. So does the M-32 Handbook. As noted, the 1987 MOU prohibited unilateral changes to RI-399. This is precisely what the Postal service has done in adding "transportation" to Operations 240-399. redefining spreading as transportation and not distribution, and changing the primary craft from clerk to mail handler.

Spreading is a Customer Services activity which is defined as distribution in the relevant regulations and, because it is distribution, it is assigned to the clerk craft by historical practice and specifically in Operation 240-339 in RI-399. For these reasons and those appearing from the examination of the record and arguments made at the hearings, the Arbitrator should find that spreading the mail is distribution and therefore the primary craft for spreading duty assignments is the clerk craft

## The USPS

Spreading work is comparable to other work that undisputedly belongs to the mail handler craft and bears no similarity to work designated as clerk craft work. APWU makes little or no attempt to assert that the work tasks involved with spreading are comparable to any of the functions to which the clerks are the primary craft. Rather, the APWU's entire case consists of a definitional construct built upon a weaving of references in handbooks and manuals, which themselves are not pertinent to craft jurisdictional issues. While the APWU seeks to characterize spreading as distribution, its argument for doing so is based on its own interpretation of handbook and manual provisions. The APWU makes little or no effort to argue that the content of spreading work is at all similar to the work involved in distribution

16

Mail handlers are principally responsible for moving or transporting mail from place to place within postal facilities. Indeed, the "APWU does not dispute [that] RI-399 provides that the Mail Handlers are the primary craft for the movement of mail and equipment from point A to point B (transporting)." The simple fact that the APWU fails to acknowledge or appreciate is that the work of spreading mail is quite accurately described as "the movement of mail from point A to point B."

R. I. 399 on its face supports the Postal Service designation of the mail handler craft as the primary craft to perform the work of spreading the mail to carrier cases. Testimony from Nicholas Barranca and Jim Bratcher establishes that the purpose of the sentence from the functions column in Operations 240-339 was to make clear that the principles and craft designations found in R. I. 399 were to be applied broadly to work performed in stations and branches throughout the Postal Service. Since that sentence operates to apply the principles and craft assignments found throughout R. I. 399 to similar work performed at stations and branches, then the designation of the mail handlers as the primary craft for spreading mail plainly is correct.

Even if R. I. 399 were deemed not to directly apply to this dispute, however, the designation of the mail handlers as the primary craft to perform the spreading work was still correct. This is because even applying traditional jurisdictional criteria used in the Postal Service to this dispute the result is still that the work belongs to the mail handlers as the primary craft.

In summary, the APWU has delved into technical postal manuals that create a management record-keeping system that serves as a tool for management to track work hours to provide information to help management run the business. The handbooks expressly forswear any intent to be cognizant of craft lines. The APWU's fundamental point, that spreading hours are counted under an LDC entitled "Distribution," is rendered meaningless by the fact that the same handbook upon which the APWU relies makes it clear mail handler hours are expected in LDC 43. Accordingly, these handbooks are not relevant to determinations of craft jurisdiction, but even if considered, lend no support to the APWU's claims. APWU's argument is like trying to apply the rules of football to a basketball game. While both sports may involve "field goals," "turnovers," "offense" and "defense," the rules of one are of no real value in interpreting the rules of the other.

The issue before the Arbitrator, unlike the APWU's hypothetical scenario, postulates that the mail has been previously grouped and marked by carrier route number. As such, the distribution of the mail has been completed and the spreading function is performed as a separate task. There is nothing about the performance of the work defined in the Issue Statement that has any remote resemblance to an operation requiring scheme knowledge. The APWU's grievance should be denied.

## The NPMHU

Because the APWU is challenging as improper a primary craft assignment made by the Postal Service, the burden falls on the APWU to produce "affirmative evidence" demonstrating that the Postal Service's decision was erroneous. If the APWU fails to meet its "heavy burden" in this case, then the Postal Service's decision to assign mail handlers as the primary craft for spreading the mail must be upheld.

Notwithstanding the complex record that has been developed in this case, the question whether the Postal Service properly assigned mail handlers as the primary craft for spreading mail to letter carrier cases based on pre-identified and pre-marked carrier route numbers is relatively simple. Because RI-399 provides that mail handlers are the primary craft for the movement and transportation of mail within postal facilities, and the spreading of mail is the movement or transportation of mail from one place inside a postal facility (e.g., a platform, a staging area, a pie rack collecting mail from a piece of automation, a distribution case) to another place in the postal facility (i.e., the letter carrier case), mail handlers must be the primary craft assigned to such work, at least when they are available in the facility or there are four or more continuous hours of mail handler work in the facility.

17

Such an assignment is fully consistent with the common and longstanding practice of the Postal Service to assign mail handlers to spread the mail, and with the terms of RI-399 itself, which provides under Operations 240-339 that work at stations and branches should be assigned to a primary craft in accordance with the assignment of similar work under the remainder of RI-399. The assignment of spreading to mail handlers as the primary craft also is fully consistent with the criteria included in the Memorandum of Understanding that established the Committee on Jurisdiction in 1975, which formed the basis for the development of RI-399 and for the Gamser Award. In addition to the nature of the duties and the efficient and effective utilization of employees, these criteria direct the Postal Service to consider "existing work assignment practices," "manpower costs," and the "contractual and legal obligations and requirements of the parties."

In response to this overwhelming case in support of the Postal Service's jurisdictional determination concerning the spreading of mail, the APWU relies on a simplistic, and ultimately unpersuasive, syllogism — namely, that clerks are the primary craft for performing all distribution (except, as the clerks acknowledge, "manual distribution of parcel post" under Operation 100 of RI-399), that spreading the mail is distribution, and therefore that spreading of mail must be clerk work. This syllogism fails, however, essentially because one of its premises — that spreading the mail is distribution — is patently false.

On many occasions, the APWU has conceded that mail handlers are the primary craft responsible for spreading mail to letter carrier cases, and its current efforts to reverse that position should be rejected. The APWU has not meet its burden of demonstrating that the Postal Service has erred, nor has the APWU proved that spreading of mail to letter carrier cases is the distribution of mail. The APWU's reliance on a series of handbooks and manuals dealing with financial management and record keeping are unpersuasive, and the APWU cannot justify its attempt to draw distinctions between mail processing and customer service operations when the task of spreading the mail is the same in both locations.

Based on the application of all of these factors, the Postal Service clearly was correct in deciding that mail handlers should be the primary craft for spreading the mail. For these reasons, the APWU's grievance should be denied, and the Arbitrator should conclude that the Postal Service acted properly when it determined that the mail handler craft is the primary craft for spreading mail.

18

## OPINION OF THE IMPARTIAL ARBITRATOR

### 1. The Stipulated Issue

An accurate and informed arbitral determination of any dispute over jurisdiction of work requires description and definition of the work at issue with as much precision and specificity as possible. In this particular case, the Parties have obviated that often difficult task by a painstakingly negotiated tripartite submission to arbitration. Thus, as the term is used in this case, "spreading the mail", means the regularly scheduled assignment of taking to carrier cases ("putting on the ledge...or stacking close to or under individual letter carrier cases") located in delivery units ("attached to a large postal facility...or in a remote area or...in a customer service operation") mail ("including but not limited to sacks, trays, flat buckets, and bundles") which previously has been marked and identified by carrier route numbers. See Joint. Exh. 4 and Tr.I at 70-76 and 127.  In that connection, it is important to emphasize at the outset the limited scope of the question presented for determination in these proceedings by joint stipulation of the Parties.

In general terms, "spreading of the mail" is the taking of mail from one location in a postal facility to another.  For purposes of this arbitration, the sometimes amorphous term "spreading the mail" has been more sharply defined as the work of taking to carrier cases mail which previously has been identified and marked by carrier route numbers; usually occurring as one of the last steps in the mail processing stream, immediately before casing and delivery by the carrier, and sometime after the mail has been identified by and marked with a carrier route number; either as mail "presorted" by a customer or after being so marked and identified by a manual, mechanized or automated operation typically performed by a clerk craft employee. (Tr.I at 70, 77; Tr.II at 78, 88,

19

184-85). Depending on the particular facility, this pre-marked mail may be taken from a loading or unloading dock; from a staging area; from a pie rack, cage, or other container that has been filled at the end of a piece of mechanized or automated machinery; or from a tray or other container filled with mail removed from pigeonholes at a distribution case.

In all of these situations, the mail is then relocated to letter carrier cases for further preparation or casing by the carrier for delivery on his or her route. It is emphasized in the question presented that the mail being moved "has been previously identified and marked by carrier route numbers." (Jt. Exh. 4). Thus, the employee performing the spreading has only to read and match a carrier route number (e.g., 1,2,3, 4, etc.) on a label, flag, placard, slide tag, or similar notation with the corresponding number on the appropriate carrier case, typically set up and marked in numerical order, to which the pre-marked mail is to be taken.

As I reminded Counsel several times throughout the arbitration hearings, the Parties have presented me with a narrow question for determination. _See, e.g._, Tr.I at 72, 123-24, 127; Tr.II at 102 ("[T]hat is the limited and sole and only issue that I will be deciding in this case"); Tr.IV at 31 ([Arbitrator has not been asked] "to ... decide anything in this case other than a rather narrow specifically-described issue submitted to me in Joint Exhibit 4"). Therefore, in judging the designation of Mail Handlers as RI-399 primary craft for assignment of the work of "spreading the mail", as specifically described and defined in the issue submitted, it is neither necessary nor appropriate (particularly in light of other matters now pending before me in National Jurisdictional Arbitration) that I express or imply any opinions about a precise definition of "distribution", work activity involving "scheme knowledge", or the controversial concept of "non-scheme distribution".

20

## II.  Applicability of R I-399 to "Spreading the Mail"

At the threshold,  APWU objects to application of RI-399 and urges me to function as an "ad hoc" arbitrator;  taking the boldly creative stand that this case is not governed by and should not be decided by application of the provisions of RI-399.  On procedural/jurisdictional  grounds, APWU urges the inapplicability of RI-399 because the original grievance filed by the Postal Workers in 1988 "did not arise under the tripartite RI-399 procedures."  Although interesting as history,  this assertion  is a *non sequitur* with respect to the governing application of RI-399 in the dispute before me for arbitration.

Following creation of the tripartite RI-399 DRP in 1992, all three Parties agreed to refer escalating but bottle-necked disputes over "spreading the mail" to final and binding arbitration by the National Jurisdictional Arbitrator they had jointly appointed pursuant to the RI-399 DRP. Further,  it is noted that the Postal Service action being grieved by APWU is an exercise of authority claimed under RI-399.  Indeed,  the original grievance filed by APWU in 1988 specifically cited and relied upon, *inter alia*, RI-399.  Finally, the precisely stipulated issue submitted to me by all three Parties for arbitration on May 29, 1997 questions the propriety of the Postal Service  assignment of the Mail Handler craft as the  RI-399 "primary craft" to spread the mail to carrier cases.    It is plain that jurisdiction and authority have been properly vested in me to hear and decide the present case under the RI-399 DRP by application of  the terms of RI-399.

APWU also objects to application of RI-399 on the substantive ground that "RI-399, applies only to Mail Processing activities and has no application to this spreading activity [which] takes place only in Customer Services operations."  From that premise,  APWU argues that  I should

0236

21

refuse to apply the RI-399 guidelines to this case and look for my decisional standards elsewhere, *i.e.*, in manuals and handbooks, custom, history and practice and arbitration precedent. While none of those traditional sources of arbitral reference and guidance may reasonably be disregarded in work jurisdiction disputes, the APWU has not persuasively demonstrated that RI-399 is applicable only to Mail Processing activities and has no application to mail spreading activity taking place in Customer Services operations.

The very language of RI-399 itself under Operations 240-339, illuminated by credible, probative and essentially unrefuted testimony about the genesis and evolution of that language, from individuals who bargained it, persuasively demonstrates the joint intent of the Parties that RI-399 primary craft designations are applicable not only to Mail Processing facilities but also to stations and branches, *i.e.*, "[t]he designation of a primary craft can be applied to a detached unit that performs or supports a mail processing operation". This record evidence firmly supports the conclusion that the mutually communicated, understood and agreed purpose of that "curious sentence" appearing in RI-399 under Operations 240-339, is to apply the RI-399 concepts and principles "to work throughout all stations and branches." Tr.II at 75-76. See also Tr.II at 137-40.

That mutually understood meaning of the above-quoted language from RI-399 Operations 240-339, which APWU urges me to disregard as a mere curiosity, is established beyond cavil by the documentary evolution of the RI-399 language regarding Operations 240-339, as buttressed by the testimony of USPS negotiator Nicholas Barranca and NPMHU negotiator James Batcher. In that connection, the different drafts in the RI-399 development process leading to the final version for Operations 240-339 are fully consistent with the testimony of James Bratcher and Nicholas

22

Barranca.  The first 1977 draft of RI-399 (NPMHU Exh. 20 and APWU Exh. 45), would have

assigned clerks as the primary craft for all work, including "allied labor", at stations and branches.

The interim draft distributed in April 1978 (APWU Exh. 46) assigned no primary craft but contained

the initial version of the "Note", assigning work at stations and branches by reference to the

remainder of RI-399 (apparently in response to the objections raised by the NPMHU representative

James Bratcher to the September 14, 1977 draft version).  The final February 16, 1979 version of

RI-399 (APWU Exh. 14), an obvious compromise between the 1977 and 1978 versions, assigns

clerks as the primary craft for the distribution of mail in Operations 240-339 (apparently in response

to objections raised by APWU representative James Wolfe to the April 14, 1978 draft version), while

still retaining the cryptic qualifying words of the "Note":— *i.e.*, "The designation of a primary craft

can be applied to a detached unit which performs or supports a mail processing operation".

USPS witness Barranca explained the reasoning for that compromise language in Operations

240-339, as follows (Emphasis added):

> [For] "distribution that took place at stations and branches, . . . [the Postal Service]
> wanted to make the assignment consistent with the assignments that were made for
> the distribution activity in the plants.  And we also recognized that there are other
> supporting activities that took place in stations and branches, . . . and we wanted to
> identify that craft assignments could be made for those supporting activities, as well
> at stations and branches, as were made at the plant." Tr.II at 70-71.Now, the activity
> that took place at stations and branches was basically . . . a microcosm . . . of all of
> the activities that took place in the plant...So, one of the ways that we considered
> identifying all of the support activities that took place at stations and branches was to
> go through this document [i.e., RI-399] and identify every potential support activity and
> make a craft designation, whether it's unloading trucks, operating forklifts, hanging
> sacks, inserting labels. And the alternative that we opted for instead of replicating the
> entire document basically within 240 to 339 was to reference the fact that there could
> be a designation of primary craft assignments for support activities at stations and
> branches. . . . So, what we did was just say, we recognize support activities take place
> at stations and branches. We're not going to repeat the whole document within 240
> to 339.  But we're going to refer the reader back to those to make the proper
> assignment. Tr.II at 73-74.

23

For his part, NPMHU witness Bratcher described his role in the development of the language in Operations 240-339, as follows (Emphasis added):

> The change in the language [in Operations 240-399 from the original draft of RI-399 to the February 16, 1979 issuance of RI-399] allowed . . . that the work in the stations would still be governed by the initial designations of [RI-]399. . . . The work of what we call spreading the mail, the basic mail handler functions, would always be mail handlers work, but could be done by other crafts if the time was not there in order to establish the position. Tr.III at 163. . . . It was our position at that time that mail handler work under the basic operations of the Postal Service was the same at stations and branches and small post offices as it was in the major post offices. Tr.III at 177.

Finally, Barranca testified that these evolutionary changes in the language of Operations 240-399 and the above expressed rationale for making those changes were discussed fully with APWU representative Wolfe as that language was developed and finalized.

The foregoing testimony of the Postal Service and NPMHU witnesses remained consistent and unwavering under rigorous cross-examination. Except for *ad hominum* attacks upon the credibility of these Postal Service and NPMHU negotiator/witnesses and bare assertions by individuals who were not privy to those negotiations, the probative evidence of the bargaining history of the language in RI-399 Operations 240-399 remains effectively unrefuted by APWU on the record before me. Based upon all of the foregoing, I find that the primary craft concepts and principles set forth in RI-399 are applicable to the work of "spreading the mail" in stations and branches. Thus RI-399 governs disposition of the instant dispute over the assignment of a primary craft for the function of spreading the mail to letter carrier cases (i.e., the taking of mail, including but not limited to sacks, trays, flat buckets, and bundles, to carrier cases), when such mail has been previously identified and marked by carrier route numbers.

24

## III. Burden of Persuasion

It is not open to reasonable debate that the Party contesting a primary craft designation under RI-399 bears the overall burden of persuasion, by a preponderance of record evidence, that the Postal Service failed, in the words of the Arbitrator Gamser in the seminal case upholding the validity of RI-399, "to abide by the [six] guidelines provided in the [1975] Memorandum [establishing the Committee on Jurisdiction] or otherwise." Gamser Award, p. 16.

## IV. The Designation of Mail Handlers as Primary Craft for Spreading the Mail

Once again, I reiterate the narrow parameters of the question submitted for determination in this case. As reflected in the Issue Statement and in testimony, "spreading the mail" is the taking of containers of mail to letter carrier cases when those containers are marked with a carrier route identifier. See Jt. 4, Tr. 77 (7-23-97); Tr. 184 (7-23-97). The mail which is spread already has been grouped or distributed to the individual carrier route and marked with a number corresponding to a number on the carrier cases. Thus, all that is required of the employee spreading that mail is to match the numbers and transport that mail to the appropriate carrier case. Whether the mail is waiting in a staging area at the delivery unit, or has just been unloaded from a truck at a station or branch, the pre-identified and marked mail to be spread needs to be moved from where it is located to the appropriate letter carrier case.

The general parameters for describing the types of Postal Service work performed by clerks and the types of Postal Service work performed by mail handlers are well-established. Thus, it cannot be gainsaid that the transporting the mail ("movement of mail from Point A to Point B") is

# Joint Exhibit 1

# Part 5

25

a function primarily assigned to and performed by the mail handler craft. Nor does anything in this record call into question the countervailing truism that the functional duties and responsibilities of clerks primarily are described in terms of performing different types of "distributions."

The custom, practice and tradition of mail transportation by mail handlers and mail distribution by clerks, reflected in statutory position descriptions [Title 39, former United States Code, Sections 3514(d) and 39 U.S.C. § 3515] and current position descriptions (USPS Exh. 3 and 4-6), permeates the primary craft designations set forth in RI-399. Duly noted are the so-called "asterisk" function qualifications and the other qualifying language in RI-399 that where a function is " an integral part of the distribution function, the entire operation is a function of the primary craft performing the distribution." [The "asterisk" requirements that the function can be "efficiently separated" and that there be "four (4) or more hours of continuous work consisting of one or more work functions in one or more operations designated to the same primary craft" are applicable to "spreading the mail." But the "integral to distribution" qualification is inapplicable in this case because, for reasons explained *infra*, "spreading the mail", as defined in the Issue Statement, *supra*, is neither distribution of mail nor is it "an integral part of the distribution function"; rather it is transportation of mail].

"Spreading the mail" is not expressly listed or defined in RI-399 but transportation functions primarily assigned to mail handlers are closely aligned with if not identical to the task of "spreading the mail", as that quoted term is defined in the Issue Statement, *supra*. In particular, the tasks of "obtaining mail from staging area[s]" and "loading ledges," both of which appear throughout RI-399 as designated to the mail handler craft, accurately describe the spreading function. By contrast, the

26

"spreading is distribution" mantra so frequently and vehemently intoned by APWU throughout this proceeding turns out to be a bare assertion unsupported in this record by history, custom, practice, arbitral precedent, manuals and handbooks or RI-399 itself. To the contrary, each of the evidentiary bases typically used to resolve jurisdictional disputes among and between Postal Service unions, especially and specifically including RI-399 and the six (6) guidelines which underpin RI-399, support the appropriateness of the Postal Service assignment of mail handlers as the primary craft to perform the function of spreading the mail to carrier cases.

There is no viable basis for concluding that the location in which such spreading of mail to carrier cases occurs should be determinative of the primary craft to be assigned to that spreading. Indeed, as described in detail, *supra*, the history of RI-399 in the developmental period 1977-1979 plainly shows that with the inclusion of the "curious sentence" in RI-399 Operations 240-339 the Parties agreed that work at stations and branches, other than the distribution that was assigned to the clerk craft, should be assigned in accordance with the requirements established under the remainder of RI-399 for mail processing operations. For purposes of convenience, the Parties did not set out in RI-399 every function that could be performed in customer service operations under Operations 240-399. Rather, the last sentence appearing under Operations 240-339 was intended to incorporate the jurisdictional assignments set forth in the balance of RI-399, and apply those assignments to stations and branches seen as a "microcosm" of a large mail processing operation.

The elaborate semantic construct fashioned by APWU to support the assertion that "spreading is distribution" is based primarily upon selected quotations taken out of context from USPS financial handbook implementing guidelines for the National Workhour Reporting System

27

(NWRS). When subjected to close scrutiny, however, that theory falls of its own weight. The cited

financial management references contain an express disclaimer of such usage. Thus, the F-2

Handbook (APWU 20, section 112) expressly provides:

> Considering that the same employee can be used in the performance
> of different activities, this categorization of labor by function no
> longer identifies the employee with the craft, but accounts solely for
> the number of hours worked in the performance of each function.

This provision is a clear statement that the F-2 Handbook cannot be relied upon to support the kinds

of jurisdictional arguments being advanced by the APWU in this case. See also "categorizing labor

by function no longer identifies the employee with the craft," USPS Exh. 29 at 122; "LDCs and

NWRS reports by function where hours are worked, not who performs that work," id. § 311.13]

(Emphasis added).

Further the APWU's contention fails even on its own terms, by misinterpreting the portion

of the F-2 Handbook that it cites in support of its contention that spreading is distribution because

it is listed under LDC 43. Simply put, LDC 43 is not limited to work performed by the clerk craft,

but rather expressly includes work by employees in the mail handler craft. In the pages following

Section 314.3 of the F-2 Handbook, there appears a listing of the "Designation Activity Codes" for

those categories of postal employees that properly may be tracked or listed under each LDC. On

page 3 of that listing, under LDC 43, the following Designation Codes are included: 11-0, 12-0, 31-

0, 32-0, 41-0, 42-0, 61-0, and 62-0. It is undisputed that Designation Codes 12-0, 32-0, 42-0, and

62-0 are codes reserved exclusively for employees in the mail handler craft. Tr.III at 32-36, 40-43.

See USPS Exh. 29 § 323.41 (second page); USPS Exh. 30 at 191 (F-22 Handbook); USPS Exh. 33

(excerpt from F-21 Manual). In addition, in a related manual entitled "Function Four Review

28

Process," USPS Exh. 32, there are numerous references to work, performed under LDC 43, that is indisputably work of the mail handler craft, including the spreading of mail.  See also USPS Exh. 32 at 60 (listing LDC 43, together with a column for "Total Clk/Mh," confirming that work of both crafts is recorded under that Labor Distribution Code).

Notwithstanding the fact that LDC 43 is entitled "Unit Distribution," work performed by mail handlers is properly assigned to that Labor Distribution Code, Tr.III at 43, and the APWU's reliance on the F-2 Handbook to assist in the determination of appropriate craft jurisdiction is entirely misplaced.  Similarly, although the M-32 Handbook lists the "spreading of mail to carrier cases" under Operations 240-339, which is listed under the heading "Distribution at Stations and Branches," that single paragraph simply does not support the proposition that all work listed, tracked, or otherwise categorized by the Postal Service under Operations 240-339 for purposes of the NWRS is distribution.  To the contrary, Nina Strait testified without effective contradiction that all work performed at stations and branches, whether distribution or not distribution,  must be listed for financial and hours management purposes as coming under Operations 240-339,.  See Tr.III at 63-64.  In addition, the Function Four Review Process Guidelines Booklet lists "allied distribution" that falls under LDC 43.  USPS 32, at 62.  All of the items listed are typical mail handler duties, including "spread Carrier mail".  It is significant to note that "spread Carrier mail" is under the "Allied Distribution" category, which indicates that it is not itself distribution. USPS 32, at 25, 27.  These sections make it clear that spreading is not distribution, even though the spreading hours are to be reported under LDC 43.

29

## CONCLUSION

In summary, the Postal Service's decision to assign mail handlers as the primary craft for the spreading of mail to letter carrier cases is fully consistent with RI-399, *per se*. If it were necessary to go beyond the confines of RI-399 to resolve such a jurisdictional dispute under the RI-399 DRP, logic and the mutual intent of the Parties support a conclusion that the appropriate principal jurisdictional standards to consider would be the six (6) criteria agreed upon by the Parties in the 1975 MOU establishing the Committee on Jurisdiction [It is noted that those six (6) criteria, used by the parties to develop RI-399, continue to be found in the collective bargaining agreements between the USPS and both APWU and NPMHU as the criteria for determining whether or not a new position was assigned to the appropriate craft]:

1.    existing work assignment practices;
2     manpower costs;
3.    avoidance of duplication of effort and "make work" assignments;
4     effective utilization of manpower, including the Postal Service's need to assign employees across craft lines on a temporary basis;
5.    the integral nature of all duties which comprise a normal duty assignment;
6.    the contractual and legal obligations and requirements of the parties.

The assignment of the mail handlers as primary craft for spreading the mail is supported not only by RI-399, *per se*, but also by those  six (6) criteria underpinning RI-399.  Claims and assertions to the contrary by APWU are not supported by probative evidence in the record before me.  Accordingly, I find and hold that the Postal Service properly assigned the mail handler craft as the primary craft to spread mail to letter carrier cases when such mail has been previously identified and marked by carrier route numbers.

30

## AWARD OF THE IMPARTIAL ARBITRATOR

The Postal Service properly assigned the mail handler craft as the primary craft to spread mail to letter carrier cases when such mail has been previously identified and marked by carrier route numbers.


Dana Edward Eischen
Signed at Spencer, New York on April 24, 1998


STATE OF NEW YORK } SS:
COUNTY OF TOMPKINS }


On this _X Y_ day of _____, 19_ _ _, I, DANA E. EISCHEN, affirm and certify, upon my oath as Arbitrator, that I am the individual described herein, that I executed the foregoing instrument as my Award in this matter and acknowledge that I executed the same

## SETTLEMENT AGREEMENT

Re:    Operations 110-129 and 180-189; Dock Connection Transfers; and Non-Jurisdictional Cases

As clarification to existing Memoranda of Understanding, Letters of Intent, and previous correspondence, the parties agree to the following:

### 1. Operations 110-129 and 180-189

Craft assignments in Operations 110-129 and 180-189 may be made by management based on the primary purpose of the operation. The parties recognize that there may be disagreements among the parties regarding what the primary purpose of any particular operation is and reserve the right to make such arguments in individual cases.

If an opening unit described in Operations 110-129 and 180-189, which normally is located inside a facility, is instead located on a platform, the RI-399 guidelines for Operations 110-129 and 180-189 still govern. If a platform operation described in Operations 210-239, which normally is located on a platform, is instead located inside a facility, the RI-399 guidelines for Operation 210-239 still govern.

In accordance with the Memorandum of Understanding (Re: Dispute Resolution Procedures), dated April 1992, "[m]anagement will not engage in operational changes for the purpose of affecting jurisdictional assignments in a facility." A change in the operation number alone, without any change in the way the operation is performed, is not considered an operational change for the purposes of that Memorandum of Understanding.

### 2. Dock Connection Transfers

For the purposes of applying item 12 of Operations 210-239, the term "making dock connection transfers" means performing the duties of verification, oversight, and record keeping associated with assuring that the proper connections and transfers are made.

### 3. Non-Jurisdictional Cases

The parties agree that those grievances not dealing with jurisdictional issues shall not be referred to the RI-399 Dispute Resolution Procedures and, if such cases already have been referred, shall be removed from the RI-399 Dispute Resolution Procedures for further processing under the terms of Article 15 of the appropriate National Agreement. Regional and Local Dispute Resolution Committees are responsible for identifying such grievances.

For these purposes, non-jurisdictional cases are those cases in which the underlying craft jurisdiction is not under challenge. These cases are cases where there exists an inventory that has been properly completed and signed by representatives of all three parties; cases where there was no dispute pending as of April 29, 1992, and there has been no claim of New or Consolidated Facilities, New Work, or Operational Change since that date; and cases where the remedy sought by the grieving union does not include permanent reassignment of the work to a different craft. The mere citation of, or reference to, RI-399 either in a union's grievance or in a management response to a grievance does not mean that the case involves a jurisdictional dispute; rather, the parties must examine each case to determine whether it involves a jurisdictional dispute that must be resolved under RI-399 or whether it is a non-jurisdictional case that should be resolved under Article 15 of the appropriate National Agreement.

J-7

The parties agree that an arbitrator hearing a non-jurisdictional case under the Article 15 procedures is not empowered to decide jurisdiction; that no party will seek a determination from the arbitrator on jurisdiction; and that any portion of the arbitrator's award which may include a decision on jurisdiction will be disregarded and will not be implemented.

## 4. Scope of the Settlement

Pursuant to the Memorandum of Understanding (dated April 16, 1992, but effective on April 29, 1992) "no new disputes will be initiated at the local level by either union challenging jurisdictional work assignments in any operations as they currently exist. Except as otherwise specifically provided in New or Consolidated Facilities, New Work, or Operational Change sections contained in this memorandum, all local craft jurisdictional assignments which are not already the subject of a pending locally initiated grievance will be deemed as a proper assignment for that facility."

Accordingly, the principles set forth in this Settlement Agreement will be applied only to any properly filed pending disputes involving those operations. No craft changes will be made based on this agreement in facilities in which no properly filed dispute is pending.

This agreement constitutes full and final settlement of the following national cases and all cases held pending the resolution of these national cases:

| | | |
|---|---|---|
| 1. | Q90M-4Q-J 95001820 | Primary purpose |
| 2. | H7C-4R-C 13068 | Dock connection transfers |

All open grievances and disputes involving these two issues will be promptly resolved or otherwise processed in accordance with the principles contained herein. All grievances held at the national level involving these two issues will be promptly remanded to the Regional Dispute Resolution Committee for prompt resolution in accordance with the principles contained herein.

*Moe Biller*                    AUG 0 3 2000

Moe Biller
President
American Postal Workers Union, AFL-CIO

*William H. Quinn*

William H. Quinn
President
National Postal Mail Handlers Union, AFL-CIO

*Anthony J. Vegliante*

Anthony J. Vegliante
Vice President, Labor Relations
U.S. Postal Service

2

0248

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
UNITED STATES POSTAL SERVICE,
THE
AMERICAN POSTAL WORKERS UNION, AFL-CIO,
AND THE
NATIONAL POSTAL MAIL HANDLERS UNION, AFL-CIO

Re:  Application of National Jurisdictional Arbitration Awards

The parties at the national level agree that the following actions shall be taken upon receipt of national awards issued under the procedures contained in the Memorandum of Understanding, Re: Dispute Resolution Procedures, dated April 1992:

1.   Regional Dispute Resolution Committees shall convene within 60 days of the date of the national award to discuss all cases held pending the outcome of the national case.  Local Dispute Resolution Committees shall convene within 60 days of the date of the national award to discuss all cases held at that level pending the outcome of the national case.  In addition, Local Dispute Resolution Committees shall convene within 60 days of any referral or remand from the regional level to discuss any cases referred or remanded to the local level.

2.   If the parties agree that the case is fully resolved by the national award and no reassignment of work to a different craft is necessary, the case shall be withdrawn by the grieving union.

3.   If the parties agree that the case is fully resolved by the national award and reassignment of work to a different craft is necessary, the Postal Service shall make such reassignments as expeditiously as possible.  Any remaining issue of additional remedy will be processed under Article 15 of the appropriate collective bargaining agreement and therefore may be settled by agreement between the Postal Service and the grieving union.

4.   If the Postal Service believes that a case is fully resolved by the national award but one or both of the union parties disagree, the Postal Service may unilaterally reassign the work to the appropriate craft, consistent with the principles described in Regional Instruction 399 and the 1992 Dispute Resolution Procedures Memorandum of Understanding.  The union challenging this management decision will then have the right to file a new dispute under the RI-399 dispute resolution procedures, and any such dispute will be given priority in arbitration scheduling.  Any remaining issue of additional remedy will be processed under Article 15 of the appropriate collective bargaining agreement and therefore may be settled by agreement between the Postal Service and the grieving union.

5.   If the parties agree that the case is not fully resolved by the national award, and that there are factual disputes or other disputes regarding the proper application of RI-399 to the fact circumstances, those cases should be resolved by the appropriate Dispute Resolution Committee, if possible, or arbitrated if necessary.

0249

6.  No reassignment of work within a facility will be made based on a national award unless there is a properly initiated dispute pending on that issue in that facility.


*Moe Biller*                          AUG 0 3 2000

Moe Biller
President
American Postal Workers Union, AFL-CIO


*William H. Quinn*

William H. Quinn
President
National Postal Mail Handlers Union, AFL-CIO


*Anthony J. Vegliante*

Anthony J. Vegliante
Vice President, Labor Relations
U.S. Postal Service

4

AGREEMENT
ON
IMPLEMENTATION OF ARBITRATION AWARD H7C-NA-C 32

The parties at the national level agree that if cases or disputes that were held pending the outcome of national arbitration award H7C-NA-C 32 ("spreading the mail," dated April 24, 1998) still have not been resolved, then the Regional Dispute Resolution Committees and Local Dispute Resolution Committees shall convene within 60 days of the date of this agreement for the specific purpose of applying the Memorandum of Understanding, Re: Application of National Jurisdictional Arbitration Awards, to all cases held pending the outcome of arbitration case H7C-NA-C 32.

_Moe Biller_          AUG 0 3 2000

Moe Biller
President
American Postal Workers Union, AFL-CIO

_William H. Quinn_

William H. Quinn
President
National Postal Mail Handlers Union, AFL-CIO

_Anthony J. Vegliante_

Anthony J. Vegliante
Vice President, Labor Relations
U.S. Postal Service

5

399 National Issues List                                                        Page 1 of 1

Gentlemen:

I have attached a National Issues list updated as of today.  This is found under Tab 16/Tab P of our respective
advocacy books.  We might want to send this to our arbitrators - please let me know.

<<NatIssues.doc>>

Joe Amma
Field Labor Relations
(425) 438-2123
(425) 290-6350 FAX

RI 399 Arbitration Exhibits
Western Area – Revised July, 2005

THE FOLLOWING ISSUES ARE PENDING BEFORE THE RI-399 NATIONAL
DISPUTE RESOLUTION COMMITTEE

Whether management violated RI-399 by assigning Mail Handlers to operations in which
trays or tubs are placed into containers (i.e., "containerization"). (H7C-1G-C 15210,
et.al.)

Whether management violated RI-399 by assigning Mail Handlers to prepare mail for the
OCR. (H7C-3Q-C 16764, et.al.)

Whether Mail Handlers may be assigned to perform incidental functions of the AC/DCS
operation. (H4C-5F-C 15342)

Whether management violated the Agreement by designating the Mail Handler Craft as
the primary craft for sweeping and other allied duties on the Small Parcel and Bundle
Sorter. (H7C-NA-C 69)

Whether the Clerk Craft has a proprietary right pursuant to RI-399 to input pertinent
information on the MOD Scale system. (H7C-NA-C 45)

Assignment of the Mail Processor, PS-4, position to operate the Letter Mail Labeling
Machine (LMLM). (Q90M-4Q-J 94021635)

Whether parties are allowed to submit post-hearing reply briefs in disputes heard under
these procedures. (S0C-3A-C 1017)

Whether the addition of the Input Subsystem to the Advanced Facer Canceler is an
operational change that requires the work to be assigned to the Clerk Craft. (Q94C-4Q-J
97028616)

Whether management violated RI-399 by assigning work on the tabbing machine to the
clerk craft. (Q98M-4Q-C 01113678)

Whether management violated RI-399 by retaining craft jurisdictional assignments at the
L&DCs as they were established at the PMPCs based on the PMPC Memorandum of
Understanding. (Q00C-4Q-C 04189233)

Assignment of the Mail Handler Craft to operate the Automated Package Processing
System (APPS). (Q00C-4Q-C 04189225)

Whether the work performed by clerks from the 030 Operation on tax day in Louisville
must be assigned to the mail handler craft pursuant to the award of an arbitrator not on
the RI-399 panel. (D98M-1D-J 01144764)

RI 399 Arbitration Exhibits
Western Area

THE FOLLOWING ISSUES ARE PENDING BEFORE THE RI-399 NATIONAL
DISPUTE RESOLUTION COMMITTEE

Whether management violated RI-399 by assigning Mail Handlers to operations in which
trays or tubs are placed into containers (i.e., "containerization"). (H7C-1G-C 15210,
et.al.)

Whether management violated RI-399 by assigning Mail Handlers to prepare mail for the
OCR. (H7C-3Q-C 16764, et.al.)

Whether Mail Handlers may be assigned to perform incidental functions of the AC/DCS
operation. (H4C-5F-C 15342)

Whether management violated the Agreement by designating the Mail Handler Craft as
the primary craft for sweeping and other allied duties on the Small Parcel and Bundle
Sorter. (H7C-NA-C 69)

Whether the Clerk Craft has a proprietary right pursuant to RI-399 to input pertinent
information on the MOD Scale system. (H7C-NA-C 45)

Assignment of the Mail Processor, PS-4, position to operate the Letter Mail Labeling
Machine (LMLM). (Q90M-4Q-J 94021635)

Whether parties are allowed to submit post-hearing reply briefs in disputes heard under
these procedures. (S0C-3A-C 1017)

Whether the addition of the Input Subsystem to the Advanced Facer Canceler is an
operational change that requires the work to be assigned to the Clerk Craft. (Q94C-4Q-J
97028616)

TO:    LOCAL DISPUTE RESOLUTION COMMITTEES
       RI 399 ARBITRATION ADVOCATES


RE: Arbitration Hearing Procedures

The undersigned members of the Pacific Area Regional Dispute Resolution Committee agree that the following procedures will govern all advocates hearing jurisdictional disputes in arbitration under the RI 399 process only in the territory covered by this RDRC.

CANCELLATION/POSTPONEMENT/REFERRAL AS INTERPRETIVE

Any advocate seeking to cancel or postpone a scheduled hearing date or to refer a scheduled case for determination as to whether or not an interpretive issue exists must contact his/her respective RDRC member in advance of the hearing date and obtain permission from that RDRC member. When an interpretive issue is raised at the hearing, a recess will be requested from the Arbitrator and the above-referenced contact will be made during the course of the hearing. Cases which an advocate contends contain an interpretive issue may only be referred to the RDRC.

OBTAINING ADDITIONAL DATES

When it becomes evident, after a hearing has begun, that the presentation of the case cannot be completed on that hearing date, the parties' advocates may jointly solicit and accept an additional date(s) from the arbitrator at the hearing, so long as that additional date(s) has not already been offered by the arbitrator and accepted by the RDRC.

ORDER OF PRESENTATION

The moving union will make its presentation first. After the moving union has presented its case in chief, the Employer and the responding union will make their respective presentations of their cases in chief in the order that those two parties have agreed to. If the Employer and the responding union are unable to agree on the order of their presentations, the Employer will make its presentation second and the responding union will make its presentation last.


Mark Villalpando
USPS Representative

Date: 12/16/04


Steven J. Zamanakos
APWU Representative

Date: 12/16/04


Rudy Santos
NPMHU Representative

Date: 12-16-04

TO:    LOCAL DISPUTE RESOLUTION COMMITTEES
       RI 399 ARBITRATION ADVOCATES

RE: Arbitration Hearing Procedures – RI 399 Process

The undersigned members of the Regional Dispute Resolution Committee agree that the following procedures will govern all advocates hearing jurisdictional disputes in arbitration under the RI 399 process only in the territory covered by this RDRC.

CANCELLATION/POSTPONEMENT/REFERRAL AS INTERPRETIVE

Any advocate seeking to cancel or postpone a scheduled hearing date or to refer a scheduled case for determination as to whether or not an interpretive issue exists must contact his/her respective RDRC member in advance of the hearing date and obtain permission from that RDRC member. When an interpretive issue is raised at the hearing, a recess will be requested from the Arbitrator and the above-referenced contact will be made during the course of the hearing. Cases which an advocate contends contain an interpretive issue may only be referred to the RDRC.

OBTAINING ADDITIONAL DATES

When it becomes evident, after a hearing has begun, that the presentation of the case cannot be completed on that hearing date, the parties' advocates may jointly solicit and accept an additional date(s) from the arbitrator at the hearing, so long as that additional date(s) has not already been offered by the arbitrator and accepted by the RDRC.

ORDER OF PRESENTATION

The moving union will make its presentation first. After the moving union has presented its case in chief, the Employer and the responding union will make their respective presentations of their cases in chief in the order that those two parties have agreed to. If the Employer and the responding union are unable to agree on the order of their presentations, the Employer will make its presentation second and the responding union will make its presentation last.

_JNA —J_
Joseph N. Amma Jr.
USPS Representative

Date: 12/14/04

Steven J. Zamanakos
APWU Representative

Date: 12/14/04

Rudy Santos
Rudy Santos
NPMHU Representative

Date: 12-14-04

TO: LOCAL DISPUTE RESOLUTION COMMITTEES

RE: GATS Numbers

In our review of cases pending before the Pacific Area Regional Dispute Resolution Committee, the undersigned RDRC members have determined that the absence of grievance numbers is hindering the processing and tracking of such cases.

Under the Grievance Arbitration Tracking System, cases involving jurisdictional disputes processed in keeping with the April 1992 Dispute Resolution Procedures MOU are to be assigned a "J" grievance number.

To facilitate the processing and tracking of jurisdictional cases, the undersigned have agreed that, effective immediately, all cases appealed from the Local Dispute Resolution Committee must be assigned a GATS "J" number prior to such appeal. This requirement will apply regardless of whether the case(s) is appealed to the RDRC (New Or Consolidated Facilities and New Work) or directly to arbitration (Operational Change). It will be the responsibility of the union initiating the appeal to contact the appropriate USPS District Labor Relations office to obtain a GATS "J" number and to add that number to the case prior to making the appeal.

Cases remanded to the LDRC will retain the assigned "J" number upon reappeal to the RDRC or to jurisdictional arbitration.

To the extent that cases previously assigned a GATS number under the Article 15 (non-jurisdictional) process are referred to the LDRC, the assigned GATS number must be modified to reflect the "J" process prior to any subsequent appeal.

Notice of this procedure is being provided to your District Labor Relations office.

| | | |
|---|---|---|
| Mark Villalpando | Steven V. Zamanakos | Rudy Santos |
| USPS Representative | APWU Representative | NPMHU Representative |
| Date: 12/16/04 | Date: 12/16/04 | Date: 12-16-04 |

TO: LOCAL DISPUTE RESOLUTION COMMITTEES

RE: Prohibition on Arbitrability Challenges Regarding GATS "J" Numbers

On December 16, 2004, the undersigned RDRC members executed an agreement requiring the union appealing/reappealing a case to the RDRC, or appealing directly to arbitration for cases involving operational changes, to obtain a GATS "J" number from the appropriate USPS District Labor Relations office and to add that number to the case prior to making the appeal/reappeal.

The undersigned RDRC members remind the local parties of the importance of assuring that GATS "J" numbers are provided and are added to the case file prior to appeal/reappeal, in keeping with the December 16, 2004 agreement.

The undersigned RDRC members further agree that no party may make an arbitrability challenge on the basis of the failure of the moving union to obtain a "J" number.

The union against which such an arbitrability challenge is made may submit this agreement to the arbitrator in support of its position that such a challenge is barred.

Mark Villalpando.
USPS Representative

Date: _12/16/04_

Steven J. Zamanakos.
APWU Representative.

Date: _12/16/04_

Rudy Santos
NPMHU Representative

Date: _12-16-04_

0258

TO: LOCAL DISPUTE RESOLUTION COMMITTEES

RE: GATS Numbers

In our review of cases pending before the Regional Dispute Resolution Committee, the undersigned RDRC members have determined that the absence of grievance numbers is hindering the processing and tracking of such cases.

Under the Grievance Arbitration Tracking System, cases involving jurisdictional disputes processed in keeping with the April 1992 Dispute Resolution Procedures MOU are to be assigned a "J" grievance number.

To facilitate the processing and tracking of jurisdictional cases, the undersigned have agreed that, effective immediately, all cases appealed from the Local Dispute Resolution Committee must be assigned a GATS "J" number prior to such appeal. This requirement will apply regardless of whether the case(s) is appealed to the RDRC (New Or Consolidated Facilities and New Work) or directly to arbitration (Operational Change). It will be the responsibility of the union initiating the appeal to contact the appropriate USPS District Labor Relations office to obtain a GATS "J" number and to add that number to the case prior to making the appeal.

Cases remanded to the LDRC will retain the assigned "J" number upon reappeal to the RDRC or to jurisdictional arbitration.

To the extent that cases previously assigned a GATS number under the Article 15 (non-jurisdictional) process are referred to the LDRC, the assigned GATS number must be modified to reflect the "J" process prior to any subsequent appeal.

Notice of this procedure is being provided to your District Labor Relations office.

| | | |
|---|---|---|
| Joseph N. Amma Jr. | Steven J. Zamanakos | Rudy Santos |
| USPS Representative | APWU Representative | NPMHU Representative |
| Date: 11/23/04 | Date: 11/23/04 | Date: 11-23-04 |

TO: LOCAL DISPUTE RESOLUTION COMMITTEES

RE: Prohibition on Arbitrability Challenges Regarding GATS "J" Numbers

On November 23, 2004, the undersigned RDRC members executed an agreement requiring the union appealing/reappealing a case to the RDRC, or appealing directly to arbitration for cases involving operational changes, to obtain a GATS "J" number from the appropriate USPS District Labor Relations office and to add that number to the case prior to making the appeal/reappeal.

The undersigned RDRC members remind the local parties of the importance of assuring that GATS "J" numbers are provided and are added to the case file prior to appeal/reappeal, in keeping with the November 23, 2004 agreement.

The undersigned RDRC members further agree that no party may make an arbitrability challenge on the basis of the failure of the moving union to obtain a "J" number.

The union against which such an arbitrability challenge is made may submit this agreement to the arbitrator in support of its position that such a challenge is barred.


_____        _____        _____
Joseph N. Amma Jr.             Steven J. Zamanakos            Rudy Santos
USPS Representative            APWU Representative            NPMHU Representative

Date: 11/23/04                 Date: 11/23/04                 Date: 11-23-04

0260

# Pacific Area
# RI-399 RDRC Representatives

American Postal Workers Union

Steven J. Zamanakos
2345 S. Alma School, Suite 201
Mesa, AZ 85210
Ph:    480-777-1880
FAX:  480-777-1886


National Postal Mail Handlers Union

Rudy Santos
PO Box 64081
Phoenix, AZ 85082-4081
Ph:    602-225-3986
FAX:  602-225-3987


United States Postal Service

Mark Villalpando
3131 Arch-Airport Road
Stockton CA 95213
Ph:    209-983-6210
FAX:  209-983-6499

# Western Area
# RI-399 RDRC Representatives

American Postal Workers Union

Steven J. Zamanakos
2345 S. Alma School, Suite 201
Mesa, AZ 85210
Ph:    480-777-1880
FAX:  480-777-1886.

National Postal Mail Handlers Union

Rudy Santos
PO Box 64081
Phoenix, AZ 85082-4081
Ph:    602-225-3986
FAX:  602-225-3987

United States Postal Service

Joseph N. Amma Jr.
8120 Hardeson Road  Room 222
Everett, WA 98203-6230
Ph:    425-438-2123
FAX:  425-290-6350

AP 3





The Postal Service, though steeped in tradition, is able to change with the times. Nowhere is this more apparent than in this book of postal terms.

The *Glossary of Postal Terms*, first published in 1974, has been updated three times to reflect the evolving language of our postal world.

The definitions in some cases are necessarily broad. And they are not intended to be precise legal definitions, but rather descriptions of what these terms generally mean in postal parlance.

The glossary was first compiled by the Southern Regional Office of Public and Employee Communications. Terms have been added, changed, and deleted as necessary by the Regions and Headquarters to reflect the latest and most common usages.

We hope you find the results helpful and informative

William F. Bolger
Postmaster General

0264

## GLOSSARY

**Accommodation Pouch.** Mailbag made to save rehandling, when warranted by the quantity of mail, in addition to regularly authorized pouches.

**Accountable.** Mail requiring the signature of the addressee upon receipt (certified or registered).

**Actual Count (AC).** Exact numerical count of all classes of mail worked.

**Additional Entry.** A post office, other than the office of original entry, where mailings of a second-class publication may be mailed. (See Original Entry and Exceptional Dispatch.)

**Administrative Support Manual (ASM).** One of the six policy directives replacing the Postal Service Manual. Replaces PSM Chapter 6 and parts of Chapter 2. Contains policies and procedures for USPS administrative and support functions. Includes postal organization, Inspection Service, communications, government relations, facilities and equipment, and procurement (See Policy Manuals.)

**Advance Deposit Account.** An account maintained for a mailer by the Postal Service, from which postage may be deducted at the time of mailing. (Also Trust Accounts.)

**Aerogramme.** Lightweight stationery that folds into a mailing envelope for correspondence to other countries.

**Airlift.** The movement of mail by air on certificated air taxi and air commuter carriers.

1

0265

**Airport Mail Facility (AMF).** A postal facility located at an airport to receive, distribute, and dispatch mail transported by air. (Also Airmail Field.)

**Air Taxi Service.** Uncertificated service contracted between designated points specifically for the movement of mail.



Air Taxi

**A-Label Service.** The variation of Express Mail Next Day Service that is picked up by the addressee at a postal facility.

**Alternative Delivery.** Use of non-postal distribution methods for all types of mail matter. Examples: facsimile and electronic funds transfer in place of First-Class Mail, air freight forwarders and airlines handling matter that could go by priority or Express Mail, private carriers of second-, third- and fourth-class mail. (Also Private Express statutes.)

**Area Distribution Center (ADC).** A mail processing facility that receives and distributes mail under the Managed Mail Program (MMP) destined for specific ZIP Code areas. One of the points within the national MMP distribution network.

**Area Distribution Center Area.** The area associated with an ADC, for which that ADC receives and distributes mail under the Managed Mail Program.

**Area Mail Processing (AMP).** The concentration of all outgoing mail at the sectional center from the associate offices for cancelation, distribution, and dispatch.

**Area Mail Processing Center (AMPC).** A central mail processing facility where part or all of both incoming and outgoing mail distribution for a sectional center area and designated adjoining associate office areas are processed. Usually the AMPC is also the sectional center, but may be exclusively a mail processing facility that has no stations, branches, or associate post offices.

**Area Maintenance Office (AMO).** An office covering a specific postal area that performs maintenance work on postal-owned equipment and buildings for postal facilities where local maintenance capability is unavailable.

**Army & Air Force Post Office (APO).** A military post office located overseas.

**Aspect Ratio.** Ratio of length to height. (See Nonstandard Mail.)

**Associate Office (AO).** An office located within the boundary of its management sectional center area that usually receives and dispatches all classes of mail from and to the MSC post office.

**Authorized Pouch.** Mailbag scheduled to be made regularly.

**Automated Business Mail Processing System (ABMPS).** A system in which the address on a postal customer's business reply or business return envelope is translated into a series of small vertical bars printed in the lower right corner of the envelope. Permits identification and sorting through high-speed automatic equipment.

**Automated Time and Attendance Procedures (ATAP).** Pilot system testing the concept of distributed data processing for time and attendance application.

2

3

**Automatic Container Unloader.** Machine that automatically unloads bulk mail center containers of mail onto mechanized conveyor systems. (Also Parcel Automatic Unloader and Sack Automatic Container Unloader.)

**Automatic Data Processing Center (ADPC).** A data processing facility that collects data on-line from post offices and supports the Postal Source Data System by furnishing information on hours worked, labor distribution, workload volumes, etc.

**Automatic Density Analysis Profile Technique (ADAPT).** A program that allows for automatic tabulation of sweepside bin densities processed over the letter sorting machines. This is calculated automatically for each sort scheme based on the accumulated volume processed.

**Automatic Fine Cull Machine (AFCM).** Equipment installed between rough cull belt and facer-canceler to fine cull collection mail.

**Autres Objets (AO)** International mail consisting of printed matter, matter for the blind, and small packets. (French)

**Auxiliary Route.** A carrier route that evaluates at less than 8 hours per day.

**Auxiliary Rural Carrier** Employee serving an auxiliary rural route, does not acquire postal career service status as a result of this service.

**Auxiliary Service Facility (ASF).** A bulk mail processing facility associated with a particular bulk mail center. Each ASF functions as a satellite to its BMC, providing turnaround service for its own service area.

4

**Auxiliary Truck Schedule.** Augments and supplements regular trips.

**Backstamp.** To make an impression with a postmarking (canceling) device on the back of a piece of mail, showing missent or date of receipt/dispatch.

**Backtrack.** Returning to a delivery point passed in error and for which carrier has some mail.

**Bag Rack.** (See Sorting Racks.)

**Bale.** Very large bundle of letters.

**Balloon.** Huge sack or pouch of mail.

**Bar Code.** A series of printed parallel bars on a mail piece, used to facilitate automated processing. (See Automated Business Mail Processing System and Facing Identification Mark.)

**Basket.** (Cart, Gondola, Gurney, Hamper, etc.) Canvas container used for hauling and sometimes distributing bulk mail. Descriptions:

| Item No. | Baskets—Other Designations | Empty Weight Lbs. | Overall Size |
|---|---|---|---|
| 1030 | Basket without casters | 23 | 30"x19"x17" |
| 1031 | Basket with four wheels | 29 | 30"x19"x17" |
| 1033 | Gurney—Small hamper | 44 | 34"x24"x22" |
| 1035 | Drag basket | 15 | 28"x17"x10" |
| 1046 | Hamper—Large | 80 | 44"x38"x32" |
| 1075 | Cart, utility, similar to a grocery cart, with four wheels | 75 | 36"x22"x20" |

**Batch.** To gather or stack collection mail on edges for machine feeding.

**Bay Lifts.** Device for lifting vehicles for repair and service.

**Bays.** Space for repair, lubrication, washing, and painting postal-owned trucks.

5

Benjamin Franklin Stamp Club. A group of elementary school students (4th, 5th, and 6th grades) organized by an official USPS representative. Clubs are established to introduce children to the fun and educational value of stamp collecting.

B-Label Service. The variation of Express Mail Next Day Service that is delivered to the addressee's street or box address.

Bin. (See Pocket.)

Block Face. One side of a street from one intersection to the next.

Board of Governors. A group of 11 members who direct the exercise of the powers of the Postal Service. Nine of them are known as Governors and are appointed by the President of the United States with the advice and consent of the Senate. The remaining two members are the Postmaster General (appointed by the Governors) and the Deputy Postmaster General (appointed by the Governors and the Postmaster General)

Brace. Entry in a scheme showing one or more post offices having the same mail supply

Branch Post Office. Unit of a main post office located outside the corporate city limits

Bricklay. To stack parcels in a trailer or van one over the other, like bricks, to achieve a stable load

Brief. Formal action taken against common carriers or mail contractors for alleged mishandling or delay of mail.

British Thermal Unit (BTU). The amount of heat required to raise the temperature of one pound of water one degree Fahrenheit. All forms of heat energy can be con-

verted to BTUs for summary reporting purposes. (See Therm.)

Buck Slip. Informal reference slip to transmit papers and information.

Bulk. Nonpreferential second-, third-, and fourth-class mail. Includes parcel post, ordinary papers, and circulars.

Bulkie. A regular size private or business envelope containing an object that makes the letter nonmachinable (dentures, fountain pens, thermometers, eyeglasses, etc.). The envelope must be culled out to protect the letter and the machines.

Bulk Mail Center (BMC). A highly mechanized mail processing plant for the distribution of third class and nonpreferential second class in bulk form, and fourth class in piece and bulk form.

Bulk Mail System. (See National Bulk Mail System.)

Bulletin of Verification (BV). Form used in international mail to notify other countries of irregularities, changes, etc.

Bull's-Eye. (See Stamp, All-Purpose Dating.)

Bum. A bundle of empty sacks or pouches.

Bumpers. Protection to walls and fences from damage by vehicles.

Bundle (noun). A package. Several pieces of mail tied or banded together and handled as a single piece.

Bundle (verb). To package or form a bundle by either tying or banding.

Business Reply Mail (BRM). Specifically printed cards, envelopes, cartons, and labels that may be mailed without prepayment of postage. Postage and fees are

6

7

collected when the mail is delivered to the addressee. Unavailable to or from other countries.

**Business Route.** City delivery route on which at least 70% of the deliveries are to businesses.

**Bypass.** Metered, permit, and official penalty mail that arrives at the post office faced in trays, etc., and does not require preparation before outgoing distribution.

**Caddy Cart.** (See Satchel Cart.)

**Cachet.** A design of words/pictures referring specifically to the new stamp on the first day cover. Usually on the front, left side of the envelope. They can be printed, rubber-stamped, individually hand-created, or paste-on labels. The cachet decorates mail matter for philatelic purposes.

**Cage.** Secure area in a post office where registered mail and other accountable items are kept. Wire mesh is usually used to separate area from rest of workroom

**Caller Service.** A convenience service provided for a fee to customers authorized to pick up their mail at the post office window. The postmaster designates the time, location, and call code.

**Canceling Machine.** Machine that processes mail by canceling stamps and placing postmarks on letters. (See Facer-Canceler.)

**Cannibalize.** To dismantle a vehicle or unit, salvage usable parts, and discard worn out items.

**Carrier.** A private transportation company or individual contractor that physically moves the mail (airline, trucking company, railroad, etc.) Also a postal letter carrier.



**Carrier Route Information System (CRIS).** A machine-readable incoming secondary distribution scheme for city delivery offices. (See Carrier Route Schemes.)

**Carrier Route Presort Third-Class Mail.** A subclass of third-class mail. Mailers who sort bulk third-class mail by individual carrier routes earn a discount off the bulk third-class rate. To qualify, mailings must contain at least 200 pieces or weigh 50 pounds. Pieces must be part of a group of 10 or more sorted to the same carrier route. Pieces that cannot be sorted to carrier routes do not qualify for the lower rate and cannot make up more than 5% of the mailing.

**Carrier Route Schemes.** Official lists of all delivery addresses on 161,000 postal routes, including city/rural delivery and post office lockbox sections. Schemes are available on magnetic tape or hard copy format for updating of customer mailing lists. (See Carrier Route Information System.)

**Carry-By.** Mail carried beyond the point of scheduled dispatch.

**Carry-Out.** Mail for the first part of the foot carrier route; the carrier takes it out of the office in a satchel.

**Case (noun).** Piece of equipment containing boxes (pigeonholes) into which letters, flats, or irregular parcels are sorted. (Also Flat or Letter Case.)

8

9

Case (verb). To sort pieces of mail or practice cards into a case.

Case Analysis System (CAS). A computer system used to analyze mail volumes and densities to determine the separations to be made on manual letter and flat cases and the best arrangement of the separations to ensure maximum productivity.

Case Label. A tag made of heavy paper or cardboard showing post office, state, or ZIP Code. It is placed above the case separation or box as a distribution guide. On carrier cases, labels are placed below rather than above the separations. (Also Header.)

Casual Employee. A supplemental work force employee subject to specific limited periods of employment in each calendar year.

Central Markup System. A centralized or computerized address label-generating operation to forward customer mail. (Also Computerized Markup and Markup.)

Certificate of Mailing. A receipt prepared by the mailer to show evidence of mailing.

Certified. A service that provides a receipt to the sender and a record of delivery at the office of address It is handled in the ordinary mail without insurance coverage Unavailable to other countries.

Certified Mail Label



CERTIFIED
No.
MAIL

Check Errors. To note, record, and report errors in mail distribution and dispatch made by other clerks.

Chunk. Small parcel.

Circs. Short for circulars. Third-class mail consisting of printed or reproduced materials sent to several people. Circs must be dispatched within 24 hours after receipt, but are not given the high priority accorded letters, daily newspapers, and other preferential mail.

City Delivery. Carrier delivery of mail addressed to residences and businesses within an area having a population of 2,500 or more, or more than 750 possible deliveries.

City Delivery Establishment. Initiation of city delivery service in an area currently not receiving it.

City Delivery Extension. Initiation of city delivery service in any area not included in boundaries of present city delivery service, but is part of an area for which city delivery service has already been established.

City. Made-up mail for a particular city. Distributed to station branches, principal firms, and letter carrier routes.

C-Label Service. Express Mail Same Day Airport Service.

Close of Business (COB). End of official working hours at any given installation.

Closed Transit Dispatches. Sealed bags of mail going through the USPS from one country to another country.

Cluster Box. A centralized unit of more than eight individually locked compartments for the delivery and collection of mail.

10

11



Cluster Boxes



Collection Box

**Coll.** A roll of stamps.

**Collect on Delivery (COD).** A service where customers may mail an article for which they have not received payment. The amount due the sender and a money order fee are collected from the addressee. USPS returns amount due the sender by money order. Unavailable to other countries.



COD Stamp Imprint

**Colis Postaux (CP).** International parcel post (French)

**Collection.** The gathering of mail from street receptacles, businesses, or customers on the street. Usually scheduled to meet processing requirements.

**Collection Box.** Street boxes for deposit of mail.

**Collection Box Insert.** A fiberboard or plastic container placed in an empty collection box to receive deposited mail.

**Collector.** USPS letter carrier who gathers mail from street and building boxes and brings it to the post office for processing.

**Combination Routes.** Motorized routes that combine the functions of a collection route, relay route, parcel post route, and/or inter/intra city route.

**Commemorative Stamps.** Postage stamps that observe historical events, noted Americans, and topics of national importance. Issued in limited quantities and sold for a limited time.

**Committed Space.** Specific cubic feet of space for mail only on a designated aircraft or flight.

**Community Post Office.** A contract branch of an independent post office to serve the postal requirements of a small community when it is inadvisable to retain or establish an independent post office.

**Complex Post Office.** A post office that has its mail totally processed at an AMPC.

**Computerized Forwarding System (CFS).** (See Central Markup System.)

12                                                                      13

0271

**Computerized Label Printing Center (CLPC).** A large facility situated at the Western Area Supply Center to print small and large strip labels, facing slips, and scheme cards.

**Computerized Markup.** Use of computers to improve delivery and reduce costs involved in forwarding undeliverable as addressed mail. (Also Central Markup System and Markup.)

**Con-Con.** Concentration and convoy of registered mail movement under controlled conditions. This is a USPS trademark.

**Consolidation Point.** (See Gateway.)

**Consumer Service Card.** A form used by customers and postal personnel to record service complaints or compliments. Postmasters or their representatives reply directly to complaints and submit them to Washington, DC, for tabulation and followup

**Contact Point.** A specific area or point designated for the exchange of mail between USPS and a transportation company or agency

**Container.** Any shipping or transport item that includes more than one piece of mail in a unit for movement. Includes sacks, pouches, trays, hampers, nutting trucks, a variety of boxes, carts, and aircraft units

**Container Cart.** A small 4-wheeled cart used by city carriers to transport delivery mail including small parcel post packages usually on postal property

**Container Pouch.** A mail pouch containing several small or lightly loaded pouches all dispatched to the same downstream point for delivery to individual destinations.

Saves handling and prevents loss between origin and delivery points.

**Container Transport System (TOW-VEYOR).** An electro-mechanical system for the movement of full or empty mail containers from one location in a facility to another. Uses programmed commands or guides to save manual labor.

**Containerized Office.** An associate office designated to send and receive bulk mail in BMC containers, general purpose mail containers, flats, and letter trays.

**Contracting Officer.** Person with authority to enter into and administer contracts on behalf of USPS.

**Contract Post Office Unit.** A postal unit that sells postage and supplies, transacts money order and registry business, and is operated under a contract by nonpostal personnel. Usually located in stores or other places of business.

**Controlled Circulation.** Periodicals mailed in bulk at flat (non-zoned) rates. These publications are frequently distributed without charge to the recipient.

**Conversion Rate.** The factor used for specific types and classifications of mail to convert weight, containers, or feet of mail to pieces.

**Conveyor.** Mechanical or gravity-operated belt or rollers for transferring mail between car or vehicle and platform, or from one location to another in a post office.

**Convoy.** To escort and guard registers and valuable shipments.

**Cord Fastener.** A combination label holder and attachment used to fasten the cord that closes the mouth of a mail sack.

15

14

**Cost Ascertainment Grouping (CAG).** The grouping of post offices according to revenue units. (Formerly First-, Second-, Third-, and Fourth-Class offices.) Categories are.

CAG A–G—Offices with 950 or more revenue units
CAG H–J—Offices with 190, but less than 950
CAG K—Offices with 36, but less than 190
CAG L—Offices with less than 36.

**Cost-of-Living Allowance (COLA).** Pay allowance that provides an adjustment of base salary schedules of employees to compensate for increases in the cost of living.

**Coupon.** That part of a manifold registry bill separated by perforations. Used for receipt to the dispatching clerk.

**Courtesy Box.** Curbside collection box with chute or snorkel for deposit of mail from a vehicle. (Also Motorist Mail Chute or Snorkel.)

**Creeper.** A platform on casters to assist maintenance employees move under vehicles.

**Critical Entry Time.** The latest time transportation can arrive at destination post office that will assure the processing of a particular class of mail to meet the service commitment.

**Cross Boundary.** Mail shipments from one bulk mail center or auxiliary service facility area to a facility in another BMC or ASF area. Bypasses the parent BMC of the originating-destinating facility.

**Cull.** To mechanically or manually remove nonletter mail (small parcels, rolls, odd-shaped material) from letter mail. At the same time the mail may be separated into airmail, specials, small parcels, and flats.



**Culling and Facing Conveyor.** A mechanized letter-facing conveyor with collection sack shakeout hopper and conveyor-belt top for culling, combined with a 2-channel edger-conveyor feeding to dual stackers.

**Curbline Delivery.** Method of city delivery where the carrier delivers to mailboxes from a vehicle without dismounting.

**Curtailed.** Mail the carrier has not cased prior to scheduled leaving time and is authorized to leave for next day casing.

**Custodial Vehicles.** Vehicles used by the post office for movement of supplies and postal equipment.

**Customer Cooperation Programs/Customer Mail Preparation Programs.** Joint effort of USPS and its customers to achieve better mail service at lower cost through special mail preparation programs. (See Presort.)

**Customer Service Representative (CSR).** USPS employee who establishes and maintains communications with customers to improve service, sell postal products, implement programs, and present customer viewpoints to postal management.

16

0273

**Customs.** Mail originating in other countries and most U.S. territories that is subject to examination and is charged a duty fee.

**Cutoff Time.** A time set by the unit manager when carriers make a final withdrawal of mail from distribution cases.

**Daylight Container.** Mail transported in carrier-owned containers on airline flights scheduled to depart between 6:01 a.m. and 8:59 p.m. at a specified transportation rate.

**Deadhead.** A vehicle traveling without mail or a letter carrier retracing a portion of a route without delivering.

**Dead Letter.** A letter that is or becomes undeliverable, or unmailable, and cannot be returned to the sender.

**Dead Letter Branch.** Geographically located postal facilities to which undeliverable and unforwardable First-Class Mail of obvious value is sent. Unpaid mail without a return address is also sent to these branches.

**Decouvert, a.** Open transit mail (French)

**Defective.** Damaged pouch, sack, lock, or key.

**Definitive Stamps.** Postage stamps issued for ordinary postal needs and placed on sale for an unlimited period. Issued when postage rates change or a new series is introduced.

**Deliver.** To take mail from the post office to the customer. (Mail picked up by the customer at an office — whether box, window, or dock — is not considered a part of delivery.)


Delivery

**Delivery Center.** A free-standing sheltered unit containing a number of lockboxes mounted in a wall. Includes mail collection receptacles, and parcel post compartments can be added.

**Delivery Unit.** A post office, station, or branch that has mail delivery functions.

**Detached Label Delivery.** A method of delivery using an address label with postage separate from the unaddressed merchandise, magazine, or paper.

**Detached Mail Unit.** Postal people assigned to a specific post office, but working in the mailroom operation of a private company to help prepare dispatches.

**Diagram.** Official plan for labeling letter cases and racks or loading mail in a vehicle, air, or rail container.

**Diplomatic.** U.S. State Department mail

**Direct.** A package, pouch, sack, or other container of mail with all pieces addressed to the same delivery unit or post office.

**Direct Runout.** In mechanized mail sortation, the conveyors that transport sacks and parcels directly to rear of van doors from sorting machine discharge chutes. Additional conveyors may be added at this discharge point to help load the van.

0274

**Directives.** Policy statements/regulations/guidelines issued by appropriate postal authorities. Includes the six policy manuals, all numbered handbooks and publications, the Postal Bulletin, Management Instructions, Headquarters Circulars, Regional Issuances, labels, notices, posters, and signs.

**Dis.** Short for *distribution at.* Used in labeling mail for two or more post offices that receive mail through the office of address.

**Dismount Delivery.** Method of delivery where a carrier leaves a vehicle for one or a few deliveries and then returns to move vehicle to next delivery.

**Dispatch.** Mail readied and loaded for transportation.

**Dispatch of Value.** Day's final outgoing dispatch or dispatch that makes a transportation schedule that meets service standards.

**Dispenser.** (See Stamp Vending Machine.)

**Distributing Unit.** The space in airport mail facilities, post offices, stations, and branches where distribution clerks sort mail.

**Distribution.** Mail sorted by address into machine bins, pigeonhole cases, trays, sacks, or pouches to group pieces with a common destination for transportation to the post office of address.

**District Office.** An office directed by a district manager who supervises the operation of management sectional centers and post offices within an established geographic area.

**Dividers.** Vertical separators for carrier cases.

**Dock Transfer.** Unloading mail from one van on a dock and reloading it on another for transportation without sorting or changing the packing form. However, a split of mail may be performed.

**Document Reconstruction Insurance.** Insurance provided for domestic Express Mail to cover loss, delay, or damage to non-negotiable items.

**Domestic.** Surface or airmail among the U.S., its territories, and possessions.

**Domestic Mail Manual (DMM).** One of the six policy directives replacing the PSM. Replaces PSM Chapter 1. Contains regulations of direct interest to mailers such as postage rates, mail classification, and mail preparation requirements. (See Policy Manuals.)

**Double Bottom Trailers.** Two trailers pulled by one tractor.

**Doubles.** More than one letter moving as one and causing an error.

**Dress the Rack.** To hang empty sacks or pouches on the distributing rack. (Also Hang the Rack.)

**Drive-Out Agreement.** An agreement between a carrier and the USPS in which the carrier furnishes personal vehicle for transportation and is reimbursed for this service.

**Drop.** Lobby slot or opening where customers deposit mail.

**Drop Letters.** Letters mailed for local delivery at post offices with neither city delivery nor collection and delivery by a rural carrier or highway contract route carrier. Letters are picked up by addressees.

20

21

Drop Shipments. Shipments of mailable items picked up from the mailer by a non-postal commerical carrier, transported to a distant city, and mailed for delivery in the city of destination and nearby areas.

Dual Address. Address using both a street address and post office box number. Place of delivery is address on line immediately above city, state, ZIP Code line.

Dumping Container. 4-wheeled parcel post container pivoted for fast dumping.

Dumping Table. Table where mail sacks or pouches are emptied.

Dump Up. To empty mail sacks and pouches on a work table or other sorting surface.

Duty. A fee collected by USPS on imported goods entering the U.S. by mail.

Eastern Area Supply Center (EASC). A large facility in Somerville, NJ, that stocks and distributes retail supplies and equipment, most postal printed matter, and capital and expendable items to the eastern states

Edger-Feeder. A machine receiving culled mail that extracts thicks and flats, edges, and automatically feeds letter mail into a facer-canceler.



Edger-Stacker. A machine receiving culled letter mail for edging and stacking, usually for manual feeding into a facer-canceler.

Electronic Computer Originated Mail (E-COM). Transfer of messages electronically from a customer's computer to a post office computer which translates the messages into hard copy for delivery by postal carriers. E-COM is a USPS trademark.

Electronic Funds Transfer System (EFTS). Direct transfer or exchange of funds between computers. A method of exchanging money electronically without using paper.

Electronic Message Service. Use of electronic technology in delivering messages.

Electronic Sort Processor (ESP). Modification to multiposition letter sorting machine/ZIP mail translator. Makes the machine quieter and more accurate.

Employee and Labor Relations Manual (ELM). One of the six policy directives replacing the PSM. Replaces PSM Chapter 4 and old Postal Manual Chapter 7. Contains USPS personnel policies and regulations, organization management, job evaluation, employee relations, training, safety and health, and labor relations. (See Policy Manuals).

Empty Equipment. All empty sacks, pouches, and other mail holding equipment.

Encoded. Mail that has a bar-half bar code representation of its ZIP Code printed on the bottom right corner of the envelope. Encoding usually results from processing on code-sort OCR equipment, but can be preprinted on customer reply envelopes.

22

23

**Encumbered Route.** A rural route with a regular rural carrier assigned. Term used in rural route consolidation studies.

**Engineering Change Board (ECB).** A group of designated postal managers who must review and approve all submitted changes to standard configurations of designated and controlled postal equipment.

**Engineering Data Isolation Technique (EDIT).** A modular electronic unit, mounted in the ZMT cabinet, which can monitor the data keyed from individual LSM consoles. Enables the electronic technician or maintenance mechanic to check out the ZMT / LSM encoding, decoding, and lette... performance and identify errors du machine malfunctioning.

**Engineering Technical Unit (ETU).** A term describing the industrial engineering function at the sectional center level.

**Equal Employment Opportunity (EEO).** A national program and policy of USPS to provide equal opportunities for all personnel in employment, training, assignment, promotion, and job security without discrimination because of race, color, religion, sex, national origin, age, physical, or mental handicap.

**Error.** Piece or unit of mail that must be rehandled, as opposed to missent mail actually transported to another office.

**Examined, Equipment.** Empty sacks and pouches that were examined for serviceability and to see that no mail was left in them.

**Exceptional Dispatch.** Delivery of second-class publications, by the publisher, to post offices other than offices of original or additional entry.

**Exchange.** To dispatch to and receive mail from another office.

**Exchange Office.** A postal facility authorized to make and dispatch or receive International and military mail, both air and surface.

**Executive and Administrative Schedule (EAS).** Salary structure applying to executive and administrative employees.

**Executive Committee.** The established organization through which the Postmaster General and senior staff collectively consider and act on major policy, planning, and other management control matters.

**Executive Leadership Program.** Authorized training for selected, experienced postal managers to participate in advanced management courses conducted by specified universities.

**Expanded ZIP Code.** (See ZIP Code.)

**Expanded ZIP Retrofit (EZR).** A microprocessor that will replace the ZIP Mail Translator associated with the MPLSM, decrease maintenance, and provide 4-digit keying.

**Expedited Preferential Mail Program.** Letter carriers case preferential mail before leaving the office, and nonpreferential mail after returning from their routes. Provides earlier mail delivery to residential areas, more consistent delivery times, and better control.

**Express Mail (EM).** The class of mail afforded the highest priority in handling and provides highly reliable service. Delivery is promised on time or postage is refunded upon application by the mailer. Receipts are required at the origin and destination for all shipments. Insurance coverage is

24

included in the rates. Express Mail is a reg-
istered USPS trademark. The services
listed are also trademarks (either regis-
tered or pending registration). The four
types of EM service are:

1. **Express Mail Same Day Airport Service.**
Available between major AMFs. (Also
C-Label.)

2. **Express Mail Custom Designed Service**
(Programmed Service). Available through-
out the U.S., but only on a pre-arranged
and scheduled basis.

3. **Express Mail Next Day Service.** Avail-
able to destinations that can be reached
overnight (Also A- and B-Label.)

4. **Express Mail International Service.**
Available to selected countries.

**Express Reshipment.** Shipment of box
mail via Express Mail service from a box
address to another location

**Faced Mail** arranged with all addresses
and stamps facing the same way.

**Facer-Canceler** (Mark II and M-36).
Machines that automatically face letter-
size mail in the same orientations and can-
cel stamps. The M-36 processing rate is
greater than the Mark II.



Facer Canceler

**Facility Bypass.** Presorted mail from or to
any post office within a facility service
area that does not require handling at the
facility (plant-loaded mail, turnaround mail
at other offices within the facility service
area, mail sent directly to a bulk mail
center, etc.).

**Facing Identification Mark (FIM).** A bar
code pattern printed near the upper right
corner of business reply mail and certain
other bar coded mail that allows USPS
equipment to mechanically face, sort, and
cancel mail.

**Facing Slip.** A paper label attached to a
package of mail showing the postal unit
where the mail is due to be distributed, the
class and type of mail, and the country or
military APO or FPO.

**Facing Table.** Table on which letters are
gathered and faced in the same direction
before running them through a canceling
machine. Some tables are fitted with con-
veyors to carry faced letters to one end of
the table and stack them automatically.
(Also Pickup Table.)

**Fair Labor Standards Act (FLSA).** A federal
statute of general application that estab-
lishes requirements for child labor, mini-
mum wage, equal pay, and overtime pay
The Department of Labor is responsible
for compliance. The law also provides for
court enforcement, if necessary. USPS
became subject to FLSA May 1, 1974.

**Field.** A general term to denote a postal
location other than national or regional
headquarters and their related units.

**Field Real Estate & Buildings Office**
(FREBO). An organizational element as-
signed the responsibility for administering
the Postal Facility Leasing Program, new
construction, repair and alteration pro-
jects, and facility improvement projects.

**Final Case.** (See Hot Case.)

**Finance Unit.** A nondelivery postal branch or station for financial services and acceptance of mail.

**Financial Management Manual (FMM).** One of the six policy directives replacing the PSM. Does not replace a specific PSM chapter; but summarizes USPS financial policies, including accounting, budgeting, planning, and asset control. Detailed procedures are in F–1, Financial Handbook for Post Offices (See Policy Manuals.)

**Fingering the Mail.** While walking between deliveries, the letter carrier thumbs through mail in the satchel and pulls out all pieces for the next mailbox.

**Firm Direct.** Mail to a single addressee that, because of volume, justifies a separation on the incoming primary or secondary sortation

**Firm Holdout Service.** Customers receiving 50 or more letters per day may pick up their mail at the post office once a day. There is no charge for this service.

**First Class Mail (FCM).** Letters, post and postal cards, all matter wholly or partially in writing or typewriting, and all matter sealed or otherwise closed against inspection. First-Class Mail is a registered USPS trademark

**First Day Cover.** An envelope, post card, or other mailing piece bearing a new stamp, a new postal card, a new stamped envelope, or a new aerogramme canceled with a special die reading "First Day of Issue" and dated. Many first day covers bear an imprinted or engraved design specifically related to the newly issued stamp

**First Handling Pieces.** Letters, flats, and parcels sorted in the local post office for the first time.

**Fixed Conveyor.** A lift for moving mail from floor to floor or a system of conveyors for an entire post office or parcel post annex.

**Flat.** A piece of First- or third-class mail too large to be distributed in a regular letter case.

**Flat Case.** (See Case.)

**Fleet Post Office (FPO).** A military post office for Navy and Marine personnel.

**Flexi-Van.** Trade name for specially designed full-size demountable motor carrier vans that can be interchangeably hauled on truck-trailers and rail flatcars. Wheels are removable.

**Float.** (See Tram.)

**Floor Crane.** Portable machine for heavy lifting (engines, differentials, front end of trucks, etc.).

**Foot Carrier.** A city delivery letter carrier who does not use a mechanical or powered vehicle.

**Fourth-Class Mail.** Merchandise, printed matter, mailable live animals, and all other material not included in First-, second-, or third-class mail.

**Franked.** Official mail authorized by law to be transmitted without prepayment of postage. Used by the Vice President, Members of Congress, and other specifically authorized officials. The envelope or wrapper bears the sender's facsimile signature.

**Fraud Order.** An order issued by the Postmaster General or delegated assistant directing a postmaster to mark

28                                                        29

FRAUDULENT and return to sender all mail addressed to any person or concern found violating the postal fraud or lottery statutes.

**Free Matter.** Material for the blind and specific military mail transmitted free of postage. Bears the postage and fees paid indicia.

**Full-Time Regular Employee.** An employee with a career appointment and a regular schedule of five 8-hour days in a service week.

**Gateway.** An important transportation center where mail routes converge and mail is routed for onward dispatch. (Also Consolidation Point.)

**General Delivery.** Mail to be picked up at post offices. Intended primarily for transients and customers who are not permanently located or who prefer not to use lockboxes. Identification is required.

**General Mail Facility (GMF).** A processing center, other than a BMC, such as a concentrated preferential mail handling center.

**General Mail System (GMS).** The entire postal system, including the bulk mail network and all postal field operations.

**General Post Office (GPO).** The main office in a city, where there are several branches. Provides complete postal services to a specific area.

**General Scheme.** Pattern of distribution of mail for a state or section of a state, showing the route or supply by which each post office receives mail.

**Gondola.** Basket. Also a 6 wheeled truck

to move pouches, sacks, and nonsackable mail.

**Governors.** (See Board of Governors.)

**Gravity Roller Conveyor.** (See Conveyor.)

**Gross Combined Weight (GCW).** Combined gross vehicle weight of tractor and trailer.

**Gurney/Hamper.** (See Basket.)

**Hang the Rack.** (See Dress the Rack.)

**Hards.** Mail laid aside for instructions on proper dispatch. (Also Selects.)

**Hash.** Mail that is not required to be ready for close connections and not in sufficient quantity to warrant a definite separation. (Also Layover or House.)

**Header.** (See Case Label.)

**Head-Out.** The starting point of a mail run or trip.

**Headquarters.** Administrative center of U.S. Postal Service at 475 L'Enfant Plaza, S.W., Washington, DC 20260.

**Highway Contract Route (HCR).** A contract for carrying mail over the highway between designated points. (Formerly Star Route.)



Highway Contract Carrier

30

that allows field employees to work temporarily in Headquarters and Headquarters people to work temporarily in the field. The 2- to 6-month assignments provide career development opportunities for employees in grades EAS 17 and above.

**Interline Movement.** Mail moving between origin and destination by connecting schedules of more than one air, highway, or rail carrier.

**Intermodal.** Use of two or more modes of transportation to move mail from origin to destination.

**International.** Surface or airmail originating in one country and destined for another.

**International Electronic Post (INTEL-POST).** An international, facsimile, electronic mail service. INTELPOST messages are deposited by mailers in hard copy form (paper), then machine scanned. The resulting electronic signals are transmitted to the destination country, where an identical hard copy is produced and delivered to the addressee. INTELPOST is a USPS trademark.

**International Exchange Office (IEO).** Post office or airport mail facility authorized to exchange mail with another country.

**International Mail Manual (IMM).** One of six policy directives replacing the PSM. The IMM replaces Pub. 42, *International Mail.* Contains regulations, classification, and other requirements for mailing between the U.S. and other countries. (See Policy Manuals.)

**International Surface Prints for Air Transportation (ISPAT).** Airlifted second-class publications to other countries.

**Irregular Parcels and Pieces (IPP).** Non-machinable third- and fourth-class items: sackable rolls and tubes, small cubes, small fragile parcels, sackable films, paper or sleeve-wrapped catalogs, and non-case-able flats. (Formerly Small Parcels and Rolls.)

**Jackpot/Jumbo.** Mail for distant separations that the clerk masses together in one box or sack because there is no room in the case or rack. Distributed when space is available.

**Junction.** Office located where two or more railway or highway routes cross, meet, or diverge. Offices having dual air and surface supply by parallel routes are not designated junctions merely because of the dual supply.

**Keyboard Sort.** To sort mail by operating a keyboard.

**Killer Bars.** Parallel lines extending to the right of the circular postmark that cancel the stamp so it cannot be reused. Killer bars can be part of most standard machine and hand cancellations.



**Label (noun).** A printed strip of paper placed in label holders (cases) of pouches or sacks showing destination, class or type of mail, office of distribution and routing instructions. Printed singly or in multiples.

34

35

0282

Label (verb). To imprint destination, routing, or other information on a label or facing slip. Also to insert labels in the holders of pouches and sacks before dispatch.

Labor Distribution Codes (LDC). The National Workhour Reporting System divides all workhours into 10 functional categories. These functions in turn are subdivided into 10 LDCs that define areas of specific activities for all postal organizations and installations.

Labor Utilization Reports (LUR). Displays each pay period by 10 major functions. Shows hours worked, types of leave taken, and hours, salaries, and benefits paid.

Layover Mail. (See Hash.)

LA Key. Key to an ordinary iron mail lock.

LA Lock. The mail lock most used on mailbags and parcel post sacks. (From Lock Andrus—developed by a mail equipment shop official named Andrus.)



LA LOCK

Lease, Regular or Commercial. Agreement to occupy and use space for a definite term at a fixed monthly rental.

Leave. Authorized absence from official duty.

Letter Carrier. A USPS employee who delivers and collects mail on foot or by vehicle in a prescribed area.

Letter Case. (See Case).

Letter Chutes. (See Mail Chutes.)

Letter Jacket. A durable envelope used for registered letters.

Letter Mail Dimensional Standards. (See Minimum Size Standards.)

Letter Sorting Machine. (See Sorting Machines.)

Letter Trays. Variety of trays used at letter sorting machines, over conveyor systems, and in place of mail pouches. Used for transporting mail between major mechanized facilities and for originating customer mail. Holds several hundred per tray.

Lettres et Cartes (LC). International mail consisting of letters, letter packages, post cards, and aerogrammes. (French)

Line Haul Charge. Fee based on the quantity (weight or space occupied) and distance mail is transported by highway or rail between two points. Distinguished from the terminal charge for loading and unloading mail.

Loading Conveyor. (See Conveyor.)

Local. Mail addressed for delivery within the postal area of the office where mailed. Used in customer separation to distinguish between immediate area and out-of-town mail.

Local Collection Box. Street letter box where mail can be deposited to obtain local city postmark.

Local Service Air Carriers. Small certified

36

37

air carriers operating in local short-haul service. Supplements mail trunkline operations of larger air carriers.

Lockbox. Rental box for public use to receive mail delivery in post office lobby or other authorized places with key or combination lock.



LOCKBOXES

Lock Holder. Small canvas bag with hooks to hang on bag rack. Holds surplus locks.

Log. Very Heavy parcel. (Also Truck.)

Loop. (See Park and Loop.)

Loose in the Mails. Material separated from an addressed envelope, container, or wrapper in which it was mailed.

Loose Loaded Parcels. Parcels loaded loose into a trailer or van without being enclosed in sacks.

Loose Pack Sack. A No. 2 sack for flats, or a No. 3 sack for letters or flats containing unsealed, faced, and stacked mail for dispatch.

Loose Sack. Sacks, pouches, and irregular pieces of mail transported outside of an air container at a particular transportation rate.

Luminescent Indicia Detector (LID). A device on the Mark II facer-canceler to detect luminescent material in the ink on stamps and meter imprints to allow automatic facing/canceling of mail.

Luminescent Ink. A stamp or indicium ink containing light reflecting additives. Provides unique sensing for automatic mechanical facing/canceling of letter mail.

M-36. (See Facer-Canceler.)

Machinable. Package or parcel that can be safely sorted by mail machinery (parcel sorter, etc.).

Machine Reading. Reading addresses electronically.

Made-Up. Fully processed mail ready for transportation.

Mailbag. A general term covering a mail sack or pouch.

Mailbag Depository. Field installations specifically designated to receive, store, ship, examine, sort, pack, wire tie, condemn, and bale mailbags. They also separate, consolidate, pack, store, issue and ship locks for mailbag equipment.

Mailbox. Any receptacle or container used by customers to receive mail by either door-to-door or curbside delivery.

Mail Chutes. Glass-front tubes with mail slots, used in tall buildings. Letters are dropped through the chute into a box on the street floor for collection.

0284



Mail Chute

**Mail Classification Center.** Unit that provides information and guidance to post offices regarding mail classification and revenue protection matters. (Formerly Postal Service Center.)

**Mail Condition Report.** A system of reports that assists in identifying and monitoring problem areas in mail processing within a postal facility and supports the development of resources necessary to meet demands of fluctuating mail volumes and service commitments.

**Mail Count.** Amount of mail in pieces or pounds that has been sorted or handled.

**Mail Cover.** A record made of information on the outside cover of any class of mail to protect national security, locate a fugitive, or obtain evidence of commission or attempted commission of a crime punishable by law by imprisonment for a term exceeding one year. The process is lawful only if authorized under postal regulations. This is one of the few ways mail information can be properly disclosed to people outside the USPS.

**Mail Equipment.** Locks, sacks, and pouches used in handling and transporting mail.

**Mail Exchange Center (MEC).** A post office or installation that performs distribution

40

but is not involved in the general mail scheme.

**Mailgram.** A low-cost written message transmitted electronically by Western Union and delivered by the USPS. Mailgram is a registered trademark of Western Union.



**Mail Handler.** An employee who loads, unloads, and moves mail, cancels stamps, and performs other duties related to the moving and processing of mail.

**Mail Pouch.** Bag used for First-Class, registered, and airmail. Also, a special blue and orange pouch used for Express Mail service.

**Mail Priority.** Preference that transportation carriers give to mail as compared to other traffic.

**Mail Receptacle.** Mailbox.

**Mail Sack.** Bag used for nonpreferential second-, third-, and fourth-class mail, air parcel post, and loose pack mail.

**Mail Stop Order.** An order issued by the USPS Judicial Officer that directs the office of delivery to return to senders any mail responding to a false representation or lottery scheme.

**Mailers' Technical Advisory Committee (MTAC).** A group that provides technical information, advice, and recommendations on postal services, programs, regulations and requirements. Members represent associations of large commercial

41

0285

mailing organizations and related mailing services.

**Maintenance Schedule.** Established dates when specific pieces of equipment are to receive preventive maintenance.

**Make Up.** To separate and group mail for dispatch.

**Managed Mail Program (MMP).** A distribution system used to mass mail at a mechanized area distribution center for receipt and 5-digit distribution within the ADC area.

**Managed Mail Tray (MM Tray).** Sleeve tray; container that can be stacked. Used to carry letter mail between selected post offices or between a customer's mail room and a designated post office.

**Management Action Program (MAP).** An approved project with identified tasks, assignments; schedules, resources, and project managers

**Management Action Series (MAS)** A program that provides newly-appointed supervisors, managers, and postmasters with 3 weeks of basic training

**Management Instructions (MI).** Looseleaf codified directives from Headquarters related to the six policy manuals. Replace Regional Instructions

**Management Operating Data System (MOD).** System used in conjunction with the Postal Source Data System. Provides local postal management with information on the relationship between workloads and actual versus planned hours (Formerly Workload Reporting System )

**Management Sectional Center (MSC)** A designated postal facility whose manager has full management responsibility for all

post offices within the assigned ZIP Code areas. (See Sectional Center.)

**Management Training Series (MTS).** Training provided for all incumbent supervisors, managers, city delivery postmasters, and staff professionals. A means for local management to periodically certify acceptable job performance. Administered locally through postal employee development centers.

**Manifold Book.** Book containing perforated forms for billing registers.

**Manpower Scheduling and Staffing Program (MSSP).** A program that assists postmasters in improving mail processing. It derives cost savings by matching manpower with mail volume (scheduling and staffing using IPSIM), methods improvement, and other production control techniques. (Formerly Productivity Improvement Program.)

**Mark II.** (See Facer-Canceler.)

**Markup.** Piece of mail undeliverable as originally addressed. Must be endorsed to show the next address where delivery is to be attempted or other disposition to be made (return to sender, etc ) (Also Central Markup System and Computerized Markup.)

**Massing.** Combining mail in various separations because of insufficient quantity, time, or space for proper separations.

**Massing Point.** A selected point where mail is combined for shipment.

**Massing Scheme.** (See State Dispatch List.)

**Master Instructor.** A postal veteran with first-hand experience. Teaches newly

42

43

Spike. To verify the proper destination of mail through piece-by-piece examination. (Also Verify.)

Stacker. Mechanical device that stacks letters at one end of a facing table.

Stamp, All-Purpose Dating. Device for imprinting name of city, branch or station, and date on registry and parcel post work. (Also Bull's Eye.)

Stamp Distribution Office. An office other than the parent sectional center designated, for security reasons, to supply stamp stock to associate offices.

Stamp, Postage. Gummed stamps used as payment for postal services glued to mail that is processed and delivered by USPS.

Stamp, Postmarking. Device for imprinting city and date on mail and canceling postage.

Stamp Tagging. A system in which stamps or postal indicia treated with luminescent ink may be readily identified and segregated from other letter mail during mechanical facing.

Stamp Vending Machine (SVM). A coin or bill operated dispenser where customers may buy postage.

Stamps By-Mail. A mail-order retail service for purchasing stamps. Customers use a self-mailer order form and pay by check (amount includes a nominal handling charge) for stamps that are delivered with their regular mail. Service is available at all city delivery post offices.

Stamped Paper. (See Postal Stationery.)

Standard Container Mail. Mail transported in air carrier-owned containers on flights

scheduled to depart between 9 p.m. and 6 a.m.

Standpoint Distribution. Distribution by use of standpoint scheme.

Standpoint Scheme. Printed or written scheme prepared for the dispatch of mail from a certain location.

Star Route. (See Highway Contract Route.)

State Case. Case for separating mail according to city destination in a single state.

State Dispatch List. Guide showing dispatch of state mail to post offices or terminals best equipped, staffed, or geographically located to perform the distribution.

States. Mixed mail for several states.

Station. (See Post Office Station.)

Storage Box. (See Relay Mailbox.)

Storage Conveyors. Conveyors on which non-preferential mail can be held for brief periods of time.

Storage Vehicles. Vehicles retired from service and awaiting sale.

Strap Out. To place straps or rubber bands around letters and flats, keeping them in delivery sequence.

Stringer. Pouch or sack hung loose on the outside of regular sacks. Also a sack with a broken drawstring.

String/Twine Tying Machine. Machine for mechanically tying bundles of letters or flats.

Strip Label. (See Label.)

Stuck. Having more mail than can be completely distributed prior to scheduled dispatch or carrier leaving time.

76

Subfunction. One of the main subdivisions of processing: culling, edging and stacking, facing and canceling, sorting, tying, pouching, bundling, and sacking.

Substitute Rural Carrier. An employee who usually replaces the regular rural carrier during annual and sick leave or other absences from the route.

Supply. The mode, method, or route by which a given office or locality receives its mail.

Supply Center. (See Eastern/Western Area Supply Center.)

Surface Preferential. All First-, second-, third-, and fourth-class mail bearing prepaid special delivery fee. All third- and fourth-class mail bearing special handling fee. All second-class mail classified as time-value publications.

Surge Conveyors. A portion of the mail conveying system that holds back surges and meters out an even flow, keeping all mail in sequence.

Sweep. (See Pull.)

Swing. Short tour required to cover an absence

Swing Room. Place where employees may spend their time while off-the-clock.

Swing Time. The periods employees spend at lunch or unemployed during their tours of duty.

Systems Engineering. The process of selecting and putting into a unified pattern the devices, mechanisms, and equipment necessary for optimum operation and control of a complex mail processing or service system

Tagged Postage Stamps. A phosphorous additive to stamp ink. The stamp glows under ultraviolet light so letter mail can be face canceled and routed to the proper stacker on the facer-canceler.

Tailboard Delivery. To deliver mail to vehicle at platform and to receive mail at that point.

Tailgate Exchange. The transfer of mail between two postal or contract vehicles at an intersecting highway point rather than at a postal installation.

Tap. To collect mail from deposit box.

Teletypewriter Exchange (TWX). A teletype communications system used in large postal facilities to send and receive information.

Terminal. Postal unit for assembly, distribution, and dispatch of transit mail.

Terminal Charge. The amount charged for services performed by carriers at airports and railroad terminals, such as loading and unloading. Based on a fee per pound of mail enplaned.

Terminal Dues. Charge levied by the destinating country to cover cost of delivery of international mail.

Terminal Handling. To receive, sort, route, and dispatch sacks, pouches, and outside parcels at truck or air terminals.

Tertiary. A third mail sorting operation.

Therm. A unit of heat energy; 100,000 British Thermal Units (BTUs).

Third-Class Mail. Usually circulars, printed matter, pamphlets, and merchandise weighing less than 16 ounces.

78

79

**Throughput Capacity.** The output of processed items from a machine.

**Throwback.** Miscased mail that must be returned for distribution.

**Throwback Case.** A separation case in delivery units for deposit of undeliverable and forwardable letters and flats.

**Throwoff Pouch.** To open a pouch and sort its contents to other pouches.

**Tieout.** To stop sorting letters and flats and tie or band the separations made.

**Timesharing Services.** Computer processing services provided post offices through terminals by either the postal data centers or commercial agencies.

**Ton-Mile.** 1 ton transported 1 mile.

**Topicals.** Area of philately with emphasis on the subject portrayed on stamps rather than the stamps themselves.

**Tour of Duty.** An employee's scheduled duty hours during a workday or workweek. (Also Shift or Trick.)

**Tracer.** Form used to locate delayed or undelivered mail.

**Tractor-Trailer.** Combination vehicle for hauling large volume of mail. The operator is an employee licensed and authorized to drive tractor trailers.

**Trailer on Flatcar (TOFC).** Mail trailer on railroad flatcar. Piggyback.

**Training Postmaster.** A management-level employee, familiar with the duties of a postmaster, who trains newly-appointed postmasters.

**Tram.** A 6-wheeled platform truck for transporting sacked mail, trayed mail, and outside packages and parcels.

80

**Transfer.** Mail that receives first postal handling outside of receiving postal complex. Contains mail for delivery outside the postal complex, but requires only onward dispatch without opening.

**Transfer Post Office (TPO).** Service unit where the transfer of mail between carriers is complicated, voluminous, and requires supervision. Usually located at a principal postal truck terminal or airport.

**Transit Charge.** Fee levied by one country for transporting, through its system, mail destined for and belonging to another country.

**Transit.** Mail received from other post offices and handled for redistribution.

**Transport.** To move mail between post offices. Accomplished by contract carriers using planes, trucks, and railroads, and by post offices using government vehicles.

**Transportation Management Office (TMO).** A facility with centralized management authority to plan, monitor, and administer all mail movement within and originating from its area.

**Transportation Management System (TMS).** A system to organize, standardize, and make more efficient the management of USPS transportation in the movement of mail and mail equipment.

**Tray Cart.** 4-wheel cart, sizes 1 and 2, to transport loaded or empty letter trays.

**Tray, Flats.** 4-sided tray, 24-, 21-, and 18-inch inside lengths, for both mechanized and nonmechanized offices.

81



Letter Trays

Tray, Letter. 3-sided tray, 24-inch inside length, for nonmechanized office; 4-sided for mechanized office. Inside size, 24 × 11 × 3¼ inches.

Trick. Tour of duty. Shift.

Truck. Very heavy parcel. (Also Log.)

Truck Schedule. Details of hour of departure and arrival at each postal unit, depot, boat dock, terminal, etc., constituting the operation of a vehicle.

Truck Terminal. Installation where mail transported or to be transported, on highway mail routes is received, sorted, and dispatched.

Trust Account (See Advance Deposit Account.)

Turnback Mail. (See Return Mail.)

Twine Tying Machine. String tying machine.

Uncoded. Mail on which the sender did not include the correct ZIP Code as part of the delivery address. (Also Unzipped.)

Undeliverable As Addressed (UAA). Mail that cannot be delivered as addressed and must be forwarded, returned to sender, or referred to the dead letter office.

Unique ZIP Code. A ZIP Code assigned to a company, based on the average daily volume of letter size pieces received, availability of ZIP Code numbers in the postal area, and relative USPS cost benefits.

82

United States Postal Service (USPS). Successor to the Post Office Department. Established July 1, 1971, by the Postal Reorganization Act (PL 91-375, Aug. 12, 1970).

Universal Mix, U.S. A sample of 1,000 pieces of collection mail. Average mix contains 806 letters; 133 un-enveloped flats, circs, magazines, and papers; 39 enveloped flats and circs; 20 irregular; and 2 oversized flats (larger than 8½ × 11").

Universal Postal Union (UPU). Worldwide postal organization. The U.S. and most other countries are members. The exchange of mail, except parcel post, between the U.S. and other nations is governed by the provisions of the UPU Convention.

Untied Dispatch. Loose letter-size or flat mail packed in sacks, pouches, or trays for direct dispatch to destinations.

Unzipped. Uncoded mail.

Utility Carrier. A full-time city delivery letter carrier used to replace scheduled absences within a group of routes.

Valentine. Collection box test card used by delivery supervisors to assure boxes are collected and at proper times.

Vehicle Hire Contracts. Use of privately-owned vehicles for city delivery.

Vehicle Maintenance Facility (VMF). Repair shop to maintain and repair postal vehicles.

Vehicle Time. Length of time postal or contract vehicle is used for city delivery.

Vehicle Transfers. Exchange of postal vehicles between offices.

Verify. (See Spike.)

83



**Vertical Improved Mail (VIM).** A mail service within high-rise buildings. A carrier delivers and collects mail from the entire building by operating a small elevator installed by the owners in a mailroom, or by using a call window or lockbox delivery system

**Water Transportation.** Movement of mail by boat over river, lake, coastal, or ocean waters



**Way Pouch.** Pouch containing mail for post offices along a certain route. Opened at each office to remove local mail and add mail from that office to other destinations

**Weight Count.** (See Piece Count.)

**Western Area Supply Center (WASC).** A large facility in Topeka, KS, that stocks and distributes retail supplies and equipment, spare parts, and expendable items to the western states. The Data Automation Division is located at WASC.

**Wing Case.** An extension of the carrier's case protruding at an angle on either side.

**Worked.** Sorted mail ready for dispatch.

**Working.** Mail that must be sorted and distributed.

**Working Pouch.** Pouch of First-Class Mail for distribution in the unit of address.

**Workload Reporting System.** (See Management Operating Data System.)

**Workroom.** The part of an installation where the mail is actually handled, separated, and dispatched.

**Workup.** To complete distribution.

**ZIP-A-LIST.** The National ZIP Code Directory on computer tape.

**ZIP Code (Zone Improvement Plan)** A system of 9-digit codes that identifies specific delivery points. The code divisions are:

1. Initial Code. The first five digits identify the individual post office or metropolitan area delivery station associated with the address.

2. Expanded Code. The additional four digits effective in 1981. These break down into:

   a. Sector. The first two additional digits designate a geographic portion of a zone. It can also indicate a portion of a rural route, part of a box section, or official designation.

   b. Segment. The last two additional digits designate the specific block face, apartment house bank of boxes,

84

85

a firm, building, or other specific delivery locations.
(ZIP Code is a registered USPS trademark.)

ZIP Mail Translator (ZMT). An attachment for an LSM that translates keying of the ZIP Code by the operator, or operator scheme keying, to the proper bin location.

ZIP Match. A software computer program capable of ZIP Coding address lists that are on tape

# ABBREVIATIONS AND ACRONYMS

Definitions In text.

| | |
|---|---|
| ABMPS | — Automated Business Mail Processing System |
| AC | — Actual Count |
| ADAPT | — Automatic Density Analysis Profile Technique |
| ADC | — Area Distribution Center |
| ADPC | — Automatic Data Processing Center |
| AFCM | — Automatic Fine Cull Machine |
| AMF | — Airport Mail Facility, also Airmail Field |
| AMO | — Area Maintenance Office |
| AMP | — Area Mail Processing |
| AMPC | — Area Mail Processing Center |
| AO | — Associate Office, also Autres Objets |
| APO | — Army & Air Force Post Office |
| ASF | — Auxiliary Service Facility |
| ASM | — Administrative Support Manual |
| ATAP | — Automated Time and Attendance Procedures |
| BMC | — Bulk Mail Center |
| BRM | — Business Reply Mail |
| BTU | — British Thermal Unit |
| BV | — Bulletin of Verification |
| CAG | — Cost Ascertainment Grouping |
| CAS | — Case Analysis System |

86

87

| | |
|---|---|
| CFS | — Computerized Forwarding System |
| CLPC | — Computerized Label Printing Center |
| COB | — Close of Business |
| COD | — Collect on Delivery |
| COLA | — Cost-of-Living Allowance |
| CP | — Colis Postaux |
| CRIS | — Carrier Route Information System |
| CSOCR | — Code Sort Optical Character Reader |
| CSR | — Customer Service Representative |
| DMM | — Domestic Mail Manual |
| EAS | — Executive and Administrative Schedule |
| EASC | — Eastern Area Supply Center |
| ECB | — Engineering Change Board |
| E-COM | — Electronic Computer Originated Mail |
| EDIT | — Engineering Data Isolation Technique |
| EEO | — Equal Employment Opportunity |
| EFTS | — Electronic Funds Transfer System |
| ELM | — Employee and Labor Relations Manual |
| EM | — Express Mail |
| ESP | — Electronic Sort Processor |
| ETU | — Engineering Technical Unit |
| EZR | — Expanded ZIP Retrofit |
| FCM | — First-Class Mail |
| FIM | — Facing Identification Mark |
| FLSA | — Fair Labor Standards Act |
| FMM | — Financial Management Manual |
| FPO | — Fleet Post Office |
| FREBO | — Field Real Estate & Buildings Office |

| | |
|---|---|
| GCW | — Gross Combined Weight |
| GMF | — General Mail Facility |
| GMS | — General Mail System |
| GPO | — General Post Office |
| HCR | — Highway Contract Route |
| ID | — Identification Card |
| IE | — Industrial Engineering |
| IEO | — International Exchange Office |
| IMM | — International Mail Manual |
| INTELPOST | — International Electronic Post |
| IPP | — Irregular Parcels and Pieces |
| IPSIM | — Interactive Postal Simulator |
| ISPAT | — International Surface Prints for Air Transportation |
| ISSP | — Incoming Secondary Sorting Program |
| LA | — Lock Andrus (key or lock) |
| LDC | — Labor Distribution Codes |
| LID | — Luminescent Indicia Detector |
| LSM | — Letter Sorting Machine |
| LUR | — Labor Utilization Reports |
| MAP | — Management Action Program |
| MAS | — Management Action Series |
| MCVM | — Multicommodity Vending Machine |
| MEC | — Mail Exchange Center |
| MI | — Management Instructions |
| MIP-SOP | — Methods Improvement Program—Standard Operating Procedures |
| MMP | — Managed Mail Program |
| MM Tray | — Managed Mail Tray |
| MOD | — Management Operating Data System |

| | |
|---|---|
| MOM | — Military Ordinary Mail |
| MPFSM | — Multiposition Flats Sorting Machine |
| MPLSM | — Multiposition Letter Sorting Machine |
| MSC | — Management Sectional Center |
| MSSP | — Manpower Scheduling and Staffing Program |
| MTAC | — Mailers' Technical Advisory Committee |
| MTM | — Methods Time Measurement |
| MTTR | — Mean Time to Repair |
| MTS | — Management Training Series |
| MVO | — Motor Vehicle Operator |
| MVRF | — Mobile Vehicle Repair Facility |
| NASS | — National Air and Surface System |
| NBMS | — National Bulk Mail System |
| NMICS | — National Maintenance Information and Control System |
| NMO | — Nonmachinable Outside |
| NO | — No Office |
| NPO | — Non-Personnel Office |
| NQI | — National Quality Index |
| NTAC | — National Test Administration Center |
| NWR | — National Workhour Reports |
| NWRS | — National Workhour Reporting System |
| OCR | — Optical Character Reader/One |
| ODIS | — Origin Destination Information System |
| OIC | — Officer-in-Charge |
| OTR | — Over the Road Container |
| PAL | — Parcel Airlift Mail |

| | |
|---|---|
| PAR | — Program for Alcoholic Recovery |
| PASS | — Profile Assessment System for Supervisors |
| PCC | — Postal Customer Council |
| PCES | — Postal Career Executive Service |
| PDC | — Postal Data Center |
| PEDC | — Postal Employee Development Center |
| PLD | — Postal Logistics Directory |
| PO | — Post Office |
| POM | — Postal Operations Manual |
| PR | — Poste Restante |
| PRC | — Postal Rate Commission |
| PS | — Postal Service Schedule |
| PSDS | — Postal Source Data System |
| PSO | — Procurement Services Office |
| PST&DI | — Postal Service Training and Development Institute |
| PVS | — Postal Vehicle Service |
| QC | — Quality Control |
| RAP | — Retail Analysis Program |
| RI | — Regional Issuance |
| SAM | — Space Available Mail |
| SC | — Sectional Center |
| SIP | — Service Improvement Program |
| SPFSM | — Single-Position Flats Sorting Machine |
| SPLSM | — Single-Position Letter Sorting Machine |
| SPO | — Serving Post Office |
| SSIS | — Schedules and Schemes Information System |
| SSPC | — Self-Service Postal Center |
| SV | — Sacs Vide |
| SVM | — Stamp Vending Machine |

90

91

TMO — Transportation
Management Office
TMS — Transportation
Management System
TOFC — Trailer on Flatcar
TOWVEYOR— Container Transport
System
TPO — Transfer Post Office
TWX — Teletypewriter Exchange
UAA — Undeliverable As
Addressed
UPU. — Universal Postal Union
USPS — United States Postal
Service
VIM — Vertical Improved Mail
VMF — Vehicle Maintenance
Facility
WASC — Western Area Supply
Center
ZIP — Zone Improvement Plan
ZMT — ZIP Mail Translator

GOVERNMENT PRINTING OFFICE

92

appointed postmasters or supervisors taking Management Action Series training.

**Mean Time to Repair (MTTR).** A statistical record of average time required to repair an item, such as equipment or component.

**Mechanization.** Manual motions replaced by mechanical aids or machines to increase operating efficiency and enhance use of employee skills.

**Merchandise Return Service.** A service whereby a company authorizes a customer to return shipments without prepayment of postage. Postage is collected upon return to original shipper.

**Merchandise Samples.** Pieces exceeding 5″ wide or high, or ¼″ thick, or is non-uniform in thickness. Samples must be mailed with detached lables and distributed to 25% or more of the addresses in a 5-digit ZIP Code area (See Detached Label Delivery.)

**Metered Mail.** Any class of mail with postage printed by a USPS-approved meter. The same privileges and conditions apply as to material mailed with stamps.

**Meter Postage.** Mechanical postage imprinter used on gummed tape or envelopes for letters and parcel post.

**Meter Tape.** Postage on gummed tape for letters and parcel post.

**Methods Improvement Program—Standard Operating Procedures (MIP-SOP).** A delivery services program that assists managers in identifying and correcting inefficient practices. Stipulates procedures that must be followed to achieve service goals to minimize daily operating costs.

**Methods Time Measurement (MTM).** A system of determining work standards by predetermined data.

**Micro Mark.** A retrofit to the Mark II facer-canceler that exchanges the old vacuum tube electronics with the latest solid state type, including microprocessors.

**Military Mailers Guide.** A volume that instructs mailers how to sort mail bound for APOs/FPOs to *flag pole* post offices. A flag pole is an overseas military post office similar to a domestic sectional center.

**Military Ordinary Mail (MOM).** A classification of military mail moved by surface transportation to a gateway facility. From a gateway facility MOM is moved by air at a particular transportation rate and priority.

**Minimum Size.** The smallest physical requirements for all mail. Except for keys and identification items, any piece *less than ¼″ thick* must meet the following minimum criteria; otherwise it is nonmailable and will be returned to sender:

> Rectangular shape.
> At least 3½″ high.
> At least 5″ long.
> At least .007″ thick.
> (See Nonstandard.)

**Mint Sets.** A folder containing all the commemorative stamps or definitive stamps/postal stationery issued during a calendar year. Contains a brief story on each stamp subject.

**Miscoded/Miszipped.** Mail with an incorrect ZIP Code as part of the delivery address.

**Misdelivery.** Mail erroneously delivered.

Mishandle. To handle mail improperly, causing delay or damage.

Missend. To send or dispatch a piece of mail improperly.

Missent. Mail that has not been dispatched according to official schemes, schedules, or special orders (Also Misdirected.)

Misthrown. Mail erroneously distributed.

Mixed City. A dispatch of mail for more than one zone in a city.

Mixed States. A dispatch of mail for several states.

Mobile Post Office. A trailer unit equipped to handle all major postal needs as an emergency or temporary replacement post office.



Mobile Office

Mobile Vehicle Repair Facility (MVRF). A 40-foot van equipped as a one-bay garage that goes to postal facilities to service vehicles.

Motorist Mail Chute. (See Courtesy Box.)

Motor Vehicle Operator (MVO). Employee hired primarily to drive postal vehicles.

Motorized Carrier. Carrier who uses a vehicle to deliver mail. A motorized route is that served by a motorized carrier.

Mounted Route. City delivered route using a vehicle for delivery to curbside boxes.

Multicoded City. A post office having more than one 5-digit ZIP Code within its delivery area.

Multicommodity Vending Machine (MCVM). Stamp and stamped envelope dispensing equipment designed for customer use in post office lobbies, outdoor mail units, or other self-serviced postal center locations.

Multiposition Flat Sorting Machine. (See Sorting Machines.)

Multiposition Letter Sorting Machine. (See Sorting Machines.)

National Air and Surface System (NASS). Computerized system operated out of the St. Louis PDC and 26 transportation management offices for production of dispatch and labeling information for all classes of mail for use by mail processing facilities.

National Bulk Mail System (NBMS). A network of 21 highly mechanized bulk mail centers and 10 auxiliary service facilities linked together and to other postal facilities by a transportation network. Each BMC or ASF processes originating and destinating bulk mail for a specific geographic area. (See Auxiliary Service Facility and Bulk Mail Center.)

National Maintenance Information and Control System (NMICS). A computerized management information system for preventive plant and equipment maintenance.

**National Quality Index (NQI).** An estimate of the national picture on missent mail, uncanceled stamp trends, based on data collected at 30 offices.

**National Test Administration Center (NTAC).** Part of Headquarters operation located in Los Angeles. Runs the USPS examination program for hiring and promoting.

**National Workhour Reporting System (NWRS).** Represents the labor expense segment of a USPS functional planning, budgeting, and reporting system NWRS records by 10 functional categories and up to 100 LDCs the hours worked, types of leave taken, hours paid, salaries and benefits paid throughout a postal fiscal year.

**National Workhour Reports (NWR).** Displays each pay period by function and LDC the hours worked compared to the operating plan, the year-to-date performance and the same period last year performance.

**Neighborhood Delivery and Collection Box.** (See Cluster Box.)

**Newspaper Treatment.** Expedited treatment provided for second-class periodicals published at least once per week featuring news of general interest. (Also Red Tag Service.)

**Night Differential.** 10% compensation added to an employee's base hourly rate for work time between 6 p.m. and 6 a.m.

**Nixie.** Letter or package not easily deliverable because of incorrect, illegible, or insufficient address. A nixie clerk is one who specializes in handling this mail.

**Nonlocal Outgoing mail.**

48

**Nonmachinable Outside (NMO).** Generally a package, parcel, or other item that because of size, weight, or special characteristic cannot be safely sorted by mail machinery (parcel sorter, etc.). Handled manually.

**Non-Personnel Office (NPO).** An office having USPS-owned vehicles but no vehicle maintenance facility.

**Nonreadable.** Mail that cannot be read with the present optical scanning machines.

**Nonstandard.** First-Class Mail weighing 1 ounce or less or single-piece third-class mail weighing 2 ounces or less and.

> More than 11½" long.
> More than 6⅛" high.
> More than ¼" thick
> The aspect ratio (ratio of height to length) is not between 1:1.3 and 1:2.5 inclusive.

**No Office (NO).** Used principally in mail schedules and in listing points traversed by highway contract routes to indicate that the point has no post office.

**Nutting Truck.** Small wheeled hand truck to move or store small quantities of mail within a postal facility. Named for designer of truck. (Also Platform Truck.)



49

**Obvious Value.** Third- and fourth-class mail undeliverable as addressed, but should not be discarded if it can be forwarded or returned to sender.

**Office Time.** Amount of time carrier spends in the office routing mail and performing other office duties before leaving to deliver mail or after returning.

**Officer-in-Charge (OIC).** Career postal employee appointed to fill a postmaster vacancy temporarily, usually for no longer than 180 days

**Official Mail.** Penalty and franked mail authorized by law to be transmitted without prepayment of postage.

**Official Matter.** (See Free Matter.)

**On-the-Clock/Off-the-Clock.** On duty, off duty

**Open Transit.** Mail from one country to another, usually in small quantities, sent to the U.S. for processing and dispatching.

**Opening Unit.** Operational area within a processing facility where pouches, sacks, and containers of mail are opened and prepared for distribution

**Operating Plan.** A structured documentation of the processes to be performed, target times to be met, and supervisory responsibilities to be exercised for an office to achieve its processing and service standards

**Operation Alert.** A program, usually in cooperation with a local agency, to alert letter carriers when elderly, handicapped, or live-alone customers are in trouble. Customers are sometimes identified by a small orange label inside their mailboxes. If customers do not collect their mail for

several days, the carrier suspects a problem and notifies the local agency. The agency checks to see if assistance is needed. (Also Postal Alert, Early Alert, etc.)

**Optical Character Reader/One.** (See Sorting Machines.)

**Ordinary.** Mail other than registered, insured, certified, COD, and special delivery or special handling.

**Ordinary Papers.** Magazines, newspapers, and other periodocals that are not entitled to the expedited service of weekly publications. (See Newspaper Treatment.)

**Originating.** Outgoing and local mail.

**Origin Destination Information System (ODIS).** An information system by which volume, service analysis, and other mail data are collected, developed, and reported in a variety of formats for all levels of postal management

**Original Entry.** The post office where a second-class publication must be entered. A written request for additional entry may by filed by the publisher.

**Outgoing.** Mail processed within a sectional center that was not previously processed or sorted. Originating mail.

**Outside Package/Parcel.** Pieces of mail that must be handled outside mail sacks because of size, weight, shape, or nature of contents.

**Over-the-Road Container (OTR).** Containers used in conjunction with the bulk mail system and train transportation of surface preferential mail. Term used in BMCs to differentiate containers that move

between the BMC and its associate facili-
ties from containers used exclusively in-
house.

**Package (noun).** The basic unit of bulk mail
for mail processing purposes. Usually six
or more copies of a second-class publica-
tion or 10 or more pieces of third-class
matter.

**Package (verb).** To bundle. Also the re-
quirements for preparation of parcels by
customers.

**Pallet.** Wooden, reusable platform on
which mail is bricklayed. Each pallet
weighs 75 pounds, measures 48" x 40"
x 6" high, and handles mail loads ranging
from 650 to 2,000 pounds. Identified by
orange stringers stenciled *U.S. Mail* (Also
Skid.)

**Pane.** One-quarter of a full sheet of stamps
(e.g., 50 stamps from a sheet of 200) cut
smaller for easier distribution and sale.
The Bureau of Engraving and Printing prints
full sheets that are perforated and cut into
panes before distribution to post offices.
Collectors often refer to a pane as a sheet.

**Paper Rack.** (See Sorting Racks.)

**Parcel Airlift Mail (PAL).** Personal military
parcels with postage paid at surface rate
plus a surcharge. Airlifted domestically to
or from a gateway facility and to or from an
overseas military unit on a space available
basis at a specified transportation rate.

**Parcel Sorting Machine.** (See Sorting ma-
chines.)

**Park and Loop.** A method of delivery where
the letter carrier parks the vehicle and
loops one or two streets, delivering mail
away from and back to the vehicle.

**Part-Time Flexible Employee.** Career em-
ployee with no fixed work schedule

52

**Part-Time Regular Employee.** Career em-
ployee assigned to a regular schedule of
less than 40 hours in a service week.

**Penalty.** Official mail of officers of the U.S.
Government (except Members of Con-
gress) and other specifically authorized of-
ficials. The envelope or wrapper bears the
words *Official Business*, mailing agency's
name, and statement of fine for unlawful
use.



Penalty Envelope

**Perforations.** Line of small cuts or holes
placed between two rows of stamps to
ease separation.

**Perimeter Office.** An office with postal-
owned vehicles that is organizationally at-
tached to a VMF for vehicle maintenance
and related programs.

**Permit.** Mail with printed indicia in lieu of a
stamp, showing that postage was paid by
the sender.

**Phasing.** Gradual imposition over a period
of years, according to statutory plan, of
higher postal rates on certain mailers,
rather than imposition of the full rate in-
crease at the time new rates are estab-
lished. Extended phasing means that rate
increases are phased over an even longer
period of time (Public Law 93-328, enacted
June 30, 1974). (Also Revenue Forgone Ap-
propriations.)

53

Government departments and agencies, other than USPS.

**Postage Due Mail.** Mail on which additional postage is collectable on final delivery. (Also Short Paid.)

**Postal Area ZIP Code.** All ZIP Code assignments other than unique. This category includes ZIP Codes assigned to postal facilities, box sections, ABMPS (bar code), caller service, VIM units (buildings), and delivery areas.

**Postal Card.** Blank card sold by the USPS with a printed or impressed postage stamp

**Postal Career Executive Service (PCES).** Two levels of USPS executives. Level I includes MSC, District, Regional, and Headquarters managers. Level II consists of USPS officers. PCES provides special assignments and training for these executives

**Postal Center.** A free standing enclosed unit containing clusters of lockbox modules (100-300 boxes). The center has a collection receptacle and a stamp-vending machine. Parcel post compartments may be added

**Postal Clerk.** An employee who separates incoming and outgoing mail according to established schemes, or performs a variety of services at a public window of a postal facility

**Postal Customer Council (PCC).** A local group of both mailing organizations and local post offices to provide the mailers a forum in which to discuss postal related matters and exchange ideas for improved mail service



Postal Clerk

**Postal Data Center (PDC).** An accounting, disbursing, and data processing facility that provides support to postal activities.

**Postal Employee Development Center (PEDC).** Modern library/learning centers with the latest self-instructional audio-visual equipment available to all postal employees.

**Postal Forum.** An annual meeting of business mailers and postal officials to discuss common problems and solutions. Held nationally and regionally in alternating years.

**Postal Logistics Directory (PLD).** An official regional document issued and maintained by the regions composed of three parts:

PART I—Regional Information. A list by name and title of districts, TMOs, BMCs, AMFs, Inspection Service, mailbag depositories, frequency table, and emergency instructions.

PART II—Operational Information. A list of all mail processing facilities in alphabetical order showing location, hours of operation, telephone numbers, transportation supplies, and type of distribution performed.

# Joint Exhibit 1

# Part 6

PART III—Labeling Information. A list showing the correct labeling for all classes of mail, including Canada, Mexico, international, and military.

**Postal Operations Manual (POM).** One of six policy directives replacing the PSM. Replaces PSM Chapters 3 and 5 and parts of Chapter 2. Contains the internal operations of post offices. Includes retail services, mail processing, transportation, delivery services, and fleet management. (See Policy Manuals.)

**Postal Rate Commission (PRC).** An independent rate and classification recommending body. Members are nominated by the President and approved by the Senate.

**Postal Service Center.** (See Mail Classification Center.)

**Postal Service Manual.** OBSOLETE. (See Policy Manuals.)

**Postal Service Schedule (PS).** Salary schedule applying to craft employees.

**Postal Service Training and Development Institute (PST&DI).** A USPS educational facility providing intensive management and technical development programs.

**Postal Source Data System (PSDS).** A modern high-speed electronic data processing network. Gathers operational and administrative data from post offices, with little or no manual intervention. Processes the data at a computer complex and disseminates information.

**Postal Stationery.** Generally, postal cards, wrappers, and envelopes with imprinted or embossed stamps. Does not include stamps. (Formerly Stamped Paper.)

**Postal Vehicle Service (PVS).** A service operated by employees of the local post

58

office to transport mail between branches, stations, terminals, and some post offices.

**Post Card.** Privately printed mailing cards for the transmission of messages.

**Poste Restante (PR).** International mail sent to general delivery. (French)

**Postique.** Philatelic center. USPS trademark.

**Postmark.** A cancelation imprint on letters and packages showing the time, date, and post office or sectional center of origin.



**Post Office (PO).** The basic organizational unit of the USPS. Generally, each PO has a specific geographic area for which it has primary responsibility for collection, delivery, and retail operations.

**Post Office Box.** (See Lockbox.)

**Post Office Branch.** Unit of a main post office located outside the corporate limits of the city or town.

**Post Office Station.** Unit of a main post office located within the corporate limits of the city or town.

**Pouch (noun).** Mailbag identified by its leather strap locking device. Generally used to transmit mail given First-Class handling.

**Pouch (verb).** To place letter mail in pouches. Also used to indicate one unit making up a direct pouch labeled to another unit.

59

Pouch-On. To prepare a pouch of First-Class Mail for another post office.

Pouch Rack. (See Sorting Racks.)

Practice Case. Miniature case with small pigeonholes or boxes made especially for practicing letter distribution with cards representing letters.

Precanceled Stamps. Stamps canceled by printing across the face before they are sold to large mailers. Avoids using the canceling machine at the time of mailing.



Precanceled Stamps

Preferential Mail. All mail receiving preferential handling, including Express Mail, all First-Class (includes priority mail), newspapers, time value magazines, and special deliveries. (Also Hot Mail.)

Preferred Rates. Postage rates, available to qualified mailers, which are maintained at low levels through Congressional subsidies and complementary limitations in the ratemaking process.

Presort. Preparation by the mailer by grouping pieces in a mailing by ZIP Code or other separation recommended by the USPS to bypass certain postal operations. A USPS trademark.

Presort First-Class Mail (Presort FCM). A subclass of First-Class Mail. Mailers who sort FCM by 5- and 3-digit ZIP Codes earn a discount off the regular rate. To qualify, mailers must have 500 pieces in the mailing and must sort the mail to any 5-digit ZIP Code when there are 10 or more pieces and then to any 3-digit ZIP Code when there are 50 or more pieces. Pieces that cannot be sorted by 5- or 3-digit ZIP Codes do not qualify for the lower rate but can count toward the 500 piece requirement.

Preventive Maintenance. System for keeping government-owned vehicles and equipment in condition for uninterrupted mail service.

Primary. The first sorting operation for outgoing or incoming mail.

Primary Case. Case used for the initial sorting of letter mail.



Primary Case

Printed Matter. International mail consisting of literary items, newspapers, magazines, books, circulars, catalogs, and price lists

Priority Mail. First-Class Mail weighing more than 12 ounces; principally flats and parcels. Provides faster delivery than parcel post.

**Philatelic Center.** A special stamp store or designated window in a post office lobby. Sells select and 4-position stamp stock and a complete line of philatelic products (Also Postique.)

**Philately.** The collection and study of postage and imprinted stamps for pleasure and profit.

**Pickup Table.** (See Facing Table.)

**Piece.** A pouch or sack of mail or unsacked article of mail.

**Piece Count.** A method of determining the number of letter mail pieces per tray by optically scanning the letter edges through the bottom slot in each tray as it passes over a scanner. Net weight is multiplied by a standard conversion factor to find the numerical count. (Also Weight Count.)

**Piece Rate.** A basis of payment for transportation under contract according to the number of pouches, sacks, or outside pieces. The rate may apply to the total distance from origin to destination or it may be a specified amount per piece per mail

**Pig/Piggyback** Movement of a single truck trailer on a rail flatcar. (Also Trailer on Flatcar.)



**Pigeonhole.** Opening in a distribution case.

**Plant Loading.** An operation where the

USPS provides mail transportation from the customer to destination, bypassing the local post office.

**Plate Block.** Two rows of stamps next to the selvage or marginal strip that includes the plate number(s) used to print the stamps. Collectors often collect a plate block of four corner stamps when there is only one plate number, and a larger block when there are additional plate numbers.

**Platform Truck.** Nutting Truck.

**Pocket.** An individual separation on the sweepside of a letter sorting machine and similar mechanized mail distribution equipment. Like a pigeonhole on a distribution case. (Also Bin.)

**Policy Manuals.** A group of six policy directives issued by Headquarters that obsoletes the Postal Service Manual. Their titles are:

1. Administrative Support Manual (ASM)
2. Domestic Mail Manual (DMM)
3. Employee & Labor Relations Manual (ELM)
4. Financial Management Manual (FMM)
5. International Mail Manual (IMM)
6. Postal Operations Manual (POM) (See individual listings for summary contents).

**Pool Case Shipments.** Parcel post that is addressed, including ZIP Code, postage paid, and destined for sectional centers in containers that can be moved with lift trucks or similar handling equipment

**Portable Lockboxes.** Post office boxes secured in a frame for central delivery in business buildings.

**Postage and Fees Paid.** The indicia printed on penalty envelopes of Federal

**Private Express Statutes.** Laws giving the USPS exclusive right to carry letters over post routes. With specific exceptions, the carrying of letters by any person or organization other than the USPS is unlawful.

**Probationary.** A career employee who has not completed the initial trial period of employment and does not yet have access to the grievance or adverse action appeal systems. Probationary periods are: the first 90 calendar days for bargaining unit employees; the first 6 months for non-bargaining unit employees.

**Processing.** Canceling and sorting mail so it can be sent from a post office. All sub-functions that accommodate these two basic steps, including in/off-movement, are part of the processing activity.

**Procurement Services Office (PSO).** Centralized purchasing office that handles most procurements in excess of $500.

**Productivity Improvement Program.** (See Manpower Scheduling and Staffing Program.)

**Profile Assessment System for Supervisors (PASS).** A personnel system the USPS uses to select initial level supervisors incorporating self- and supervisor-evaluation of candidates.

**Program for Alcoholic Recovery (PAR).** A formal program to help alcoholic employees resume their usefulness to the USPS through recovery.

**Prohibitory Order.** A USPS order requested by the addressee of a pandering advertisement, which directs the sender to make no further mailings to that addressee.

**PS Label.** An identification sticker printed in various sizes, shapes, and colors. In mail processing, labels are applied on all classes of mail, specifying a particular type of handling.

**PS Tag.** A heavy cardboard printed in various colors, attached to a pouch, sack, or tray that provides information on contents, mail makeup, and routing instructions. Provides specific handling information.

**Public Service Appropriations.** Annual appropriations by Congress for public service costs incurred in providing maximum nationwide postal service. Applies to communities where post offices may not be as self-sustaining as elsewhere.

**Pull.** To remove sorted mail from cases (boxes, etc.) and transport to next point of handling. (Also Sweep.)

**Pull Racks.** To take bags from the rack for dispatch. To close and lock all sacks and pouches containing mail in sorting racks, usually at the end of each trip or working tour. (Also Skin the Rack.)

**Qualifying Pieces.** Pieces which meet all requirements for a presort reduced rate. All pieces must bear the proper presort endorsement.

**Quality Control (QC).** The control of various mail processing factors to produce a consistent, uniform distribution that conforms to specified standards.

**Rack.** (See Sorting Racks.)

**Rail Van.** A railroad-owned trailer designed for use on intermodal moves. Can be transported either on a rail flatcar or over the highway.

**Readable.** ZIP Codes and addresses on letter mail that can be read by optical scanning machines.

Rebuts. International mail being returned to sender.

Red. Piece of registered mail. The term originated when registered mail was dispatched in red-striped pouches.

Red Man/Money Man. Register clerk.

Red Run. An assignment to handle registered mail.

Red Tag Service. (See Newspaper Treatment.)

Reflective Tape. Material on the belt panel of trucks to improve the visibility of vehicles at night.

Regional Headquarters. An office managed by a Regional Postmaster General. Responsible for all aspects of postal management, transportation, equipment, supplies, facilities, and personnel within a large geographic area consisting of many states. There are five postal regions. Northeast, Eastern, Central, Southern, and Western.

Regional Issuance (RI). A directive originating in the regions for the regions. Used by Regional Headquarters to instruct all installations under their jurisdictions on a need to know basis.

Registered. Added protection for valuable and important mail. Gives evidence of mailing, delivery, and indemnity in case of loss or damage.

Relay. The sequenced portion of a city delivery route that is delivered from a relay box to a relay box, or from a vehicle back to the vehicle. It can weigh up to 35 pounds.

Relay Mailbox. Large street box used for mail storage or relay of mail to carriers.

Removal. An order, signed by a customer, directing that mail addressed to a former location be forwarded to a new address.

Residential Route. City delivery route on which at least 70% of the customers are nonbusiness.

Residue. Mail for small offices that have no direct separation space in case or rack.

Residue Case. Case for distributing mail for small offices that are not included in the primary or secondary case.

Rest Bar. A stool with a heavy base, adjustable as to height and angle of seat.

Retail Analysis Program (RAP). A management tool to study customer traffic. Used to decide the best location or relocation for postal facilities or units, and their staffing needs.

Retrace. The portion of a rural route on which the carrier travels and returns on the same road.

Return. Mail that must be sent in the opposite direction to be dispatched properly. (Also Turnback.)

Return Receipt Card. Card signed by the addressee of a registered, certified, or insured article and returned to the sender.

Revenue/Cost Analysis System. A group of methods used to collect and develop revenue, volume, and cost data for mail classes and special services as required by postal management.

Revenue Forgone Appropriations. Phasing. Appropriations authorized by Congress to reimburse USPS on an annual basis for revenue not received as a result of phased or lower rates for certain categories of mail, such as second class.

54

**Revenue Protection.** A national program to stop the loss of revenue by identifying and collecting short or unpaid postage and fees, uncanceled stamps, and misclassified mail.

**Revenue Unit.** The average amount of revenue received from postal rates and fees during the fiscal year for 1,000 pieces of originating mail and special service transactions. The amount in fiscal year 1979 was $158.56. The number of revenue units is used to categorize post offices by size. (See Cost Ascertainment Grouping.)

**Rewrap Area.** The area in which damaged or broken parcels are endorsed and rewrapped.

**Riffle.** To quickly thumb through the top of a tray of mail or the side of a bundle of mail by sliding the thumb along the edge.

**Roller Canceler.** A canceling device for second, third, and fourth class mail.

**Roller Table.** Table with a series of rollers as its surface to ease manual mail sorting and separating to a container at a sorting point within a processing facility.

**Rolls.** Mail in form of rolls, limited in size by postal regulations. (See Irregular Parcels and Pieces.)

**Rotary Lock.** Special lock for pouches of registered mail. The lock rotates to the next higher number with each turn of the key.



Rotary Lock

**Rotary Sack Rack.** (See Sorting Racks.)

**Route** (noun). Scheduled course to be followed by employees or contractors in performing transportation or delivery duties.

**Route** (verb). To designate the time, schedule, mode of transportation (air/highway/rail), and line of travel to be used in dispatching mail from a postal unit or transportation terminal and to put mail in sequence of delivery.

**Run.** The scheduled line of travel and operation of a mail transportation vehicle.

**Rural Boxes.** Mailboxes on rural routes for delivery of customer mail without dismounting from the vehicle. Used also on city delivery curbside routes.

**Rural Carrier.** Employee who delivers and collects all classes of mail in rural communities that have no convenient postal facilities. Furnishes nearly all the services provided by a small post office.



Rural Carrier

**Rural Delivery Service.** A rural route operated primarily to deliver and collect mail from roadside boxes owned and maintained by residents in communities that have no other convenient postal facilities. (Formerly Rural Free Delivery.)

**Sack** (noun). A bag with a draw cord and fastener used by the USPS to transport mail other than First Class.

Sack (verb). To place mail in sacks

Sack Car. Carload of empty equipment

Sack Rack. (See Sorting Racks.)

Sack Routing System. The sorting of parcels into numbered sacks corresponding to route or geographical areas.

Sack Sorting and Dispatch System. A large mechanical overhead trolley system with suspended carriers or trays. Has keyboard input stations at central, remote in-house, and platform locations. Has discharge elements for in-house rework of mail, dispatch sequencing, and direct delivery to truck or rail cars.

Sack Sorting Machine. (See Sorting Machines.)

Sacs Vide (SV). Empty foreign mail equipment. (French)

Saratoga. A large satchel used for collections.

Satchel. A pouch used for carrying up to 35 pounds of mail by city delivery letter carriers on their routes. It is not used on 100% mounted routes.

Satchel Cart. Small portable handcart used by city carriers to transport satchels of delivery mail.

Sawtooth Platform. A sorting platform for sacks with a series of platform trucks arranged around the edge to form sawtooth pattern for ease and accessibility to loading.

Schedules and Schemes Information System (SSIS). Subsidiary program of Manpower Scheduling and Staffing Program. It is a data base of the work schedules and scheme knowledge of the employees within the office in question.

Scheme. A systematic plan to guide the effective distribution of mail to destination.

Scheme Knowledge. Proved by testing of an incoming, outgoing, or standpoint scheme.

Screenline. Partition separating public lobby from post office workroom.

Secondary. A second mail sorting operation.

Secondary Case. Case used for making separations that cannot be included in the primary case, such as second handling.

Second-Class Mail. Newspapers, magazines, and other periodicals issued at stated intervals, and not entered as controlled circulation mail

Sectional Center (SC). A designated geographic area defined by ZIP Codes. The SC office is used for presort and makeup of certain classes of mails, computation of certain postal charges, distribution and dispatch. (See Management Sectional Center.)

Sector/Segment. (See ZIP Code.)

Selects. (See Hards.)

Self-Service Postal Center (SSPC). An unmanned postal unit providing postal financial and mailing services by customer-operated equipment.

Selvage. The nonpostage strip or strips on the edge of a sheet of stamps showing the plate number, Mr. ZIP, and notice of copyright. Mail Early inscriptions appeared prior to 1978.

Separations. (See Pigeonhole /Pocket/Bin.)

**Sequenced.** Mail made up by mailers in order of delivery

**Sequence Loading.** Loading mail onto a vehicle in the order it will be unloaded at destinations

**Service Improvement Program (SIP).** Program to improve First-Class Mail service.

**Service Standards.** Commitments on dependability and timeliness of mail service that the public can expect for each class of mail.

**Serving Post Office (SPO).** A postal facility at which Mailgram messages are received in electronic form, printed, and sealed in envelopes

**Se Tenant.** Stamps joined together as in the original sheet, but differing in design, overprint, color, or perforation. (French)

**Set Up.** To face letters, packages and papers the same direction on the work table to ease sorting into sacks and pouches

**Shakeout.** Emptying mail from sacks and pouches

**Sheet.** A complete, unseparated group of stamps as printed on a press. The sheet is cut into four panes for sale in post offices and philatelic centers

**Shift.** Employee's assigned workhours. Also, Tour of Duty, or Trick.)

**Short Paid.** Postage due mail

**Shuttle Containers.** Large steel mesh baskets for intercity transportation of parcel post in use experimentally in some localities

**Shuttle Service.** Transporting mail between given points on schedule

**Sidewalk Service.** Carriers serving boxes at the edge of the sidewalk nearest the residence.

**Single-Position Flats Sorting Machine.** (See Sorting Machines.)

**Single-Position Letter Sorting Machine.** (See Sorting Machines.)

**Skid.** A wooden structure, usually 4 × 4 ft., that holds various kinds of material. Usually moved by fork-lift truck. (Also Pallet.)

**Skin Sack.** Sack or pouch containing a small amount of mail

**Skin the Rack.** (See Pull Rack.)

**Skip.** Letter that was processed through a canceling machine without canceling postage stamps.

**Sleeper.** Letter that is lodged in the back of a case instead of lying flat in pigeonhole.

**Slugs.** First- or third-class mail too large to be distributed in a case. Thick pieces manually culled from the facing and canceling operation.

**Small Packets.** International mail consisting mostly of merchandise and commercial samples.

**Small Parcels and Rolls.** (See Irregular Parcels and Pieces.)

**Snorkel.** (See Courtesy Box.)

**Sorting Conveyor.** (See Conveyor.)

**Sorting Machines.**

1. **Letter/Flat.**
a. **Letter Sorting Machine (LSM).** Covers a variety of semiautomatic machines making from 50 to 300 mail sorts keyed by operators at stations on the machine consoles.

70

71



Sorting Machine

b. **Flat Sorting Machine (FSM).** Machine that mechanically sorts flat mail.

c. **Single-Position Flats Sorting Machine (SPFSM).** FSM that allows an operator to key flats into 100 bins at a rate of approximately 40 pieces per minute

d. **Single-Position Letter Sorting Machine (SPLSM).** LSM with one operator and a machine processing capability of approximately 3,600 pieces per hour with 99 separations.

e **Multiposition Flats Sorting Machine (MPFSM).** FSM capable of handling a full range of flats

f. **Multiposition Letter Sorting Machine (MPLSM).** An LSM with multiple input stations or operator keying consoles, generally 12, with a machine processing capability of 43,200 pieces per hour into 277 separations



LSM

g. **Bar Code Reader/Sorter.** Machine capable of reading bar-coded letter mail and sorting up to 305 separations.

h. **Optical Character Reader/One (OCR).** An automatic mail sorting system that locates the address written on the face of an envelope and reads the bottom line or the second from bottom line. OCR is interlocked with letter sorting machines and processes letters at the rate of 36,000 per hour. The only manual involvement is the loading of mail in the transport system to the LSM, unloading unreadable items, and sweepside activities.

i. **Code Sort Optical Character Reader (CSOCR).** An optical character reader that reads the ZIP Code, prints a bar code, sorts and stacks the mail.

**2. Sack/Parcel.**

a. **Monorail.** (Also Power & Free.) An overhead trolley system for hanging or placing sacks on a carrier to be transported for processing or dispatched at given areas.

b. **Parcel.** A large memory-controlled machine with parcel inputs, operation station, sorting, and discharge elements for primary sorting of parcels to secondary sorting positions. Provides related primary and secondary separations, or both, from a single input.

c. **Sack.** Similar to a parcel sorting machine, but of heavier construction. For primary sorting of sacks to sawtooth platform, secondaries, or direct to highway trucks or mail storage cars.

d. **Sack or Parcel—Carousel.** A machine

72

73

with a series of pallets traveling horizontally. Sacks or parcels are placed and coded for a specific destination along the travel route within the post office. The pallet tilts and discharges to a slide or conveyor at destination.

e. Sack or Parcel—Over and Under. Same as the carousel, except that pallets return to coding station vertically, traveling below outgoing pallets.

f. Sack or Parcel—Multibelt. A series of conveyors where sacks or parcels can be deposited. Each conveyor terminates at a specific separation area.



Bag Rack

Sack Sorter



Sorting Racks.

1. Regular (Bag, Pouch, Sack, Paper, Parcel) A metal framework with hooks to hang mailbags while filling with letter mail, circulars, newspapers, parcel post 5 to 16 bag capacity

2. Rotary A mechanical circular rack to a BMC Rotates to a predetermined scheme and positions correct bag (sack, etc.) near the operator for minimum movement and maximum accuracy

3. Circular. A stationary circular rack used in offices other than BMCs

74

Space Available Mail (SAM). A classification of military mail transported to and from overseas bases by air on a space available basis at a specified rate.

Special Delivery. A mailing system available for all classes of mail, except Express Mail. Receives preferential handling in processing and expedited delivery, including Sunday and holiday delivery.

Special Handling. A service for third- and fourth-class mail only. Provides preferential handling in dispatch and transportation, but no special delivery.

Special Services. Mail for which the customer must pay or sign for.

Special Service Transaction. Services for a fee other than postage (CODs, money orders, certified mail, etc).

Speedy Bag. A plastic bag used to segregate and identify special delivery mail to expedite delivery.

Speedy Line. A queuing system to reduce customer waiting time during peak periods in service lobbies, using signs with movable stanchions and fixed hooks that are connected by ropes. Customers line up single-file for the next available clerk at all-purpose windows.

75

**Amma Jr, Joseph N - Washington, DC**

| | |
|---|---|
| **From:** | VPDaniel4npmhu@cs.com |
| **Sent:** | Wednesday, August 23, 2006 2:11 PM |
| **To:** | Amma Jr, Joseph N - Washington, DC; Garcia, Gail D - Denver, CO; Padilla, April A - Denver, CO |
| **Cc:** | szamanakos@apwu.org; Mitchell, Marsha L - Denver, CO; Benitez, Tony P - Denver, CO |
| **Subject:** | Re: FW: Signature request 8-29-06 Arb date w/Lankford |

Gentlemen,

I disagree with your position on payment for the cancellation for the 8/29 hearing date. I take the position that the APWU is responsible for the cancellation fees.

The APWU sent out it's position paper on August 1, 2006, along with there appeal to Arbitration. It was already inside the 30 day period. As you know, the NPMHU has held the position that the cases scheduled for arbitration should have at the minimum a 30 day notice for the scheduling letter.

I raised the issue of the APWU position paper stating that the LIPS was the same as the SPBS on August 3, 2006. The APWU disagreed with my position on August 4, 2006. On August 8, 2006, I responded by taking the position that the DRP's do not provide for arguing arbitrability in front of a Regional Arbitrator on the issue of a national dispute. In addition, the DRP does provide for the DRC to place such cases on hold. The APWU never responded to my August 8, 2006, response.

This is such that should have been placed on hold, even though the USPS and the APWU don't agree. I had no choice but to refuse to sign the scheduling letter.

Had the hearing date been canceled at that time, the penalty would be much less that it is today. Had the case been appealed to Arbitration prior to 30 days in advance of the hearing date, the hearing date could have been canceled without incurring any penalty. So even though I refused to sign the scheduling letter, I am not liable for the cancellation on the 11th hour.

Efraim Daniel

0312

### Amma Jr, Joseph N - Washington, DC

| | |
|---|---|
| **From:** | Amma Jr, Joseph N - Washington, DC |
| **Sent:** | Wednesday, August 23, 2006 12:21 PM |
| **To:** | Garcia, Gail D - Denver, CO; 'VPDaniel4npmhu@cs.com'; Padilla, April A - Denver, CO |
| **Cc:** | szamanakos@apwu.org; Mitchell, Marsha L - Denver, CO; Benitez, Tony P - Denver, CO |
| **Subject:** | FW: Signature request 8-29-06 Arb date w/Lankford |
| **Importance:** | High |

Gail:

I received a call from Steve this AM.

Please contact Arbitrator Lankford and cancel the the 8/29 date.

Regarding billing, the APWU takes the position that the NPMHU should be billed as they refused to sign the scheduling letter.  I do not believe that the USPS has any responsibility for payment of the hearing date, as we were also prepared to go forward.

Efraim:

Please note the USPS and APWU positions on payment outlined above.


Joe Amma
Field Labor Relations
(425) 438-2123
(425) 290-6350 FAX

-----Original Message-----
**From:** Amma Jr, Joseph N - Washington, DC
**Sent:** Tuesday, August 22, 2006 3:46 PM
**To:** 'VPDaniel4npmhu@cs.com'; szamanakos@apwu.org
**Subject:** RE: Signature request 8-29-06 Arb date w/Lankford
**Importance:** High

Efraim:

Steve was at convention last week and requested some additional time for response.


Steve:

If I have not heard further from you by 3 PM DC time tomorrow (8/23), I will cancel the date.  I can be reached at (202) 268-7410.


Thanks.


Joe Amma
Field Labor Relations
(425) 438-2123

8/23/2006

0313

(425) 290-6350 FAX

-----Original Message-----
**From:** VPDaniel4npmhu@cs.com [mailto:VPDaniel4npmhu@cs.com]
**Sent:** Tuesday, August 22, 2006 3:09 PM
**To:** Amma Jr, Joseph N - Washington, DC; szamanakos@apwu.org
**Subject:** Re: Signature request 8-29-06 Arb date w/Lankford

Joe,

Since there has been no reply to your 8/14 e-mail and the COB on 8/21 has come and gone, why has the 8/29 hearing date not been canceled?

Efraim

8/23/2006

## Amma Jr, Joseph N - Washington, DC

**From:** Amma Jr, Joseph N - Washington, DC

**Sent:** Monday, August 14, 2006 11:22 AM

**To:** 'VPDaniel4npmhu@cs.com'; szamanakos@apwu.org

**Subject:** RE: Signature request 8-29-06 Arb date w/Lankford

Steve/Efraim:

In light of the dispute over the scheduling of Seattle APWU case 02123526 for hearing on August 29, I have reviewed the RI 399 documents and discussed the issue with Management's representative on the NDRC. The following is an analysis of RDRC Management's position on this issue; I have attempted to reflect your stated positions as accurately as possible - please feel free to correct those reflections as needed.

The case was discussed from the APWU file at our meeting of April 24, 2006. Thereafter, I had the management case file sent to my office for preparation of my position paper and copying and forwarding of the case file to both of you. Steve had selected the case as the APWU pick for arbitration on August 29.

Upon receipt of the Steve's RDRC position paper, Efraim stated his position that the "this case should be placed on hold pending the outcome of the national discussion" of the SPBS, citing Questions 1 and 2 of the 10/21/92 Joint Q&As from the National parties and refused to sign the arbitration scheduling letter.

Steve has disputed that the Seattle case is covered by the National dispute over SPBS and stated his position that any argument over whether or not the case is covered by the National case must, at this point, be determined by the arbitrator. He has also expressed a concern that refusal to sign the scheduling letter is unprecedented and could open the door for such actions in the future.

Re the 10/21/92 Q&As, Question 1 clearly lists SPBS as a National issue and Question 2 clearly vests in the RDRC the right to place cases containing such issues on hold. In our meetings, by my recollection, we have traditionally done that during our RDRC meeting discussions and have generally deferred to any member who maintains that such an issue is involved in a case before us. The referral to hold has required the signature of all three parties, as Question 2 would suggest.

Additionally, the DRP MOU on p. 4 provides that any member of the RDRC can identify an appealed dispute as involving an interpretive issue and notify the other parties in writing prior to the issuance of the RDRC's decision. When such a written notice has been attached, the moving union may only appeal to the NDRC. While it is arguable whether a claim that the instant case should be held under the SPBS dispute rises to the level of an interpretive dispute, I believe that the issue of whether the instant case should be held or whether the Regional arbitrator should determine the application of the National dispute to the facts of the instant case does pose an interpretive dispute.

Regarding refusal to sign the scheduling letter, the DRP MOU of April 29, 1992 contains several references to arbitration scheduling:

P.2  All parties to the DRP may participate in the proceedings, but all parties will be bound by the decision whether they participate or not;

P.5  All scheduling of regional arbitration cases will be jointly performed and all scheduling correspondence will be jointly signed.

## SUMMARY

I believe that an interpretive question has been evidenced at this point, as follows:

When one union declares that a case involves one of the issues pending at the National level, does that union have a unilateral right to require that the case be held pending resolution of the National level dispute, even if one or both of the other members on the RDRC disagree, or, in the alternative, must the issue of whether the National level dispute is involved be determined by the Regional 399 arbitrator?

0315

As this is an APWU case, I am requesting that Steve raise this issue with the NDRC.

Absent further comment from either of you, or a change in your positions, I will advise Gail to cancel the date by COB on Monday, 8/21.

Thanks.

Joe Amma
Field Labor Relations
(425) 438-2123
(425) 290-6350 FAX

-----Original Message-----
**From:** VPDaniel4npmhu@cs.com [mailto:VPDaniel4npmhu@cs.com]
**Sent:** Tuesday, August 08, 2006 4:22 PM
**To:** szamanakos@apwu.org
**Cc:** Amma Jr, Joseph N - Washington, DC
**Subject:** Re: Signature request 8-29-06 Arb date w/Lankford

Steve,

The Q and A in the Dispute Resolution Procedures does not provide for arguing arbitrability in front of a Regional Arbitrator on the issue of a national dispute. It does, however, provide for the Dispute Resolution Committee to place such cases on hold.

How would this decision have an impact on other cases in the Western or Pacific area, if those cases don't include issues already at the National level?

You are the one taking the position that the LIPS is nothing other than an SPBS, not me. I am merely doing what the Q and A guides me to do.

Efraim

7/14/06

ED   1130am   OK to cancel.

SZ   1130am   w/ Attys, hold until notice from him. Sees refusal to sign as issue.

8/14/2006

**Amma Jr, Joseph N - Washington, DC**

| | |
|---|---|
| **From:** | VPDaniel4npmhu@cs.com |
| **Sent:** | Tuesday, August 08, 2006 4:22 PM |
| **To:** | szamanakos@apwu.org |
| **Cc:** | Amma Jr, Joseph N - Washington, DC |
| **Subject:** | Re: Signature request 8-29-06 Arb date w/Lankford |

Steve,

The Q and A in the Dispute Resolution Procedures does not provide for arguing arbitrability in front of a Regional Arbitrator on the issue of a national dispute. It does, however, provide for the Dispute Resolution Committee to place such cases on hold.

How would this decision have an impact on other cases in the Western or Pacific area, if those cases don't include issues already at the National level?

You are the one taking the position that the LIPS is nothing other than an SPBS, not me. I am merely doing what the Q and A guides me to do.

Efraim

Q+A  10/21/92

   #2  Action

   #7  List

Qs:

How to handle when I refuse to sign seld. ltr?
     See DRP p.2

DRC re. Nat'l (intrp) dispute.
       p.4

Reg. Arb. seld.                    jointly signed
       p.5

8/8/2006

## Amma Jr, Joseph N - Washington, DC

**From:**    Amma Jr, Joseph N - Washington, DC
**Sent:**    Tuesday, August 08, 2006 2:21 PM
**To:**    Padilla, April A - Denver, CO
**Cc:**    Mitchell, Marsha L - Denver, CO; Garcia, Gail D - Denver, CO
**Subject:** RE: RI 399 Seattle Case pending arbitration (8/29/06)

April:

Efraim has taken the position that the case is withdrawn and held based on Steve's position paper; he has suggested that Steve select a back-up.

Steve has taken the position that the threshold issue of whether the case can be withdrawn has to be decided by the arbitrator.

Absent Steve selecting a back-up, and I suspect that he will not do so, we will be giving the date back. My view is that one or both of the unions will be responsible for the date, but not us.

We will need to hold for a couple days until we see if Steve offers a back-up and then notify the arbitrator. Let's see where we are at the end of this week.

Joe Amma
Field Labor Relations
(425) 438-2123
(425) 290-6350 FAX

-----Original Message-----
**From:** Padilla, April A - Denver, CO
**Sent:** Tuesday, August 08, 2006 11:38 AM
**To:** Amma Jr, Joseph N - Washington, DC
**Cc:** Mitchell, Marsha L - Denver, CO; Garcia, Gail D - Denver, CO
**Subject:** FW: RI 399 Seattle Case pending arbitration (8/29/06)

Good Morning Joe,

I spoke with Efraim a few minutes ago and he will not sign the scheduling letter. I informed him that we will be incurring arbitrator fee's and we need to notify Arbitrator Lankford. Efraim said I need to speak with you. What would you like to do in regard to the 8/29/06 hearing before Lankford since Efraim will not sign the scheduling letter?

Thank You,
April Padilla
-----Original Message-----
**From:** Garcia, Gail D - Denver, CO
**Sent:** Tuesday, August 08, 2006 9:06 AM
**To:** Mitchell, Marsha L - Denver, CO
**Cc:** Padilla, April A - Denver, CO
**Subject:** FW: RI 399 Seattle Case pending arbitration (8/29/06)

The latest on 8/29/06. Hopefully Efraim will send the letter today.

Gail

**0318**

-----Original Message-----
**From:** Amma Jr, Joseph N - Washington, DC
**Sent:** Tuesday, August 08, 2006 6:18 AM
**To:** 'Stephen Zamanakos'; VPDaniel4npmhu@cs.com
**Cc:** Garcia, Gail D - Denver, CO; Benitez, Tony P - Denver, CO; Olson, Ann L - Minneapolis, MN
**Subject:** RE: RI 399 Seattle Case pending arbitration (8/29/06)

Efraim/Steve:

From the below set of messages, I assume that we are scheduling the case for 8/29 and will deal with the procedural argument first. If my understanding is correct, the appeal and RDRC member position papers need to be forwarded to Gail Garcia at the GPC in Denver so that a scheduling letter can be produced.

Thanks.


Joe Amma
Field Labor Relations
(425) 438-2123
(425) 290-6350 FAX

          -----Original Message-----
          **From:** Stephen Zamanakos [mailto:szamanakos@apwu.org]
          **Sent:** Friday, August 04, 2006 12:57 PM
          **To:** VPDaniel4npmhu@cs.com
          **Subject:** RE: RI 399 Seattle Case pending arbitration (8/29/06)

          Efraim
          I disagree. The National case has to do with staffing of the SPBS over and above the keying rotation. The Seattle case has to do with the keying and what duties the keyers rotate to. Your Union has already agreed that clerks key on an SPBS and rotate to other duties such as sweeping. You'll have to make your arguments at the hearing and let the arbitrator decide.
          Steve

          _____

          **From:** VPDaniel4npmhu@cs.com [mailto:VPDaniel4npmhu@cs.com]
          **Sent:** Thursday, August 03, 2006 2:48 PM
          **To:** joseph.n.ammajr@usps.gov; Stephen Zamanakos
          **Cc:** Bflynn@npmhu.org; npmhu316@inetmail.att.net
          **Subject:** RI 399 Seattle Case pending arbitration (8/29/06)

          Steve & Joe,

          On 8/2/06 I received the APWU's position paper and appeal to arbitration of the Seattle BMC case to be scheduled for 8/29 (02123526/02CO12).

          In the APWU position, Steven J. Zamanakos makes the following statements:

          A. "The APWU stresses also that the "LIPS" is nothing more than a locally retrofitted "SPBS"."

          B. "The "LIPS" is an "SPBS" modified locally to fit a smaller "footprint" then an "SPBS"."

In light of the position taken by the APWU, I am taking the position that this case should be placed on hold pending the outcome of the national discussion of the PBS. I take this position in accordance with questions 1 &2 of the Q and A - RI-399 Dispute Resolution Procedures. This action should be taken by the RDRC committee.

Thank you for your attention in regard to this matter.

Efraim Daniel
RDRC Member for the NPMHU

0320

**Amma Jr, Joseph N - Washington, DC**

| | |
|---|---|
| **From:** | VPDaniel4npmhu@cs.com |
| **Sent:** | Tuesday, August 08, 2006 10:28 AM |
| **To:** | Amma Jr, Joseph N - Washington, DC; szamanakos@apwu.org |
| **Cc:** | Garcia, Gail D - Denver, CO |
| **Subject:** | Re: Signature request 8-29-06 Arb date w/Lankford |

Steven & Joe,

This is to notify you that I will not be signing the scheduling letter for the 8-29-06 date w/Lankford for case number E00C-1E-J 02123526.

As you know, the APWU claimed in their Position Paper on the Seattle BMC case that the LIPS is the same as the SPBS. It is not appropriate for a Regional Arbitrator to decide what is or is not a National Issue. Since the SPBS is pending at the NDRC level, in accordance with the Q and A, the RDRC **must** place case number E00C-1E-J 02123526 on hold.

Therefore, the APWU should select a backup case for the hearing date of 8/29.

Efraim Daniel
RDRC Western Area Member

0321



## APPEAL TO REGIONAL ARBITRATION

DATE: _8-1-06_

KEN  DE AATE
WESTERN  AREA - USPS
1745  STOUT  ST  SUITE 400
DENVER, CO 80229

Dear Sir:

Please be advised that pursuant to the M.O.U. on RI-399, I have
authorized and hereby appeal the below referenced case to
arbitration.

Installation _SEATTLE  BMC_          Case # _EDOC-1E-J  02123526_

Operation # _"LIPS"_

Sincerely,

_signature_

Authorized Union Representative
APWU

cc:  RDRC Members

## REGIONAL DISPUTE RESOLUTION COMMITTEE

E00C-1E-J02123526  DIST982
2005-08-23  02C012
CLASS ACTION
FEDERAL WAY  WA  98063
0500

**Unresolved Dispute**

Case No: _____        Installation: SEATTLE BMC

Operation No: 134-139  Descriptive Title of Operation: LIPS

Pursuant to the terms and conditions of the trilaterally negotiated RI 399 National
Dispute Resolution MOUs, dated April 16, 1992, the designated Regional representatives
for the USPS, APWU and NPMHU met on 4/24/06 to discuss the above-referenced
case.

Following a full review and discussion of the operation(s) in dispute in the above-
referenced case, the Regional parties were **unable to reach agreement** on the issue(s)
identified as follows:

ASSIGNMENT OF MAIL HANDLERS TO PERFORM

THE KEYING FUNCTIONS ON THE LIPS MACHINE.

_____

_____

_____

_____

_____

_____


_____        _____        _____
Joseph N. Amma Jr.              Steven J. Zamanakos              Efraim Daniel
USPS Representative             APWU Representative              NPMHU Representative

Date: 7/14/06                   Date: 8/1/06                     Date: 7/24/06

Note: The position of each of the respective parties is attached to this decision.

**REGIONAL DISPUTE RESOLUTION COMMITTEE**

**Unresolved Dispute-Management Position Paper**

Case No: EOOC - IE - J 02123526    Page 1 of 2
(025012)

The following represents Management's position regarding the above-referenced case:

In The Spring of 2002, Management Made An Operational Change In The Standard Separation Operation (MECO) Introducing A Mechanized LIPS Machine. The Operation Had Been Staffed By Mail Handlers To That Point. Proper Advance Notice Was Provided To The Unions Under The DRP MOUs.

Management Properly Assigned The Keying Function On The Newly-Installed LIPS To The MH Craft. The Work In The Operation, When Done Manually, Had Been Performed By MHs And The Depth Of Sortation Did Not Change. In Addition To The Existing Jurisdictional Assignment, Management Also Considered The Efficiency Of The Operation, As Required By RI 399; The Provisions Of RI 399 Assigns Such Keying To The MHs When Performed On A Non-Scheme Basis For Sacks, Pouches And Outside Parcels; The

Joseph N. Amma Jr.          Date
USPS Representative

0324

# REGIONAL DISPUTE RESOLUTION COMMITTEE

## Unresolved Dispute-Management Position Paper

Case No: S00C- 1E - J 0212352C
(02C012)

Page 2 of 2

The following represents Management's position regarding the above-referenced case:

SIMILARITY TO THE KEYING BEING PERFORMED ON THE SACK

SORTING MACHINES; AND THE 1997 DETERMINATION THAT THE PRESENCE

OF A KEYING FUNCTION IS NOT THE SOLE DETERMINANT OF CRAFT

JURISDICTION.

MANAGEMENTS POSITIONS OF 4/26/02, 12/18/02, AND 7/27/05

ARE INCORPORATED HEREIN BY REFERENCE.

JNA~J.
Joseph N. Amma Jr.
USPS Representative

7/14/06
Date

0325

# REGIONAL DISPUTE RESOLUTION COMMITTEE

## Unresolved Dispute-NPMHU Position Paper

Case No:     E00C-1E-J 02123526
Local No:    02C012

The following represents the NPMHU's position on the subject case:

The dispute in this case is what craft should perform the Keying Function on the Linear Parcel Sorter (LIPS) at the Seattle Bulk Mail Center (SBMC).

The Mail Handlers Union's position is that the work in question has been properly assigned by Management to the Mail Handler Craft.

Prior to the installation of the LIPS at the SBMC the work in question was performed manually by the Mail Handler Craft. Except for the change from a manual sortation to a mechanized sortation, the work in question has not changed in the depth of sortation. It was non-scheme sortation prior to the introduction of the LIPS and to this day is still non-scheme sortation.

The APWU's assertion that because the LIPS have a Keying Position it should automatically be assigned to the Clerk Craft is incorrect. Mail Handlers have held Keying Positions on the Sack Sorting Machines since they were introduced in the mid 80's. In addition, Peter Sgro in his July 14, 1997 letter to the field stated that "there is no established rule where craft determination is predicated solely on whether it is a keying operation." When making a craft determination, Management should utilize the principles of RI 399 as the primary guideline. In the instant case, Management did follow the RI 399 guidelines and determined the appropriate craft based on but not limited to the history and the efficiency of the operation.

Therefore the APWU's challenge to the work in question must be denied and the assignment of Keying on the LIPS to Mail Handlers be upheld.

The Mail Handler LDRC position paper dated June 1, 2002 is incorporated hereto by reference.


_Efraim Daniel_
Efraim Daniel
NPMHU RDRC Representative

July 24, 2006
Date

August 1, 2006

APWU vs. USPS                                         Seattle, WA BMC
NPMHU – Intervener                                    E00C-1E-J 02123526

## APWU POSITION PAPER

A review of the July 27, 2005 LDRC appeal of the parties clearly articulates that APWU is challenging the assignment of mail handler employees to the "keying position" on the "LIPS". Incorporated into that argument is the fact that keyers must rotate to other duties for their ergonomic safety breaks. Consequently, sweeping and other allied duties on the "LIPS" are involved in this appeal.

The APWU disagrees with the Employer that this case involves an "operational change". The APWU views this as a "New Work" case similar to the introduction of other automation such as "APPS". The APWU is unaware of a "LIPS" or "SPBS" previously being installed at the Seattle BMC. The only equipment using a similar keying pad as the "LIPS" is the parcel sorter. The keying on that equipment is performed by clerks.

The APWU stresses also that the "LIPS" is nothing more than a locally retrofitted "SPBS". It is built using standard "off the shelf" parts for an "SPBS". The "LIPS" itself is not a nationally deployed piece of equipment. The "SPBS" is the nationally deployed piece of equipment and its jurisdiction was established in the late 1980s (Attachment #1). In the jurisdiction letter, the Employer refers to the "keying function" as "Distribution" and further instructs that "Clerks will key for no more than 2 hours before rotating to other duties." The NPMHU never challenged this position and it has been accepted nationwide. Local management does not have the authority to change nationally negotiated craft jurisdictions by modifying the nationally deployed equipment.

In addition, Headquarters USPS established the position description of "Parcel Post Distributor, Machine, SP 2-439" (Attachment #2) as "The position assigned to the keying function..." This position description is assigned to the clerk craft. In addition, instructions from headquarters USPS in May 1996 (Attachment #3) instruct local managers to use "MODS operation numbers 134-139" for the "LIPS". The instructions go on to state that the above operation numbers are those assigned to the "SPBS".

Which craft performed the work locally is irrelevant. The parties at the national level established the jurisdiction of keying as clerk work. Local management does not have the authority to change that decision regardless of the history of the work locally.

In the final analysis,

"If it walks like a duck, and talks like a duck and looks like a duck then it's a duck."

1

The "LIPS" is an "SPBS" modified locally to fit a smaller "footprint" then an "SPBS". The parties at the national level established the keying functions as distribution and the jurisdiction of the clerk craft. This is beyond the authority of the parties at either the local or regional level to change.

Steven J. Zamanakos
RDRC Member - APWU

2

ATTACHMENT
#1
10 PAGES



**UNITED STATES POSTAL SERVICE**
475 L'ENFANT PLAZA SW
WASHINGTON DC 20260

Mr. Thomas A. Neill
Industrial Relations Director
American Postal Workers
 Union, AFL-CIO
1300 L Street, N.W.
Washington, DC 20005-4128

Re: H7C-NA-C 69
M. BILLER
WASHINGTON, DC 20005

Dear Mr. Neill:

Recently, you met with Dave Stanton in a prearbitration discussion of the above-referenced case.

The issue in this grievance appears to involve a Regional Instruction 399 dispute.

Accordingly, we agreed to refer this matter to the National Dispute Resolution Committee (NDRC) as provided for in the April 16, 1992, Memorandum of Understanding between the parties. Additionally, the parties agreed to add this case to the special list of RI-399 cases which has been developed to assist in the administrative handling of this matter.

Please sign and return the enclosed copy of this letter as your acknowledgement of agreement to hold this case.

Sincerely,

Anthony J. Vegliante
Manager
Grievance and Arbitration
Labor Relations

Thomas A. Neill
Industrial Relations Director
American Postal Workers
 Union, AFL-CIO

12-15-92
Date

Enclosure

0329



## American Postal Workers Union, AFL-CIO

1300 L Street, NW, Washington, DC 20005

Moe Biller, President
(202) 842-4246

February 28, 1991

CERTIFIED NUMBER 35251

Mr. Joseph J. Mahon, Jr.
Assistant Postmaster General
Labor Relations Department
United States Postal Service
475 L'Enfant Plaza, S. W.
Washington, D. C.  20260

RE:  APPEAL TO ARBITRATION
H7C-NA-C-69
Small Parcel Bundle Sorter

**National Executive Board**

Moe Biller
President

William Burrus
Executive Vice President

Douglas C. Holbrook
Secretary-Treasurer

Thomas A. Neill
Industrial Relations Director

Kenneth D. Wilson
Director, Clerk Division

Thomas K. Freeman, Jr.
Director, Maintenance Division

Donald A. Ross
Director, MVS Division

George N. McKeithen
Director, SDM Division

Norman L. Steward
Director, Mail Handler Division

**Regional Coordinators**

James F. Williams
Central Region

Philip C. Flemming, Jr.
Eastern Region

Elizabeth "Liz" Powell
Northeast Region

Archie Salisbury
Southern Region

Raydell E. Moore
Western Region

Dear Mr. Mahon:

In accordance with the provisions of Article 15 of the
1987 Collective Bargaining Agreement, the American Postal
Workers Union appeals to arbitration the above referenced
grievance.

Sincerely,

Moe Biller
President

MB/ema
opeiu #2
afl-cio

cc:  Director Industrial Relations
     Robert Tunstall
     files

attachment:  Step 4 decision(H7C-NA-C-69)

CERTIFIED ARTICLE NUMBER 35251



**UNITED STATES POSTAL SERVICE**
ROOM 9014
475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-4100
TEL (202) 268-3816
FAX (202) 268-3074

OFFICE OF THE
ASSISTANT POSTMASTER GENERAL
LABOR RELATIONS DEPARTMENT

RECEIVED

FEB 26 1991

APWU
CLERK DIVISION

Mr. Robert L. Tunstall
Assistant Director
Clerk Craft Division
American Postal Workers
    Union, AFL-CIO
1300 L Street, N.W.
Washington, DC  20005-4128

Re: H7C-NA-C 69
    M. Biller
    Washington, DC  20005

Dear Mr. Tunstall:

Recently, we met to discuss the above-captioned grievance at the fourth step of our contractual grievance procedure.

The issue in this case is two-fold:  1) whether management violated the Agreement by designating the Mail Handler Craft as the primary craft for sweeping and other allied duties on the Small Parcel and Bundle Sorter and 2) whether management violated the Agreement by selecting a one and one-half hour rotation between keying and sweeping for clerks operating the Small Parcel and Bundle Sorter.

It is management's position that no contractual violation can be established.  The Union has not identified any provision of the Agreement which would prohibit the designation of the Mail Handler Craft as the primary craft for sweeping and other allied duties.  In the Step 4 appeal, the Union asserts that the sweeping and other allied duties are "integral to operation of the Small Parcel and Bundle Sorter," but has provided no evidence to prove that assertion.  Further, the Union has not identified any provision which requires a specific, or a different, rotation.

It was in early 1988 that the Union was informed of management's decisions regarding the staffing and rotation on the Small Parcel and Bundle Sorter which are protested in this grievance.  This grievance was not filed until December 1989.  It is apparent that the Union's failure to grieve this matter at the time it first became aware of the staffing determinations protested herein contradicts its current position that a violation is involved.



OFFICIAL OLYMPIC SPONSOR

CERTIFIED ARTICLE NUMBER 35251

2

Robert Tunstall

In that no violation has been established in this matter, this grievance is denied.

Time limits were extended by mutual consent.

Sincerely,

Patricia A. Heath
Grievance & Arbitration
   Division

Date 2/26/91

0332



**UNITED STATES POSTAL SERVICE**
Labor Relations Department
475 L'Enfant Plaza, SW
Washington, DC  20260-4100



RECEIVED
MAR 2 0 1990
OFFICE OF THE
PRESIDENT

March 14, 1990

Mr. Moe Biller
President
American Postal Workers
  Union, AFL-CIO
1300 L Street, NW
Washington, DC  20005-4128

Dear Moe:

This letter is to acknowledge receipt of your February 13
correspondence regarding a proposal for a joint study of
ergonomic factors related to the Small Parcel and Bundle
Sorter.

This matter is being reviewed.  A further response will be
sent to you in the near future.

In the interim, should you have any questions regarding the
foregoing, please contact Curtis Warren of my staff at
268-5359.

Sincerely,

Joseph J. Mahon, Jr.
Assistant Postmaster General

0333



## American Postal Workers Union, AFL-CIO
1300 L Street, NW, Washington, DC 20005

February 13, 1990

Moe Biller, President
(202) 842-4246

Joseph J. Mahon
United States Postal Service
475 L'Enfant Plaza, S.W.
Washington, D.C. 20260

Re: Small Parcel and Bundle Sorter Ergonomics

Dear Mr. Mahon:

National Executive Board
Moe Biller, President

William Burrus
Executive Vice President

Douglas C. Holbrook
Secretary-Treasurer

Thomas A. Neill
Industrial Relations Director

Kenneth D. Wilson
Director, Clerk Division

Richard I. Wevodau
Director, Maintenance Division

Donald A. Ross
Director, MVS Division

George N. McKeithen
Director, SDM Division

Norman L. Steward
Director, Mail Handler Division

Regional Coordinators
James P. Williams
Central Region

Philip E. Flemming, Jr.
Eastern Region

Lawrence Bockmore II
Northeast Region

Archie Salisbury
Southern Region

Bayard K. Moore
Western Region

Officers of the APWU Clerk Division have had several discussions with Postal Officials concerning ergonomic problems with the small parcel and bundle sorter. It is my understanding that Postal Service representatives have expressed a willingness to enter a joint study of seating for small parcel and bundle sorter operators. That would be a worthwhile effort, but we believe consideration of ergonomic factors should go beyond the question of seating.

We therefore propose that the parties enter a joint study of ergonomic factors related to the small parcel and bundle sorter. Such a study should be undertaken promptly, on the basis of very specific areas of inquiry, and should include a commitment by the parties to accept the results and be guided them.

Please give me your prompt response to this proposal. We continue to receive expressions of serious concern from the field about the effects of this equipment. The APWU contact person on this issue is William Burrus, Executive Vice President, who may be reached at (202) 842-4246.

Sincerely,

Moe Biller

MB:mjm

0334



## American Postal Workers Union, AFL-CIO

1300 L Street, NW, Washington, DC 20005

Moe Biller, President
(202) 842-4246

AZC-NA-C 69                    December 27, 1989

Mr. Joseph J. Mahon, Jr.
Assistant Postmaster General
Labor Relations Department
U. S. Postal Service
475 L'Enfant Plaza, SW
Washington, D.C.  20260

**National Executive Board**

Moe Biller, President

William Burrus,
Executive Vice President

Douglas C. Holbrook
Secretary-Treasurer

Thomas A. Neill
Industrial Relations Director

Kenneth D. Wilson
-tor, Clerk Division

Joel Weisblat
Director, Maintenance Division

Donald A. Ross
Director, MVS Division

George N. McKeithen
Director, SDM Division

Norman L. Stewart
Director, Mail Handler Division

**Regional Coordinators**

James P. Williams
Central Region

Philip C. Flemming, Jr.
Eastern Region

Lawrence Boucher III
Northeast Region

Archie Salisbury
Southern Region

Raydell E. Moore
Western Region

Dear Mr. Mahon:

    In accordance with the provisions of Article 15,
Section 3.D of the 1987-1990 Collective Bargaining
Agreement, the American Postal Workers Union files a
step 4 grievance on the following dispute:

    1. Designation of the Mailhandlers Craft as the
       primary craft for sweeping and other allied
       duties integral to operation of the Small
       Parcel and Bundle Sorter.

    2. The selection of a one and one-half hour
       rotation between keying and sweeping for Clerks
       operating the Small Parcel and Bundle Sorter.

    The Union contends that these decisions violate
Article 19, 34, 14, 7, 1 and 37 as well as various
handbooks and guidelines incorporated into the
Agreement, including, but not limited to Regional
Instruction 399.

                                        Sincerely,

                                        Moe Biller

                                        Moe Biller, President

MB/ndh
opeiu#2
afl-cio

Mr. Moe Biller
President
American Postal Workers
   Union, AFL-CIO
1300 L Street, NW
Washington, DC  20005-4107

P 108 832 690

Dear Mr. Biller:

This is in further reference to the deployment of the Small
Parcel and Bundle Sorter.

It has been determined that this equipment will be staffed as
follows:

| | |
|---|---|
| 1. Transporting empty equipment. | Mail Handler |
| 2. Obtaining mail from staging area. | Mail Handler |
| 3. Dumping sacks, pouches or containers. | Mail Handler |
| 4. Culling by type/characteristic and rewrap of bundles. | Mail Handler |
| 5. Distribution of IPPs, newspapers, rolls, letter or flat bundles or slugs. | Clerk |
| 6. Inserting labels. | Clerk |
| 7. *Pulling containers. | Mail Handler |
| 8. *Containerizing and transporting. | Mail Handler |

* Clerks will key for no more than 2 hours before rotating to
other duties.  When not keying, clerks will perform these
duties.  Personnel assigned to perform these duties in
addition to the minimum number required to implement the
rotation will be from the primary craft.

2

Mr. Biller

The position assigned to the keying function is Parcel Post Distributor, Machine, SP 2-439. This position was modified in 1985 to provide for operation of the Circular Bundle Sorter. In the near future, you will be provided with a modification to the position description that eliminates the reference to "circular," thereby recognizing that the current generation of equipment does not necessarily have to be constructed in a circular configuration.

If you have any questions regarding the foregoing, please contact Frank Jacquette, 268-3823, at your convenience.

Sincerely,

Joseph J. Mahon, Jr.
Assistant Postmaster General

0337



**UNITED STATES POSTAL SERVICE**
Labor Relations Department
475 L'Enfant Plaza, SW
Washington, DC 20260-4100

**June 16, 1988**



Mr. Joseph N. Amma, Jr.
Director, Contract Administration
Laborers' International Union of North
America, AFL-CIO, Mail Handlers Division
One Thomas Circle, NW, Suite 525
Washington, DC 20005-5802

Dear Mr. Amma:

This is in further reference to our discussions regarding staffing of Small Parcel and Bundle Sorters (SPBS).

As we previously indicated, the Mail Handler Craft will be the primary craft for performing sweeping duties. However, clerk craft employees who will perform the keying function will be rotating to sweeping duties to provide relief from keying. Under normal conditions, the maximum number of clerks performing sweeping duties will be as follows:

| Keyers | Keyer/Sweepers |
|--------|----------------|
| 1-2 | 1 |
| 3-4 | 2 |
| 5-6 | 3 |

If you have any questions regarding the foregoing, please contact Frank Jacquette on 268-3823 at your convenience.

Sincerely,

William J. Downes, Director
Office of Contract Administration

0338

STD POSITION DESCRIPTION                               U. S. Postal Service

## PARCEL POST DISTRIBUTOR (MACHINE),  PS-05

### FUNCTIONAL PURPOSE

Makes incoming or outgoing parcel post or bundled mail
separations on an electro-mechanical parcel post sorting machine
or a bundle sorting machine by operation of a keyboard (1)
applying machine codes to ZIP Code numbers covering delivery
points such as stations and branches or (2) outgoing distribution
by applying machine codes to ZIP Code, directs, alphabetical or
geographic groupings, or a combination of (1) and (2).

### DUTIES AND RESPONSIBILITIES

1. Reads address on each parcel or bundle positioned on the
   supply belt by the facer.  Associates address with the
   applicable machine code and depresses keys on the keyboard
   to set the triggering mechanism on the pallets to dump the
   item at the desired destination runout belt or chute.

2. When automatic feed system is not present, pushes mail
   items on signal by buzzer or light to respective pallets
   that the keying device has set to trigger at the selected
   destination runout.

3. May periodically change assignments during a tour with the    185
   facer if the occupant of that assignment is qualified to
   perform the distribution assignment.

4. Loads labels and related consumable items on machines
   equipped with bar code sorters.

5. Performs other clerical duties as assigned when not
   occupied in the keying or facing functions on the machine.

6. May operate other mail sorting machines using similar
   keypad after completion of appropriate training.

### SUPERVISION

Supervisor of unit to which assigned.

### SELECTION METHOD

Senior Qualified

### BARGAINING UNIT

CLERK

(Continued on Next Page)

Document Date: 11-02-94                    Occupation Code: 2315-06XX
                                           SPD Number: SP-2439

0339

STD POSITION DESCRIPTION                          U. S. Postal Service

## PARCEL POST DISTRIBUTOR (MACHINE),   PS-05

**(Continued from Previous Page)**

**KEY POSITION REFERENCE**

KP-0012

186

**(End of Document)**

Document Date: 11-02-94                    Occupation Code: 2315-06XX
                                           SPD Number: SP-2439

Page:     2

ATTACHMENT #3
1 PAGE

MANAGER, IN-PLANT OPERATIONS
OPERATIONS SUPPORT

**UNITED STATES**
**POSTAL SERVICE**

| DATE RECEIVED: 5/22/96 | | |
|---|---|---|
| ALLEGHENY AREA IN-PLANT SUPPORT | ACTION | INFO |
| BURNS, KATHY | | |
| SCHOBERT, JUDY | | |
| GOOD, WALTER | ✗ | |
| FROEMTHALER, FRANK | | |
| CODER, JIM | | |
| HULL, JIM | | |
| KUHNE, STEVE | | |
| JONES, BOB | | |
| NANZ, DENNIS | | |
| PARISH, ANIL | | |
| PERSHING, WAYNE | | |
| WAGNER, JIM | | |
| FILE # | | |
| SUSPENSE # | | |
| SUSPENSE DATE: | 5/31/96 | |

May 24, 1996

MANAGERS, IN-PLANT SUPPORT (AREA)

SUBJECT:    MODS Operation Number - LIPS Machine

Many facilities nationwide have installed Linear Integrated Package Sorter (LIPS)
machines. There is no MODS operation number specifically designated for
reporting the volume and hours associated with mail worked on the LIPS
machine. As a result, various operation numbers are being used nationwide.

To be consistent in reporting, the following MODS operation numbers, based on
the type of mail being worked, must be utilized for reporting data associated with
LIPS machines.

| | |
|---|---|
| 134 | SPBS, Outgoing Pref |
| 135 | SPBS, Outgoing BBM |
| 136 | SPBS, Incoming Pref |
| 137 | SPBS, Incoming BBM |
| 138 | SPBS, Priority, Outgoing |
| 139 | SPBS, Priority, Incoming |

In those cases in which an SPBS and a LIPS machine are housed in the same
facility, Local Units can be used to differentiate between the equipment types.

If you have any questions regarding the above, please contact Alice VanGorder
at (202) 268-6864.

Robert J. Sheehan

cc: Area MODS Coordinators
    Wilkes-Barre IS
    Minneapolis Customer Support

475 L'ENFANT PLAZA SW RM 7831
WASHINGTON DC 20260-2804
202-268-4305
FAX: 202-268-5389

**Amma Jr, Joseph N - Washington, DC**

| | |
|---|---|
| **From:** | Amma Jr, Joseph N - Washington, DC |
| **Sent:** | Friday, July 14, 2006 11:40 AM |
| **To:** | Lucero, Teresa A - Denver, CO - Contractor |
| **Subject:** | 399 case |

Teresa:

Per our conversation this morning, I am sending you, via Express Mail, various documents for a case that will be scheduled for hearing on 8/29/06. As I noted, the case file is several hundred pages and the copier I use here is not working.

Please process the materials as follows:

One copy of the case file, which I have banded and marked as COPY, each to Steve Zamanakos and Efraim Daniel.

The original of the Unresolved Dispute and Management Position Papers to Efraim Daniel:

    1135 N. 87th Way
    Scottsdale, AZ  85257-4132

A copy of the UD and MPP to Steve Zamanakos:

    2345 S. Alma School, Suite 201
    Mesa, AZ  85210

Please send their materials via Express Mail.

Finally, the documents inside the case file folder are internal and should not be copied; I have marked them that way.

As always, thanks for your help.


Joe Amma
Field Labor Relations
(425) 438-2123
(425) 290-6350 FAX

0342

## Amma Jr, Joseph N - Washington, DC

| | |
|---|---|
| **From:** | Amma Jr, Joseph N - Washington, DC |
| **Sent:** | Friday, July 14, 2006 11:00 AM |
| **To:** | Garcia, Gail D - Denver, CO |
| **Cc:** | Padilla, April A - Denver, CO; Mitchell, Marsha L - Denver, CO |
| **Subject:** | 8/29/06 399 Hearing Date |

Gail:

This is advance notice that Steve Zamanakos will be appealing Seattle BMC Case 02123526 for hearing before Arbitrator Lankford on August 29.  That is a good date.


Joe Amma
Field Labor Relations
(425) 438-2123
(425) 290-6350 FAX

0343

**Amma Jr, Joseph N - Washington, DC**

| | |
|---|---|
| **From:** | Amma Jr, Joseph N - Washington, DC |
| **Sent:** | Friday, July 14, 2006 10:57 AM |
| **To:** | 'Stephen Zamanakos'; 'VPDaniel4npmhu@cs.com' |
| **Cc:** | Benitez, Tony P - Denver, CO; Olson, Ann L - Minneapolis, MN; Dennis, Joyce - Seattle, WA; Lucero, Teresa A - Denver, CO - Contractor |
| **Subject:** | 8/29/06 Arbitration Date |

Steve/Efraim:

At our 4/24/06 RDRC meeting, Steve selected Seattle BMC case 02123526 (02C012) regarding the LIPS machine as the case that would go forward on the 8/29/06 hearing date before Arbitrator Lankford.

I have prepared the Unresolved Dispute and Management Position Paper documents and have forwarded them, along with the case file, to the Western Area for copying (due to the size of the file and the breakdown of the copier at my office) and submission to both of you. As usual for APWU appeals, the original of the UD and MPP documents will be sent first to Efraim; when he has completed his position paper, he will forward the original documents to Steve for his position paper and appeal. Both of you will receive full copies of the case file; copies of the UD and MPP will be included with the copy to Steve.

Any questions, I am in my office next week.

Thanks.

Joe Amma
Field Labor Relations
(425) 438-2123
(425) 290-6350 FAX

0344

LABOR RELATIONS
SEATTLE CUSTOMER SERVICE AND SALES DISTRICT

 **UNITED STATES**
**POSTAL SERVICE**

### Local BMC Management LDRC Position

**Wednesday, July 27, 2005**

| | |
|---|---|
| Installation: | **Seattle Bulk Mail Center** |
| Installation Finance #: | **54-6148** |
| Grievant's Name: | **Class Action** |
| Grievant's SSN: | **N/A** |
| Incident Date: | **June 13, 2002** |
| Local Union Grievance #: | **02C012** |
| 1st Local Mgmt Grievance #: | **E00C-1E-C 02123536** |
| Modified Mgmt Grievance #: | **E00C-1E-J 02123536** |

**Subject: Jurisdiction of LIPS Staffing**

To: Regional LDRC

The above referenced grievance was discussed in the LDRC process several times at the Seattle BMC. The Mail handlers were represented by Monica Taylor, the APWU representative was Doug Clark and I attended for Management. The grievance concerns the APWU's contention that Management has improperly staffed the LIPS machine since installing it at the BMC.

**ISSUE:** Does the migration of work from a manual Standard Separation Operation (staffed with mail handlers) in Meca to a mechanized LIPS Machine require management to assign the keying positions to the clerk craft?

Or,

When a mail handler operation is mechanized, and proper notice is given to all parties of the change, does management have the right to assign the keying positions to the mail handlers?

**BACKGROUND:**

An operational change occurred at the Seattle BMC in the spring of 2001 with the installation of the LIPS machine. The machine was slated to be used to automate the Standard (3rd Class) Operation. Prior to this change, Mail handlers exclusively were used to staff the "Standard (3rd Class) Operation and the work was performed manually. The work involves the non-scheme sortation of small bundles of third class mail and was done according to a three digit sortation.

In December of 2001 management notified both unions of it's intent to mechanize this operation by installing (after modification) the LIPS machine. Written notification occurred in March of 2002.

Both unions were given the required advance notification of this operational change and following the 30 day period, beginning on June 13, 2002 Mail handlers were used to staff all functions on this machine. The instant grievance was filed by the local APWU as a result. Documents related to the advance notification were exchanged at the LDRC meeting.

**APWU's Position:** The APWU contends that with the introduction of this machine, the nature of the work changed at the BMC. The union contends that the keying positions on the LIPS machine, by their electro-mechanical nature belong to the clerk craft. The APWU states they have no problem with the mail handlers staffing the sweeping function of the machine but believe the keying must be assigned to clerks.

P O BOX 9000
SEATTLE WA 98109-9401
(206) 442-6230
FAX: (206) 442-6257

0345

E00C-1E-J 02123536; 02C012
July 27, 2005                                                                                                    **page 2**

In effect, the union is arguing regardless of the level of sortation, if keying is involved and the machine is classified as a type of SPBS, then the keying work belongs to the clerks. They base this position on the SPBS machines and the traditional staffing associated with that machine. The APWU contends that the LIPS machine is a variation on the SPBS machine and uses a description found in the F-45 manual as a basis for this contention.

The APWU also relies on the job descriptions of clerks and mail handlers and points specifically to the duties of the Parcel Post Machine Clerk as found in the position description. The union states they are aware of no other facilities where management has staffed this exclusively machine with mail handlers.

**MANAGEMENT'S POSITION:** The parties were very cordial at the LDRC meetings and sincerely attempted to find resolution to this matter. However, those resolutions did not meet the operational needs as described by management. The reasons for this are listed below.

*Prior Jurisdiction - Mail Handlers:* Management states the work previously belonged to the mail handlers. Their understanding was that to the degree possible, work was to stay with the craft that historically performed it. While the Inventory did not apply (no LIPS machine at the time it was created), there was no dispute between the parties that the Mail Handlers historically performed this work at the BMC, prior to the LIPS.

*Operational Change – Notice Given:* Management believes that in situations where Operational change occurs, as long as notice provisions are met, Management is free to make assignments as it sees fit. The basis for this belief is found in Article 3. As long as the assignment is not in violation of Article 5 (arbitrary or capricious or a violation of some other regulation) and is made for a valid business reason, there should be and are no constraints on management's decision.

In this case, management states, the work was previously done by the Mail Handlers. The rotation of keying and sweeping is more efficient if confined to one craft. The actual level of keying is of a similar nature and complexity as that found in the sack sorter (also performed by mail handlers).

*Efficiency:* Management states that it was more efficient to continue the craft jurisdiction as it existed before the change. The primary reason was the training involved. Approximately 16 hours of training is given for this machine but the Mail Handlers already had the separations down. Clerks would be starting off from scratch on this former mail handler operation. The next consideration was how to staff the operation if crafts were mixed. Overtime provisions differ between the crafts. If overtime was needed, the administration for clerks would be more complicated than for the mail handlers. Taken into consideration, it was simpler to continue the mail handler jurisdiction.

*Other Facilities Staff with Mail Handlers:* The APWU points to Des Moines Iowa as an example of a facility that has a LIPS machine staffed entirely with Clerks. Management countered with examples of Southern BMCs that are staffed entirely with Mail Handlers. Also discussed were examples of facilities that mix the two crafts on the machines. Clearly there is no hard and fast rule.

*Electro-Mechanical Nature of the Work and Bid Position Descriptions:* Management believes this argument is not on point and refers to the BMC sack sorters as evidence of an exception to this rule. Management also points to the 1997 Sgro letter that states "there is no established rule where craft determination is predicated solely on whether it is a keying operation." R.I. 399 is identified as the proper system to use to determine the jurisdiction. Management used this process and points to the section on operational change as it's basis for the decision it made, as well as prior jurisdiction.

E00C-1E-J 02123536; 02C012
July 27, 2005                                                                    page 3

The APWU points to the bid description of Parcel Post Machine Clerk as justification for giving this work to the clerks. Management states were this work "distribution" rather than sortation this argument might have merit. However, the mail is not being "distributed", in the sense that clerks perform distribution, i.e. using a scheme or 5 digit zip code. It is being processed using a simple 3 digit process similar to the sack sortation process.

Also, the APWU argument that the LIPS is a form of SPBS may be correct, however considering the arguments raised here, Management believes it is not dispositive of this argument. Examples exist of several variations of staffing for this machine. Given the former jurisdiction of the work, the level of complexity of the work and the proper process being followed, management asserts it properly assigned the work to the mail handlers, regardless of the "type of machine" the LIPS is deems to be.

*Training for the LIPS:* The APWU states the training for this machine is derived from the clerk training for SPBS. The APWU says the keypad used on the LIPS is more similar to the SPBS than it is to the sack sorter. While interesting facts, Management does not believe either is particularly relevant to the question of whether jurisdiction of this work should remain with the Mail Handlers or be changed to the clerk craft. R.I. 399 does not address training or type of machinery.

*Remedy:* Again, in the LDRC discussions it was noted that both parties were being very reasonable and it was clear there is a good working relationship between them. The APWU indicated they were only asking for the keying positions, consistent with their SPBS arguments and the Mail Handlers were giving serious consideration to that remedy. However, Management was not in agreement with that solution, based on the reasoning above. Management believes if the procedural requirements are met (notification 30 days out), that changes of this nature are within it's rights under Article 3.

Taking into consideration that no matter which way Management had assigned this work, a grievance would likely have resulted, management made the decision based on the regulations (R.I. 399) that was in the best interest of the Postal Service. On that basis, this LDRC case and the remedy requested by the APWU is denied. **Management believes the answer to the first issue is No and the answer to the second is yes.**

Sincerely,

*Susan Houser*

Susan Houser
Labor Relations Specialist

cc:  Plant Manager, Seattle BMC
    Manager, Human Resources
    Manager, Labor Relations
    Mail Handler Rep., M. Taylor
    APWU Representative, D. Clark

**UNITED STATES POSTAL SERVICE**   *7001 8510 0006 7427 3049*

December 19, 2002

Doug Blakely
National Business Agent
APWU, AFL-CIO
Northwest Regional Office
4110 NE 122nd Avenue, #200
Portland, OR 97230

                                        Decision: Denied
                                        E00C-1E-C 02123526
                                        Class Action
                                        Seattle BMC 98063
                                        (LOC. 02C012)

Dear Mr. Blakely:

This will acknowledge a Step 3 grievance meeting on October 3, 2002 relative to the above referenced grievance.

The grievance concerns an alleged violation of Article 19 (PO 430 & EL 201) and 37.

The Union contends management is utilizing the LIPS to key 5 digit mail to its destination.

The Union requests the LIPS operation be staffed with at least two keyer positions and the 2 sweeper positions as prescribed in the Small Sorter and Bundle Machine manual. To pay the clerk craft at the overtime rate, one hour for every hour that the LIPPS operation is manned by the mail handler craft.

It is our position that the decision to assign the work to the mail handler craft was based on two factors. First, the work is currently assigned to mail handler and there would be no change in the depth of the sortation and second, RI 399 guidelines issued 2/16/79 defining mail handler work to include "mechanized sorting of sacks, pouches, and outside parcels requiring no scheme knowledge."

The Alaska 5 digit that was used during the test has been removed form the LIPS machine discharges. In addition, the Small Sorter and Bundle Machine manual is not applicable to the LIPS.

Therefore, based on the facts of the case, the evidence of record, the reasons articulated in the Step 2 decision and the National Agreement this grievance is denied.

In my judgment, the grievance does not involve any interpretive issue pertaining to the National Agreement or any supplement thereto which may be of general application. Unless the Union believes otherwise, the case may be appealed directly to Regional Arbitration in accordance with the provisions of Article 15 of the National Agreement.

Respectfully,

Janice San Jose
Labor Relations Specialist

cc:     Sr. Plant Manager, Seattle
        Manager Seattle BMC
        Manager, Human Resources, Seattle WA
        District Manager, Seattle
        Leon Reel, Western Area Grievance Processing
        Kenneth DeHate, Western Area Labor Relations
        Omar Gonzalez, APWU

# AMERICAN POSTAL WORKERS UNION, AFL-CIO

✓ **STEP 3**
GRIEVANCE
APPEAL FORM

| GRIEVANT - PERSON OR UNION (FROM LINE 8) APWU LOCAL 7042 | WORK LOCATION CITY AND ZIP CODE (FROM LINE 10) Federal Way, Wa.  98003 | | REGIONS GRIEVANCE # 02\|235⊔6 | |
|---|---|---|---|---|
| DISCIPLINE (NATURE OF) OR CONTRACT (ISSUE) Art 37, Art 19, PO430, EL201 | CRAFT Clerk | DATE OF STEP 2 3-19-02 | LOCAL GRIEVANCE #02C-012 | USPS GRIEVANCE # |

THE ABOVE GRIEVANCE IS BEING APPEALED TO STEP 3          5-14--02

Regional Director of
Employee & Labor Relations
Pacific Area
US Postal Service
400 Oyster Point Blvd
S San Francisco, CA  94099

Any appeal from an adverse decision
in step 2 shall be in writing to the
Regional Director for Employee and
Labor Relations, with a copy to the
Employers Step 2 representative, and
shall specify the reasons for the appeal.
(Within fifteen (15) days)

The appeal is in accordance with Article 15 Grievance Arbitration Procedures Sec. 2 Step 2 (h) and Step 3(a) for the following reasons:

The United States Postal Service, Seattle Bulk Mail Center, violated Article 37, Art 19, PO 430, EL 201 by assigning mailhandler craft to operate a new LIPS machine. This machine will be used to process 'small bundles' of flats.

In managements Step 2 response, their decision was based on two (2) factors: The first was that the work now (manual operation) is assigned to the mailhandler craft and two, based on Regional Guidelines concerning "Mail Processing Work Assignment Guidelines" issued 2/16/79.

In answer to the first factor, the installation of the LIPS machine creates NEW WORK.  In answer to the second factor, the guidelines stated sacks, pouches and outside parcels requiring no scheme knowledge. From this Management felt 'small bundles' also was a part of the guidelines. Nowhere does The Guidelines say Small Bundle. On the other hand, As of 11-02-94 The United States Postal Service, in EL 201, describing the duties of the Parcel Post Distribution (Machine) Operator, Clerks, states clearly, "bundle sorting machine".

In the early test of the LIPS machine, the standard UK-1 Sack Keystation was used. There were many problems. Then someone thought that sense this was a 'clerk' machine, maybe a UK-1 Parcel 10 Key Keystation might work, but non of the mailhandler personnel were qualified on the 10 Key Parcel Keystation. So two newly hired mailhandlers who were clerk-casuals for a very long time, and 10 key qualified, were used to run the test for the LIPS machine using the 10 key keystation. The test went very well. ⇢

**CORRECTIONS:** In the Step 1 form, The Union mistakenly annotated Articles that did not pertain to this grievance. Those Articles were 33 1&2, 38 4A1 & B. The proper articles are 19, 37, PO 430, and EL 201.

**Attached:** Managements Step 2 Decision; STD Position Description for Parcel Post Distributor (Machine)(EL 201)

And we have attached the Step 2 appeal grievance form, the employers written Step 2 decision and our corrections and additions to the Step 2 decision if we submitted it to employers Step 2 representative.

ANS'D MAY 2 1 2002

Step Two Grievance Designee
Seattle Bulk Mail Center

 **UNITED STATES**
**POSTAL SERVICE**

## STEP 2 GRIEVANCE DECISION

April 26, 2002

**Installation:** Seattle BMC
**Installation Fin #:** 54-7617
**Grievant's Name:** Class Action
**Grievant's SSN:** N/A
**Craft:** Clerk
**Incident Date:** 03/19/02
**Local Union No:** 02C-012
**Local Mgmt No:** E00C-1E-C02123526
**Subject:** Staffing of LIPS Machine
**Issue Code:**

Mr. Douglas J. Clark
Branch President, APWU Local 7042
Seattle Bulk Mail Center
Federal Way, WA 98063-3531

Dear Mr. Clark:

The subject grievance was discussed with Union Stewart Billy R. Reed at Step II of the Grievance/Arbitration procedure on April 17, 2002 at 1:15 P.M.

**ISSUE:**

The Union alleges that management violated the provisions of Article 19, Article 33.1, Article 38, 4A1 and Article 38, B. when it established Mailhandler staffing for the mechanized Linear Integrated Parcel Sorter (LIPS) machine. Management believes that since the present Standard A bundle sorting operation is currently staffed 100% with Mailhandlers and since the LIPS machine will process the same mail with the same sortations that all staffing belongs to the Mailhandler craft.

**UNION POSITION:**

The APWU Union argues two primary reasons why the staffing of the LIPS machine should be primarily the Clerk craft.

First, the Union believes that the LIPS machine should follow the prescribed staffing guidelines used for a different piece of postal equipment, the Small Parcel and Bundle Sorter (SPBS) machine. The Clerk Craft wants the keyer positions and sweeper positions.

Second, during the testing phase of the LIPS machine, Mr. Reed observed three (3) discharges set up with sacks to 5-digit Alaska destinations. At a meeting with the Plant Manager and some members of his staff a commitment had been made that only 3-digit sortations would take place

34301 9TH AVE. S
FEDERAL WAY WA 98063-0500
(253) 874-7200
FAX: (253) 874-7237

Page 1 of 2

0351

Step Two Grievance #: E00-1E-C02123526
Date: April 26, 2002

on the LIPS machine. Mr. Reed believes management broke that agreement when the 5-digit destinations were included in the test.
As a remedy the APWU requests that the LIPS machine be staffed with at least two (2) keyer positions and the two (2) sweeper positions as prescribed in the Small Sorter and Bundle Machine manual. In addition they request that the Clerk Craft be paid at the overtime rate, on hour for every hour that the LIPS operation in manned by the Mailhandler craft.

## MANAGEMENT POSITION:

Standard A bundles of catalogs are currently separated to a 3-digit sort by the Mailhandler craft. A LIPS machine has been installed to mechanize the operation. A meeting was held with both the Clerk craft and the Mailhandler craft on 3/27/02 to discuss the initial staffing of the LIPS machine. Both unions presented their rationale for staffing of the LIPS machine. It was decided, after listening to the input from both unions to assign the LIPS operation to the Mailhandler craft. Management's decision was made based two factors. One, the work is currently assigned to the Mailhandlers and there will be no change in the depth of sort of the mail. Two, based on Regional Guidelines concerning "Mail Processing Work Assignment Guidelines" issued 2/16/79, the definition of Mailhandler work includes the "mechanized sorting of sacks, pouches, and outside parcels requiring no scheme knowledge".
While this guideline precedes the development of mechanization to assist in the sorting of bundles, the sorting of the 3-digit bundles conforms to the above definition.
At the time I write this decision the LIPS machine continues to be in a testing mode and no bids to either craft have been posted. We did test the machine, which the APWU union observed, to determine if a 5-digit sort could be made on the LIPS machine, using a function key. The three (3) Alaska 5-digit destinations have been removed from the LIPS machine discharges and will not be returned to the machine when we go live.

The grievance is denied. Based on the above, the Union has failed to meet its burden of proof that the keying and sweeping positions should be assigned to the Clerk craft.

Nick J. Vendetti
Step 2 Designee

CC:      Plant Manager, Seattle Bulk Mail Center
         Managers, Distribution Operations
         Supervisor, Distribution Operations
         Manager, Labor Relations Seattle District
         Manager, Human Resources Seattle District
         File

34301 9TH AVE. S
FEDERAL WAY WA 98063-0500
(253) 874-7200
FAX: (253) 874-7237

United States Postal Service

# Grievance Summary - Step 1

1. Grievant's Name (Last, First and Middle Initial)

Forward the original of this form to the Step 2 Management Official. Complete items 1 through 12 and 21.
If grievance is denied, complete items 13 through 20. If additional space is required, continue on reverse.
See Handbook EL-921, Supervisor's Guide to Handling Grievances.

| 2. Facility | 3. Craft | 4. Grievant's Title |
|---|---|---|
| Seattle BMC | APWU | Class Action |

| 5. Date of | | 6. Was Grievance Timely at Step 1? | 7. Date of Step 1 Answer | 8. Union Official |
|---|---|---|---|---|
| a. Incident 03/21/02 | b. Step 1 Meeting | ☒ Yes    ☐ No | 04/03/02 | Billy Reed |

9. Issue (Complaint or Allegation)

The Seattle BMC installed a LIPS machine to process STD A mail previously separated by the mailhandler craft. After a meeting was held with the crafts, management decided it most appropriate that the mailhandlers would staff the machine. The APWU states that this machine is a sister to the SPBS machine and should be staffed by the clerks.

10. Remedy Requested (Specify in detail. Resolve Grievance)

The APWU wants the keying and sweeping part of the operation be staffed by the clerk craft.

11. Decision (Check One)    ☐ Settled    ☒ Denied    ☐ Closed    ☐ Withdrawn    ☐ Other _____

12. Reasons for Decision

The only change being made is that the Seattle BMC is automating a manual operation. The work, a 3-digit sort is being maintained. It follows that the work should remain with the mailhandler craft.

| 13. | | | 14. Craft or Relevant Seniority Date |
|---|---|---|---|
| a. Level 5 | b. Step 0 | Section | a. Designation Standard | N/A |

| 15. Check One | | 16. Off Days | 17. Work Schedule |
|---|---|---|---|
| ☒ FTR  ☐ PTR  ☐ PTF   al Designation Code | | | N/A |

18. Background (State All Relevant Facts. Attach All Supporting Documents)

Standard bundles are currently separated to a 3-digit sort by the mailhandler craft. A LIPS machine has been installed to automate the operation. There will be no upgrading of sort to 5-digit levels. A meeting was held with both crafts on 3/27/02 to discuss the staffing of the machine. Management and both unions attended. Both unions presented their rationale for staffing of the machine. It was determined there was no change to the depth of sort of the mail and the work was currently assigned to mailhandlers and would remain with the mailhandlers.

19. Management's Position

Management thinks it is appropriate that the work be completed by mailhandlers.

20. Union's Position

The APWU thinks the keying and sweeping should be performed by the clerk craft.

| 21. a. Management Official | 21. b. Telephone Number | 21. c. Signature |
|---|---|---|
| James E. Irvin Manager, Distribution Operations | (253) 874-7272 | |

TransFORM PS Form 2608

0353

## AMERICAN POSTAL WORKERS UNION, AFL-CIO   STEP 1 GRIEVANCE OUTLINE WORKSHEET

| DISCIPLINE (NATURE OF) OR CONTRACT ( ISSUE) | CRAFT | DATE | LOCAL GRIEVANCE | USPS GRIEVANCE |
|---|---|---|---|---|
| 1. Article 37 | Clerk | 3-19-02 | # 02C-012 | # |

| UNIT / SEC / BR / STA / OFC | DATE / TIME | USPS REP - SUPERVISOR | GRIEVANT AND / OR STEWARD |
|---|---|---|---|
| 6. Seattle Bulk Mail Center | 3-19-02/1000 | Mr. Lynn Walker | Billy R. Reed Sr. |

| STEP 1 DECISION BY (NAME AND TITLE) | DATE & TIME | INITIALS | INITIALING ONLY VERIFIES DATE OF DECISION |
|---|---|---|---|
| 7. JAMES E. IRVIN   MDO | 4/3/02 1000 | | |

| GRIEVANT PERSON OR UNION (LASTNAME FIRST) | ADDRESS | CITY | STATE | PHONE |
|---|---|---|---|---|
| APWU | PO Box 3380   Federal way | WA | 98603-3380 | (253)952-2798 |

| SOCIAL SECURITY NUMBER | SERVICE SENIORITY CRAFT | FTR-PTR-PTF | LEVEL | STEP | DUTY HRS | OFF DAYS |
|---|---|---|---|---|---|---|
| 9. | | FTR | 5 | S | 6-2;30p.m. | Sa Su M T W T F |

| JOB / PAY LOCATION (UNIT / SEC / BR / STA / OFC) | WORK LOCATION CITY AND ZIP CODE | LIFETIME SECURITY | VETERAN |
|---|---|---|---|
| 10. Seattle Bulk Mail Center | Federal Way, WA 98003 | YES   NO | YES   NO |

11.   Pursuant to article 15 of the national agreement we hereby appeal to step 2 the following grievance alleging a violation of (but not limited to) the following: NATIONAL, (Art./Sec.)  Art. 19, 33 Sec. 1 & 2, 38 Sec. 4A1, 38 Sec. B

LOCAL MEMO ( ART / SEC) OTHER MANUALS, POLICIES, MINUTES, ETC.
EL 811.4, 811.41, 811.42, 311.5, ELM 351.31, 351.1, 351.51, 351.52a.

(A) **PROBLEM:** The Staffing for the new LIPPS Machine should follow the prescribed staffing guidelines from the USPS. The Clerk Craft should have received bids for the two keyer positions and the two sweeper positions. The Seattle BMC Management awarded all positions to the Mail handler Craft.

(B) *BACKGROUND :* In all but one LIPPS Machine operation USPS wide, there is only one where the Mail handler Craft has all bids.

(C) *DOCUMENTS:*

(D) *CORRECTIVE ACTION :* To staff the LIPPS operation with at least the two(2) keyer positions and the two(2) sweeper positions as prescribed in the Small Sorter and Bundle Machine manual. To pay the Clerk Craft at the overtime rate, one hour for every hour that the LIPPS operation be manned the Mail handler craft.

*Received on 3-21-02*

(E) *MANAGEMENT'S RESPONSE:* DENIED - LIPS SORTATION WILL BE RESTRICTED TO 3 DIGIT SORT. CURRENT 3 DIGIT WORK IS BEING DONE BY MAILHANDLERS.

# AMERICAN POSTAL WORKERS UNION, AFL-CIO

**STEP 2**
**GRIEVANCE**
**APPEAL FORM**

| DISCIPLINE (NATURE OF) OR CONTRACT (ISSUE) | CRAFT | DATE | LOCAL GRIEVANCE | USPS GRIEVANCE |
|---|---|---|---|---|
| 1. ART. 37 \ (LIPPS Machine) | Clerk | 4-07-02 | 02C-012 | # |

| TO USPS STEP 2 DESIGNEE (NAME AND TITLE) | INSTALLATION/SEC.CEN./BMC | PHONE |
|---|---|---|
| 2. Mike Merlino, Step 2 Contact | Seattle Bulk Mail Center | |

| FROM LOCAL UNION (NAME OF) | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| 3. Seattle BMC Local 7042 | PO Box 3380 | Federal Way | WA | 98063 |

| STEP 2 AUTHORIZED UNION REP (NAME & TITLE) | AREA CODE   PHONE (OFFICE) | AREA CODE   PHONE (OTHER) |
|---|---|---|
| 4. , Clerk Craft | (253) 952-2798 | |

| LOCAL UNION PRESIDENT | AREA CODE   PHONE (OFFICE) | AREA CODE   PHONE (OTHER) |
|---|---|---|
| 5. Douglas J. Clark | (253) 952-2798 | ( ) |

**WHERE - WHEN**                 **STEP 1 MEETING AND DECISION**                 MET WITH

| UNIT/SEC/BR/STA/OFC | DATE/TIME | USPS REP | GRIEVANT AND/OR STEWARD |
|---|---|---|---|
| 6. Seattle BMC | 4-3-02/1000 | Mr. Jim Irvin | Billy R. Reed Sr. |

| STEP 1 DECISION BY (NAME & TITLE) | DATE & TIME | | INITIALS ONLY VERIFIES DATE OF DECISION |
|---|---|---|---|
| 7. Mr. Jim Irvin   MDO | 4-3-02   1000 Hrs. | INITIALS | |

| GRIEVANT PERSON OR UNION (LAST NAME FIRST) | ADDRESS | CITY | STATE | PHONE |
|---|---|---|---|---|
| 8. Seattle BMC  Local 7042 | PO Box 3380 | Federal Way | Wa. | (253) 952-2798 |

| SOCIAL SECURITY | SERVICE SENIORITY / CRAFT | FTR | PTR | PTF | LEVEL | STEP | DUTY HOURS | OFF DAYS |
|---|---|---|---|---|---|---|---|---|
| 9. | Clerk | ☐ | ☐ | ☐ | | | 0600-1430 | Sa Su M T W T F |

| JOB # PAY LOCATION (UNIT / SEC / BR / STA / OFC) | WORK LOCATION CITY AND ZIP CODE | LIFETIME SECURITY | VETERAN |
|---|---|---|---|
| 10. 547617   Seattle BMC | Federal Way, WA 98003 | | |

11.  Pursuant to article 15 of the National Agreement we hereby appeal to Step 2 the following Grievances Alleging a Violation of ( but not limited to ) the following: NATIONAL , ( Art. / Sec. )     YES ☐ NO ☐ i   YES ☐ NO ☐

LOCAL MEMO ( ART / SEC ) OTHER MANUALS, POLICIES , L/M MINUTES, ETC.

12   DETAILED STATEMENT OF FACTS / CONTENTIONS OF THE GRIEVANT: At a meeting with the Plant Manager, Mr. Ken Billings, other members of his staff and representatives of the Mail Handler Craft, the Clerk Craft was assured that the new LIPPs machine would be used only for 3-digit sortation. When asked specifically about the Alaska 5-digit mail, the reply was, that mail would be sent to the Alaska 115 area to be worked by the clerks assigned to the Alaska 115 section. On Monday, April 1st, I, Billy R. Reed Sr., Clerk Craft Director, attended a **LIVE MAIL** test of the LIPPS machine, and specifically looked at the three Alaska 5-digit run-offs. There were three sacks, each labeled for dispatch **(NOT FOR MOVEMENT TO THE ALASKA 115 WORK AREA)**. When asked, a supervisor stated that the 5-digit mail was keyed by touching a single key that had been programmed for each of the 5-digit destinations. Any way anyone could ever look at this, it would still be **"KEYING 5-DIGIT MAIL TO DESTINATION-BY DISTRIBUTION".**

List of attached papers as identified:

13.   CORRECTIVE ACTION REQUESTED

To include, but not limited to,   **SEE STEP ONE CORRECTIVE ACTION.**

SIGNATURE AND TITLE OF AUTHORIZED UNION REP



# NATIONAL POSTAL MAIL HANDLERS UNION
### DIVISION OF LIUNA, AFL-CIO
## LOCAL 302

RECEIVED

JUL 3 1 2006

MESA NBA OFFICE

ERNIE GRIJALVA, *Local President*

| JUANITA CONTRERAS | DOT HENDERSON | KIMBERLY GARCIA | GEORGE RAMOS |
|---|---|---|---|
| *Vice President* | *Treasurer* | *Recording Secretary* | *State Executive Board Member* |

5901 CHRISTIE AVENUE, SUITE 301 • EMERYVILLE, CALIFORNIA 94608 • TELEPHONE (510) 597-1501 • FAX (510) 597-1999

---

| |
|---|
| In the matter of Arbitration |
| American Postal Worker's Union |
| And |
| U.S. Postal Service |
| And |
| National Postal Mail Handlers Local 302 |

CASE #: F98C – 1F J – 01185458

Arbitrator: Donald A. Anderson

Hearing Date: June 27, 2006

Post Office: Oakland, Ca ISC

Class Action

## *CLOSOING STATEMENT FOR THE MAIL HANDLERS UNION*

On the Issue of Arbitrability:

As stated at the hearing by both the Mail Handlers Union and the Postal Service, this

grievance is not properly presentable before the Arbitrator. The grievance was appealed

through the Dispute Resolution Procedures. As supported at the Hearing the Dispute

Resolution Procedures limit the filing of new grievances concerning jurisdiction of one

craft or another. After the signing of the Dispute Resolution Procedures by all parties of

the Postal Service, the APWU and Mail Handlers Union at the National Level, the parties



were limited to their ability to file jurisdictional claims. These grievances would only be proper if one of the allowable conditions existed. The conditions that would allow a proper grievance to be filed are: **new work, new or consolidated facility, or an operational change.** None of these triggers existed in the filing of this instant grievance.

The work in question, "scanning" with the Midas System, began in 1991, in Oakland and Mail Handlers were scanning as part of the dispatching of mails as soon as the "Midas System: came to the foreign mails dispatched operations and no grievances were filed and no disputes were raised. In 1998 the International Mails Operation was moved to a temporary location, while awaiting construction of a new facility. Mail Handlers continued to scan at this location and no grievances were initiated by APWU. In 2000 the operation was moved to its current and permanent operation. As supported by witnesses Administrative Vice President Harry Walker and Clementine Stanley, mail handler in the dispatch unit from 1971 to present, that Mail Handlers scanned in 1991 and continued to scan at all locations since then and that no grievance, nor RI – 399 dispute regarding the dispatch of mail in foreign was initiated by the APWU.

In June of 2001, the discontent of one disgruntled employee not having held the bid of expeditor but not wanting to return to her bid filed a grievance after 13 years of involvement with foreign mails dispatch, with her union, the APWU filed a grievance, although No allowable trigger was present in accordance with "RI – 399" guidelines for the dispute process. The APWU grievance is improper under the Dispute Resolution Procedure Memorandum. The grievance is improper and/or untimely.

0357

At the Hearing it came out that this grievance had been withdrawn at an earlier arbitration proceeding. As stated by Arbitrator Anderson, the APWU had withdrawn this grievance in a previous hearing.

## On the Merits:

The APWU simply did not present any evidence or testimony at the hearing that would establish this work is improperly assigned to the Mail Handler Craft. The APWU grievance was simply that Clerks are accountable for verifying the load and therefore must perform the scanning duties. The accountability was unsupported by evidence. The APWU could not produce one instance of a clerk craft employee being held accountable for a mistake. There were no instances of reprimand; letters of discipline, or any other support that clerk craft employees are held accountable. In fact, Mail Handlers performing the scanning duties have individual codes, which show what employee is scanning the mail to what destination, into what container and on what date.

The APWU Advocate claimed that the job description for a clerk includes "keeping records". He attempted to indicate that this would apply to the scanning in the Midas System. Scanning is not keeping records. It is the Midas System itself that keeps the records. The Mail Handler scans the label to show that is being loaded by the Mail Handler into the van. The clerk verifies that the labels were scanned and re-scans the label. The only records kept are those kept by the Midas System, not any individual employee.

The fact is the scanning operation is incidental to the loading of a vehicle. The primary purpose of the operation is loading mail that has been tagged and labeled by clerks in the bagging unit. Dollies are brought to the dock area. The dollies are labeled and each sack on the dolly is labeled. The Mail Handler scans the label on the dolly, and each sac on the dolly, with a wand. The Mail Handler then loads the sack onto a belt, removing the tags as he/she loads the belt. The tags are taken to the Clerk Expediter who rescans them with the Midas. The sacks proceed on the belt to the ship container/van. The scanning of the mail as it is being loaded is incidental. The primary purpose of this operation is to load the mail into the ship container/van. The labels are generated by Clerk Craft Employees in the bagging unit and placed onto the dollies by a clerk craft employee. The dollies are labeled by the clerk craft employees. Mail Handlers are responsible for loading the container. The scanning is simply a tool that reads the label placed by the clerk as it is being loaded into the vehicle. It would not be efficient or effective to have a clerk stand by, scan the sacks and then wait while the Mail Handler loads the sacks onto the belt and remove the tags to give to the clerk expeditor. Scanning is incidental tot the loading of the van. The Midas System is a tool used by the Postal Service, incidental to the loading of the van the Mail Handlers. The Postal Service is entitled to use this tool in the most efficient and effective ay. The purpose is simply to keep track of the mail loaded onto the van and by which Mail Handler employee. To sustain the APWU's grievance would be to require the USPS to create a new and unnecessary job.

---

There is simply no justification that this work should be assigned to the Clerks Crafts. Testimony was given by Mail Handler Clementine Stanley that she has performed the

scanning duties since the Midas System was introduced in 1991. Ms. Stanley testified that no special skills are needed; you simply point at the label and load the sacks, while removing the label/tag(s).

Mr. Harry Walker is also a Mail Handler at the Oakland ISC. MR. Walker testified that he was a Union Representative at the time the Midas System was introduced. He worked in that operation and performed the scanning duties. Additionally he was involved in preparing the inventory when this operation was located at the Oakland Plant. Mail Handlers were indicated as performing the scanning duty. The clerk filed no objection, and management and both unions signed the Inventory. This inventory was presented as Mail Handler Exhibit 1 at the hearing. He also testified that there were no changes in the operation of the required duty functions when the operation moved from the Oakland Plant to the current location

Current ISC Mail Handler Shop Steward Mokneta Murray testified that Mail Handlers have always scanned and continued to scan the mail.

Witnesses for the Mail Handler Union clearly support that Mail Handlers have performed this function sine the Midas System was introduced in 1991. Witnesses for the Mail Handlers Union clearly support that the scanning is incidental to the loading of the vans (ship containers). We have clearly supported that no special skills are necessary and it would no be efficient or effective to separate this function from the loading function, which is the primary purpose of the operation. We ask that you find this grievance filed by the APWU as non-arbitral. Failing that, we ask that you rule in favor of the Postal

Service and the Mail Handlers Union that the work is properly assigned to the Mail

Handler Craft.

Thank you,

Don McAlister, Advocate
National Postal Mail Handlers Union
Local 302

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____ )

NATIONAL POSTAL MAIL HANDLERS              )
UNION,                                     )
                                           )
     Plaintiff,                           )
                                           )
     v.                                   )    Case No. 1:06CV01986 (JR)
                                           )
AMERICAN POSTAL WORKERS UNION,             )
AFL-CIO,                                   )
                                           )
     and                                  )
                                           )
UNITED STATES POSTAL SERVICE,              )
                                           )
     Defendants.                          )
_____ )

## PROPOSED ORDER

Upon consideration of Plaintiff's Motion for Summary Judgment, the

Memorandum in Support, and all filed pleadings and the information contained therein, it

is ORDERED that:

Summary judgment is granted to Plaintiff National Postal Mail Handlers Union.

DONE, this the ___ day of _____, 2007.


_____
James Robertson
United States District Judge